JESSE SBAIH & ASSOCIATES, LTD.
Jesse M. Sbaih (#7898)
Ines Olevic-Saleh (#11431)
The District at Green Valley Ranch
170 South Green Valley Parkway, Suite 280
Henderson, Nevada 89012
Tel      (702) 896-2529
Fax      (702) 896-0529
Email: jsbaih@sbaihlaw.com

*Attorneys for Relator Tali Arik, M.D.*

## UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| UNITED STATES OF AMERICA *ex rel.* TALI ARIK, M.D., | Case No.: 2:19-cv-01560-JAD-VCF |
| Plaintiff/Relator, | |
| vs. | **FIRST AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL FALSE CLAIMS ACT** |
| DVH HOSPITAL ALLIANCE, LLC, INC. d/b/a DESERT VIEW HOSPITAL; | |
| Defendants, | **JURY TRIAL DEMANDED** |

### I.

### INTRODUCTION

1.     This case involves a widespread, massive, intentional, and fraudulent billing scheme to the Medicare and Medicaid health insurance programs by Defendant DVH Hospital Alliance, LLC d/b/a Desert View Hospital ("Desert View Hospital" or "Defendant").

2.     This action arises under the Federal False Claims Act, 31 U.S.C. §§ 3729, *et seq.* (the "False Claims Act").

3.     This Honorable Court has jurisdiction over this case pursuant to 31 U.S.C. §§ 3730(b) and 3732(a).

4.     This Honorable Court also has jurisdiction over this case pursuant to 31 U.S.C. § 1331.

5.      This action is not based on a public disclosure.

6.      The operative allegations are based on the Relator's direct knowledge.

7.      Venue is proper in this District pursuant to 31 U.S.C. § 3732(a) because the Defendant transacts business in this District and because most, if not all, of the acts and omissions of which Relator complains occurred in this District.

8.      As required by 31 U.S.C. § 3730(b)(2), Relator has provided to the Attorney General of the United States and the United States Attorney for the District of Nevada a statement of material evidence and information that Relator possesses regarding this Complaint.

9.      Because the statement includes attorney-client communications and work product of Relator's counsel and was submitted to the Attorney General of the United States and the United States Attorney, in their capacity as potential co-counsel in this litigation, the Relator understands the subject statement to be confidential.

## II.

## PARTIES

10.     The Relator, Tali Arik, M.D. ("Dr. Arik" or "Relator"), is a resident of the State of Nevada and has been a board-certified cardiologist since 1987.

11.     In or about January 2005, Dr. Arik began practicing medicine, in the field of cardiology, in Pahrump, Nevada.

12.     On or about November 15, 2015, Dr. Arik began seeing cardiac patients at Desert View Hospital, the only hospital in Nye County, Nevada, which serves a rural population of approximately forty-five thousand (45,000) people.

13.     From January 1, 2018 to December 31, 2018, Dr. Arik served as Medical Chief of Staff at Desert View Hospital.

14.     The United States of America (the "United States") provides reimbursement to Desert View Hospital for claims and requests for payment under Medicare, Champus, and Tricare.

15.     The United States also pays for a significant portion of claims and requests for payments that are made to the Medicaid program of the State of Nevada.

16.     DVH Hospital Alliance, LLC is a Delaware corporation that owns, operates, and does business as Desert View Hospital, a Critical Access Hospital in Pahrump, Nevada.

**III.**

**THE FALSE CLAIMS ACT & THE IMPLIED FALSE CERTIFICATION THEORY**

17.     In salient part, the False Claims Act provides that any person who:

A. knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;

B. knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;

C. conspires to commit a violation of subparagraph (A), (B), (D), (E), (F), or (G)

…

is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 (28 U.S.C. 2461 note; Public Law 104–410 [1]), plus 3 times the amount of damages which the Government sustains because of the act of that person.

31 U.S.C. § 3729(a)(1).

18.     In ***Universal Health Services, Inc. v. United States***, 136 S.Ct. 1989 (2016), the United States Supreme Court explained that the Implied False Certification Theory applies "when a defendant submits a claim, it impliedly certifies compliance with all conditions of payment. But if that claim fails to disclose the defendant's violation of a material statutory, regulatory, or contractual requirement, so the theory goes, the defendant has made a misrepresentation that renders the claim 'false or fraudulent' under § 3729(a)(1)(A)." ***Id.*** at 1995.

19.     Specifically, the United States Supreme Court held that, "[t]he implied false certification theory can be a basis for FCA liability when a defendant submitting a claim makes

specific representations about the goods or services provided, but fails to disclose noncompliance with material statutory, regulatory, or contractual requirements that make those representations misleading with respect to those goods or services." *Id.* at 1993-94.

**IV.**

**DESERT VIEW HOSPITAL AND ITS INTERACTIONS WITH GOVERNMENT HEALTH INSURANCE PLANS**

20.     Desert View Hospital is a rural hospital with a Medicare Critical Access Hospital ("CAH") designation in accordance with 42 CFR § 485.601, *et seq.*

21.     CAH designation is given to eligible rural hospitals by the Centers for Medicare and Medicaid Services ("CMS").

22.     Congress created the CAH designation through the Balanced Budget Act of 1997 in response to the prevalence of rural hospital closures during the 1980s and early 1990s.

23.     The CAH designation is designed to reduce the financial vulnerability of rural hospitals and improve access to healthcare by keeping essential services in rural communities.

24.     As a condition of participation, CMS requires that a CAH comply with applicable Federal laws and regulations related to the health and safety of patients, including the CAH regulations and the Emergency Medical Treatment and Labor Act ("EMTALA"), which are set forth below.  42 CFR § 485.608.

25.     As a further condition of participation, CMS requires that a CAH have "in effect an agreement with at least one hospital…for *[p]atient referral and transfer*."  42 CFR § 485.616(a)(1) (emphasis added).

26.     As another condition for participation, CMS requires that a CAH maintain "***no more than 25 inpatient beds***. Inpatient beds may be used for either inpatient or swing-bed services." 42 CFR § 485.620(a) (emphasis added).

27.     In addition, as a condition of participation, CMS requires that a CAH have "agreements or arrangements (as appropriate) with one or more providers or suppliers participating under Medicare to furnish other services to its patients, including -(i) Services of doctors of medicine or osteopathy; (ii) Additional or specialized *diagnostic and clinical laboratory services that are not available at the CAH*…." 42 CFR § 485.635(c) (emphasis added).

28.     Furthermore, Medicare participating hospitals (including a CAH) must meet the requirements of EMTALA, a Federal Regulation whose requirements are set forth in 42 CFR §489.24.

29.     Under the provisions of 42 CFR §489.24, hospitals with an emergency department that participate in Medicare (including a CAH) are required under EMTALA to, among other things, "[p]rovide for an appropriate transfer of the individual if either the individual requests the transfer *or the hospital does not have the capability or capacity to provide the treatment necessary to stabilize the [Emergency Medical Condition] (or the capability or capacity to admit the individual)*…." *See* salient portions of CMS Manual System, Transmittal 46 (May 29, 2009), Part II- *Interpretive Guidelines- Responsibilities of Medicare Participating Hospitals in Emergency Cases*. (Emphasis added).

30.     "Hospitals [including a CAH] are required to adopt and enforce a policy to ensure compliance with the requirements of 42 CFR §489.24 [EMTALA]." *Id.*

31.     During the relevant time period, Desert View Hospital's revenue was mostly derived from Medicare, Medicare Advantage, and Medicaid, a joint state-federal program in which healthcare providers serve financially disadvantaged or disabled patients and submit claims for government reimbursement.

32.     A CAH, such as Desert View Hospital, is paid for its services primarily by submitting invoices to various payers, including Medicare, Medicare Advantage, Medicaid, CHAMPUS, and Tricare.

33.     Based on information and belief, Desert View Hospital handles all billing, reimbursement, and collection processes relating to its hospital services.

34.     Desert View Hospital, as a CAH, is not subject to Medicare's Inpatient Prospective Payment System ("IPPS") or the Hospital Outpatient Prospective Payment System ("OPPS").

35.     Rather, due to its CAH status, the Medicare program reimburses Desert View Hospital for most inpatient and outpatient services to Medicare patients under a "cost-based reimbursement."

36.     "Cost-based reimbursement" provides a tremendous financial advantage to CAHs (such as Desert View Hospital) by allowing them to be reimbursed at one hundred one percent (101%) of costs on all their hospital Medicare revenue.

37.     Under Medicare guidelines, medical expenses must be prudent, reasonable, and related to patient care.

**V.**

**SUMMARY OF CLAIMS**

38.     The Relator seeks to recover, on behalf of the United States, damages and civil penalties arising from Desert View Hospital's violations of the Federal False Claims Act, 31 U.S.C. §§ 3729, *et seq.*

39.     Prior to January 10, 2019, Desert View Hospital was operating under the guidelines of Federal law.   However, in doing so, Desert Valley Hospital's patient admissions and testing/procedures were low, which resulted in severe financial distress for Desert View Hospital.

40.     Consequently, Susan Davila (the CEO at Desert View Hospital) met with Relator (who was Medical Chief of Staff at Desert View Hospital at the time) on multiple occasions to discuss increasing admissions of patients, decreasing transfers from the hospital, and performing tests/procedures in order to enhance the financial stability and profitability of Desert View Hospital.

41.     During a December 2018 meeting, Ms. Davila advised Relator and others that she had relieved Rural Physicians Group ("RPG") of their duties as hospitalists at Desert View Hospital

because they were not admitting a sufficient number of patients, were transferring too many patients out of Desert View Hospital, and that RPG's manner of practicing medicine was contrary to the financial interests of Desert View Hospital.

42.    Ms. Davila further advised Relator that her "job was on the line" if more beds are not filled at Desert View Hospital by increasing admissions and decreasing transfers in order to enhance revenue.

43.    Ms. Davila further told Relator that more testing/procedures on patients must be performed in order to ensure the financial viability of Desert View Hospital.

44.    Finally, Ms. Davila advised Relator that Desert View Hospital will be entering into a lucrative contract (believed to be approximately 30% more than RPG was paid) with Vista Health, Mirza, M.D., P.C. ("Dr. Mirza") to replace RPG and to assume the hospitalist duties at Desert View Hospital.

45.    From approximately January 10, 2019 to the present, Desert View Hospital (in conspiracy with Dr. Mirza) implemented and executed a widespread scheme whereby it, among other things:

(1) fraudulently and knowingly admitted patients to Desert View Hospital who required transfer to a higher level of care hospital in order to retain patients at Desert View Hospital in violation of CMS regulations and EMTALA, which resulted in increased billing charges and reimbursements from, among others, Medicare and Medicaid;

(2) fraudulently and   knowingly subjected admitted   patients to   a   multitude   of unnecessary   medical   testing/procedures   in   order   to   increase   billing   charges   and reimbursements from, among others, Medicare and Medicaid;

(3) fraudulently   and   knowingly attributed false diagnoses and   levels   of   severity   of illness to patients in order to increase its billing charges and reimbursements from, among others, Medicare and Medicaid.  This billing practice is known as "upcoding;"

(4) fraudulently and knowingly performed medical procedures that it was not equipped and/or staffed to perform (such as pacemaker implants and cardioversions) in violation of, among other things, CAH regulations and EMTALA in order to increase its billing charges/reimbursements from, among others, Medicare; and

(5) fraudulently and knowingly used "swing beds" as inpatient acute care hospital beds in violation of CAH regulations (which limit Desert View Hospital to twenty-five (25) acute hospital beds) in order to increase its billing charges and reimbursements from, among others, Medicare and Medicaid.

