# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

United States of America ex rel. Tali Arik,

    Plaintiff

v.

DVH Hospital Alliance, LLC,

    Defendant

Case No.: 2:19-cv-01560-JAD-VCF

**Order Granting Defendant's Motion to Dismiss and Granting Plaintiff's Motion Seeking Leave to Amend**

[ECF Nos. 22, 23, 42, 46]

Relator Tali Arik brings this qui tam suit under the False Claims Act (FCA) against defendant DVH Hospital Alliance, LLC, claiming that Desert View Hospital and its staff defrauded the federal government by seeking reimbursement for medically unnecessary and improper services, treatments, and tests.[1]  DVH Hospital moves to dismiss Arik's claims, arguing that Arik has failed to plead his allegations with sufficient particularity under Federal Rule of Civil Procedure 9(b); failed to allege sufficient facts demonstrating the hospital's noncompliance with federal regulations; and alleged nothing more than his subjective disagreement with the hospital staff's diagnoses, which is insufficient to support a fraud claim.[2]  Because Arik's claims are insufficiently pled, I grant the motion to dismiss and partially grant his motion seeking leave to amend.[3]  Arik may amend if he can allege (1) actual violations of the various regulations governing Desert View Hospital, (2) material certification of medical services seeking reimbursement for improper treatment, (3) sufficient indicia that false claims were actually submitted to and reimbursed by the federal government, and (4) facts

---

[1] ECF No. 14 (first amended complaint).

[2] ECF No. 22 (motion to dismiss).

[3] ECF No. 42 (motion seeking leave to amend).

demonstrating more than mere disagreement with the diagnoses and treatments of the hospital's staff.  Arik may not amend his complaint to add new relators.

## Background[4]

### I.  Arik's allegations

Arik is an experienced cardiologist who worked at Desert View Hospital in Nye County, Nevada, for roughly three years as a physician, including one year as Medical Chief of Staff.[5]  In early 2019, Arik became troubled by certain new practices and policies at the hospital.[6]  The hospital's CEO, Susan Davila, had informed Arik that low patient admissions, high patient transfer rates, and conservative testing and treatment practices had plunged the hospital into financial precarity.[7]  To remedy this problem, Davila proposed two solutions: contracting with a new hospitalist company and hospitalist, and proactively treating more patients at Desert View, thereby increasing patient admissions and decreasing transfers to other hospitals.[8]  Davila's solution appeared to work—from January through May 2019, revenue at the hospital grew by 50% for patients covered by Humana Medicare Advantage insurance.[9]

But Arik maintains that the hospital generated this revenue by violating federal law, misdiagnosing plaintiffs, and providing improper patient treatment.[10]  Arik's complaint details 42 patients—identified by number, their medical histories, chief complaints, diagnoses, and, in

---

[4] This is merely a summary of facts alleged in the complaint and should not be construed as findings of fact.

[5] ECF No. 14 at ¶¶ 11–13.

[6] *Id.* at ¶¶ 39–41.

[7] *Id.*

[8] *Id.* at ¶¶ 42–44.

[9] *Id.* at ¶ 51.

[10] *Id.* at ¶ 45.

some cases, their treatments or diagnostic testing.  Arik claims that each of these patients was mistreated in some way, relying both on his medical experience and the practice standards articulated by medical texts like *Braunwald's Cardiology Practice Standards* and *ACC Appropriate Use Criteria Methodology: 2018 Update: A Report of the American College of Cardiology Appropriate Use Criteria Task Force*.[11]  He also broadly claims that Desert View Hospital "willfully and fraudulently submitted" claims for unspecified reimbursement "for services rendered" to each patient, and "was paid by the government based on a false certification of compliance with Federal Regulations and EMTALA."[12]

Arik's assessments of these patients' treatments are not uniform—some describe specific discrepancies between symptom presentation and diagnosis/treatment, while others express his disagreement with certain diagnoses.  For example, patient 25 was admitted for a "left molar tooth infection," but then underwent an expensive echocardiogram, which is normally reserved for heart conditions.[13]  Patient 26 also received an echocardiogram after complaining of weakness and fatigue, despite an echocardiogram not being appropriate for his symptoms.[14]  But for someone like patient 42, Arik appears to merely disagree with the hospitalist's diagnosis,

---

[11] *See, e.g.*, *id.* at ¶¶ 118–34.

[12] *Id.* at ¶ 70; *see also id.* at ¶¶ 71–77, 93–98, 104, 108–11, 115, 158.  For other patients, Arik abandons even this level of specificity, claiming that "Desert View Hospital willfully and fraudulently submitted a claim for thousands of dollars for these unnecessary medical tests and was paid by the government in violation of the False Claims Act."  *See id.* at ¶¶ 134–148; *see also id.* at ¶¶ 150–56 (swapping "unnecessary medical tests" with "higher reimbursing code").

[13] *Id.* at ¶ 138

[14] *Id.* at ¶ 139.