46.     On or about May 17, 2019, after Relator's concerns about Desert View Hospital's widespread violation of the law and jeopardizing patient safety went unremedied, Relator resigned his medical privileges at Desert View Hospital.

47.     Relator is presently the only resident cardiologist living and working in Pahrump, Nevada who provides full-time outpatient cardiology medical care to members of the community.

48.     In such capacity, Relator is privy to highly sensitive and confidential medical records/charts that are generated at Desert View Hospital for his cardiology patients.

49.     Relator's careful review of his patients' medical records and while using his keen understanding of the appropriate standards to diagnose and treat medical patients, has left Relator with no doubt that Desert View Hospital has engaged and continues to engage in a fraudulent and widespread scheme to increase revenue at the expense of taxpayers in a blatant and willful violation of the False Claims Act.

50.     Based on information and belief, despite Desert View Hospital's knowledge of its willful and fraudulent scheme, Desert View Hospital billed the United States and was reimbursed tens of millions, if not over a hundred million, of dollars of taxpayer money for claims that were wrongful, not medically necessary, and/or inflated.  Relator believes that Desert View Hospital's widespread scheme continues unabated.

51.     Based on information and belief, from January 2019 through May 2019 (due to Desert View Hospital's submission of claims in violation of the False Claims Act), Desert View Hospital's revenue grew by approximately 50% year-over-year for Humana Medicare Advantage patients and likely for other government funded programs.

**V.**

**ALLEGATIONS AGAINST DESERT VIEW HOSPITAL**

**(1)    Desert View Hospital Fraudulently and Knowingly Admitted Patients Who Required Transfer to a Higher Level of Care Hospital for the Sole Purpose of Increasing Revenue at the Expense of the Taxpayers and Without Consideration of Patients' Well-Being**

**A. Cardiology Patients:**

52.     The best course of care for patients presenting to a hospital with chest pain symptoms is to develop a management care plan based on, among other things, patient medical history and objectively derived information from clinical imaging and laboratory data.

53.     Multiple clinical trials with peer review and oversight by expert committees of the American College of Cardiology, American Heart Association, and European Society of Cardiology have set forth well-established standards for managing these patients.

54.     Relevant cardiology practice standards are available in review format through peer-reviewed articles, a universally known medical resource www.uptodate.com, and established textbooks of cardiology.

55.     *Braunwald's Heart Disease A Textbook of Cardiovascular Medicine* ("*Braunwald's Cardiology Practice Standards*") is the most authoritative book of cardiology. The most recent publication of *Braunwald's Cardiology Practice Standards* (11th edition 2019) is used as a reference herein.

56.     Early Invasive Strategy is the standard for the so-called non-ST elevation myocardial infarction [NSTEMI], the most common type of a heart attack. *Braunwald's Cardiology Practice Standards*, pg. 1203.

57.     References regarding this Early Invasive Strategy are described, documented, and thoroughly discussed in Chapter 60 of the *Braunwald's Cardiology Practice Standards* on page 1203, and the associated table 60G.4 on page 1207.

58.     The subject table in *Braunwald's Cardiology Practice Standards* describes four (4) types of criteria for management of patients presenting to an acute hospital setting with symptoms of chest pain as follows: (1) Very-High-Risk Criteria; (2) High-Risk Criteria; (3) Intermediate-Risk Criteria; and (4) Low-Risk Criteria.  *Braunwald's Cardiology Practice Standards*, pg. 1207.

59.     *Braunwald's Cardiology Practice Standards* defines the various criteria as follows:

-Very-High-Risk Criteria involves the following: (1) Hemodynamic (*i.e.,* heart rate and/or blood pressure) instability or cardiogenic shock (i.e.; lack of blood sufficient for organ function); (2) Life-threatening arrhythmias or cardiac arrest; (3) Mechanical complications of MI (Myocardial Infarction); (4) Acute heart failure; and/or (5) Recurrent dynamic ST-T wave changes (an abnormal wave segment on an EKG), particularly with intermittent ST-elevation.

-High-Risk Criteria involves the following: (1) Rise and fall in cardiac troponin (an enzyme released from the heart muscle that is indicative of heart muscle damage detected by analyzing blood samples) compatible with an MI; (2) Dynamic ST-T wave changes without symptoms (silent); and/or (3) Elevated TIMI (a scoring system to determine the patient's risk of a cardiac event such as an MI) > 4 or GRACE (another assessment tool to determine acute risk) > 140.

-Intermediate-Risk Criteria involves the following: (1) Diabetes mellitus; (2) Renal insufficiency (kidney failure); (3) LVEF (Left Ventricular Ejection Fraction) < 40% or congestive heart failure; (4) Early post MI angina (chest pain); (5) Prior PCI (previous placement of a stent); (6) Prior CABG (prior bypass surgery); and/or (7) TIMI (2-3) or GRACE (109-140) risk score.

-Low-Risk Criteria involves none of the characteristics mentioned above.

*Braunwald's Cardiology Practice Standards*, pg. 1207.

60.     Desert View Hospital is properly equipped to manage *only* patients who meet Low-Risk Criteria (*i.e.,* patients presenting to the hospital with chest pain symptoms and do not meet the Very-High-Risk Criteria, High-Risk Criteria, and/or the Intermediate-Risk Criteria).

61.     The management of all higher levels of risk require the presence of a cardiac catheterization laboratory, cardiovascular physicians and support staff, and equipment to perform interventional and surgical cardiac procedures.

62.     At all relevant times, Desert View Hospital did not have a cardiac catherization laboratory that was equipped and staffed to perform interventional cardiac procedures.

63.     The Early Invasive Strategy for patients meeting the characteristics set forth under the Very-High-Risk Criteria, High-Risk Criteria, and/or Intermediate-Risk Criteria is described in detail on page 1195 of *Braunwald's Cardiology Practice Standards*.

64.     "A meta-analysis of 7 trials confirmed an overall significant 25% reduction in mortality and a 17% reduction in nonfatal MI [Myocardial Infarction] after 2 years of follow-up in patients managed with an early invasive strategy [*i.e.*; undergoing cardiac catherization after an MI]." *Braunwald's Cardiology Practice Standards*, pg. 1195.

65.     "Similar findings were reported in an individual patient level meta-analysis from 3 contemporary randomized trials and involving 5467 patients who were followed for 5 years." ***Id.***

66.     "Thus, an Early Invasive Strategy [immediate transfer to a higher level of care hospital with a cardiac cath lab] is recommended in patients with NSTE-ACS who have ST segment changes and/or positive troponin assay on admission, or in whom these high-risk features develop over the subsequent 24 hours." ***Id.***

67.     "Other high-risk indicators such as recurrent ischemia or evidence of congestive heart failure, also indicate an Early Invasive Strategy [immediate transfer to a higher level of care hospital with a cardiac cath lab]." ***Id.***

68.     Furthermore, "[a]n Early Invasive Strategy [immediate transfer to a higher level of care hospital with a cardiac cath lab] is also advised in patients with NSTE–ACS previously treated with CABG and in patients who have had NSTE–ACS within 6 months of a previous PCI." ***Id.***

69.    The following are examples of multiple patients that Desert View Hospital was required to (and did not) transfer to a higher level of care hospital with a cath lab:

70.    **Patient 1:**

Patient 1 presented to Desert View Hospital on _____ with complaints of chest pain and cardiac enzymes diagnostic of myocardial infarction, a heart attack. Patient 1's presentation was consistent with the High-Risk-Criteria.

Dr. Mirza wrote in Patient 1's chart, "stable for Lexiscan. I m [sic] aware of elevated enzymes." Dr. Mirza's notation is consistent with a patient experiencing a heart attack.

However, rather than transfer Patient 1 to a higher level of care facility with a cardiac cath lab as required by well-established cardiology guidelines and Federal Regulations, Patient 1 was admitted to Desert View Hospital and underwent an unnecessary nuclear stress test on _____.

According to *Braunwald's Cardiology Practice Standards*, patients (like Patient 1) having a heart attack must be immediately transferred to an acute care hospital that has a cardiac cath lab, which is properly equipped and staffed to provide angiograms and coronary intervention (stents). *Braunwald's Cardiology Practice Standards*, pg. 290.

Patient 1 remained hospitalized at Desert View Hospital for three (3) days and underwent an unnecessary nuclear stress test, a very costly test used to determine whether a patient has coronary artery disease and heart attack risk. However, Patient 1 was already diagnosed with a heart attack using a very inexpensive blood test. The subject nuclear stress test also subjected Patient 2 to increased risk of harm including, but not limited to, death.

Desert View Hospital (in order to improve its patient census and increase its revenue) did not transfer Patient 1 to a higher level of care facility in violation of, among other things, 42 CFR § 485.608 (requiring compliance with Federal Regulations), 42 CFR § 485.635(c)(requiring the transfer of patients to a higher level of care), and EMTALA.

Desert View Hospital, not only jeopardized the health and safety of Patient 1, but Relator believes, that it willfully and fraudulently submitted a claim for thousands of dollars for services rendered to Patient 1 and was paid by the government based on a false

certification of compliance with Federal Regulations and EMTALA in violation of the False Claims Act.

71.   **Patient 2:**

Patient 2 presented to Desert View Hospital on _____with complaints of chest pain and cardiac enzymes diagnostic of myocardial infarction, a heart attack. Patient 2's presentation was consistent with High-Risk Criteria.

A notation on the nuclear stress test worksheet indicates that Dr. Mirza was aware of Patient 2's elevated cardiac enzyme (troponin), which is evidence of myocardial infarction.

However, rather than transfer Patient 2 to a higher level of care hospital with a cardiac cath lab as required by well-established cardiology guidelines and Federal Regulations, Patient 2 was admitted to Desert View Hospital and underwent an unnecessary nuclear stress test on _____.

According to *Braunwald's Cardiology Practice Standards*, patients (like Patient 2) having a heart attack must be immediately transferred to an acute care hospital that has a cardiac cath lab, which is properly equipped and staffed to provide angiograms and coronary intervention (stents). *Braunwald's Cardiology Practice Standards*, pg. 290.

Patient 2 was hospitalized at Desert View Hospital and underwent an unnecessary nuclear stress test, a very costly test used to determine whether a patient has coronary artery disease and heart attack risk. However, Patient 2 was already diagnosed with a heart attack using a very inexpensive blood test. The subject nuclear stress test also subjected Patient 2 to increased risk of harm including, but not limited to, death.

Desert View Hospital (in order to improve its patient census and increase its revenue) did not transfer Patient 2 to a higher level of care facility in violation of, among other things, 42 CFR § 485.608 (requiring compliance with Federal Regulations) 42 CFR § 485.635(c)(requiring the transfer of patients to a higher level of care), and EMTALA.