1  without explaining the basis for his disagreement or whether the grounds for his disagreement

2  would have been apparent at the time of diagnosis.[15]

3  **II.    Desert View Hospital**

4        The Department of Health and Human Services, Centers for Medicare & Medicaid

5  Services (CMS) designated Desert View Hospital a "critical access hospital" (CAH), which

6  receives significant federal funding to maintain access to and reduce the financial vulnerability

7  of hospitals serving rural communities.[16]  CAHs are subject to a variety of specific regulations,

8  as well as regulations that govern hospitals and medical providers more generally.  Three sets of

9  interrelated regulations are relevant to this action: Medicare's requirements,[17] CAH

10 regulations,[18] and the Emergency Medical Treatment and Labor Act (EMTALA).[19]

11       **A.    Medicare**

12       The Medicare program provides basic health insurance for individuals who are 65 or

13 older, disabled, or have end-stage renal disease.[20]  "[N]o payments may be made . . . for any

14 expenses incurred for items or services . . . [that] are not reasonable and necessary for the

15 diagnosis or treatment of illness or injury to improve the functioning of a malformed body

16 member[.]"[21]  Medicare reimburses providers for inpatient hospitalization only if "a physician

17 certifies that such services are required to be given on an inpatient basis for such individual's

18

---

19 [15] *Id.* at ¶ 156 ("[O]ne of the diagnoses is acute myocardial infarction . . . .  Patient 42 did not have myocardial infarction.").

20 [16] *Id.* at ¶¶ 20–23.

21 [17] 42 U.S.C. § 1395, *et seq.*

   [18] 42 C.F.R. Part 485 Subpart F.

22 [19] 42 U.S.C. § 1395dd.

23 [20] *id.* § 1395c.

   [21] *id.* § 1395y(a)(1)(A).

medical treatment, or that inpatient diagnostic study is medically required and such services are necessary for such purpose."[22]

CMS administers the Medicare program and issues guidance governing reimbursement. CMS defines a "reasonable and necessary" service as one that "meets, but does not exceed, the patient's medical need," and is furnished "in accordance with accepted standards of medical practice for the diagnosis or treatment of the patient's condition . . . in a setting appropriate to the patient's medical needs and condition."[23]  Medically necessary services are those "needed to diagnose or treat an illness, injury, condition, disease, or its symptoms and that meet accepted standards of medicine."[24]  The Medicare program expects doctors to exercise their clinical judgment based on "complex medical factors" but does not give them unfettered discretion to decide whether inpatient admission is medically necessary: "The factors that lead to a particular clinical expectation must be documented in the medical record in order to be granted consideration."[25]  And medical necessity is considered a question of fact: "A physician's order or certification will be evaluated in the context of the evidence in the medical record."[26]

### B.    Critical Access Hospitals

In 1997, the Balanced Budget Act created the CAH certification program for hospitals located in rural areas.[27]  CAHs are reimbursed differently by both Medicare and Medicare Advantage than other acute hospitals, and those providers' reimbursement schemes also differ

---

[22] *Id.* § 1395f(a)(3).

[23] CMS, Medicare Program Integrity Manual § 13.5.4 (2019).

[24] CMS, Medicare & You 2020: The Official U.S. Government Medicare Handbook 114 (2019).

[25] 42 C.F.R.§ 412.3(d)(1)(i); *see also id.* § 412.3(a)–(c); *see generally* 42 U.S.C. § 1395f(a)(3).

[26] 42 C.F.R. § 412.46(b); *see also id.* §§ 412.3(d)(1)(i), 412.3(d)(3).

[27] 105 Pub. L. 33, 111 Stat. 251, § 1820 (Aug. 5, 1997).

1  from one another.[28]  Hospitals must meet specific requirements to qualify for CAH certification

2  and receive the CAH Medicare reimbursement rates, including complying with applicable

3  federal laws and regulations "related to the health and safety of patients;" maintaining a

4  maximum number of 25 inpatient beds, which may be used for either inpatient or swing-bed

5  services; and establishing agreements with other hospitals to provide "[a]dditional or specialized

6  diagnostic and clinical laboratory services that are not available at the CAH."[29]

7       **C.    EMTALA**

8       EMTALA, colloquially known as the "Patient Anti-Dumping Act,"[30] proscribes the

9  "dumping" of emergency patients unable to pay for services, generally requiring intake hospitals

10  receiving Medicare reimbursement to stabilize those patients.[31]  Under EMTALA, a hospital

11  must screen and treat an emergency patient, unless the patient requests transfer in writing or the

12  hospital is unable to provide adequate medical treatment to stabilize the patient.[32]  Violations of

13  EMTALA are subject to civil monetary penalties, and the statute provides a private right of

14  action against hospitals for violations of EMTALA but not against physicians.[33]

15

16

17

---

18  [28] *Compare* 42 C.F.R. §§ 413.1(a)(2)(i), 413.1(b), 413.5, 413.70, 413.114 (articulating a cost-based reimbursement scheme coupled with interim, per diem payment for operating expenses),

19  *with* 42 U.S.C. § 1395w-23 *and id.* § 422.300 (articulating a capitation payment system, with fixed payments based on previous cost reports and risk adjustments).

20  [29] 42 C.F.R §§ 485.608, 485.620(a), 485.635(c)(1)(ii).

   [30] *Eberhardt v. City of Los Angeles*, 62 F.3d 1253, 1255 (9th Cir. 1995).