Desert View Hospital, not only jeopardized the health and safety of Patient 2, but Relator believes, that it willfully and fraudulently submitted a claim for thousands of dollars for services rendered to Patient 2 and was paid by the government based on a false certification of compliance with Federal Regulations and EMTALA in violation of the False Claims Act.

///

72.     **Patient 3**:

Patient 3 presented to Desert View Hospital on _____ with complaints of chest pain, abnormal EKG and enzymes positive for myocardial infarction, a heart attack.  Patient 3's presentation was consistent with Very-High-Risk Criteria.

Rather than transfer Patient 3 to a higher level of care hospital with a cardiac cath lab as required by well-established cardiology guidelines and Federal Regulations, Patient 3 was admitted to Desert View Hospital on _____.

According to *Braunwald's Cardiology Practice Standards*, patients (like Patient 3) having a heart attack must be immediately transferred to an acute care hospital that has a cardiac cath lab, which is properly equipped and staffed to provide angiograms and coronary intervention (stents).  *Braunwald's Cardiology Practice Standards*, pg. 290.

Patient 3 was hospitalized at Desert View Hospital without the necessary treatment until _____.  Thereafter, Patient 3 was finally and tardily transported to higher level of care facility.

Desert View Hospital (in order to improve its patient census and increase its revenue) did not transfer Patient 3 to a higher level of care facility for two (3) days in violation of, among other things, 42 CFR § 485.608 (requiring compliance with Federal Regulations) 42 CFR § 485.635(c)(requiring the transfer of patients to a higher level of care), and EMTALA.

Desert View Hospital, not only jeopardized the health and safety of Patient 3, but Relator believes, that it willfully and fraudulently submitted a claim for thousands of dollars for services rendered to Patient 3 and was paid by the government based on a false certification of compliance with Federal Regulations and EMTALA in violation of the False Claims Act.

73.     **Patient 4**:

Patient 4 presented to Desert View Hospital on _____ with complaints of NSTEMI-type acute coronary syndrome manifest as heart palpations, abnormal EKG, and shortness of breath with positive cardiac enzymes (a heart attack).  Patient 4's presentation was consistent with High-Risk Criteria.

Dr. Mirza wrote in Patient 4's chart that the patient will "get an echocardiogram, carotid ultrasound, and Lexiscan stress test for a further cardiac workup."

However, rather than transfer Patient 4 to a higher level of care hospital with a cardiac cath lab as required by well-established cardiology guidelines and Federal Regulations, Patient 4 was admitted to Desert View Hospital and underwent an unnecessary nuclear stress test on _____ and other cardiac tests.

According to *Braunwald's Cardiology Practice Standards*, patients (like Patient 4) having a heart attack must be immediately transferred to an acute care hospital that has a cardiac cath lab, which is properly equipped and staffed to provide angiograms and coronary intervention (stents). *Braunwald's Cardiology Practice Standards*, pg. 290.

Patient 4 was hospitalized at Desert View Hospital and underwent several unneeded cardiac tests and an unnecessary nuclear stress test, a very costly test used to determine whether a patient has coronary artery disease and heart attack risk. However, Patient 4 was already diagnosed with a heart attack using a very inexpensive blood test. The subject nuclear stress test also subjected Patient 4 to increased risk of harm including, but not limited to, death.

Desert View Hospital (in order to improve its patient census and increase its revenue) did not transfer Patient 4 to a higher level of care facility in violation of, among other things, 42 CFR § 485.608 (requiring compliance with Federal Regulations), 42 CFR § 485.635(c)(requiring the transfer of patients to a higher level of care), and EMTALA.

Desert View Hospital, not only jeopardized the health and safety of Patient 4, but Relator believes, that it willfully and fraudulently submitted a claim for thousands of dollars for services rendered to Patient 4 and was paid by the government based on a false certification of compliance with Federal Regulations and EMTALA in violation of the False Claims Act.

74.    **Patient 5**:

Patient 5 presented to Desert View Hospital on _____and was diagnosed with myocardial infarction, NSTEMI-type (a heart attack). Patient 5's presentation was consistent with High-Risk Criteria.

In his notes, the admitting physician states in his plan, "if troponin continued to be mounting upward trend probably need intervention

cardiology services which will be discussed [sic]." However, Patient 5 already had the diagnosis of NSTEMI.

Rather than transfer Patient 5 to a higher level of care hospital with a cardiac cath lab as required by well-established cardiology guidelines and Federal Regulations, Patient 5 was admitted to Desert View Hospital and underwent an unnecessary nuclear stress test on _____and other cardiac tests.

According to *Braunwald's Cardiology Practice Standards*, patients (like Patient 5) having a heart attack must be immediately transferred to an acute care hospital that has a cardiac cath lab, which is properly equipped and staffed to provide angiograms and coronary intervention (stents).   *Braunwald's Cardiology Practice Standards*, pg. 290.

Patient 5 was hospitalized at Desert View Hospital and underwent several unneeded cardiac tests and an unnecessary nuclear stress test, a very costly test used to determine whether a patient has coronary artery disease and heart attack risk.  However, Patient 5 was already diagnosed with a heart attack using a very inexpensive blood test.  The subject nuclear stress test also subjected Patient 5 to increased risk of harm including, but not limited to, death.

Desert View Hospital (in order to improve its patient census and increase its revenue) did not transfer Patient 5 to a higher level of care facility in violation of, among other things, 42 CFR § 485.608 (requiring compliance with Federal Regulations), 42 CFR § 485.635(c)(requiring the transfer of patients to a higher level of care), and EMTALA.

Desert View Hospital, not only jeopardized the health and safety of Patient 5, but Relator believes, that it willfully and fraudulently submitted a claim for thousands of dollars for services rendered to Patient 5 and was paid by the government based on a false certification of compliance with Federal Regulations and EMTALA in violation of the False Claims Act.

75.     **Patient 6**:

Patient 6 presented to Desert View Hospital on _____ with complaints of dizziness while undergoing dialysis.  A blood test revealed that the patient suffered from congestive heart failure, and myocardial infarction with serum troponin 0.24.  Patient 6's condition was consistent with High-Risk Criteria.

Rather than transfer Patient 6 to a higher level of care hospital with a cardiac cath lab as required by well-established cardiology

guidelines and Federal Regulations, Patient 6 was admitted to Desert View Hospital on _____.

According to *Braunwald's Cardiology Practice Standards*, patients (like Patient 6) having a heart attack must be immediately transferred to an acute care hospital that has a cardiac cath lab, which is properly equipped and staffed to provide angiograms and coronary intervention (stents). *Braunwald's Cardiology Practice Standards*, pg. 290.

Desert View Hospital (in order to improve its patient census and increase its revenue) did not transfer Patient 6 to a higher level of care facility in violation of, among other things, 42 CFR § 485.608 (requiring compliance with Federal Regulations), 42 CFR § 485.635(c)(requiring the transfer of patients to a higher level of care), and EMTALA.

Desert View Hospital, not only jeopardized the health and safety of Patient 6, but Relator believes, that it willfully and fraudulently submitted a claim for thousands of dollars for services rendered to Patient 6 and was paid by the government based on a false certification of compliance with Federal Regulations and EMTALA in violation of the False Claims Act.

76.     **Patient 7**:

Patient 7 presented to Desert View Hospital on _____with complaints of worsening shortness of breath due to congestive heart failure, in the context of multiple critical diagnoses including a gastrointestinal bleed only one week prior. On admission, there was clinical and chest x-ray evidence of congestive heart failure with further confirmation based on laboratory studies, and laboratory evidence of non-ST segment elevation myocardial infarction. Patient 7's condition was consistent with Very-High-Risk Criteria.

Rather than transfer Patient 7 to a higher level of care hospital with a cardiac cath lab as required by well-established cardiology guidelines and Federal Regulations, Patient 7 was admitted to Desert View Hospital on _____.

According to *Braunwald's Cardiology Practice Standards*, patients (like Patient 7) having a heart attack must be immediately transferred to an acute care hospital that has a cardiac cath lab, which is properly equipped and staffed to provide angiograms and coronary intervention (stents). *Braunwald's Cardiology Practice Standards*, pg. 290.

Desert View Hospital (in order to improve its patient census and increase its revenue) did not transfer Patient 7 to a higher level of care facility in violation of, among other things, 42 CFR § 485.608 (requiring compliance with Federal Regulations), 42 CFR § 485.635(c)(requiring the transfer of patients to a higher level of care), and EMTALA.

Desert View Hospital, not only jeopardized the health and safety of Patient 7, but Relator believes, that it willfully and fraudulently submitted a claim for thousands of dollars for services rendered to Patient 7 and was paid by the government based on a false certification of compliance with Federal Regulations and EMTALA in violation of the False Claims Act.

77.    **Patient 8**:

Patient 8 presented to Desert View Hospital on _____ with complaints of cardiac instability and a history of coronary bypass surgery with congestive heart failure and rapid atrial fibrillation.

Patient 8 already had an established cardiologist and electrophysiologist in Las Vegas and was scheduled for evaluation and treatment of the atrial fibrillation condition with a procedure (TEE/Cardioversion) not available at Desert View Hospital.

However, rather than transfer Patient 8 to a higher level of care hospital as required by well-established cardiology guidelines and Federal Regulations, Patient 8 was admitted to Desert View Hospital and underwent the very high risk cardioversion procedure (which was performed by Dr. Mirza) without TEE (Transesophageal Echo), which unnecessarily placed Patient 8 at risk of a stroke.  In addition, the subject procedure was performed in the absence of a certified nurse anesthetist or anesthesiologist, with no intensive care bed available for monitoring of the patient during and after the procedure, or in the event of a complication of the Cardioversion, which unnecessarily put Patient 8 at risk of respiratory failure and arrest.

Desert View Hospital (in order to improve its patient census and increase its revenue) did not transfer Patient 8 to a higher level of care facility and performed a very high risk procedure on Patient 8 in violation of, among other things, 42 CFR § 485.608 (requiring compliance with Federal Regulations), 42 CFR § 485.635(c)(requiring the transfer of patients to a higher level of care), and EMTALA.

Desert View Hospital, not only jeopardized the health and safety of Patient 8, but Relator believes, that it willfully and fraudulently

submitted a claim for thousands of dollars for services rendered to Patient 8 and was paid by the government based on a false certification of compliance with Federal Regulations and EMTALA in violation of the False Claims Act.

### B.  Neurology Patients:

78.  The best course of care for patients presenting to a hospital with symptoms or signs of a transient ischemic attack (TIA, aka mini-stroke) or cerebrovascular accident (CVA, aka stroke) is to develop a management care plan based on, among other things, patient medical history and objectively derived information from clinical imaging and laboratory data.

79.  Multiple clinical trials with peer review and oversight by expert committees of the American Heart Association Stroke Council, Council on Cardiovascular Nursing, Council on Peripheral Vascular Disease, and Council on Clinical Cardiology have established standards for managing stroke patients and published these standards in important peer-reviewed journals.