21
   [31] *Id.* (characterizing H.R. Rep. No. 241, 99th Cong., 1st Sess. (1986), *reprinted in* 1986
22  U.S.C.C.A.N. 726-27); *see also* 42 U.S.C. § 1395dd(a).

   [32] 42 U.S.C. § 1395dd(a), (b).

23
   [33] *Eberhardt*, 62 F.3d at 1257 ("The plain text of EMTALA explicitly limits a private right of action to the participating hospital."); *see also* 42 C.F.R. §§ 489.24(g), 489.53(b).

### III.     Arik's suit

Arik brings this *qui tam* suit on behalf of the United States, which has declined to intervene in this action.[34]  He alleges that Desert View Hospital falsely certified its compliance with EMTALA, the CAH regulations, and, in his briefing, Medicare's requirements, and submitted fraudulent requests seeking reimbursement for improper and unnecessary medical services.[35]  Desert View Hospital moves to dismiss, arguing that Arik's allegations are insufficiently particularized, he has failed to allege actual violations of the applicable regulations, and his theories of fraud are insufficiently pled.[36]  Arik disagrees[37] but also seeks leave to amend his complaint[38] and provides a proposed amended complaint[39] that adds new allegations, relators, and defendants.  I grant Desert View's motion to dismiss and grant Arik's motion seeking leave to amend in part, as I do not permit him to add new relators to his complaint.

### Discussion

### I.     Motion to dismiss

District courts employ a two-step approach when evaluating a complaint's sufficiency on a Rule 12(b)(6) motion to dismiss.  The court must first accept as true all well-pled factual allegations in the complaint, recognizing that legal conclusions are not entitled to the assumption of truth.[40]  Mere recitals of a claim's elements, supported by only conclusory statements, are

---

[34] ECF No. 2 at 2.

[35] *See generally* ECF No. 14.

[36] *See* ECF No. 22.

[37] ECF No. 41.

[38] ECF No. 42.

[39] ECF No. 43.

[40] *Ashcroft v. Iqbal*, 556 U.S. 662, 678–79 (2009).

insufficient.[41]   The court must then consider whether the well-pled factual allegations state a plausible claim for relief.[42]   A claim is facially plausible when the complaint alleges facts that allow the court to draw a reasonable inference that the defendant is liable for the alleged misconduct.[43]   Additionally, "as with all fraud allegations, a plaintiff must plead FCA claims 'with particularity'" under Rule 9(b).[44]   To satisfy Rule 9(b), "a pleading must identify 'the who, what, when, where, and how of the misconduct charged,'" as well as "'what is false or misleading about [the purportedly fraudulent] statement, and why it is false.'"[45]

### A.      The FCA

The FCA imposes significant civil liability on any person who "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval"; "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim"; or "conspires to commit" either of the previous acts.[46]   The Act allows a private plaintiff to enforce its provisions by bringing a qui tam suit on behalf of the United States.[47]   To state an FCA claim, a plaintiff must allege "(1) a false statement or fraudulent course of conduct, (2) made with scienter, (3) that was material, causing (4) the government to pay out money or forfeit

---

[41] *Id.*

[42] *Id.* at 679.

[43] *Id.*

[44] *Winter ex rel. United States v. Gardens Reg'l Hosp. and Med. Ctr., Inc.*, 953 F.3d 1108, 1116 (9th Cir. 2020).

[45] *Cafasso, U.S. ex rel. v. Gen. Dynamics C4 Sys., Inc.*, 637 F.3d 1047, 1055 (9th Cir. 2011) (quoting *Ebeid ex rel. United States v. Lungwitz*, 616 F.3d 993, 998 (9th Cir. 2010) (internal quotation marks and citations omitted)) (alteration in original).

[46] 31 U.S.C. § 3792(a)(1).

[47] *Id.* § 3730(b).

moneys due."[48]   Courts are advised to interpret the FCA "broadly, in keeping with Congress's intention 'to reach all types of fraud, without qualification, that might result in financial loss to the Government.'"[49]

Arik's allegations fall under a "false certification" theory of FCA liability, which can be either "express" or "implied."[50]   Express certification occurs when "the entity seeking payment certifies compliance with a law, rule[,] or regulation as part of the process through which the claim for payment is submitted."[51]   Implied certification occurs "when the defendant submits a claim for payment that makes specific representations about the goods or services provided, but knowingly fails to disclose the defendant's noncompliance with a statutory, regulatory, or contractual requirement."[52]   As the Supreme Court held in *Universal Health Services, Inc. v. United States ex rel. Escobar*, under the implied-certification theory, a defendant's payment request must make "specific representations about the goods or services provided" and the defendant's "failure to disclose noncompliance with material statutory, regulatory or contractual requirements [must render] those representations misleading half-truths."[53]

---

[48] *United States ex rel. Campie v. Gilead Scis., Inc.*, 862 F.3d 890, 899 (9th Cir. 2017).

[49] *Gardens Reg. Hosp.*, 953 F.3d at 1116 (quoting *United States v. Neifert-White Co.*, 390 U.S. 228, 232 (1968)).

[50] *See id.* at 1114.

[51] *Ebeid*, 616 F.3d at 998.

[52] *Universal Health Servs., Inc. v. United States ex rel. Escobar*, 136 S. Ct. 1989, 1995 (2016).