80.  The most comprehensive such practice guideline was published in the journal "*Stroke Guidelines for the Early Management of Patients with Acute Ischemic Stroke*," January 31, 2013 (the "*Stroke Guidelines*").

81.  The *Stroke Guidelines* are considered definitive and authoritative in the field of stroke care and management and are used herein as a reference.

82.  The *Stroke Guidelines* "deal with the acute diagnosis, stabilization, and acute medical and surgical treatments of acute ischemic stroke, as well as early inpatient management, secondary prevention, and complication management." *Stroke Guidelines*, pg. 2.

83.  The *Stroke Guidelines* are to be followed by "prehospital care providers, physicians, allied health professionals, and hospital administrators responsible ***for the care of acute ischemic stroke patients within the first 48 hours from stroke onset***." *Id.* at 1 (emphasis added).

84.  According to the *Stroke Guidelines*, outcomes for stroke patients are significantly improved "within the first hours of acute stroke" if guidelines are followed.  ***Id.***

85.    Therefore, according to the *Stroke Guidelines*, a hospital is required to adhere to the following guidelines relating to the evaluation and treatment of stroke patients:

> Patients should be transported rapidly to the closest available certified PSC [Primary Stroke Center] or CSC [Comprehensive Stroke Center]....    In some instances, this may involve aeromedical transport and hospital bypass.

*Id.* at 9.

86.     According to the American Heart Association, a Certified Primary Stroke Center ("PSC") must meet the following standards:

-A dedicated stroke-focused program;

-Staffing by qualified medical professionals trained in stroke care;

-Individualized care to meet stroke patients' needs;

-Patient involvement in their hospital care;

-Coordination of post-discharge patient self-care based on recommendations of the Brain Attack Coalition and guidelines published by the American Heart Association/American Stroke Association or equivalent guidelines;

-Streamlined flow of patient information while protecting patient rights, security and privacy;

-Collection of the hospital's stroke-treatment performance data;

-Hospital team performance data; and

-Use of data to assess and continually improve quality of care for stroke patients

*See* http://www.heart.org/HEARTORG/Professional/HospitalAccreditationCertification/PrimaryStrokeCenterCertification/Primary-%20%20Stroke-Center-Certification_UCM_439155_SubHomePage.jsp

87.    According to the American Heart Association, a Comprehensive Stroke Center ("CSC") must meet the following standards:

> Eligibility standards include all components of a Primary Stroke Center plus:
> -Availability of advanced imaging techniques, including MRI/MRA, CTA, DSA and TCD; and

-Availability of personnel trained in vascular neurology, neurosurgery and endovascular procedures;

-24/7 availability of personnel, imaging, operating room and endovascular facilities;

-ICU/neuroscience ICU facilities and capabilities; and

-Experience and expertise treating patients with large ischemic strokes, intracerebral hemorrhage and subarachnoid hemorrhage

*See*:

https://www.heart.org/HEARTORG/Professional/HospitalAccreditationCertification/ComprehensiveStrokeCenterCertification/Comprehensive-Stroke-Center-ertification_UCM_455446_SubHomePage.jsp

88.     At all relevant times referenced herein, Desert View Hospital was not a PSC and/or a CSC.

89.     Based on information and belief, Spring Valley Hospital (a United Health Services subsidiary and CSC) is eighteen (18) minutes away from Desert View Hospital by helicopter transport and less than sixty (60) minutes by ambulance.

90.     In a peer-reviewed article entitled "*The Value of Urgent Specialized Care for TIA and Minor Stroke*" published in the influential New England Journal of Medicine on April 21, 2016, it was stressed that patients presenting with symptoms of a TIA/minor strokes must be cared for by "specialized TIA units in which urgent evidence-based care is delivered by stroke specialists."

91.     At all relevant times referenced herein, Desert View Hospital did not have a specialized TIA unit and/or any stroke specialists on call or on staff.

92.     The following are examples of multiple patients that Desert View Hospital was required to (and did not) transfer to a PSC, CSC, or TIA Unit at a PSC or CSC.

93.     **Patient 9:**

Patient 9 presented to Desert View Hospital on _____ with a diagnosis of cerebrovascular accident, a stroke patient.

According to the *Stroke Guidelines*, patients (like Patient 9) having a stroke must be immediately transferred to a PSC or CSC.

However, rather than transfer Patient 9 to a PSC or a CSC, Patient 9 was held in a swing bed.

Desert View Hospital (in order to improve its patient census and increase its revenue) did not transfer Patient 9 to a higher level of care facility in violation of, among other things, 42 CFR § 485.608 (requiring compliance with Federal Regulations), 42 CFR § 485.635(c)(requiring the transfer of patients to a higher level of care), and EMTALA.

Desert View Hospital, not only did it jeopardize the health and safety of Patient 9, Relator believes that Desert View Hospital willfully and fraudulently submitted a claim for thousands of dollars for services rendered to Patient 9 and was paid by the government based on a false certification of compliance with Federal Regulations and EMTALA in violation of the False Claims Act.

94.    **Patient 10:**

Patient 10 presented to Desert View Hospital on _____ with a diagnosis of "TIA with left-sided weakness resolved with some numbness on the left side of the face."  However, this was not a TIA because it was documented that there was not complete resolution.  This was a cerebrovascular accident (a stroke) with associated symptoms of speech difficulties and left facial droop documented on presentation.

The emergency room admission was a "code white," which is the universal alert that a patient is having a  stroke AND the designation for an acute stroke requiring evaluation based on a stroke protocol at a stroke center. The purpose of the alert is to mobilize the resources needed to evaluate and treat the patient diagnosed having an acute stroke.

According to the *Stroke Guidelines*, patients (like Patient 10) having a stroke must be immediately transferred to a PSC or CSC.

However, rather than transfer Patient to a PSC or a CSC, Patient 10 was admitted into Desert View Hospital.

Desert View Hospital (in order to improve its patient census and increase its revenue) did not transfer Patient 10 to a higher level of care facility in violation of, among other things, 42 CFR § 485.608 (requiring compliance with Federal Regulations), 42 CFR §

485.635(c)(requiring the transfer of patients to a higher level of care), and EMTALA.

Desert View Hospital, not only did it jeopardize the health and safety of Patient 10, Relator believes that Desert View Hospital willfully and fraudulently submitted a claim for thousands of dollars for services rendered to Patient 10 and was paid by the government based on a false certification of compliance with Federal Regulations and EMTALA in violation of the False Claims Act.

95.     **Patient 11:**

Patient 11 presented to Desert View Hospital on _____ with a diagnosis of cerebrovascular accident, a stroke.

According to the *Stroke Guidelines*, patients (like Patient 11) having a stroke must be immediately transferred to a PSC or CSC.

However, rather than transfer Patient 11 to a PSC or a CSC, Patient 11 was admitted into Desert View Hospital.

Desert View Hospital (in order to improve its patient census and increase its revenue) did not transfer Patient 11 to a higher level of care facility in violation of, among other things, 42 CFR § 485.608 (requiring compliance with Federal Regulations), 42 CFR § 485.635(c)(requiring the transfer of patients to a higher level of care), and EMTALA.

Desert View Hospital, not only did it jeopardize the health and safety of Patient 11, Relator believes that Desert View Hospital willfully and fraudulently submitted a claim for thousands of dollars for services rendered to Patient 11 and was paid by the government based on a false certification of compliance with Federal Regulations and EMTALA in violation of the False Claims Act.

96.     **Patient 12:**

Patient 12 presented to Desert View Hospital on _____ with a diagnosis of a TIA.

According to the *Stroke Guidelines*, patients (like Patient 12) having a TIA must be immediately transferred to TIA Unit at a PSC or CSC.

However, rather than transfer Patient 12 to a PSC or a CSC, Patient 12 was held at a swing bed.

Desert View Hospital (in order to improve its patient census and increase its revenue) did not transfer Patient 12 to a higher level of care facility in violation of, among other things, 42 CFR § 485.608 (requiring compliance with Federal Regulations), 42 CFR § 485.635(c)(requiring the transfer of patients to a higher level of care), and EMTALA.

Desert View Hospital, not only did it jeopardize the health and safety of Patient 12, Relator believes that Desert View Hospital willfully and fraudulently submitted a claim for thousands of dollars for services rendered to Patient 12 and was paid by the government based on a false certification of compliance with Federal Regulations and EMTALA in violation of the False Claims Act.

97.     **Patient 13:**

Patient 13 presented to Desert View Hospital on _____ with a diagnosis of a TIA.

According to the *Stroke Guidelines*, patients (like Patient 13) having a TIA must be immediately transferred to TIA Unit at a PSC or CSC.

However, rather than transfer Patient 13 to a PSC or a CSC, Patient 13 was held at a swing bed.

Desert View Hospital (in order to improve its patient census and increase its revenue) did not transfer Patient 13 to a higher level of care facility in violation of, among other things, 42 CFR § 485.608 (requiring compliance with Federal Regulations), 42 CFR § 485.635(c)(requiring the transfer of patients to a higher level of care), and EMTALA.

Desert View Hospital, not only did it jeopardize the health and safety of Patient 13, Relator believes that Desert View Hospital willfully and fraudulently submitted a claim for thousands of dollars for services rendered to Patient 13 and was paid by the government based on a false certification of compliance with Federal Regulations and EMTALA in violation of the False Claims Act.

98.     **Patient 14:**

Patient 14 presented to Desert View Hospital on _____ with a diagnosis of a TIA.

According to the *Stroke Guidelines*, patients (like Patient 14) having a TIA must be immediately transferred to TIA Unit at a PSC or CSC.

However, rather than transfer Patient 14 to a PSC or a CSC, Patient 14 was held at a swing bed.

Desert View Hospital (in order to improve its patient census and increase its revenue) did not transfer Patient 14 to a higher level of care facility in violation of, among other things, 42 CFR § 485.608 (requiring compliance with Federal Regulations), 42 CFR § 485.635(c)(requiring the transfer of patients to a higher level of care), and EMTALA.

Desert View Hospital, not only did it jeopardize the health and safety of Patient 14, Relator believes that Desert View Hospital willfully and fraudulently submitted a claim for thousands of dollars for services rendered to Patient 14 and was paid by the government based on a false certification of compliance with Federal Regulations and EMTALA in violation of the False Claims Act.

**C. Gastrointestinal Patients:**

99.     Gastrointestinal bleeding ("GI bleeding") is associated with increased morbidity and mortality in patients of advanced age with clinically significant coexisting illnesses.

100.     The management of acute lower GI bleeding is the subject of a Clinical Practice Review titled *Acute Lower Gastrointestinal Bleeding* published in the prestigious New England Journal of Medicine on March 16, 2017 ("*GI Bleeding Standards*").

101.     According to the *GI Bleeding Standards*, "[c]olonoscopy should be the initial procedure for most patients presenting with acute lower gastrointestinal bleeding. It should generally be performed within 24 hours after presentation, after hemodynamic resuscitation and colon cleansing." *GI Bleeding Standards*, pg. 1056.

102.     During all relevant times herein, Desert View Hospital lacked the facilities, staff (gastroenterologist), and equipment to perform *emergency* colonoscopy on patients available on a twenty-four (24) hour basis.