[53] *Escobar*, 136 S. Ct. at 2001; *see also United States ex rel. Rose v. Stephens Inst.*, 909 F.3d 1012, 1018 (9th Cir. 2018) ("We conclude, therefore, that Relators must satisfy *Escobar*'s two conditions to prove falsity, unless and until our court, en banc, interprets *Escobar* differently.") (assessing whether *Escobar* overturned the Ninth Circuit's holding in *Ebeid*, which held that implied false-certification claims were subject to a tripartite test).

1           **1.       *Arik's allegations fail to satisfy Rule 9(b)'s pleading standards.***

2           Arik's professional disagreement with Desert View's diagnoses and treatments are well-

3   documented,[54] but he has failed to allege sufficient facts indicating (1) whether the described

4   claims were submitted to the government for reimbursement; (2) whether DVH Hospital's

5   alleged false certifications were implied or express; and (3) if implied, what material

6   misrepresentations were made to the government regarding those claims.  The Ninth Circuit does

7   not require a plaintiff to "identify representative examples of false claims to support every

8   allegation,"[55] but he must allege "particular details of a scheme to submit false claims paired

9   with reliable indicia that lead to a strong inference that claims were actually submitted."[56]  Arik

10  broadly asserts that claims were submitted for reimbursement through Medicare, Medicare

11  Advantage, Medicaid, CHAMPUS, and Tricare,[57] while cursorily repeating that DVH Hospital

12  "submitted" unnecessary and fraudulent claims that were "paid by the government."[58]  Not only

13  do these allegations fail to "supply reasonable indicia that false claims were actually submitted,"

14  but they fail to articulate to whom those claims were submitted, whether they included implied or

15  express certifications, whether those false certifications were material to DVH Hospital receiving

16

---

17  [54] *See ,e.g.*, ECF No. 14 at ¶¶ 134–56.

    [55] ECF No. 41 at 12 (quoting *Ebeid*, 616 at 998)).

18
    [56] *Ebeid*, 616 F.3d at 998 (quoting *United States ex rel. Grubbs v. Ravikumar Kanneganti*, 565
19  F.3d 180, 190 (5th Cir. 2009)) (internal quotation marks omitted); *see also United States v. Ojai
    Valley Cmty. Hosp., Inc.*, 2018 WL 6177257, at *7 (C.D. Cal. Jul. 30, 2018) ("Relator has not
20  pleaded who submitted the false claims, any specific claims that were submitted to CMS, any
    actual fraudulent charges Ojai submitted, or why the representations were false.").

21  [57] ECF No. 14 at ¶¶ 14, 32.

22  [58] *Id.* at ¶ 139; *see also id.* at ¶ 141 ("Relator believes that Desert View Hospital willfully and
    fraudulently submitted a claim for this unnecessary medical test and was paid by the government
23  in violation of the False Claims Act."); ¶ 152 ("Relator believes that Desert View Hospital
    willfully and fraudulently submitted a claim for the higher reimbursing code and was paid by the
    government . . ."); ¶ 156 (same); ¶ 158.

payment, and under what scheme DVH Hospital reaped ill-gotten financial rewards.[59]  But

because Arik could amend his complaint to remedy these pleading deficiencies,[60] I dismiss his

claims without prejudice.

### 2.    *Arik's theories of fraudulent activity*

Arik alleges multiple theories of fraud, which largely divide into two buckets: Desert

View Hospital falsely certified compliance with the CAH program and EMTALA when it sought

federal reimbursement; and the hospital provided medically unnecessary treatments and received

federal reimbursement, in violation of Medicare's regulations.  DVH Hospital makes two

arguments in reply.  First, it asserts that Arik fails to allege non-compliance with CAH

regulations or EMTALA and, regardless, the hospital's compliance with those regulations is

immaterial to federal reimbursement of claims.  Second, it argues that Arik's disagreement with

the hospital staff's treatment plans fails to support an FCA claim.

---

[59] As DVH Hospital argues, these details matter.  Under Medicare Advantage, for example, a diagnosis is sent to a Medicare Advantage insurer, who reviews the claim for potential inaccuracies before submitting risk-adjustment data to the government to develop prospective, yearly capitation rates.  *See* ECF No. 22 at 20–21 (citing 42 C.F.R. § 422.503(b)(4)(vi)).  So if Arik alleges fraud under a Medicare Advantage program, he would also need to allege DVH Hospital's fraud went undetected, thereby passing along inflated risk-adjustment data to the government and resulting in inaccurate capitation rates for services.  *See id.*  But for Medicare, DVH Hospital is liable for fraud where it submits a cost report that contains inaccurate inpatient service reports and receives an inflated reimbursement above its per diem rate.  *See id.* at 20.  Other district courts have persuasively dismissed FCA claims for similarly inadequate pleadings.  *See, e.g.*, *United States ex rel. Modglin v. DJO Glob. Inc.*, 114 F. Supp. 3d 993, 1028 (C.D. Cal. 2015) (dismissing FCA claim under Rule 9(b) because relators did not plead "any allegations concerning the rules government reimbursement under any of these programs in the third amended complaint"); *United States v. Todd Spencer M.D. Med. Group*, No. 11-1176, 2016 WL 7229135, at *5 (E.D. Cal. Dec. 14, 2016) (dismissing express certification claim because relator failed to allege facts showing that defendants expressly certified their compliance with various laws).