103.    The following is an example of a patient that Desert View Hospital was required to (and did not) transfer to higher level of care facility for the patient to undergo a colonoscopy.

104.    **Patient 15:**

> Patient 15 presented to Desert View Hospital on _____ with serious rectal bleeding in the context of a history of coronary stents taking recommended dual antiplatelet therapy, consisting of aspirin and clopidogrel.

> According to the *GI Bleeding Standards*, patients (like Patient 15) having a GI Bleed must be immediately transferred to a higher level facility to undergo a coloscopy.

> However, rather than transfer Patient 15 to higher level of care facility to undergo a colonoscopy, Patient 15 was admitted into Desert View Hospital.

> Desert View Hospital (in order to improve its patient census and increase its revenue) did not transfer Patient 15 to a higher level of care facility in violation of, among other things, 42 CFR § 485.608 (requiring compliance with Federal Regulations), 42 CFR § 485.635(c)(requiring the transfer of patients to a higher level of care), and EMTALA.

> Desert View Hospital, not only did it jeopardize the health and safety of Patient 15, Relator believes that Desert View Hospital willfully and fraudulently submitted a claim for thousands of dollars for services rendered to Patient 15 and was paid by the government based on a false certification of compliance with Federal Regulations and EMTALA in violation of the False Claims Act.

**D.  Renal Failure Patients:**

105.    Acute Renal Failure/Acute Kidney Injury conditions require specialized nursing care, equipment, and consultants to be available daily.

106.    During all relevant times herein, Desert View Hospital had no staff nephrologist and/or the capability to perform dialysis on patients who need it.

107.    The following are examples of patients that Desert View Hospital was required to (and did not) transfer to higher level of care facility for the patient to consult with a nephrologist and/or to undergo dialysis.

108.     **Patient 16:**

Patient 16 presented to Desert View Hospital on _____ with multiple critical medical condition including, but not limited to, renal failure and congestive heart failure, and pneumonia.

Patients (like Patient 16) having renal failure and other organ failures must be immediately transferred to a higher level facility to obtain critical care evaluation and treatment.

However, rather than transfer Patient 16 to higher level of care facility with an ICU where multiple medical specialists (including a nephrologist and pulmonologist), equipment (such as a ventilator), and ancillary staff (critical care nurses) are available, Patient 16 was admitted into Desert View Hospital.

Desert View Hospital (in order to improve its patient census and increase its revenue) did not transfer Patient 16 to a higher level of care facility in violation of, among other things, 42 CFR § 485.608 (requiring compliance with Federal Regulations), 42 CFR § 485.635(c)(requiring the transfer of patients to a higher level of care), and EMTALA.

Desert View Hospital, not only did it jeopardize the health and safety of Patient 16, Relator believes that Desert View Hospital willfully and fraudulently submitted a claim for thousands of dollars for services rendered to Patient 16 and was paid by the government based on a false certification of compliance with Federal Regulations and EMTALA in violation of the False Claims Act.

109.     **Patient 17:**

Patient 17 presented to Desert View Hospital on _____ with diagnoses of sepsis and pneumonia, in the context of underlying congestive heart failure and renal failure.

Patients (like Patient 17) having renal failure and other organ failures must be immediately transferred to a higher level facility to obtain critical care evaluation and treatment.

However, rather than transfer Patient 17 to higher level of care facility with an ICU where multiple medical specialists (including a nephrologist and pulmonologist), equipment (such as a ventilator) and ancillary staff (critical care nurses) are available, Patient 17 was held at a swing bed and later admitted into Desert View Hospital.

Desert View Hospital (in order to improve its patient census and increase its revenue) did not transfer Patient 17 to a higher level of care facility in violation of, among other things, 42 CFR § 485.608 (requiring compliance with Federal Regulations), 42 CFR § 485.635(c)(requiring the transfer of patients to a higher level of care), and EMTALA.

Desert View Hospital, not only did it jeopardize the health and safety of Patient 17, Relator believes that Desert View Hospital willfully and fraudulently submitted a claim for thousands of dollars for services rendered to Patient 17 and was paid by the government based on a false certification of compliance with Federal Regulations and EMTALA in violation of the False Claims.[1]

110.   **Patient 18:**

Patient 18 presented to Desert View Hospital on _____ with a diagnosis of acute renal failure and altered mental status.

Patients (like Patient 18) having renal failure must be immediately transferred to a higher level facility to obtain critical care evaluation and treatment.

However, rather than transfer Patient 18 to higher level of care facility with an ICU where multiple medical specialists (including a nephrologist and neurologist), and ancillary staff (critical care nurses) are available, Patient 18 was admitted into Desert View Hospital.

Desert View Hospital (in order to improve its patient census and increase its revenue) did not transfer Patient 18 to a higher level of care facility in violation of, among other things, 42 CFR § 485.608 (requiring compliance with Federal Regulations), 42 CFR § 485.635(c)(requiring the transfer of patients to a higher level of care), and EMTALA.

Desert View Hospital, not only did it jeopardize the health and safety of Patient 18, Relator believes that Desert View Hospital willfully and fraudulently submitted a claim for thousands of dollars for services rendered to Patient 18 and was paid by the government based on a false certification of compliance with

---

[1] In addition to failing to transfer Patient 17 (mentioned above) to a higher level of care facility to address renal failure, Desert View Hospital was required to transfer Patient 17 to a higher level of care hospital because Patient 17 was septic. Desert View Hospital did not have and continues not to have an infectious diseases specialist on staff. *See Severe Sepsis and Septic Shock*, published in the New England Journal of Medicine, August 29, 2013.

Federal Regulations and EMTALA in violation of the False Claims Act.

111. **Patient 19:**

Patient 19 presented to Desert View Hospital on _____ with multiple critical diagnoses of congestive heart failure, deep vein thrombosis, acute renal failure, and atrial fibrillation with rapid ventricular response.

Patients (like Patient 19) having renal failure and other organ failures must be immediately transferred to a higher level facility to obtain critical care evaluation and treatment.

However, rather than transfer Patient 19 to higher level of care facility with an ICU where multiple medical specialists (including a nephrologist and pulmonologist), equipment (such as a ventilator) and ancillary staff (critical care nurses), Patient 19 was admitted into Desert View Hospital.

Desert View Hospital (in order to improve its patient census and increase its revenue) did not transfer Patient 19 to a higher level of care facility in violation of, among other things, 42 CFR § 485.608 (requiring compliance with Federal Regulations), 42 CFR § 485.635(c)(requiring the transfer of patients to a higher level of care), and EMTALA.

Desert View Hospital, not only did it jeopardize the health and safety of Patient 19, Relator believes that Desert View Hospital willfully and fraudulently submitted a claim for thousands of dollars for services rendered to Patient 19 and was paid by the government based on a false certification of compliance with Federal Regulations and EMTALA in violation of the False Claims Act.

**E. Respiratory Failure Patients:**

112. Respiratory Failure medical conditions require specialized nursing care, equipment, and consultants to be available daily.

113. During all relevant times herein, Desert View Hospital had no staff pulmonologist and/or the capability to perform mechanical ventilation on patients who need it on a daily basis.

114. In addition to Patient 16 (discussed above) who suffered from respiratory failure and was not transferred, the following is another example of another patient that Desert View Hospital was

required to (and did not) transfer to higher level of care facility for the patient to consult with a pulmonologist and/or to undergo mechanical ventilation.

115.     **Patient 20:**

Patient 20 presented to Desert View Hospital on _____ with acute hypoxic respiratory failure.

Patients (like Patient 20) having respiratory failure must be immediately transferred to a higher level facility to obtain critical care evaluation and treatment.

However, rather than transfer Patient 20 to higher level of care facility with multiple medical specialists (including a pulmonologist), equipment (such as a ventilator) and ancillary staff (critical care nurses), Patient 20 was admitted into Desert View Hospital.

Desert View Hospital (in order to improve its patient census and increase its revenue) did not transfer Patient 20 to a higher level of care facility in violation of, among other things, 42 CFR § 485.608 (requiring compliance with Federal Regulations), 42 CFR § 485.635(c)(requiring the transfer of patients to a higher level of care), and EMTALA.

Desert View Hospital, not only did it jeopardize the health and safety of Patient 20, Relator believes that Desert View Hospital willfully and fraudulently submitted a claim for thousands of dollars for services rendered to Patient 20 and was paid by the government based on a false certification of compliance with Federal Regulations and EMTALA in violation of the False Claims Act.

**(2)     Desert View Hospital Fraudulently and Knowingly Subjected Admitted Patients to a Multitude of Unnecessary Medical Testing/Procedures in Order to Increase Billing Charges/Reimbursements from, among others, Medicare and Medicaid**

116.     Overutilization of healthcare resources has long been a concern of the government, the taxpayer, and professional medical societies.

117.     The American College of Cardiology was an early leader in the development of criteria to optimize the ordering of tests to facilitate the most information derived from testing at the highest value.

118.    The authoritative source for appropriate cardiology testing is the *ACC Appropriate Use Criteria Methodology: 2018 Update:  A Report of the American College of Cardiology Appropriate Use Criteria Task Force*, published in the Journal of the American College of Cardiology volume 71 #8 2018 pages 935 through 948 (the "*Cardiology Appropriate Use Criteria*").  The *Cardiology Appropriate Use Criteria* is used as a reference herein.

119.    The *Cardiology Appropriate Use Criteria* provides the following:

> In response to the imperative to improve the utilization of cardiovascular procedures in an efficient and contemporary fashion, the American College of Cardiology (ACC), along with other relevant organizations, developed appropriate use criteria (AUC) for multiple procedures and testing modalities.  The first AUC document was published in 2005 and focused on indications for radionuclide imaging [also known as nuclear stress testing].  During the ensuing 12 years, 14 AUC documents have been published covering the appropriateness of individual cardiac imaging procedures (radionuclide imaging, cardiac computed tomography, cardiac magnetic resonance imaging, echocardiography, and diagnostic catheterization).  Recently, AUC documents have combined these diagnostic modalities into multimodality publications focused specifically on the diagnosis and evaluation of disease states, such as stable ischemic heart disease detection and risk assessment, chest pain evaluation in the emergency department, and cardiovascular imaging in heart failure.

*Cardiology Appropriate Use Criteria*, pg. 936.

120.    Section 3.1 of the *Cardiology Appropriate Use Criteria* defines "appropriate use" as follows:

> An appropriate diagnostic or therapeutic procedures is one in which the expected clinical benefit exceeds the risks of the procedure by a sufficiently wide margin, such that the procedure is generally considered acceptable or reasonable care.  For diagnostic imaging procedures, benefits include incremental information, which when combined with clinical judgment, augments efficient patient care.  These benefits are weighed against the expected negative consequences (risks include the potential hazard of missed diagnoses, radiation, contrast, and/or unnecessary downstream procedures).

*Id.* at pg. 939.