[60] Arik's proposed second amended complaint, while providing considerably more detail regarding Desert View Hospital's improper diagnoses and treatments, does not adequately remedy these pleading defects and seemingly provides no new details about whether these fraudulent claims were actually submitted for reimbursement.

### a.   *CAH and EMTALA violations under the FCA*

Arik does not clearly allege that DVH Hospital violated CAH regulations or EMTALA in treating its patients.  Among other requirements, a CAH facility must maintain agreements with other hospitals to refer or transfer patients requiring "diagnostic and clinical laboratory services that are not available at the CAH" and maintain "no more than twenty-five inpatient beds."[61] EMTALA broadly proscribes "'dumping' patients" unable to pay for emergency treatment on other hospitals, permitting those patients' transfer only at the patients' request or where the receiving hospital is incapable of providing adequate treatment.[62]  Neither regulation, however, seemingly places an affirmative duty on hospitals to transfer patients.[63]  And as DVH Hospital points out, Arik does not allege violations of these provisions; the hospital maintains statutorily mandated transfer agreements with other hospitals and, instead of dumping patients, it (perhaps too) enthusiastically treats them.[64]  Arik appears to concede this, not only failing to explain how

---

[61] 42 C.F.R. §§ 485.616(a)(1), 485.620(a), 485.635(c).  In his opposition, Arik asserts that DVH Hospital submitted fraudulent claims under 42 C.F.R. § 412.3(d)(1), which states that inpatient admission is appropriate for payment when the admitting physician expects a patient will need to remain for hospital care that "crosses two midnights."  *See* ECF No. 41 at 10.  Allegations supporting this theory, and this regulation, are nowhere to be found in the operative pleading.

[62] *Bryant v. Adventist Health Sys./West*, 289 F.3d 1162, 1165 (9th Cir. 2002) (interpreting 42 U.S.C. § 1395dd(a)–(c)).

[63] *Id.* at 1166; *James v. Sunrise Hosp.*, 86 F.3d 885, 887 (9th Cir. 1996) (noting that EMTALA was designed to require hospitals to stabilize and treat patients, absent a request for transfer or an inability to provide treatment); *Booker v. Desert Hosp. Corp.*, 947 F.2d 412, 414 (9th Cir. 1991) ("The legislative history of the Act does indicate that Congress intended to prevent hospitals from refusing to treat or from dumping patients who lack insurance coverage."); *see also Kizzire v. Baptist Health Sys., Inc.*, 441 F.3d 1306, 1310 (11 Cir. 2006) (holding that an EMTALA violation exists only where a hospital "either fails to adequately screen a patient, or discharges or transfers the patient without first stabilizing the patient's emergency medical condition.") (internal citations omitted).

[64] *See generally* ECF No. 14.

DVH Hospital violated EMTALA or CAH in his opposition,[65] but impliedly admitting that the operative complaint is devoid of allegations regarding the hospital's improper number of inpatient beds.[66]  These deficiencies hamstring Arik's false-certification claims based on EMTALA or CAH regulations.

It is also unclear whether compliance with these regulations is material to receiving federal reimbursement, as required for an FCA claim.[67]  The Ninth Circuit has not addressed whether violations of EMTALA or CAH regulations can support a false-certification claim.[68] But the FCA defines materiality as having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property.[69]  This materiality requirement is a "rigorous" one, centering on whether the government is likely to attach significance to compliance in deciding whether to tender payment.[70]  Though not dispositive, materiality can be demonstrated by alleging that the government "would have the option to decline to pay if it knew of the defendant's noncompliance" or if compliance is explicitly a "condition of payment."[71]

---

[65] *See generally* ECF No. No. 41.

[66] *Id.* at 20 ("Specifically, in the proposed SAC, it is clearly and unequivocally stated that Desert View made a false certification by . . . using in excess of the 25 inpatient bed limit.")

[67] *Escobar*, 136 S. Ct. at 2002–03.

[68] In *Adomitis ex. rel. United States v. San Bernardino Mountains Community Hospital District*, the Ninth Circuit upheld dismissal of an FCA action brought by a relator for violations of the CAH program's "distance requirements."  816 Fed. Appx. 64, 66 (9th Cir. 2020) (unpublished). It did not, however, definitively state that the CAH regulations could, or could not, support an FCA claim.

[69] 31 U.S.C. § 3792(b)(4).

[70] *Escobar*, 136 S. Ct. at 2002–03.

[71] *Id.* at 2001, 2003; *see also U.S. ex rel. Hendow v. Univ. of Phoenix*, 461 F.3d 1166, 1175–76 (9th Cir. 2006) (noting that the receipt of Title IV funds was "explicitly conditioned" on compliance with the incentive compensation ban in finding that defendant's false compliance with those bans was material to the government's reimbursement decision).