121.    In section 10 of the *Cardiology Appropriate Use Criteria* (titled "Conclusions"), it is reiterated that:

> [T]he focus of the AUC is to encourage optimal patient care via professional stewardship of technology utilization within cardiovascular medicine.  The effort is to join with all cardiovascular practitioners and stakeholders in providing optimal clinical decision making to foster high-quality cardiovascular care for patients, and to work toward patterns of care that both promote appropriate utilization and minimize use that lacks sufficient value whenever possible…The AUC's are now having an impact on the performance of tests and procedures and specific patient populations, by providing a mechanism to achieve the goal of a substantial reduction in waste due to unnecessary tests and procedures.

*Id.* at pg. 945-46.

122.    In addition, Chapter 3 of *Braunwald's Cardiology Practice Standards* (which is titled "Clinical Decision Making and Cardiology") is devoted to appropriate ordering of tests.

123.    In *Braunwald's Cardiology Practice Standards*, the following is stated:

> Clinical reasoning should guide not only test interpretation, but also test ordering.  Tests that are ordered for good reasons are more conclusive, and tests that are ordered indiscriminately can cause clinicians to arrive at the wrong conclusions.  Ideally, a test should be used to validate or reject an articulated hypothesis–a plausible conjecture that is generated by patient's condition.

*Braunwald's Cardiology Practice Standards*, pg. 29.

124.    "To aid with test selection and avoid overtesting, the American College of Cardiology (ACC) and other organizations have developed appropriate-use criteria to guide clinicians' decisions about ordering cardiac tests." *Id.*

125.    "This effort is driven by both the need to avoid excessive false-positive test results and the need to contain the cost of medical care."  *Id.*

126.    "The goal of appropriate use guidelines is to reduce overuse errors and maximize the value of diagnostic testing and procedures." *Id.*

127.    "The general principle of any test ordering strategy is that a plausible hypothesis (a provisional diagnosis) should be formulated first, followed by testing." ***Id.***

128.    "The appropriate-use criteria are designed to avoid testing when the results are unlikely to improve patient care or outcomes." ***Id.***

129.    As stated before, the ACC has appropriate use criteria for echocardiography and nuclear stress testing.

130.    In *Braunwald's Cardiology Practice Standards*, the echo criteria are delineated in table 14G.1, pages 245-251.

131.    In *Braunwald's Cardiology Practice Standards*, the nuclear stress criteria are delineated in table 18G.1, pages 343-347.

132.    The before-mentioned criteria are published in the Journal of the American College of Cardiology volume 63 #4 2014 pages 382-406 under the title *2013 Multimodality Appropriate Use Criteria for the Detection and Risk Assessment of Stable Ischemic Heart Disease* (the "*2013 Multimodality Appropriate Use Criteria*").

133.    The following are examples of inappropriate, wasteful, and in some cases egregiously and grossly inappropriate ordering of tests at Desert View Hospital, inconsistent with appropriate use criteria. These results provide little to no value in the management of the patients cited here.

134.    **Patient 21:**

>    Patient 21 presented to Desert View Hospital on _____ with a diagnosis of congestive heart failure, one of many such admissions for him.

>    This is a patient of the Relator with end-stage heart disease seen in the office only several days prior, _____, and counseled 45 minutes regarding end-of-life decisions given the severity of his condition. At the end of that counseling the patient elected to have a DNR status. This patient had already undergone extensive prior outpatient testing establishing the severity of his condition.

>    Despite these facts, Patient 21 was admitted into Desert View Hospital on _____. On _____, Dr. Mirza

ordered yet another echocardiogram, stating in his _____ progress note "congestive heart failure, improving.  We will get an echocardiogram to see how the heart is pumping."   In the same _____ progress note, a few lines later, Dr. Mirza states, "we will also do a stress test on Wednesday to check the heart."

Neither of these tests was indicated because the results from the tests would not have changed the management of the patient in addition to the fact that they had been recently performed.

Desert View Hospital, not only did it jeopardize the health and safety of Patient 21 by performing the various unnecessary tests on Patient 21, Relator believes that Desert View Hospital  willfully and fraudulently submitted a claim for thousands of dollars for these unnecessary medical tests and was paid by the government in violation of the False Claims Act.

135.    **Patient 22:**

Patient 22 presented to Desert View Hospital on _____ and was seen by Relator in consultation on _____.

This frail 86-year-old patient was admitted with a several days history of weakness, fatigue, poor appetite, and abdominal discomfort.  No cardiac complaints.

Patient 22 already had an echocardiogram on _____.  Despite that, the admitting physician ordered another echocardiogram done on _____, which Relator interpreted.

In addition, the admitting physician ordered a nuclear stress test despite the absence of any indication for such testing given that there were no active cardiac symptoms. Relator canceled the study. The next day, the nuclear cardiac stress test was re-ordered and performed despite Relator's advising in prior consultation that the test is not warranted.

Neither of these tests was indicated because the results from the tests would not have changed the management of the patient in addition to the fact that the patient already had the echo and that was no medical indication for the nuclear stress test.  Most importantly, the patient did not have any cardiac symptoms.

Desert View Hospital, not only did it jeopardize the health and safety of Patient 22 by performing the various unnecessary tests on Patient 22, Relator believes that Desert View Hospital  willfully and fraudulently submitted a claim for thousands of dollars for

these unnecessary medical tests and was paid by the government in violation of the False Claims Act.

136.   **Patient 23:**

Patient 23 presented to Desert View Hospital on or about _____ and underwent an echocardiogram _____.

Patient 23 had already had a complete echocardiogram on _____. This test was repetitive having been done less than three (3) weeks earlier.

The echo test was not indicated because the results from the test would not have changed the management of the patient as one was performed a few short weeks earlier.

By performing an unnecessary test on Patient 23, Relator believes that Desert View Hospital willfully and fraudulently submitted a claim for this unnecessary medical test and was paid by the government in violation of the False Claims Act.

137.   **Patient 24:**

Patient 24 presented to Desert View Hospital on _____ and underwent an echocardiogram on _____ after already having had multiple echoes within the preceding two (2) months.

Patient 24 had an office echocardiogram on _____ and then underwent aortic valve replacement on _____ with another echo the day of surgery. Patient 24 was seen by Relator in follow-up office visit and had an appropriate postoperative echocardiogram performed on _____.

On _____, Patient 24 was admitted into Desert View Hospital with complaints of dizziness and dehydration. While admitted for less than forty-eight (48) hours, Patient 24 was subjected to an MRI of the brain, chest x-ray, CT scan of the brain, and carotid ultrasound. In addition, another echocardiogram was performed on _____. No abnormal findings of any significance were noted on those tests as documented in the discharge summary of _____.

None of these tests was indicated and did not correlate with Patient 24's complaints during the hospitalization.

By performing multiple unnecessary tests on Patient 24, Relator believes that Desert View Hospital willfully and fraudulently

submitted a claim for these unnecessary medical tests and was paid by the government in violation of the False Claims Act.

138.   **Patient 25:**

Patient 25 presented to Desert View Hospital on _____ with a left molar tooth infection.

Despite that and despite the absence of any cardiovascular symptoms or documentation of any abnormal cardiac findings on examination, Patient 25 underwent an echocardiogram during the hospital admission.

The test was not indicated and did not correlate with Patient 25's complaints during the hospitalization.

By performing an unnecessary test on Patient 25, Relator believes that Desert View Hospital willfully and fraudulently submitted a claim for this unnecessary medical test and was paid by the government in violation of the False Claims Act.

139.   **Patient 26:**

Patient 26 presented to Desert View Hospital on _____ with weakness and fatigue and found to have hyponatremia (low sodium level) when the laboratory studies returned.

Despite the absence of any cardiac symptoms or any abnormal cardiac findings on examination, Patient 26 underwent an echocardiogram during the hospitalization.

In his admission note, Dr. Mirza stated, "because of history of hypertension, will get an echocardiogram." However, history of hypertension does not meet appropriate use criteria for obtaining a hospital echocardiogram in a patient admitted for noncardiac reasons.

The test was not indicated and did not correlate with Patient 26's complaints during the hospitalization.

By performing an unnecessary test on Patient 26, Relator believes that Desert View Hospital willfully and fraudulently submitted a claim for this unnecessary medical test and was paid by the government in violation of the False Claims Act.

140.   **Patient 27:**

Patient 27 presented to Desert View Hospital on _____ after a recent discharge for airways disease and COPD. He was

readmitted for similar reasons with admission diagnosis of COPD and sepsis.

In a _____ progress note, Dr. Mirza states, "wife reported that he is not breathing well. She would like to have a stress test and an echocardiogram done while he is here… Which I will order."

None of these tests was indicated and did not correlate with Patient 27's complaints during the hospitalization.

By performing multiple unnecessary tests on Patient 27, Relator believes that Desert View Hospital willfully and fraudulently submitted a claim for these unnecessary medical tests and was paid by the government in violation of the False Claims Act.

141.   **Patient 28:**

Patient 28 presented to Desert View Hospital on _____ because of atrial fibrillation. This was 1 of at least 4 admissions for the same diagnosis in the past two (2) months at Desert View Hospital.

Despite having had multiple echocardiograms in the previous two (2) months, including one at Summerlin Hospital to which she had been transferred in the interim for atrial fibrillation ablation and insertion of a pacemaker, Patient 28 underwent yet another echocardiogram on _____.

In his progress note of _____, Dr. Mirza acknowledges a prior echocardiogram done at Summerlin Hospital 2 weeks before.

The test was not indicated due to recent multiple echocardiograms performed on Patient 28.

By performing an unnecessary test on Patient 28, Relator believes that Desert View Hospital willfully and fraudulently submitted a claim for this unnecessary medical test and was paid by the government in violation of the False Claims Act.

142.   **Patient 29:**

Patient 29 presented to Desert View Hospital on _____ with complaints of nausea and vomiting along with passing of gas and diarrhea. Patient 29 had had a similar episode in _____.

Despite the absence of cardiac symptoms, Patient 29 underwent an echocardiogram and carotid ultrasound. In addition, in the discharge instructions by the nurse practitioner Cyndi Houtrouw, she, among other things, states, "follow-up with Dr. Mirza as scheduled for TEE [transesophageal echocardiogram] and coronary angiogram.

In other words, without having confirmed the presence or absence of a neoplasm suggested on abdominal CT, this 88-year-old woman is being arranged to undergo complex cardiac procedures with high risk, in anticipation of a possible recommendation of high risk mitral valve surgery based on the hospital echocardiogram, even though Patient 29 was not admitted with any cardiac symptoms.

None of these tests was indicated and did not correlate with the Patient 29's complaints during the hospitalization.

By performing multiple unnecessary tests on Patient 29, Relator believes that Desert View Hospital willfully and fraudulently submitted a claim for these unnecessary medical tests and was paid by the government in violation of the False Claims Act.

143.   **Patient 30**:

Patient 30 presented to Desert View Hospital on _____ with an admission diagnosis of palpitations and underwent a nuclear stress test on _____.

In Dr. Mirza's admission note, he states that the patient came to the hospital because of palpitations but had a normal cardiac rhythm on arrival. Dr. Mirza further states that Patient 30 was excessively fatigued and deconditioned and therefore "needs a [sic] echo and Lexiscan stress test, along with treatment as per ACC guidelines."