1    But Arik sidesteps this pleading requirement entirely.  Like the relator in *United States v.*

2  *San Bernardino Mountains Community Hospital District*, Arik "fails to link these [CAH]

3  'conditions of participation' to payment requirements."[72]  As that court persuasively reasoned, in

4  dismissing relator's claims, "[t]here are numerous laws and regulations a hospital must comply

5  with to receive and maintain CAH designation, and Relator does not point to a specific

6  regulation, statute, or agreement 'explicitly condition[ing]' the payment of claims" on CAH's

7  requirements.[73]  So too here.  And Arik fails to rebut DVH Hospital's assertion that EMTALA

8  violations cannot form the basis of an FCA claim, much less explain how federal reimbursement

9  is tied to DVH Hospital's compliance with EMTALA.[74]  So I dismiss Arik's theories of fraud

10  based on false certification of compliance with EMTALA or CAH regulations with leave to

11  amend, on the condition that he allege actual violations of those regulations and indicia that the

12  hospital's compliance with those regulations is material to the government's decision to provide

13  reimbursement.

14

---

15  [72] *United States v. San Bernardino Mountains Cmty. Hosp. Dist.*, No. EDCV 17-02, 2018 WL 5264362, at *6 (C.D. Cal. Jun. 14, 2018).

16  [73] *Id.* (internal citations omitted) (alterations in original); *see also United States v. Ojai Valley Cmty. Hosp., Inc.*, No. CV 17-6972, 2018 WL 6177257 at *8 (C.D. Cal. Jul. 30, 2018) ("Relator does not point to a specific regulation, statute, or agreement 'explicitly condition[ing]' the payment of claims on the location requirements or number of beds") (alteration in original).

18  [74] While Desert View Hospital incorrectly asserts that EMTALA does not contain a private right of action, *see* ECF No. 22 at 8, the statute permits private suits against hospitals, just not physicians.  *See Eberhardt*, 62 F.3d at 1256–57.  But Desert View Hospital is seemingly correct that no court has expressly held that EMTALA violations can form the basis of an FCA claim. *See United States ex rel. Sibley v. Delta Reg'l Med. Ctr.*, No. 4:17-cv-00053, 2018 U.S. Dist. LEXIS 164155, at *2 (N.D. Miss. Sept. 25, 2018) ("The merits of this motion rest on an issue of first impression: Can EMTALA violations form the basis of a False Claims Act case?"); *United States ex rel. Vanderlan v. Jackson HMA, LLC*, No. 3:15-CV-767, 2020 WL 2323077, at *9 (S.D. Miss. May 11, 2020) (acknowledging that there is no prior FCA case premised on alleged EMTALA violations).  I decline Desert View Hospital's invitation to rule that EMTALA cannot support an FCA claim as a matter of law.  But if Arik continues to employ EMTALA violations as a partial basis for his FCA claims, I will expect both parties to fully brief the issue.

###### b.     FCA claims based on medically illegitimate services

In his opposition, Arik re-engineers many of his claims to assert that DVH Hospital defrauded the government by violating 42 U.S.C. § 1395y(a) *et seq.*, which states that the federal government will not provide Medicare reimbursement for services that "are not reasonable or necessary for the diagnosis or treatment of illness or injury."[75]  Arik's first amended complaint makes no mention of the Medicare "medical necessity" requirement, though it does allege that hospital staff provided unnecessary treatments and that CAHs are required to abide by all applicable federal regulations.[76]  Putting aside this omission, DVH Hospital concedes, as it must, that medical-necessity certifications are material to federal reimbursement decisions, but argues that Arik's allegations are nothing more than his subjective disagreement with other doctors' clinical judgments and are not actionable under the FCA.[77]

The Ninth Circuit's recent decision in *Winter ex rel. United States v. Gardens Regional Hospital and Medical Center, Inc.*[78] guides my analysis.  There, the court addressed whether relator's subjective disagreement with hospital staff's certifications regarding the medical necessity of inpatient admissions could form the basis of an FCA claim.[79]  As a matter of first impression, the court concluded that it could, holding that "false certification of medical necessity can give rise to FCA liability," and that "the FCA does not require a plaintiff to plead an 'objective falsehood.'"[80]  Instead, a physician's certification that treatment was "medically

---

[75] ECF No. 41 at 9–11.

[76] *See generally* ECF No. 14.

[77] ECF No. 22 at 18.

[78] *Gardens Reg'l Hosp.*, 953 F.3d 1108 (9th Cir. 2020).

[79] *Id.* at 1117.

[80] *Id.* at 1118–19.

necessary" "can be false or fraudulent for the same reasons [that] any opinion can be false or fraudulent."[81]   The Ninth Circuit also determined that the *Gardens Regional Hospital* relator sufficiently alleged fraudulent conduct: she reviewed inpatient admissions at the defendant hospital, determined that those admissions failed to satisfy the hospital's own admission criteria, and presented evidence that those admissions were improperly billed to Medicare.[82]

Arik's operative pleading fails to satisfy this standard.  Unlike the *Gardens Regional Hospital* relator, Arik's complaint neither claims that Desert View Hospital violated Medicare's "medical necessity" test nor alleges that the hospital's staff falsely certified that they were compliant with this Medicare requirement upon receiving reimbursement.  Arik also does not provide sufficient allegations demonstrating that any of these claims were submitted for Medicare reimbursement.  And Arik's disagreements with the hospital's medical decisions are inconsistent, often asserting nothing more than his "reasonable difference of opinion."[83]  For example, in patient 37's case, Arik asserts that the hospital's diagnosis of acute renal failure was inappropriate, given that her kidney-function parameters were "only those of chronic kidney disease stage II."[84]  And for patient 23, Arik criticizes the tests administered for the patient, claiming that their results would not affect the patient's ongoing treatment.[85]  These do not resemble the diagnostic and treatment disagreements provided by the *Gardens Regional Hospital* relator, who "allege[d] that a number of the hospital admissions were for diagnoses that had been

---

[81] *Id.* at 1119.