Dr. Mirza failed to document anything to which any ACC appropriate use testing guidelines apply. In addition, the nuclear medicine stress test does not meet any appropriate use criterion on the basis of palpitations. Finally, there is no appropriate use criterion for performing an echocardiogram for the symptom of palpitations.

None of these tests were indicated and did not correlate with Patient 30's complaints during the hospitalization.

Desert View Hospital, not only did it jeopardize the health and safety of Patient 30 by performing the various unnecessary tests on Patient 30, Relator believes that Desert View Hospital willfully and fraudulently submitted a claim for thousands of dollars for

these unnecessary medical tests and was paid by the government in violation of the False Claims Act.

144.    **Patient 31**:

Patient 31 presented to Desert View Hospital on _____ with a chief complaint of groin pain due to an injury.  In the hospital emergency room, Patient 31 denied any cardiac symptoms.

In Dr. Mirza's notes, he said that Patient 31 was admitted for "AFIB ACS." However, Patient 31 did not have ACS [acute coronary syndrome].  In his History and Physical, Dr. Mirza wrote, "Will get an echocardiogram to rule out ischemia." An echocardiogram is not an appropriate test in this context and will not serve his reason for ordering it which was "rule out ischemia." The test was ordered and performed.  Patient 31 also underwent a nuclear stress test.

None of these tests were indicated and did not correlate with Patient 31's complaints during the hospitalization.

Desert View Hospital, not only did it jeopardize the health and safety of Patient 31 by performing the various unnecessary tests on Patient 31, Relator believes that Desert View Hospital  willfully and fraudulently submitted a claim for thousands of dollars for these unnecessary medical tests and was paid by the government in violation of the False Claims Act.

145.    **Patient 32**:

Patient 32 presented to Desert View Hospital on _____ with notation in the admission history that there was chest pain that had resolved by the time the patient arrived in the emergency room.   Patient 32's EKG and cardiac enzymes showed no evidence of myocardial infarction.

Patient 32 was diagnosed as Acute Coronary Syndrome ("ACS"). However, Patient 32 did not meet the criteria for this diagnosis.

Nonetheless, Patient 32 was kept at Desert View Hospital and underwent an echocardiogram and a nuclear stress test.  Patient had already had an echocardiogram on _____.

In addition, while at Desert View Hospital, Patient 32 also underwent multiple other tests including a CT angiogram of the chest with history noted to be fever and cough, which patient did not have according to the admission history, a CT scan of the abdomen and pelvis with and without contrast even though Patient 32 was admitted with chest pain, and an abdominal ultrasound two

(2) days in a row even though nothing was mentioned in the admission history about abdominal symptoms.

None of these tests were indicated and did not correlate with Patient 32's complaints during the hospitalization.

Desert View Hospital, not only did it jeopardize the health and safety of Patient 32 by performing the various unnecessary tests on Patient 32, Relator believes that Desert View Hospital willfully and fraudulently submitted a claim for thousands of dollars for these unnecessary medical tests and was paid by the government in violation of the False Claims Act.

146.    **Patient 33:**

Patient 33 presented to Desert View Hospital on _____ with syncope/fainting.   In the admission history, it was documented that Patient 33 was in no distress and, in the emergency room, she already underwent a brain CT scan that showed no significant abnormality.

Despite the unremarkable brain CT scan, Patient 33 underwent a brain MRI scan on _____.   On admission, Dr. Mirza inappropriately pre-determined that Patient 33 would be admitted for 2-3 days.

While at Desert View Hospital, Patient 33 underwent multiple tests including an echocardiogram even though the physical exam documented no abnormality of the heart.   Patient 33 also underwent a nuclear medicine stress test for which there was no appropriate use criterion met.  In addition, Patient 33 underwent a carotid ultrasound.

At the time of discharge, Patient 33 was not in stable condition with a blood pressure 99/56 (compared with the admission blood pressure of 190/103) and a urinary tract infection, which was not treated while in the hospital, and documentation of renal function that was decreased to 50% compared with what was documented on admission.

In summary, none of these tests were indicated and did not correlate with Patient 33's complaints during the hospitalization. Patient 33 was admitted to Desert View Hospital with a simple fainting episode and underwent multiple unnecessary tests including a full cardiac workup for which there was no indication, and then after all of that discharged without her dehydration and urinary tract infection treated, with a blood pressure below 100, which was unstable and unsafe blood pressure.

Desert View Hospital, not only did it jeopardize the health and safety of Patient 33 by performing the various unnecessary tests on Patient 33, Relator believes that Desert View Hospital willfully and fraudulently submitted a claim for thousands of dollars for these unnecessary medical tests and was paid by the government in violation of the False Claims Act.

147.    **Patient 34:**

Patient 34 presented to Desert View Hospital on _____ with chief complaint of shortness of breath due to pneumonia. Prior to that admission, Patient 34 had been at Desert View Hospital during which admission she underwent implantation of a pacemaker and subsequently developed pneumonia.

In the admission history and physical, Dr. Mirza states, "needs a echo [sic] and Lexiscan stress test, along with treatment as per, will be addressed as well.  In the ER cardiac enzymes were not elevated.  EKG showed nonspecific changes no acute ST elevations seen."

Despite being admitted with a noncardiac problem with a recent history of cardiac admissions and cardiac testing, repeat cardiac testing was ordered by Dr. Mirza and performed by Desert View Hospital.

None of these tests were indicated and did not correlate with Patient 34's complaints during the hospitalization.

Desert View Hospital, not only did it jeopardize the health and safety of Patient 34 (who was 91 years old) by performing the various unnecessary tests on Patient 34, Relator believes that Desert View Hospital willfully and fraudulently submitted a claim for thousands of dollars for these unnecessary medical tests and was paid by the government in violation of the False Claims Act.

148.    **Patient 35:**

Patient 35 presented to Desert View Hospital on _____ with shortness of breath and palpitations and was found to have atrial fibrillation.

This was new onset, not accompanied by symptoms of acute coronary syndrome, no EKG or cardiac enzyme evidence of myocardial ischemia.  Despite the absence of an indication, the patient underwent a nuclear stress test on _____.

The nuclear stress test was not indicated and did not correlate with Patient 35's complaints during the hospitalization.

Desert View Hospital, not only did it jeopardize the health and safety of Patient 35 by performing the unnecessary test on Patient 35, Relator believes that Desert View Hospital  willfully and fraudulently submitted a claim for thousands of dollars for these unnecessary medical tests and was paid by the government in violation of the False Claims Act.

By performing an unnecessary test on Patient 35, Relator believes that Desert View Hospital willfully and fraudulently submitted a claim for this unnecessary medical test and was paid by the government in violation of the False Claims Act.

149.    In addition to failing to transfer Patients 1, 2, 4, 5, and 15 to a higher level of care facility, these patients were also subjected to multiple unnecessary tests without any basis.  None of the tests these patients were subjected to were relevant to their cause for admission and provided no added value in their diagnosis and treatment.  By performing unnecessary tests on Patients 1,2, 4, 5, and 15, Relator believes that Desert View Hospital willfully and fraudulently submitted claims for these unnecessary medical tests and was paid by the government for said claims in violation of the False Claims Act.

**(3)    Desert View Hospital Fraudulently and Knowingly Attributed False Diagnoses and Levels of Severity of Illness to Patients in Order to Increase Its Billing Charges/Reimbursements from, among others, Medicare and Medicaid.  This practice is known as "upcoding"**

150.    **Patient 36:**

Patient 36 presented to Desert View Hospital on _____.  He was admitted with noncardiac chest pain and had a normal nuclear stress test on _____.

However, Patient 36 was discharged with a diagnosis of Acute Coronary Syndrome ("ACS"), which reimburses at a higher rate than non-specific chest pain.

By "upcoding" Patient 36's diagnosis, Relator believes that Desert View Hospital willfully and fraudulently submitted a claim for the higher reimbursing code and was paid by the government in violation of the False Claims Act.

///

151.    **Patient 37**:

Patient 37 presented to Desert View Hospital on _____ Multiple diagnoses are listed on page two (2) of the Emergency Department Summary of Care.

Patient 37's primary symptom was shortness of breath related, with an underlying diagnosis of congestive heart failure, along with atrial fibrillation and rapid ventricular response.

Two (2) diagnoses are included that would increase the reimbursement for this patient's admission: (1) transient cerebral ischemia not specified; and (2) acute renal failure not specified.

There is no documentation that Patient 37 had any kind of cerebral ischemic event. With respect to Patient 37's kidney function, Patient 37's parameters were only those of chronic kidney disease stage II with BUN of 17 creatinine of 0.89, which are not abnormal in a 78-year-old female.

These very same diagnoses are carried forward to Patient 37's _____ admission. These very same diagnoses are carried forward to Patient 37's _____ re-admission.

By "upcoding" Patient 37's diagnosis, Relator believes that Desert View Hospital willfully and fraudulently submitted claims for the higher reimbursing codes and was paid by the government in violation of the False Claims Act.

152.    **Patient 38**:

Patient 38 presented to Desert View Hospital on _____. Patient 38's admission diagnosis was coded as acute myocardial infarction, unspecified, ICD 10 code I21.9, and acute embolism and thrombosis of unspecified vein ICD 10 code I82.90

These codes reimburse at a much higher rate than chest pain. However, there was no EKG or enzyme evidence that the patient had sustained a myocardial infarction. In fact, the Dr. Mirza diagnosis on admission was congestive heart failure.

By "upcoding" Patient 38's diagnosis, Relator believes that Desert View Hospital willfully and fraudulently submitted a claim for the higher reimbursing code and was paid by the government in violation of the False Claims Act.

///

153.    **Patient 39:**

Patient     39 presented     to     Desert     View     Hospital on _____.  The admission BUN and creatinine are 35 and 2.0, respectively, consistent with chronic kidney disease.

However, in the discharge summary, a diagnosis of acute renal failure (which did not exist) was substituted for chronic kidney disease.  The former reimburses at a higher rate than the latter.  In addition, the discharge diagnosis was given as "systolic dysfunction" (heart failure), which did not exist based on the echocardiogram that was previously performed.

By "upcoding" Patient 39's diagnosis and falsely creating a "heart failure" diagnosis, Relator believes that Desert View Hospital willfully and fraudulently submitted a claim for the higher reimbursing code and was paid by the government in violation of the False Claims Act.

154.    **Patient 40**:

Patient     40 presented     to     Desert     View     Hospital on _____.  The admission diagnosis and discharge diagnosis were stated to be acute renal failure, resolved at discharge.

However, the patient's admission BUN and creatinine were completely normal at 20 and 1.29, respectively.  The calculated GFR was 54, which is consistent with chronic kidney disease stage III, not the stated diagnosis code of acute renal failure.  A diagnosis of Acute Renal Failure reimburses at a significantly higher level than chronic kidney disease.

By "upcoding" Patient 40's diagnosis, Relator believes that Desert View Hospital willfully and fraudulently submitted a claim for the higher reimbursing code and was paid by the government in violation of the False Claims Act.