[82] *Id.* at 1120.

[83] *Id.*

[84] ECF No. 14 at ¶ 151.

[85] *Id.* at ¶ 136.  Arik also criticizes the hospital's continued treatment of a patient who had requested "do not resuscitate" status, without explaining whether that treatment occurred after he had become nonresponsive or whether that patient had changed his mind.  *See id.* at ¶ 134.

disproven by laboratory tests" and that "several admissions were for psychiatric treatment," despite the hospital not being a psychiatric hospital and the patients never seeing a psychiatrist.[86]

But I do not wish to overstate the inadequacy of Arik's pleadings.  Many of his current allegations closely resemble the *Gardens Regional Hospital* relator's, including his descriptions of patients receiving echocardiograms for tooth aches and nausea, as well as receiving echocardiograms despite a glaring absence of documented heart abnormalities.[87]  And Arik's proposed second amended complaint thoroughly bolsters his "medical necessity" allegations, sufficiently indicating at the pleading stage that Desert View Hospital's staff committed fraud if they submitted these claims for reimbursement.[88]  While I will not prematurely foreclose DVH Hospital's ability to bring a successive Rule 12(b)(6) motion challenging the sufficiency of these pleadings, Arik's proposed second amendment complaint appears to more than satisfy the "medically necessary" pleading standard articulated in *Gardens Regional Hospital* to support his FCA claim.

## II.      Motion for leave to amend

Federal Rule 15(a)(1)(B) permits a plaintiff to amend his pleadings "once as a matter of course" within 21 days of receiving a Rule 12(b) motion.  Outside of that 21-day period, a plaintiff must seek leave of court or the defendant's permission to file an amended pleading.[89] "The court should freely give leave when justice so requires."[90]  Arik seeks leave to amend his

---

[86] *Gardens Reg'l Hosp.*, 953 F.3d at 1120–21.

[87] ECF No. 14 at ¶¶ 138, 142, 146.

[88] *See generally* ECF No. 43.

[89] Fed. R. Civ. P. 15(a)(2).

[90] *Id.*; *see also Eminence Capital, LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1051 (9th Cir. 2003) (holding that Rule 15's amendment policy should "be applied with extreme liberality") (internal citations and quotation marks omitted).

1   complaint and provides a proposed amended complaint, which adds new relators, defendants,

2   and allegations.  Desert View Hospital opposes his motion, claiming that his proposed second

3   amended complaint is overlong and futile, improperly seeks to add new relators, and violates the

4   FCA's sealing requirements.

5          As discussed above, I find that amendment is certainly not futile—Arik could (and has

6   partially demonstrated that he can) bolster his allegations to (1) create a reasonable inference of

7   DVH Hospital's fraudulent activity; (2) articulate whether and how the hospital submitted

8   fraudulent claims for federal reimbursement; (3) show noncompliance with federal regulation;

9   and (4) demonstrate that the false certification, whether implied or express, of these fraudulent

10  claims was material to the government's decision to reimburse or otherwise recompense Desert

11  View Hospital.[91]  But I caution Arik that his proposed second amended complaint is prolix,

12  contains unnecessary legal citations, and fails to remedy or address a number of the pleading

13  deficiencies identified by DVH Hospital.  Should he choose to amend his complaint, I expect

14  him to pare it down and remedy those issues.

15         I also find that Arik did not need to file his proposed second amended complaint under

16  seal when seeking leave to amend.  Desert View Hospital is correct that the FCA's sealing

17  requirements are strict and "intended to allow the Government an adequate opportunity to fully

18  evaluate the private enforcement suit and determine both if that suit involves matters the

19  Government is already investigating and whether it is in the Government's interest to intervene

20  and take over the civil action."[92]  But the Ninth Circuit has long held that a violation of the

21

---

22  [91] *Kendall v. Visa USA, Inc.*, 518 F.3d 1042, 1051 (9th Cir. 2008) ("Dismissal with leave to amend is proper if it is clear that the complaint could not be saved by amendment.").

23  [92] *U.S. ex rel. Pilon v. Martin Marietta Corp.*, 60 F.3d 995, 998–99 (2d Cir. 1995) (quoting S. Rep. No. 345, 99th Cong., 2d Sess. 23–24, *reprinted in* 1986 U.S.C.C.A.N. 5266, 5289).

sealing requirement "does not per se require dismissal of a qui tam complaint," based largely on whether the government has had an adequate opportunity to study the claims for possible intervention.[93]  Arik properly filed this suit under seal, the government declined to intervene, and the case was then unsealed.  Desert View Hospital provides no Ninth Circuit authority that an amended complaint bolstering previously presented allegations need be filed under seal[94] and, regardless, the government expressly waived any of the privileges associated with sealing procedures for the proposed amended complaint.[95]

Arik may not, however, amend his complaint to include new relators.  The FCA "unambiguously establishes a first-to-file bar, preventing successive plaintiffs from bringing related actions based on the same underlying facts."[96]  This bar is "exception-free" and applies regardless of whether the new relator seeks to intervene or join the action, or seeks to file a

---

[93] *U.S. ex rel. Lujan v. Hughes Aircraft Co.*, 67 F.3d 242, 245 (9th Cir. 1995).