155.    **Patient 41:**

Patient 41 presented to Desert View Hospital on _____ with a chief complaint of left lower quadrant pain that began the day before after he walked into a pole, which was sticking out of his yard.

There is no documentation on the history or the physical exam of heart failure or ischemic heart disease, yet the Emergency Department Summary of Care (page 2) provides a diagnosis of

congestive heart failure, chest pain and acute ischemic heart disease ICD 10 code I24.9.

By "upcoding" Patient 41's diagnosis, Relator believes that Desert View Hospital willfully and fraudulently submitted a claim for the higher reimbursing code and was paid by the government in violation of the False Claims Act.

156.   **Patient 42:**

Patient 42 presented to Desert View Hospital on _____ with chest pain.   Patient 42 has a history of coronary disease and previous stenting.   Patient 42's cardiac enzymes and EKG were negative for ischemic injury.

However, on page two (2) of the emergency department summary of care, one of the diagnoses is acute myocardial infarction, unspecified to which is attached to the ICD 10 Code I. 21.9.

Patient 42 did not have myocardial infarction.  Diagnosing Patient 42 and coding Patient 42 for this diagnosis instead of chest pain would result in significantly higher reimbursement.

By "upcoding" Patient 42's diagnosis, Relator believes that Desert View Hospital willfully and fraudulently submitted a claim for the higher reimbursing code and was paid by the government in violation of the False Claims Act.

157.   In addition to being subjected to unnecessary testing, Patient 25 was upcoded to MI and Patient 27 was upcoded to sepsis.   Relator believes that Desert View Hospital willfully and fraudulently submitted claims for these Patient 25 and Patient 27 and was paid by the government for said claims in violation of the False Claims Act.

**(4)   Desert View Hospital Fraudulently and Knowingly Performed Procedures for Which Desert View Hospital was Not Properly Staffed and/or Equipped to Perform**

158.   **Patient 43:**

Patient 43 presented to Desert View Hospital on _____ with a chief complaint of nausea and vomiting and generalized weakness going on for a week.

Patient 43's admission EKG showed atrial fibrillation with rapid ventricular response.   Patient 43 underwent an echocardiogram which in this context is appropriate.  However, despite the lack of

an indication based on appropriate use criteria, Patient 43 underwent a nuclear stress test.

In addition, a cardioversion (a procedure involving direct shock of the patient's heart while sedated) was performed on Patient 43 for which there was not appropriate staff (no anesthesiologist/nurse anesthetist), equipment (no transesophageal echo), or facility (no procedure room), which placed Patient 43 at a high risk for, among other things, stroke and respiratory complications.

Desert View Hospital, not only did it jeopardize the health and safety of Patient 43, Relator believes that Desert View Hospital willfully and fraudulently submitted a claim for thousands of dollars for services rendered to Patient 43 and was paid by the government based on a false certification of compliance with Federal Regulations and EMTALA in violation of the False Claims Act.

159.    Patient 11, previously discussed, was also admitted to Desert View Hospital on or about _____.    At that time, Patient 11 underwent a cardioversion for which there was not appropriate staff (no anesthesiologist/nurse anesthetist), equipment (no transesophageal echo), or facility (no procedure room).   In this case, Patient 11 did suffer a stroke as of a result of the cardioversion, which required Patient 11 to be readmitted and inappropriately not transferred to a stroke center on _____. ***See*** *Braunwald's Cardiology Practice Standards*, pg. 735-36.

160.    Desert View Hospital, not only did it jeopardize the health and safety of Patient 11, Relator believes that Desert View Hospital  willfully and fraudulently submitted a claim for thousands of dollars for services rendered to Patient 11 and was paid by the government based on a false certification of compliance with Federal Regulations and EMTALA in violation of the False Claims Act.

161.    Patient 34, previously discussed, had a pacemaker implanted at Desert View Hospital on or about _____.   However, at the time, Desert View Hospital was not properly staffed (no anesthesiologist/nurse anesthetist, staff trained to assist in cardiac procedures, and/or staff to address complications) and was not properly equipped (no cardiac cath lab) to implant pacemakers.

*See Complications and Health Care Costs Associated with Transvenous Cardiac Pacemakers in a Nationwide Assessment,* American College of Cardiology Foundation (2017).

162.    Desert View Hospital, not only did it jeopardize the health and safety of Patient 34, Relator believes that Desert View Hospital  willfully and fraudulently submitted a claim for thousands of dollars for services rendered to Patient 11 and was paid by the government based on a false certification of compliance with Federal Regulations and EMTALA in violation of the False Claims Act.

163.    Patient 8, previously discussed, underwent a cardioversion for which there was not appropriate staff (no anesthesiologist/nurse anesthetist), equipment (no transesophageal echo), or facility (no procedure room).

164.    Desert View Hospital, not only jeopardized the health and safety of Patient 8, but Relator believes, that it willfully and fraudulently submitted a claim for thousands of dollars for services rendered to Patient 8 and was paid by the government based on a false certification of compliance with Federal Regulations and EMTALA in violation of the False Claims Act.

**(5)**    **Desert View Hospital Fraudulently and Knowingly used "Swing Beds" as Inpatient Acute Care Hospital Beds in Violation of CAH Regulations**

165.    As another condition for participation, CMS requires that a CAH maintain "***no more than 25 inpatient beds***. Inpatient beds may be used for either inpatient or swing-bed services." 42 CFR § 485.620(a) (emphasis added).

166.    Relator is providing thirteen (13) Admission Summary Sheets where patients admitted into Desert View Hospital were placed in a "swing bed" despite the a diagnosis of (among other things) atrial fibrillation, chest pain, uncontrolled diabetes, congestive heart failure, sepsis, acute coronary syndrome, cerebrovascular accident, and transient ischemic attack.

167.    Said patients should have been admitted into an acute care bed or transferred to an appropriate higher level of care hospital.

168.   Relator believes that Desert View Hospital  willfully, fraudulently, and frequently submitted claims for hundreds of thousands (likely millions) of dollars for patients unlawfully placed in "swing beds" (instead of an acute care bed) and was paid by the government based on a false certification of compliance with CAH regulations in violation of the False Claims Act.

## FIRST CLAIM FOR RELIEF

### Violations of the Federal False Claims Act, 31 U.S.C. § 3729(a)

169.   Relator incorporates paragraphs 1 through 168 of this Complaint as though fully set forth herein.

170.   As described above, Desert Valley Hospital has submitted and/or caused to be submitted false or fraudulent claims by engaging in a widespread scheme that entailed the following:

(1) fraudulently and  knowingly admitting  patients to  Desert  View  Hospital who required transfer to a higher level of care hospital in order to retain patients at Desert View  Hospital in violation of CMS regulations and EMTALA, which resulted in increased billing charges and reimbursements from, among others, Medicare and Medicaid;

(2) fraudulently and  knowingly subjecting  patients to  a  multitude  of  unnecessary medical testing/procedures in order to increase billing charges and reimbursements from, among others, Medicare and Medicaid;

 (3) fraudulently  and  knowingly attributing false diagnoses and  levels  of  severity of illness to patients in order to increase its billing charges and reimbursements from, among others, Medicare and Medicaid.  This billing practice is known as "upcoding;"

(4) fraudulently and knowingly performing medical procedures that it was not equipped and/or staffed to perform (such as pacemaker implants and cardioversions) in violation of, among other things, CAH regulations and EMTALA in order to increase its billing charges/reimbursements from, among others, Medicare; and

(5) fraudulently and knowingly using "swing beds" as inpatient acute care hospital beds in violation of CAH regulations (which limit Desert View Hospital to twenty-five (25) acute hospital beds) in order to increase its billing charges and reimbursements from, among others, Medicare and Medicaid.

171.   In doing so, Desert Valley Hospital has, among other things, violated:

1.   31 U.S.C. § 3729(a)(1)(A) by knowingly presenting, or causing to be presented false or fraudulent claims for payment or approval;

2.   31 U.S.C. § 3729(a)(1)(B) by knowingly making, using or causing to be made or used, a false record or statement material to a false or fraudulent claim; and/or

3.   31 U.S.C. § 3729(a)(1)(G) by knowingly making, using, or causing to be made or used, a false record or statement material to an obligation to pay or transit money or property to the United States Government, or knowingly concealing or knowingly and improperly avoiding or decreasing an obligation to pay or transmit money or property to the United States Government.

172.   Because of the false or fraudulent claims made by Desert View Hospital, the United States has suffered and continues to suffer damages valued in the millions of dollars at the expense of taxpayers.

**WHEREFORE**, Relator prays for judgment against Desert View Hospital as follows:

1.   Desert View Hospital to pay an amount equal to three (3) times the amount of damages the United States has sustained because of Desert View Hospital's actions, plus a civil penalty against Desert View Hospital of not less than $5,000.00 and not more than $10,000.00 for each violation of 31 U.S.C. § 3729;

2.   Relator be awarded the maximum allowed pursuant to 31 U.S.C. § 3730(d);

3.   Desert View Hospital to cease and desist from violating the False Claims Act, 31 U.S.C. § 3729, *et seq.*;

4.   Relator be awarded all costs of this action, including attorney fees, expenses, and costs pursuant to 31 U.S.C. § 3730(d); and

5.   The United States and Relator be granted all such other relief as the Court deems just and proper.

DATED this 14th day of February, 2020.

JESSE SBAIH & ASSOCIATES, LTD.


By /s/ Jesse M. Sbaih_____
    Jesse M. Sbaih (#7898)
    Ines Olevic-Saleh (#11431)
    The District at Green Valley
    170 South Green Valley Parkway, Suite 280
    Henderson, Nevada 89012
    *Attorneys for Relator*


### RELATOR'S DEMAND FOR JURY TRIAL

Relator, by and through the law firm of Jesse Sbaih & Associates, Ltd., hereby demands a jury trial of all issues in the above-captioned matter.

DATED this 14th day of February, 2020.


JESSE SBAIH & ASSOCIATES, LTD.


By /s/ Jesse M. Sbaih_____
    Jesse M. Sbaih (#7898)
    Ines Olevic-Saleh (#11431)
    The District at Green Valley
    170 South Green Valley Parkway, Suite 280
    Henderson, Nevada 89012
    *Attorneys for Relator*

## CERTIFICATE OF SERVICE

Pursuant to FRCP Rule 5(b), I certify that I am an employee of the law firm of Jesse Sbaih & Associates, Ltd., and that on this 14th day of February, 2020, I caused **FIRST AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL FALSE CLAIMS ACT JURY TRIAL DEMANDED** to be served via electronic service to the following:

John H. Cotton, Esq.
JOHN H. COTTON & ASSOCIATES, LTD.
7900 West Sahara, Suite 200
Las Vegas, NV 89117
jhcotton@jhcottonlaw.com
    *Attorneys for Defendants*


Roger W. Wenthe, Esq.
U.S. ATTORNEY'S OFFICE
501 Las Vegas Boulevard South, Suite 1100
Las Vegas, NV 89101
roger.wenthe@usdoj.gov
    *Attorneys for the United States*



                 /s/ Jennifer Davidson_____
                An employee of Jesse Sbaih & Associates, Ltd.