[94] Desert View Hospital cites two unpublished District of Massachusetts cases that denied a motion for leave to amend because the proposed amended complaint was not filed under seal. *See* ECF No. 50 at 15 (citing *United States ex rel. Wilson v. Bristol Myers Squibb, Inc.*, No. 06cv12195, 2011 WL 2462469, at *4–6 (D. Mass. June 16, 2011); *United States ex rel. Estate of Cunningham v. Millennium Labs. of Cal.*, No. 09-12209, 2014 WL 309374, at *2–3 (D. Mass. Jan. 27, 2014)).  These cases are nonbinding and distinguishable.  In *Wilson*, for example, the amended complaint sought to add entirely new allegations that might have required government investigation.  *Wilson*, 2011 WL 2462469 at *6.  Here, the "amended complaint and the previous complaints are substantially similar, doing no more than elaborating on the issues that the government has already reviewed and on which the government based its decision to decline intervention," so there is "no bar to filing."  *Id.*

[95] ECF No. 51, Ex. 1.  Other courts in the Ninth Circuit have taken a similar position.  *See, e.g.*, *United States v. Walgreen Co.*, No. CV09-1293, 2017 WL 10591756, at *3 (C.D. Cal. May 1, 2017) ("Courts in this and other circuits have concluded that sealing an amended complaint is not required where the amended complaint is substantially similar to the original complaint because the government has had an opportunity to investigate."); *East Bay Mun. Util. Dist. v. Balfour Beatty Infrastructure, Inc.*, No. 13-CV-02032, 2014 WL 2611312, at *3 (N.D. Cal. June 11, 2014) ("Requiring an amended complaint to be sealed does not benefit the government if the amended complaint relates to the same claims and conduct as the original complaint that the government already had the opportunity to study.").

[96] *U.S. ex rel. Lujan v. Hughes Aircraft Co.*, 243 F.3d 1181, 1187 (9th Cir. 2001).

successive or separate action.[97]  Arik claims that this bar only applies to relators bringing actions

based on identical facts, and that his proposed relators brought to light "new" information

regarding "inpatient admissions" and the "fraudulent alteration of billing codes."[98]  But the Ninth

Circuit has expressly rejected Arik's understanding of the first-to-file bar,[99] noting in *Lujan v.*

*Hughes Aircraft Co.* that the FCA bars relators whose allegations are "the same material

elements of fraud described" in the first suit, "regardless of whether the allegations incorporate

somewhat different details."[100]  Arik's new relators allege facts that bolster his own allegations

and thus are barred by the FCA's clear statutory language from joining his suit.

## CONCLUSION

IT IS THEREFORE ORDERED that DVH Hospital's motion to dismiss **[ECF No. 22] is**

**GRANTED**.  Arik's claims against DVH Hospital are dismissed without prejudice and with

leave to amend.

IT IS FURTHER ORDERED that Arik's motion seeking leave to amend **[ECF No. 42] is**

**GRANTED IN PART:** Arik has until November 11, 2020, to file his second amended

---

[97] *Id.* at 1183; *see also* 31 U.S.C. § 3730(b)(5) ("When a person brings a [qui tam action], no person other than the Government may intervene or bring a related action based on the facts underlying the pending action."); *United States ex rel. Doe v. Janssen Pharm. N.V.*, 2018 WL 5276291 at *2 (C.D. Cal. Apr. 18, 2018) (denying proposed relator's intervention, despite new relator being "the same person" as the initial relator, because the first-to-file rule "prevents a person from bringing a 'related action'" and "from intervening in any way") (internal citations and quotation marks omitted).

[98] ECF No. 51 at 9.  I note, with some frustration, that both parties' arguments are contradictory on the issue of whether Arik presents "new" or "similar" allegations in the proposed second amended complaint.  In seeking to avoid sealing requirements, Arik claims that his allegations are not new; but in seeking to add relators, Arik claims the opposite.  In seeking to require sealing, DVH Hospital claims that Arik's allegations are new; but in seeking to bar the addition of new relators, it claims the opposite.

[99] *Hughes Aircraft Co.*, 243 F.3d at 1188 ("Lujan contends that we should use an identical, not material facts, test.  We reject this contention.").

[100] *Id.* at 1189.

complaint consistent with this order.  If he fails to do so, Arik's claims against DVH Hospital will be deemed abandoned and dismissed and this case will be closed without further prior notice.

IT IS FURTHER ORDERED that Arik's and DVH Hospital's requests for judicial notice **[ECF Nos. 23, 46] are DENIED** because the proffered documents either did not factor into my decision or did not need to be judicially noticed in order to be reviewed.

_____
U.S. District Judge Jennifer A. Dorsey
Dated: October 21, 2020