JESSE SBAIH & ASSOCIATES, LTD.
Jesse M. Sbaih (#7898)
Ines Olevic-Saleh (#11431)
The District at Green Valley Ranch
170 South Green Valley Parkway, Suite 280
Henderson, Nevada 89012
Tel      (702) 896-2529
Fax      (702) 896-0529
Email: jsbaih@sbaihlaw.com

MORGAN VERKAMP, LLC
Sonya A. Rao, *pro hac vice*
35 East Seventh Street
Cincinnati, Ohio  45202
Tel (513) 651-4400
Fax (513) 651-4401
Email Sonya.Rao@morganverkamp.com

*Attorneys for Relator*

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEVADA**

| | |
|---|---|
| UNITED STATES OF AMERICA *ex rel.* TALI ARIK, M.D. <br><br> Plaintiff and Relator, <br><br> vs. <br><br> DVH HOSPITAL ALLIANCE, LLC, d/b/a DESERT VIEW HOSPITAL;; VISTA HEALTH MIRZA, M.D., P.C. d/b/a VISTA HEALTH; and IRFAN MIRZA, M.D., <br><br> Defendants. | Case No.: 2:19-cv-01560-JAD-VCF <br><br><br> **THIRD AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL FALSE CLAIMS ACT** <br><br><br> **JURY TRIAL DEMANDED** |

**I.**

**INTRODUCTION**

1.      Relator Tali Arik, M.D. brings this *qui tam* complaint alleging violations of the False Claims Act by Defendants DVH Hospital Alliance, LLC, d/b/a Desert View Hospital, a/k/a Desert View Regional Medical Center ("Desert View"); Vista Health Mirza, M.D. P.C., d/b/a Vista Health ("Vista Health"); and Irfan Mirza, M.D. ("Dr. Mirza").

2.      This action arises under the False Claims Act, 31 U.S.C. §§ 3729, *et seq.*

3.      This Court has jurisdiction pursuant to 31 U.S.C. § 3730(b), 31 U.S.C. § 3732(a), and 28 U.S.C. § 1331.

4.      Venue is proper in this District pursuant to 31 U.S.C. § 3732(a) because the Defendants transact business in this District and because most, if not all, of the acts and omissions of which Relator complains occurred in this District.

5.      As required by 31 U.S.C. § 3730(b)(2), Relator has provided to the Attorney General of the United States and the United States Attorney for the District of Nevada a statement of material evidence and information that Relator possesses regarding this Complaint.

## II.

## THE PARTIES

6.      Relator Tali Arik, M.D. ("Dr. Arik"), is a Nevada resident.  He is licensed to practice medicine in Nevada.  He is Board-certified in internal medicine, with a subspeciality Board certification in cardiology.  Dr. Arik became Board-certified in 1987.

7.      In or about January 2005, Dr. Arik began practicing medicine in the field of cardiology, in Pahrump, Nevada.

8.      On or about November 15, 2015, Dr. Arik began seeing cardiac patients at Desert View, the only hospital in Nye County, Nevada, which serves a rural population of approximately forty-five thousand (45,000) people.

9.      From January 1, 2018 to December 31, 2018, Dr. Arik served as Medical Chief of Staff at Desert View.

10.     The United States provides reimbursement to Desert View and Vista Health for claims and requests for payment under Medicare, Tricare, CHAMPVA, and other Government-funded healthcare programs.

11.     The United States also reimburses between 66% and 76%, depending on the year, of claims and requests for payments to the Nevada Medicaid program.

12.      DVH Hospital Alliance, LLC is a Delaware corporation.  It owns, operates, and does business as Desert View Hospital, a Critical Access Hospital in Pahrump, Nevada.  Desert View is a

wholly-owned subsidiary of Universal Health Services, Inc., which is a Fortune 500 company headquartered in King of Prussia, Pennsylvania.

13.    Desert View is a 25-bed rural hospital in Pahrump.  Desert View opened in or about 2006.  From then until 2016, when it was acquired by Universal Health Services, Desert View was owned by Rural Health Group.

14.    Defendant Vista Health is a domestic professional corporation which is, on information and belief, domiciled in Fort Mojave, Arizona.

15.    Since approximately January 10, 2019 and continuing, Vista Health Mirza has provided hospitalist services at Desert View pursuant to a Hospitalist Services Agreement.

16.    Dr. Mirza is a resident of Nevada and is an officer/employee/agent of Vista Health.

17.    Since approximately January 10, 2019, Dr. Mirza has provided hospitalist services at Desert View.

18.    Based on information and belief, there exists, and at all relevant times there existed, a unity of interest and ownership between Defendants Vista Health and Dr. Mirza, such that any individuality and separateness between Vista Health and Dr. Mirza does not exist.

19.    Based on information and belief, Dr. Mirza is the alter ego of Vista Health.  Dr. Mirza has been dominating and controlling the business and daily operations of Vista Health. Adherence to the fiction of the separate existence of Vista Health would permit an abuse of the corporate privilege, sanction fraud, and promote injustice.

### III.

### THE FALSE CLAIMS ACT

20.    In salient part, the False Claims Act provides for liability of any person who:

A.  knowingly presents, or causes to be presented, a false or fraudulent claim [to the United States] for payment or approval; [or]

B.  knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim[.]

31 U.S.C. §§ 3729(a)(1)(A)-(B).

21.    The term "claim"—

(A) means any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property, that—

(i) is presented to an officer, employee, or agent of the United States; or

(ii) is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest, and if the United States Government—

(I)    provides or has provided any portion of the money or property requested or demanded; or

(II)    will reimburse such contractor, grantee, or other recipient for any portion of the money or other property which is requested or demanded; …

31 U.S.C. §§ 3729(b)(2)(A).

22.    A person who violates 31 U.S.C. §§ 3729(a)(1)(A)-(B)

is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 (28 U.S.C. 2461 note; Public Law 104–410), plus 3 times the amount of damages which the Government sustains because of the act of that person.

31 U.S.C. § 3729(a)(1).

23.    The False Claims Act is to be interpreted broadly, "in keeping with the Congress's intention 'to reach all types of fraud, without qualification, that might result in financial loss to the Government.'" *United States ex rel. Winter v. Gardens Reg'l Hosp. & Med. Ctr., Inc.*, 953 F.3d 1108, 1116 (9th Cir. 2020), *quoting United States v. Neifert-White Co.*, 390 U.S. 228, 232 (1968).

## IV.

## <u>GOVERNMENT-FUNDED HEALTHCARE PROGRAMS</u>

24.    Title XVIII of the Social Security Act, 42 U.S.C. §§ 1395, *et seq.*, establishes the Health Insurance for the Aged and Disabled Program, commonly referred to as the Medicare Program (the "Medicare Program" or "Medicare").

25.     Medicare is a federally-funded healthcare program that provides basic health insurance for individuals who are 65 or older, disabled, or have end-stage renal disease. 42 U.S.C. §§ 1395c, 1395o.

26.     The Department of Health and Human Services, Centers for Medicare & Medicaid Services ("CMS"), administers the Medicare program and issues guidance governing reimbursement.

27.     The Medicare Program is comprised of four parts: A, B, C, and D.

28.     Medicare Part A provides federal government funds to help pay for, among other things, the costs of inpatient hospital costs, related post-hospital costs, home health services, and hospice care provided to Medicare beneficiaries. *See generally* 42 U.S.C. §§ 1395c, *et seq.*

29.     Medicare Part B provides federal government funds to help pay for, among other things, physician services. *See generally* 42 U.S.C. §§ 1395j – 1395w-5.

30.     Healthcare providers submit Part A and Part B claims to Medicare through intermediaries known as Medicare Administrative Contractors ("MACs").   42 U.S.C. §§ 1395h, 1395u.  MACs perform a variety of administrative functions for Medicare, which include processing provider claims and paying providers on behalf of Medicare.  During the relevant time period, the MAC with jurisdiction over Nevada, and to whom Defendants submitted Medicare claims, was Noridian Healthcare Solutions, LLC ("Noridian").

31.     The Medicare Program, through its MACs, pays a significant portion of every claim. 42 U.S.C. §§ 1395g, 1395w-4.  The Medicare beneficiary, or his or her supplemental insurance carrier, may be required to pay the balance owed the provider. The beneficiary's payment is sometimes referred to as a "co-payment." Beneficiaries may also pay deductibles.  42 U.S.C. §§ 1395e, 1395*l*.

32.     The CMS-1450 Form (hereinafter "Inpatient Claim Form") is the standardized claim form used by institutional facilities to submit Part A claims on behalf of Medicare beneficiaries.  Many other government-funded healthcare programs have also adopted the use of this form.

33.     The CMS-1500 Form (hereinafter "Professional Claim Form") is the standardized claim form used by non-institutional providers to submit Part B claims on behalf of Medicare beneficiaries.  As with the Inpatient Claim Form, many other government-funded healthcare programs have adopted the use of this form.

34.     The Inpatient Claim Form contains information such as the patient's name, the patient's date of birth, the patient's diagnoses, the date that the patient was admitted to the hospital, the services that were provided during the patient's stay at the hospital, and the provider's total charges for those services.

35.     For each Medicare beneficiary who receives inpatient services, providers submit the Inpatient Claim Form to the appropriate MAC, and the MAC then determines the amount of reimbursement that will be paid to the provider on behalf of the Medicare program.

36.     In submitting an Inpatient Claim Form, a provider certifies that "the billing information as shown on the face hereof is true, accurate and complete," and that the provider "did not knowingly or recklessly disregard or misrepresent or conceal material facts."

37.     Part C allows Medicare beneficiaries to enroll in a Medicare Advantage Plan.   A Medicare Advantage Plan is an alternative to traditional Part A and Part B coverage, and is offered by private companies that are approved by Medicare.  42 U.S.C. §§ 1395w-21 *et seq.*

38.     A person who joins a Part C Medicare Advantage Plan will obtain both Part A and Part B coverage through the private insurer.  42 U.S.C. § 1395w-22.  Medicare Advantage Plans may offer extra coverage, such as vision, hearing, dental, and/or health and wellness programs. Most include Medicare prescription drug coverage (Part D).

39.     Providers who submit inpatient claims on behalf of Medicare Advantage beneficiaries also use the standardized Inpatient Claim Form to document key information regarding a patient, and to allow the Medicare Advantage organization to determine the amount of reimbursement that will be paid to the provider.  The Medicare Advantage organization then pays the claim.

40.     Medicare Advantage organizations are funded by the United States.  Medicare pays a fixed amount for each enrolled beneficiary to each Medicare Advantage organization.  That amount, also called a "capitation payment," is adjusted periodically to reflect the health status of its enrollees. 42 U.S.C. § 1395w-23(a); 42 C.F.R. § 422.308(c).  Such adjustment ensures that Medicare Advantage "organizations are paid appropriately for their plan enrollees (that is, less for healthier enrollees and more for less healthy enrollees)."  70 Fed. Reg. 4588, 4657 (Jan. 28, 2005).

41.     The risk-adjusted payment to Medicare Advantage organizations is determined by looking to the diagnosis-related information contained in the Inpatient Claim Form, information which the Medicare Advantage organization transmits to CMS.  74 Fed. Reg. 54,634, 54,674 (Oct. 22, 2009). Each diagnosis code submitted must be supported by a properly documented medical record.  42 U.S.C. §§ 1395*l*(e), 1395y(a)(1)(A); 42 C.F.R. § 422.310(d).

42.     TRICARE (formerly known as the Civilian Health and Medical Program of the Uniformed Services, or "CHAMPUS") is a separate federally-funded healthcare program that provides health insurance to active duty and retired military members, as well as their families and survivors. 10 U.S.C.S. § 1076d.

43.     TRICARE, like Medicare, enlists regional contractors to function as administrative intermediaries that, *inter alia*, process provider claims and pay providers on behalf of TRICARE.  10 U.S.C.S. § 1095b.  During the relevant time period, the regional contractor with jurisdiction over Nevada, and to whom Defendants submitted claims for TRICARE patients, was Health Net Federal Services ("Health Net").

44.     Providers who submit inpatient claims on behalf of TRICARE beneficiaries submit an Inpatient Claim Form that documents key information regarding each patient, which allows TRICARE's regional contractors to determine the amount of reimbursement that will be paid to the provider on behalf of TRICARE.

45.     The Civilian Health and Medical Program of the Department of Veteran Affairs ("CHAMPVA") is a federally-funded healthcare program that provides health insurance to spouses and children of military veterans died in the line of duty, or who have been permanently and totally disabled or have died from a service-related disability.

46.     Providers who submit inpatient claims on behalf of CHAMPVA beneficiaries submit an Inpatient Claim Form that documents key information regarding each patient, which allows CHAMPVA to determine the amount of reimbursement that will be paid to the provider.

47.     Medicaid was established under Title XIX of the Social Security Act.  42 U.S.C. §§ 1396-1 *et seq.*

48.     Medicaid provides health coverage to low-income individuals and people with various disabilities.  In Nevada, Medicaid is jointly administered by CMS and the Nevada Department of Health and Human Services ("NDHS").  Medicaid is funded in part by federal government funds.

49.     Nevada Medicaid beneficiaries include low-income adults, children, pregnant women, parents of dependent children, individuals with disabilities, and certain Medicare beneficiaries.

50.     Providers who submit inpatient claims on behalf of Medicaid beneficiaries also submit an Inpatient Claim Form that documents key information regarding each patient, which allows NDHS to determine the amount of reimbursement that will be paid to the provider on behalf of Medicaid.

51.     Defendants Desert View, Vista Health, and Dr. Mirza are liable for fraud as described herein, as it relates to Medicare, Medicaid, and other Government-funded healthcare programs, because they have submitted and continue to submit, or caused or continue to be to be submitted inpatient and/or outpatient claims for unnecessary and inaccurate services, and have thereby received undue and inflated reimbursements from Medicare, Medicaid, and other Government-funded healthcare programs.

## V.

## CRITICAL ACCESS HOSPITALS

52.     In 1965, Congress amended the Social Security Act by creating the Medicare program. The Medicare program initially paid for inpatient hospital services provided on a "fee-for-service" or "cost" basis, through which (a) hospitals would submit claims for all the services they provided, and (b) Medicare would pay for them.

53.     This cost-based reimbursement system gave hospitals and physicians nearly complete control of how much they were paid by Medicare, and it provided the Government with little to no means of questioning either the legitimacy or the necessity of the care that Medicare beneficiaries received.

54.     Because the cost-based reimbursement system allowed a hospital to increase its Medicare revenues simply by increasing its costs, it also promoted inefficiency, wastefulness, and fraud.  As a result, Medicare spending for hospital costs more than doubled between 1970 and 1975, and doubled again by 1980.

55.     Under the cost-based system, hospitals (and many other providers) were required to provide the United States with "Annual Cost Reports."  These reports amalgamated all of a hospital's costs over the relevant time period so that Medicare and other public insurance programs could assess whether the hospital had been over- or under-paid for the prior year.

56.     Cost reports submitted by providers, including hospitals, must include certifications signed by an Officer or Administrator of the provider.

57.     In 1983, Congress replaced the fee-for-service construct with the Prospective Payment System ("PPS").   Under this system, payment for inpatient services was based on a patient's Diagnosis Related Group ("DRG").  Each DRG accounted for the patient's primary clinical diagnosis and other factors such as the patient's age, sex, secondary diagnoses, and severity levels.  The DRG functioned as a standardized classification that reflected the relative cost to care for a patient in the same condition.

58.     Under the PPS system, a hospital determines a patient's DRG upon admission.  The DRG value is then multiplied by a predetermined base rate to calculate the fixed amount that the hospital will be prospectively paid to care for that patient.

59.     The PPS system provides incentives for hospitals to provide accurate and efficient treatments to similarly situated patients, while discouraging unnecessary services.   Generally speaking, if a hospital incurs fewer actual costs than a patient's DRG provides for, the hospital is allowed to retain the additional PPS funds for that patient.  Conversely, if the hospital incurs greater costs than a patient's DRG provided for, the hospital operates at a loss for that patient.   The assumption underlying PPS is that with enough patients, the DRG payments will result in reasonable compensation for the hospitals.

60.     Between 1984 and 1987, the growth in Medicare's payments to hospitals decreased by 60%, while most hospitals' financial health improved due to efficiency, and patient outcomes showed no discernible damage.

61.     However, during the 1980s and 1990s, almost 400 hospitals across the country closed due to the financial impact that the PPS system had on their revenues.  Rural hospitals with lower patient volumes were hit particularly hard by the transition to the PPS system.

62.     In 1997, responding in part to these closures and the difficulties in health care access they engendered, Congress created the Medicare Rural Hospital Flexibility Program to benefit rural hospitals that could be disadvantaged by DRG-based PPS payments.  This program created a new hospital type, known as the Critical Access Hospital ("CAH").

63.     To be eligible for the CAH designation, a hospital must have 25 or fewer acute care inpatient beds; be located more than 35 miles from another hospital; maintain an annual average length of stay of 96 hours or less for acute care patients; and provide 24/7 emergency care services.

64.     Desert View has been a CAH since it opened in or around 2006.

65.     Rather than receive DRG reimbursements under the PPS system, a hospital that qualifies as a CAH receives cost-based reimbursements equal to 101% of the allowable costs that it incurs to provide care to Medicare beneficiaries.

66.     Allowable costs must be reasonable and related to patient care, and include the services that are necessary and proper in providing inpatient or outpatient services.

67.     As with PPS reimbursements, CAHs submit individual inpatient claims on behalf of each Medicare patient using the standardized Inpatient Claim Form.  These patient-specific claims include such information as the patient's name, date of birth, and diagnoses, the date that the patient was admitted to the hospital, the services that were provided during the inpatient stay, and the CAH's total charges for those services.

68.     The rate at which a CAH is reimbursed for providing inpatient services is determined by looking to the CAH's historical costs.  Specifically, the rate is determined by dividing the hospital's historical allowable costs (*i.e.,* the hospital's total expenses minus any offsets and costs not supported by Medicare) by the total number of patient days reported by the CAH.  This calculation results in a daily rate of payment that is based on what it has historically cost the CAH to treat its patients.

69.     The payment calculus includes routine inpatient service costs, ancillary service costs (including radiology, laboratory, and therapy costs), outpatient service costs (including emergency department costs), and other general service costs (including payroll, employee benefits, administrative costs, nursing costs, laundry service, housekeeping, and dietary costs).

70.     Many of these costs will vary with the total volume of inpatient admissions and the amount of ancillary services that are provided during each inpatient stay.

71.     Desert View submitted an Annual Cost Report for 2019.  The report was prepared on or about June 25, 2020.  It reports myriad categories of costs.

72.     Annual Cost Reports must be attested by a responsible hospital official under oath.  The Desert View cost report for 2019 includes this representation, to be signed by an "Officer or Administrator" of the provider:

> MISREPRESENTATION OR FALSIFICATION OF ANY INFORMATION CONTAINED IN THIS COST REPORT MAY BE PUNISHABLE BY CRIMINAL, CIVIL AND ADMINISTRATIVE ACTION, FINE AND/OR IMPRISONMENT UNDER FEDERAL
>
> LAW. FURTHERMORE, IF SERVICES IDENTIFIED IN THIS REPORT WERE PROVIDED OR PROCURED THROUGH THE PAYMENT DIRECTLY OR INDIRECTLY OF A KICKBACK OR WERE OTHERWISE ILLEGAL, CRIMINAL, CIVIL AND ADMINISTRATIVE FINES AND/OR IMPRISONMENT MAY RESULT.
>
> CERTIFICATION BY CHIEF FINANCIAL OFFICER OR ADMINISTRATOR OF PROVIDER(S)
>
> I HEREBY CERTIFY that I have read the above certification statement and that I have examined the accompanying electronically filed or manually submitted cost report and the Balance sheet and Statement of Revenue and Expenses prepared by DESERT VIEW REGIONAL MEDICAL CENTER (29-1311) for the cost reporting period beginning 01/01/2019 and ending 12/31/2019 and to the best of my knowledge and belief, this report and statement are true, correct, complete and prepared from the books and records of the provider in accordance with applicable instructions, except as noted. I further certify that I am familiar with the laws and regulations regarding the provision of health care services, and that the services identified in this cost report were provided in compliance with such laws and regulations.
>
> I have read and agree with the above certification statement. I certify that I intend my electronic signature on this certification statement to be the legally binding equivalent of my original signature.

73.     Desert View's year-end cost report for 2019 confirms that costs such as inpatient routine service costs, outpatient service costs, general costs, and ancillary service costs (including costs for operating rooms, diagnostic radiology, laboratories, respiratory therapy, physical therapy, and drugs charged to patients) are reported by Desert View to CMS.

74. Payment of each claim for inpatient services at a CAH is still predicated on the CAH's submission of the Inpatient Claim Form. Medicare applies the CAH's cost-based rate to the information contained in the patient-specific Inpatient Claim Form, and throughout the course of the year, the CAH receives cost-based reimbursements for those claims as interim payments from Medicare.

75. A Medicare beneficiary can generally receive inpatient care in a CAH for no more than four consecutive days. Medicare pays the CAH for the inpatient stay of a Medicare beneficiary if a physician or other qualified practitioner orders the admission and certifies that an individual is discharged or transferred to a hospital within 96 hours of CAH admission. The physician must complete the certification, sign it, and document the medical records no later than one day before submitting the inpatient services claim.

76. Payment for professional medical services furnished in a CAH is based on the physician fee schedule, billed charge or other fee, as would apply if the services had been furnished in a hospital outpatient department.

77. At the end of the CAH's fiscal year, the CAH submits a final cost report for a reconciliation of its costs to treat Medicare beneficiaries. The cost report includes the CAH's total costs and charges associated with providing services to all patients; the portion of those costs and charges allocated to Medicare patients; and the Medicare payments that have already been received for those patients. If the final settlement determination is greater than the payments already made to the CAH, an underpayment will be declared, and Medicare will make an additional lump-sum payment to the CAH.

78. Desert View's year-end cost report for 2019 represented that Medicare owed Desert View an additional $313,241 in Medicare funds to account for the actual costs it incurred to provide services to Medicare beneficiaries throughout 2019.

79. Because reimbursement for inpatient services is based on the CAH's actual costs rather than its patients' diagnoses, a CAH does not have the same cost-reducing incentives that exist in the DRG-based PPS system. The CAH reimbursement scheme rewards increased admissions (thereby

increasing the number of cost-based claims that CAH can submit), and creates an incentive to increase costs (thereby increasing the CAH's per-patient reimbursement rate).

80.     Desert View is a rural hospital with a CAH designation in accordance with 42 CFR § 485.601 *et seq*.  Thus, Desert View does not receive DRG-based PPS payments from Medicare. Rather, Medicare reimburses Desert View based on the costs it incurs on behalf of its Medicare beneficiaries.

81.     TRICARE also provides cost-based reimbursement to CAHs.  As with Medicare, TRICARE provides cost-based reimbursements equal to 101% of the allowable costs that the CAH incurs to provide care to TRICARE beneficiaries.

82.     With regard to Medicaid, each state determines how it will reimburse CAHs for Medicaid services. Several states utilize some form of cost-based reimbursement for CAHs, while other states follow a prospective payment system (PPS).

83.     In Nevada, the Medicaid program provides cost-based reimbursement to CAHs.  NDHS provides cost-based reimbursements equal to 100% of the allowable costs that the CAH incurs to provide inpatient care to Medicaid beneficiaries.  The United States pays the majority of costs associated with the treatment of Nevada Medicaid beneficiaries.  In 2019, for example, the United States paid for 75% of the state's Medicaid program.

84.     Some Medicare beneficiaries (about 40%, in Nevada) participate in capitated "Medicare Advantage" program.  Under these programs, the United States pays a per-beneficiary rate to an insurer, who then pays providers, generally on a fee-for-service basis.

85.     The capitation rates paid by the United States on account of a Medicare beneficiary vary depending on a variety of factors.  Part C insurers, like providers, file Annual Cost Reports reflecting amounts disbursed to providers.

86.     The amount that a Medicare Advantage organization will reimburse a CAH for providing care to Medicare Advantage beneficiaries is determined by private contracts between the Medicare Advantage organization and the CAH.

87.     However, the amount that Medicare pays to the Medicare Advantage organization, which in turn is used to fund the payment to the CAH, is determined through the risk-based analysis described above.

88.     The goal of risk adjustment is to appropriately reimburse a provider for health care interventions.  But if a hospital does not accurately report its patients' health statuses, then payments from Medicare to a Medicare Advantage organization, which in turn fund payments to providers for the services they provide to Medicare beneficiaries, may not be associated with the true costs of treatment.

89.     Desert View's fraud as it relates to the Medicare Advantage programs, as alleged herein, went undetected, thereby passing along inflated risk-adjustment data to the government and resulting in inaccurate capitation rates for services.

## VI.

## THE "MEDICAL NECESSITY" REQUIREMENT

90.     "[N]o payment [by Medicare] may be made ... for any expenses incurred for items or services ... [that] are not reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member[.]" 42 U.S.C. § 1395y(a)(1)(A).

91.     Medicare reimburses medical providers for inpatient hospitalization only if "a physician certifies that such services are required to be given on an inpatient basis for such individual's medical treatment, or that inpatient diagnostic study is medically required and such services are necessary for such purpose[.]" 42 U.S.C. § 1395f(a)(3).

92.     CMS defines a "reasonable and necessary" service as one that "meets, but does not exceed, the patient's medical need," and is furnished "in accordance with accepted standards of medical practice for the diagnosis or treatment of the patient's condition ... in a setting appropriate to the patient's medical needs and condition[.]" CMS, Medicare Program Integrity Manual § 13.5.4 (2019).

93.     The Medicare program defines "medically necessary" as those health care services, which are "needed to diagnose or treat an illness, injury, condition, disease, or its symptoms and that

meet accepted standards of medicine." CMS, Medicare & You 2020: The Official U.S. Government Medicare Handbook 114 (2019).

94.    Inpatient admission "is generally appropriate for payment under Medicare Part A when the admitting physician expects the patient to require hospital care that crosses two midnights." 42 CFR § 412.3(d)(1).

95.    Doctors do not have unfettered discretion to decide whether inpatient admission is medically necessary: "The factors that lead to a particular clinical expectation *must be documented in the medical record* in order to be granted consideration." 42 CFR § 412.3(d)(1)(i) (emphasis added).

96.    The regulations consider medical necessity a question of fact: "No presumptive weight shall be assigned to the physician's order under § 412.3 or the physician's certification ... in determining the medical necessity of inpatient hospital services … A physician's order or certification will be evaluated in the context of the evidence in the medical record." *Id.* § 412.46(b).

97.    An admission is medically unnecessary when a patient is admitted to a hospital for treatments that the hospital cannot provide because it lacks the necessary facilities.  *Winter ex rel. United States v. Gardens Reg'l Hosp. & Med. Ctr., Inc.*, 953 F.3d 1108, 1120-21 (9th Cir. 2020).

98.    "Because medical necessity is a condition of payment, every Medicare claim includes an express or implied certification that treatment was medically necessary."  *Id.* at 1114.  Therefore, "*claims for unnecessary treatment are false claims*." *Id*. (emphasis added).

99.    Services reimbursed under Tricare, CHAMPVA, Medicaid, and other Government-funded healthcare programs must also be medically necessary, and claims under these programs that a provider knows are not medically necessary constitute false claims.

## VII.

## INTERQUAL

100.    InterQual Level of Care Criteria 2019 ("InterQual") is a hospital industry-standard set of criteria developed (and updated annually) by McKesson Health Solutions LLC, and are reviewed and validated by a national panel of clinicians and medical experts, including those in the community and academic practice settings, as well as within the managed care industry.

101.    InterQual criteria are a synthesis of evidence-based standards of care, current practices, and consensus from licensed specialists and/or primary care physicians.  InterQual criteria provide support for determining the medical appropriateness of hospital admission, continued stay, and discharge.

102.    Medicare uses InterQual to evaluate whether claims are appropriate for payment.

103.    In fact, "the InterQual criteria represent the 'consensus of medical professionals' opinions,' so a failure to satisfy the criteria also means that the admission went against the medical consensus." *Winter*, 953 F.3d at 1115.

104.    Many hospitals (including, upon information and belief, Desert View) use InterQual as a benchmark for whether a patient should be admitted to the hospital for treatment.

## VIII.

## <u>SCIENTER AND MATERIALITY UNDER THE FCA</u>

105.    Concerns about doctors being exposed to liability due to their clinical judgment can be alleviated through the "strict enforcement of [The False Claim] Act's" scienter and materiality requirements.  *Winter,* 953 F.3d at 1117.

106.    "Defendants act with the required scienter if they know the treatment was not medically necessary, or act in deliberate ignorance or reckless disregard of whether the treatment was medically necessary." *Id.*, *citing* 31 U.S.C. § 3729(b)(1).

107.    "A complaint needs only to allege facts supporting a plausible inference of scienter." *Id.* at 1122.

108.    "[T]he term 'material' means having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." 31 U.S.C. § 3729(b)(4).

109.    "[P]roof of materiality can include ... evidence that the defendant knows that the Government consistently refuses to pay claims in the mine run of cases based on noncompliance with the particular statutory, regulatory, or contractual requirement."  *Universal Health Servs., Inc. v. United States*, 136 S. Ct. 1989, 2003 (2016).

110.    "Congress *prohibited* payment for treatment 'not reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member[.]'" *Winter*, 953 F.3d at 1122 (9th Cir. 2020), *quoting* 42 U.S.C. § 1395y(a)(1)(A).

111.    Medicare pays inpatient hospitalization "only if such services are required to be given on in inpatient basis for such individuals' medical treatment[.]" *Id.*, *quoting* 42 U.S.C. § 1395f(a)(3).

112.    Physicians are gatekeepers, and hold the key to reimbursement for services provided with public health insurance.  Medicare regulations require all doctors to acknowledge:

> Medicare payment to hospitals is based in part on each patient's principal and secondary diagnoses and the major procedures performed on the patient, as attested to by the patient's attending physician by virtue of his or her signature in the medical record. Anyone who misrepresents, falsifies, or conceals essential information required for payment of Federal funds, may be subject to fine, imprisonment, or civil penalty under applicable Federal laws.

> *Id.*, *quoting* 42 C.F.R. § 412.46(a)(2).

113.    "[I]f a physician cannot in good faith certify that an individual may reasonably be expected to be discharged or transferred within 96 hours after admission to the CAH, the CAH will not receive Medicare reimbursement for any portion of that individual's inpatient stay.  This would be determined based on a medical review of the case."  CMS Manual, Transmittal 234, March 10, 2017.

114.    A hospital and physician's compliance with the requirements and regulations detailed above are material to Medicare's decision of whether to allow payment of claims for services provided.  *See* 42 C.F.R. § 412.3(a) ("This physician order must be present in the medical record and be supported by the physician admission and progress notes, in order for the hospital to be paid for hospital inpatient services under Medicare Part A"); 42 C.F.R. § 412.46(a)(2) ("Anyone who misrepresents, falsifies, or conceals essential information required for payment of Federal funds, may be subject to fine imprisonment, or civil penalty under applicable Federal laws").

115.    Allegations of a provider's false certification of medical necessity, in tandem with allegations that the government would not have paid for such claims had it known that inpatient hospitalizations were medically unnecessary, sufficiently pleads materiality under the FCA.  *Id.* at 1122.

# XI.

## THE FALSE CLAIMS ACT & THE IMPLIED FALSE CERTIFICATION

116.    In *Universal Health Services, Inc. v. United States*, 136 S.Ct. 1989 (2016), the United States Supreme Court held that submission of a claim certifies its truthfulness.  "[W]hen a defendant submits a claim, it impliedly certifies compliance with all conditions of payment.  But if that claim fails to disclose the defendant's violation of a material statutory, regulatory, or contractual requirement, so the theory goes, the defendant has made a misrepresentation that renders the claim 'false or fraudulent' under § 3729(a)(1)(A)."  *Id.* at 1995.

# XII.

## DEFENDANTS' FRAUDULENT SCHEME

### A.    Unnecessary Inpatient Admissions and Testing

117.    From approximately January 10, 2019 to the present, Defendants have engaged in a systematic and pervasive pattern of knowingly submitting fraudulent claims to Government-funded healthcare programs for services that were not reasonable or necessary.  This was accomplished by increasing inpatient admissions for patients who did not need to be admitted to the hospital, and by providing those patients with unnecessary services during their inpatient stays.

118.    From January 1 to December 31, 2018, Dr. Arik was the Medical Chief of Staff at Desert View.

119.    During the period of his involvement at Desert View, Dr. Arik observed that it was common for inpatient beds to be empty.  This occurred because Desert View had limited inpatient facilities:  For example, it had no cardiac-care or medical/surgical intensive care capabilities; no cardiac catheterization lab; and quite limited surgical facilities.  Additionally, critical access hospital inpatient admissions must, on average, last fewer than 96 hours.

120.    Critical Access Hospitals are required to have agreements in place with larger hospitals to accept transfers from the CAH, and must have contracts in place to ensure the transport of patients to such facilities.

121.    In his role as Chief of Staff, as well as his role as the only cardiologist practicing in Pahrump, Dr. Arik ensured that only patients whose medical needs could be fully addressed at Desert

View were admitted to an inpatient bed, and that patients whose needs could not be met at Desert View were transferred to hospitals in or around Las Vegas.

122.     Desert View Chief Executive Officer Susan Davila frequently met with Dr. Arik and urged him to admit more patients for inpatient care; order fewer transfers to tertiary-care hospitals; and increase the administration of tests, all in order to bolster the financial stability and profitability of Desert View.

123.     In December 2018, Dr. Arik met with Ms. Davila and James Oscarson, Desert View's manager of business development.

124.     During the meeting, Ms. Davila advised Dr. Arik and others that she had relieved Rural Physicians Group ("RPG") of its duties as hospitalists at Desert View because RPG physicians were not admitting a sufficient number of inpatients, and were transferring too many patients out of Desert View to bigger hospitals.  Ms. Davila advised that RPG's manner of practicing medicine was contrary to the financial interests of Desert View.

125.     Ms. Davila further advised Dr. Arik that her "job was on the line" if more beds were not filled at Desert View by increasing inpatient admissions and decreasing transfers in order to enhance revenue.

126.     Ms. Davila also told Dr. Arik that more testing/procedures on patients must be performed in order to ensure the financial viability of Desert View.

127.     Ms. Davila also advised Dr. Arik that Desert View would be entering into a lucrative contract (believed to be approximately 30% more than RPG was paid) with defendants Vista Health and Dr. Mirza (collectively "Vista Health Defendants"), to replace RPG and to assume the hospitalist duties at Desert View.

128.     A November 2018 Executive Summary confirms that Desert View's net revenues were down $1.9 million year-over-year, with gross revenues down $11 million.  The Summary also reported that Desert View would be "contracting with a new hospitalist group, Vista Health" and would be "actively marketing DVH inpatient services."

129.    On January 10, 2019, Desert View entered into a Hospitalist Services Agreement with Vista Health (hereinafter, the "Vista Health Hospitalist Agreement") for the provision of hospitalist services to Desert View inpatients.

130.    Dr. Mirza was publicly reprimanded and put on six months' probation by the Arizona Medical Board by Order dated September 16, 2016, in Case No. MD-14-1195A, based on a finding that he had caused actual harm to two patients by implanting pacemakers which were not medically indicated.  He once had a California medical license, which was revoked by a Disciplinary Order on or about August 25, 2017, with that revocation stayed with a three-year suspension so long as his practice was monitored.  This was followed by surrender of his California license on May 9, 2019.  In the meantime, a formal Complaint was filed before the Board of Medical Examiners of the State of Nevada on August 24, 2018, relating to the disciplinary action taken in Arizona.  That case was resolved by a Settlement Agreement which became final on December 3, 2018.  Desert View's contract with Dr. Mirza's company to provide hospitalist services began six weeks later, on January 10, 2019.

131.    Dr. Mirza was assigned to perform hospitalist duties for Desert View, pursuant to the Vista Health Hospitalist Agreement.  On or about January 10, 2019, in accordance with the Vista Health Hospitalist Agreement, Dr. Mirza began to treat patients at Desert View.

132.    Pursuant to the Vista Health Hospitalist Agreement, Desert View and the Vista Health Defendants agreed to participate in the "necessary teamwork" that would promote the purposes of the Vista Health Hospitalist Agreement, and that the Vista Health Defendants would "demonstrate active support for the Hospital's Mission."

133.    The Vista Health Defendants were responsible for "managing length of stay, cost, and clinical outcomes for designated patients at the Hospital," which included:  (a) providing inpatient hospital coverage from the time a patient was admitted at Desert View, including decisions regarding the types of medical testing/procedures the patient's condition necessitated; (b) reporting discharges to primary care physicians; (c) deciding what patients to admit for inpatient services at Desert View, rather than outpatient care or transfer to another facility; (d) performing all pre-admission assessments; (e) making recommendations regarding the appropriate level of care; (f) initiating and/or

discontinuing medical consultations; (g) managing surgical cases upon request; and (h) assisting with the transfer of out-of-area patients to Desert View.

134.    Pursuant to the Vista Health Hospitalist Agreement, Desert View agreed to pay the Vista Health Defendants $660,000 per year, to be paid in monthly installments of $55,000.

135.    In addition to the direct compensation from Desert View for their hospitalist services, the Vista Health Hospitalist Agreement allowed the Vista Health Defendants to directly bill to and collect from state- and federally-funded insurance programs for the professional services they provided to persons admitted as inpatients at Desert View.

136.    Therefore, the Vista Health Defendants' compensation has been and is directly correlated to the earnings of Desert View. In other words, the more inpatient admissions, the less patient transfers, and the longer a patient remains hospitalized at Desert View, the more money Vista Health Defendants earned and continue to earn.

137.    Since January 2019, the Vista Health Defendants have increased Desert View's revenue by, among other things, (1) increasing inpatient admissions to Desert View; (2) failing to transfer patients to a facility capable of meeting their medical needs, instead admitting them to Desert View; and (3) ordering a multitude of medical testing without supporting requisite medical necessity.

138.    The Vista Health Defendants have been knowingly submitting claims for payment to and collecting payments from Medicare, Medicaid, and other Government-funded health insurance programs for medically unnecessary inpatient admissions.

139.    As a direct result of the concerted efforts of Desert View, the Vista Health Defendants, and the other named Defendants to increase inpatient admissions without medical necessity, Desert View's inpatient volume grew tremendously.

140.    For example, despite generally lower emergency department visits at Desert View, the Vista Health Defendants were able to convert such visits to inpatient admissions at a rate much higher than before Vista Health began providing hospitalist services to Desert View.

141.    In January 2019, the first month of the Vista Health Hospitalist Agreement, inpatient admissions were 68.1% higher than in January 2018.  This resulted in a 44.35% increase in net revenue.  In February 2019, inpatient admissions were 63.1 % higher than in February 2018, yielding

a 26.48% increase in net revenue. In March 2019, inpatient admissions increased by 37.4% from March 2018, resulting in a 36.75% increase in net revenue.  And in April 2019, inpatient admissions were 62.7% higher than in April 2018, which yielded an additional $2.9 million in net revenue.

142.    In January 2019, Ms. Davila released a CEO Status Report stating that the "Vista Health Hospitalist Group started January 10," and that "more patients [were] remaining at DVH with less overall transfers to Las Vegas."

143.    The February 2019 CEO Status Report stated that "Inpatient and OBS volumes continue to rise with new hospitalist group Vista Health leading admissions."

144.    The March 2019 CEO Status Report stated that "Inpatient and OBS volumes continue [to be] strong in March- driven by hospitalist group Vista Health."

145.    During the relevant time period, Desert View's revenue was mostly derived from Medicare and other Government-funded healthcare programs.

146.    After becoming aware of Desert View's scheme to defraud Medicare and Medicaid and lack of concern for patient safety for the sake of profit, Dr. Arik met with Dr. Daniel McBride (Chief Medical Officer at Valley Health) to convey his concerns.

147.    Dr. Arik advised Dr. McBride about the serious patient quality concerns that were being communicated to him by his own patients, relatives of patients, hospital staff, and local providers, as well as the corroborating evidence of substandard care that he was able to gather from reviewing some patient charts.  Dr. McBride advised Dr. Arik to have a meeting with him and Ms. Davila, but that meeting was cancelled due to inclement weather.

148.    Thereafter, Ms. Davila sent a letter to Dr. Arik claiming that he had violated HIPAA by accessing his own patients' medical records, which he had done to investigate their complaints concerning their treatment at Desert View.  Dr. Arik was ordered to appear before the hospital's Medical Executive Committee.

149.    On February 26, 2019, Desert View issued a disciplinary suspension to Dr. Arik for accessing his own patients' medical records, which he had done to investigate their complaints concerning their treatment at Desert View.  The notice of suspension, which was personally authorized by Ms. Davila, also informed Dr. Arik that a formal investigation against him was being commenced.

150.     Desert View never investigated the patient quality concerns that prompted Dr. Arik to investigate his patients' treatment at Desert View.

151.     In the same February 2019 monthly operating report mentioned above, Desert View stated that an increase in testing revenue was due, in part, to the fact that "Dr. Arik, cardiologist, was previously driving cardiology services to HCP."

152.     Desert View was consistently concerned with what it called "leakage" to other facilities.   By way of example, the March 2019 CEO Status Report stated that "Dr. Muhkerjee continues to maintain [a] small volume of scheduled GI procedures weekly.  DVH is experiencing increased leakage to OP Surgery Center in LV."

153.     Desert View was aware that keeping more inpatients in the hospital resulted in more revenues, due to the hospital's CAH status.  A January 2019 monthly operating report stated that the hospital's "Average daily census [had] doubled over prior year which frequently necessitated the use of overflow surge plans.  This increase in acuity created a rise in LOS [length of stay] which in a CAH environment creates a positive result in reimbursement (Per Diem per day vs. DRG)."  Similar facts were reported in the operating reports for February 2019, March 2019, and April 2019.

154.     Desert View was also aware that an increase in inpatient admissions created an opportunity to increase the volume of tests it administered.   The January 2019 monthly operating report noted that "Radiology also experienced a nice increase in nuclear med stress tests and echo order from the increased inpatient volumes."  Similar facts were reported in the operating reports for February 2019, March 2019, and April 2019.

155.     In a May 15, 2019 email, Ms. Davila requested a report on Dr. Arik's referrals because she "want[ed] to know how much business he is sending over the hill and where all of that is going."

156.     On or about May 17, 2019, after Dr. Arik's concerns about Desert View's violations of the law and the jeopardizing of patient safety went unremedied, Dr. Arik resigned his medical privileges at Desert View.

157.     Dr. Arik is presently the resident cardiologist living and working in Pahrump, Nevada who provides full-time outpatient cardiology medical care to members of the community.

158.    In such capacity, Dr. Arik is privy to highly sensitive and confidential medical records/charts that are generated at Desert View for his cardiology patients.

159.    In addition, Dr. Arik is privy to highly sensitive and confidential medical records/charts from another medical provider in Pahrump, Nevada and acquired confidential information relating to Desert View's billing practices from a former biller at Desert View.

160.    Based on this information and his knowledge of the Pahrump medical community, Dr. Arik has reason to believe that Defendants' fraudulent conduct is ongoing.

161.    To satisfy the pleading standard in a False Claims Act case, a relator need only submit "particular details of a scheme to submit false claims with reliable indicia that lead to a strong inference that claims were actually submitted."  *U.S. ex rel. Macias v. Pac. Health Corp*, 2014 U.S. Dist. LEXIS 202026, at *18 (C.D. Cal. Nov. 5, 2014)*, citing Ebeid v. Lungwitz*, 616 F.3d 993, 998-99 (9th Cir. 2010) ("The use of representative examples is simply one means of meeting the pleading obligation").

162.    The following are representative examples of patients who were improperly admitted at Desert View for inpatient care and/or provided unnecessary inpatient services such as improper tests.[1]

163.    On behalf of these representative patients, Defendants submitted claims that were paid in whole or in part by Medicare or other Government-funded healthcare programs.

164.    Defendants' fraud was the result of corporate policies and practices, and was carried out on a widespread basis.  The following representative patient examples provide reliable indicia that, as a result of Defendants' fraud, claims for improper patient admissions and/or improper patient services were both submitted and paid by Government-funded healthcare programs.

165.    For each of the following representative examples, Desert View and the Vista Health Defendants were paid by a Government-funded healthcare program based on the false certification of their compliance with 42 U.S.C. § 1395y(a)(1)(A).

166.    For each of the following representative examples, Desert View and the Vista Health Defendants knew that their claims for payment to the Government-funded healthcare programs were

---

[1] Relator substitutes the patients' true names with anonymous identifiers.

false, or had deliberately ignored their falsity, or had recklessly disregarded their falsity, in violation of the False Claims Act.

167.    For each of the following representative examples, had the Government known that the admission and/or medical testing of these patients was not reasonable and medically unnecessary, it would not have paid on the claims submitted on those patients' behalf.

**Medicare Patients**

**Patient Three**

168.    Patient Three was a Medicare beneficiary.

169.    Patient Three presented to Desert View with complaints of chest pain.  Examination in the emergency department revealed an abnormal EKG and enzymes positive for myocardial infarction; that is, Patient Three had a heart attack.  Patient Three's presentation was consistent with Very-High-Risk Criteria.

170.    According to Braunwald's Cardiology Practice Standards, a treatise which is widely regarded as the "gold standard" for the diagnosis, treatment, and care of patients exhibiting findings consistent with a heart attack (like Patient Three), they must be immediately transferred to an acute care hospital that has a cardiac catheterization ("cath") lab, which is properly equipped and staffed to provide angiograms and coronary intervention (stents).

171.    Desert View did not and does not have a cath lab, nor has it ever had a cardiac intensive care unit.

172.    Patient Three was admitted as an inpatient to Desert View on February 13, 2019.

173.    Patient Three's inpatient admission was not medically necessary because Desert View was not a setting appropriate for Patient Three's medical needs and condition.  *See* Medicare Program Integrity Manual § 13.5.4 (2019); *see also Winter*, 953 F.3d at 1114 (inpatient admissions of a patient to a medical facility, which lacks the ability to provide treatment for the patient's condition, gives rise to a false certification of medical necessity).

174.    Desert View incurred costs as a result of the inpatient services, ancillary services (including various tests), and other services that were provided to Patient Three.  Based on information

and belief, these costs were incorporated into Desert View's cost report that was submitted to CMS at the end of the year.

175.    Patient Three was discharged from Desert View on February 15, 2019.

176.    On February 21, 2019, Desert View submitted an Inpatient Claim Form to Medicare in the amount of $17,076.85 for the inpatient services provided to Patient Three.  Noridian, serving as an intermediary for Medicare, paid Desert View $2,426.48 for the inpatient services that were provided to Patient Three at a cost-based rate of $1,920.00 per day, after accounting for a $1,364 deductible and a $49.52 sequestration amount.

177.    Based on information and belief, Vista Health also submitted a Professional Claim Form to Medicare for the professional services provided to Patient Three at Desert View.

178.    Because Patient Three's inpatient admission was not necessary, Defendants' claims for inpatient and professional services to Medicare were false, and Medicare's payments for those services were a result of Defendants' false claims.

**Patient Five**

179.    Patient Five was a Medicare beneficiary and a TRICARE beneficiary.

180.    Patient Five presented to Desert View and was diagnosed with myocardial infarction, NSTEMI-type (a heart attack).  Patient Five's presentation was consistent with High-Risk Criteria.

181.    The admitting physician stated in his plan notes that "if troponin continued to be mounting upward trend probably need intervention cardiology services which will be discussed [sic]." However, Patient Five already had the diagnosis of NSTEMI.

182.    Patient Five should have immediately been transferred to a hospital equipped for treatment of cardiac patients.

183.    Although Desert View did not have a cath lab necessary to treat Patient Five, Patient Five was admitted as an inpatient to Desert View on August 3, 2019.

184.    Patient Five's admission was not medically necessary because Desert View lacked the capability to treat Patient Five's medical needs and condition.

185.    Patient Five was subjected to several unnecessary cardiac tests and an unnecessary nuclear stress test.  This costly diagnostic procedure is appropriate only when less costly tests do not

resolve the question whether a patient has had a heart attack:  Patient Five had already been properly diagnosed with a low-cost blood test.

186.    Desert View incurred costs as a result of the inpatient services, ancillary services (including the unnecessary tests), and other services that were provided to Patient Five.  Based on information and belief, these costs were incorporated into Desert View's cost report that was submitted to CMS at the end of the year.

187.    Patient Five was discharged from Desert View on August 6, 2019.

188.    On August 12, 2019, Desert View submitted an Inpatient Claim Form to Medicare in the amount of $20,737.42 for inpatient services provided to Patient Five.

189.    Noridian, serving as an intermediary for Medicare, paid Desert View $4,308.08 for the inpatient services that were provided to Patient Five at a cost-based rate of $1,920.00 per day, after accounting for a $1,364 deductible and an $87.92 sequestration amount.

190.    On August 29, 2019, Desert View submitted another Claim Form to TRICARE in the amount of $20,737.42 for the inpatient services provided to Patient Five.  The Claim Form certified that there had been a prior payment on this claim in the amount of $4,308.08.

191.    TRICARE paid Desert View an additional $1,364 (an amount equal to the deductible) for the inpatient services that were provided to Patient Five.

192.    Based on information and belief, Vista Health also submitted a Professional Claim Form to Medicare for the professional services that were provided to Patient Five at Desert View.

193.    Because Patient Five's inpatient admission was medically unnecessary, Defendants' claims for inpatient and professional services to Medicare and Tricare were false, and Medicare and Tricare's payments for those services were a result of Defendants' false claims.

**Patient Seven**

194.    Patient Seven was a Medicare beneficiary.

195.    Patient Seven presented to Desert View with complaints of worsening shortness of breath due to congestive heart failure.  Patient Seven had multiple critical diagnoses including a gastrointestinal bleed one week prior.

196.    Patient Seven also exhibited clinical and chest x-ray evidence of congestive heart failure with further confirmation based on laboratory studies, and laboratory evidence of non-ST segment elevation myocardial infarction.  Patient Seven's condition was consistent with Very-High-Risk Criteria.

197.    Although Desert View did not have an ICU to deal with Patient's serious medical comorbidities, Patient Seven was admitted as an inpatient to Desert View on July 11, 2019.

198.    Patient Seven's inpatient admission was not medically necessary because Desert View lacked the capability to treat Patient Seven's medical needs and condition.

199.    Desert View incurred costs as a result of the inpatient services, ancillary services (including various tests), and other services that were provided to Patient Seven.  Based on information and belief, these costs were incorporated into Desert View's cost report that was submitted to CMS at the end of the year.

200.    Patient Seven was discharged from Desert View on July 14, 2019.

201.    On July 18, 2019, Desert View submitted an Inpatient Claim Form to Medicare in the amount of $31,876.63 for the inpatient services that were provided to Patient Seven.

202.    Noridian, serving as an intermediary for Medicare, paid Desert View $5,644.80 for the inpatient services that were provided to Patient Seven, at a cost-based rate of $1,920.00 per day, and after accounting for a $115.20 sequestration amount.

203.    Based on information and belief, Vista Health also submitted a Professional Claim Form to Medicare for the professional services that were provided to Patient Seven at Desert View.

204.    Because Patient Seven's inpatient admission was medically unnecessary, Defendants' claims for inpatient and professional services to Medicare were false, and Medicare's payment for those services was a result of Defendants' false claims.

**Patient Eight**

205.    Patient Eight was a Medicare beneficiary.

206.    Patient Eight presented to Desert View with complaints of cardiac instability and a history of coronary bypass surgery with congestive heart failure and rapid atrial fibrillation.

207.    Patient Eight already had an established cardiologist and electrophysiologist in Las Vegas and was scheduled for evaluation and treatment of the atrial fibrillation condition with a procedure (TEE/Cardioversion) not available at Desert View.

208.    Cardioversion requires a certified nurse anesthetist or anesthesiologist, and transesophageal echocardiogram.  Although Desert View has neither, Patient Eight was admitted as an inpatient on July 13, 2019 and underwent a cardioversion.

209.    Patient Eight's inpatient admission was not medically necessary because Desert View lacked the capability to treat Patient Eight's medical needs and condition.

210.    Desert View incurred costs as a result of the inpatient services, ancillary services (including various tests), and other services that were provided to Patient Eight.  Based on information and belief, these costs were incorporated into Desert View's cost report that was submitted to CMS at the end of the year.

211.    Patient Eight was discharged from Desert View on July 15, 2019.

212.    On July 19, 2019, Desert View submitted an Inpatient Claim Form to Medicare in the amount of $34,798.36 for the inpatient services provided to Patient Eight.

213.    Noridian, serving as an intermediary for Medicare, paid Desert View $2,426.48 for the inpatient services that were provided to Patient Eight at a cost-based rate of $1,920.00 per day, and after accounting for a $1,364 deductible as well as a $49.52 sequestration amount.

214.    Based on information and belief, Vista Health also submitted a Professional Claim Form to Medicare for the professional services that were provided to Patient Eight at Desert View.

215.    Because Patient Eight's inpatient admission was medically unnecessary, Defendants' claims for inpatient and professional services to Medicare were false, and Medicare's payment for those services was a result of Defendants' false claims.

**Patient 12**

216.    Patient 12 was a Medicare beneficiary and a TRICARE beneficiary.

217.    Patient 12 presented to Desert View with a diagnosis of a transient ischemic attach ("TIA"), which is a type of stroke.

218.     According to the Stroke Guidelines, patients having a stroke (like Patient 12) must be immediately transferred to a Primary Stroke Center ("PSC") or Comprehensive Stroke Center ("CSC").

219.     Desert View was not a PSC or CSC necessary to treat Patient 12; notwithstanding this, Patient 12 was admitted to Desert View on February 4, 2019.

220.     Patient 12's inpatient admission was not medically necessary because Desert View lacked the capability to treat Patient 12's medical needs and condition.

221.     Desert View incurred costs as a result of the inpatient services, ancillary services (including various tests), and other services that were provided to Patient 12.  Based on information and belief, these costs were incorporated into Desert View's cost report that was submitted to CMS at the end of the year.

222.     Patient 12 was discharged from Desert View on February 5, 2019.

223.     On May 4, 2020, Desert View submitted an Inpatient Claim Form to Medicare in the amount of $15,381.96 for the inpatient services provided to Patient 12 from February 4 to February 5.

224.     On May 4, 2020, Desert View also submitted an Inpatient Claim Form to TRICARE in the amount of $15,381.96 for the inpatient services provided to Patient 12.

225.     TRICARE paid Desert View $4,353.57 for the inpatient services that were provided to Patient 12.

226.     Based on information and belief, Vista Health also submitted a Professional Claim Form to Medicare for professional services that were provided to Patient 12 at Desert View.

227.     Because Patient 12's inpatient admission was medically unnecessary, Defendants' claims for inpatient services to Medicare and TRICARE were false, and TRICARE's payment for those inpatient services was a result of Defendants' false claim.

### Patient 15

228.     Patient 15 was a Medicare beneficiary.

229.     Patient 15 presented to Desert View with serious rectal bleeding and a history of coronary stents.  This patient was taking dual antiplatelet therapy, consisting of aspirin and clopidogrel.

230.     According to the Acute Lower Gastrointestinal Bleeding published in the prestigious New England Journal of Medicine on March 16, 2017 ("GI Bleeding Standards"), patients (like Patient 15) having a GI Bleed must immediately undergo a colonoscopy, which Desert View was not staffed and/or equipped to perform.

231.     Patient 15 was admitted to Desert View on July 5, 2019.

232.     Patient 15's admission was not medically necessary because Desert View lacked the capability to treat Patient 15's medical needs and condition.

233.     Patient 15 was subjected to unnecessary testing, including a CT scan of the head, carotid ultrasound, and an echocardiogram, withal of which are unrelated to treatment for rectal bleeding.

234.     Desert View incurred costs as a result of the inpatient services, ancillary services (including the unnecessary tests), and other services that were provided to Patient 15.  Based on information and belief, these costs were incorporated into Desert View's cost report that was submitted to CMS at the end of the year.

235.     Patient 15 was discharged from Desert View on July 7, 2019.

236.     On July 11, 2019, Desert View submitted an Inpatient Claim Form to Medicare in the amount of $34,905.26 for the inpatient services provided to Patient 15 from July 5 to July 7.

237.     Based on information and belief, Vista Health also submitted a Professional Claim Form to Medicare for the professional services that were provided to Patient 15 at Desert View.

238.     Because Patient 15's inpatient admission was medically unnecessary, Defendants' claims for inpatient and professional services to Medicare were false.

**Patient 16**

239.     Patient 16 was a Medicare beneficiary.

240.     Patient 16 presented to Desert View with multiple critical medical conditions including, but not limited to, renal failure and congestive heart failure, and pneumonia.

241.     Patients having renal failure and other organ failures (such as Patient 16) must be immediately transferred to a higher level facility to obtain critical care evaluation and treatment.

242.    However, even though Desert View does not have an ICU to deal with the subject patient's serious multiple medical comorbidities, Patient 16 was admitted as an inpatient to Desert View on January 23, 2019.

243.    Patient 16's inpatient admission was not medically necessary because Desert View lacked the capability to treat Patient 16's medical needs and condition.

244.    Desert View incurred costs as a result of the inpatient services, ancillary services (including various tests), and other services that were provided to Patient 16.  Based on information and belief, these costs were incorporated into Desert View's cost report that was submitted to CMS at the end of the year.

245.    Patient 16 was discharged from Desert View on January 26, 2019.

246.    On January 31, 2019, Desert View submitted an Inpatient Claim Form to Medicare in the amount of $42, 356.08 for the inpatient services provided to Patient 16.

247.    On February 4, 2019, Desert View submitted an additional Inpatient Claim Form to Medicare in the amount of $2,615.77 for the inpatient services provided to Patient 16.

248.    Noridian, serving as an intermediary for Medicare, paid Desert View $5,644.80 for the inpatient services that were provided to Patient 16 at a cost-based rate of $1,920.00 per day, after accounting for a $115.20 sequestration amount.

249.    Based on information and belief, Vista Health also submitted a Professional Claim Form to Medicare for the professional services that were provided to Patient 16 at Desert View.

250.    Because Patient 16's inpatient admission was not necessary, Defendants' claims for inpatient and professional services to Medicare were false, and Medicare's payments for those services were a result of Defendants' false claims.

**Patient 17**

251.    Patient 17 was a Medicare beneficiary.

252.    Patient 17 presented to Desert View with diagnoses of sepsis and pneumonia, in the context of underlying congestive heart failure and renal failure.

253.    Patients having renal failure and other organ failures (such as Patient 17) must be immediately transferred to a higher level facility to obtain critical care evaluation and treatment.

254.    However, even though Desert View does not have an ICU to deal with Patient 17's serious multiple medical comorbidities, Patient 17 was admitted as an inpatient to Desert View on February 4, 2019.

255.    Patient 17's inpatient admission was not medically necessary because Desert View lacked the capability to treat Patient 17's medical needs and condition.

256.    Desert View incurred costs as a result of the inpatient services, ancillary services (including various tests), and other services that were provided to Patient 17.  Based on information and belief, these costs were incorporated into Desert View's cost report that was submitted to CMS at the end of the year.

257.    Patient 17 was discharged from Desert View on February 7, 2019.

258.    On February 13, 2019, Desert View submitted an Inpatient Claim Form to Medicare in the amount of $29,740.78 for the inpatient services provided to Patient 17.

259.    Noridian, serving as an intermediary for Medicare, paid Desert View $4,308.08 for the inpatient services provided to Patient 17 at a cost-based rate of $1,920.00 per day, after accounting for a $1,364 deductible and an $87.92 sequestration amount.

260.    Based on information and belief, Vista Health also submitted a Professional Claim Form to Medicare for the professional services that were provided to Patient 17 at Desert View.

261.    Because Patient 17's inpatient admission was not necessary, Defendants' claims for inpatient and professional services to Medicare were false, and Medicare's payments for those services were a result of Defendants' false claims.

**Patient 20**

262.    Patient 20 was a Medicare beneficiary.

263.    Patient 20 presented to Desert View with acute hypoxic respiratory failure.

264.    Even though Desert View does not have an ICU to deal with Patient 20's serious multiple medical comorbidities, Patient 20 was admitted as an inpatient to Desert View on January 30, 2019.

265.    Patient 20's inpatient admission was not medically necessary because Desert View lacked the capability to treat Patient 20's medical needs and condition.

266.     Desert View incurred costs as a result of the inpatient services, ancillary services (including various tests), and other services that were provided to Patient 20.  Based on information and belief, these costs were incorporated into Desert View's cost report that was submitted to CMS at the end of the year.

267.     Patient 20 was discharged from Desert View on February 1, 2019.

268.     On February 11, 2019, Desert View submitted an Inpatient Claim Form to Medicare in the amount of $19,122.44 for the inpatient services provided to Patient 20.

269.     Noridian, serving as an intermediary for Medicare, paid Desert View $3,763.20 for the inpatient services provided to Patient 20 at a cost-based rate of $1,920 per day, after accounting for a $72.80 sequestration amount.

270.     Based on information and belief, Vista Health also submitted a Professional Claim Form to Medicare for the professional services that were provided to Patient 20 at Desert View.

271.     Because Patient 20's inpatient admission was not necessary, Defendants' claims for inpatient and professional services to Medicare were false, and Medicare's payments for those services were a result of Defendants' false claims.

**Patient 24**

272.     Patient 24 was a Medicare beneficiary.

273.     On July 13, 2019, Patient 24 was admitted as an inpatient into Desert View with complaints of dizziness.

274.     However, there was no medical indication for Patient 24's inpatient admission, nor any certification by the admitting physician that this patient would require hospital care for more than two (2) midnights is false within the meaning of 42 CFR § 412.3(d)(1).

275.     Furthermore, the inpatient admission of Patient 24 did not meet InterQual criteria.

276.     In addition, according to the medical chart, Patient 24 was subjected to an MRI of the brain, CT scan of the brain, carotid ultrasound, and a cardiac echocardiogram, which were not indicated and did not correlate with Patient 24's complaints in the medical chart.

277.     Desert View incurred costs as a result of the inpatient services, ancillary services (including the unnecessary tests), and other services that were provided to Patient 24.  Based on

information and belief, these costs were incorporated into Desert View's cost report that was submitted to CMS at the end of the year.

278.  Patient 24 was discharged from Desert View on July 15, 2019.

279.  On July 19, 2019, Desert View submitted an Inpatient Claim Form to Medicare in the amount of $39,315.21 for the inpatient services provided to Patient 24.

280.  On November 14, 2019, Desert View submitted another Inpatient Claim Form to Medicare in the amount of $39,315.21 for the inpatient services provided to patient 24.

281.  Noridian, serving as an intermediary for Medicare, paid Desert View $1,090.47 for the inpatient services provided to Patient 24.

282.  Based on information and belief, Vista Health also submitted a Professional Claim Form to Medicare for the professional services that were provided to Patient 24 at Desert View.

283.  Because Patient 24's inpatient admission to Desert View was medically unnecessary and did not even satisfy the hospital's own admissions criteria, Defendants' claims for inpatient and professional services to Medicare were false, and Medicare's payment for those services was a result of Defendants' false claims.

**Patient 35(p)**

284.  Patient 35(p) was a Medicare beneficiary.

285.  Patient 35(p) presented to Desert View on or around May 10, 2020 due to elevated blood pressure.

286.  Patient 35(p), underwent (among other things) a nuclear stress test.  This test was not indicated and was medically unnecessary because according to his medical chart the patient "was chest pain free," or asymptomatic.

287.  The American College of Cardiology Foundation and the American Society of Nuclear Cardiology, in conjunction with six other nationally recognized societies, publish Appropriate Use Criteria for nuclear stress tests.  These criteria state that it is inappropriate to perform a nuclear stress test on a patient, like Patient 35(p), who is asymptomatic and low risk for coronary heart disease.

288.     Patient 35(p) also underwent (among other things) an echocardiogram which was previously recently performed.  This test was not indicated and medically unnecessary because it was recently performed.

289.     The American College of Cardiology Foundation and the American Society of Echocardiography, in conjunction with several other nationally recognized societies, publish Appropriate Use Criteria for echocardiography.  These criteria state that it is inappropriate to perform another echocardiogram on a patient like, like Patient Three5(p), who is merely presents with high blood pressure and no signs of hypertensive heart disease.

290.     Desert View incurred costs as a result of the inpatient services, ancillary services (including these unnecessary tests), and other services that were provided to Patient 35(p).  Based on information and belief, these costs were incorporated into Desert View's cost report that was submitted to CMS at the end of the year.

291.     Patient 35(p) was discharged from Desert View on or around May 12, 2020.

292.     Based on information and belief, Desert View submitted an Inpatient Claim Form to Medicare for the inpatient services provided to Patient 35(p).

293.     Based on information and belief, Noridian, serving as an intermediary for Medicare, paid Desert View for the inpatient services provided to Patient 35(p).

294.     Based on information and belief, Vista Health also submitted a Professional Claim Form to Medicare for the professional services that were provided to Patient 35(p) at Desert View.

**Patient 37**

295.     Patient 37 was a Medicare beneficiary and a CHAMPVA patient.

296.     Patient 37 presented to Desert View with multiple diagnoses, which are listed on page two of the emergency department Summary of Care.

297.     Desert View does not have the facilities to provide "ICU/Intermediate" care services to patients like Patient 37.

298.     However, even though Desert View did not have the facilities necessary to treat Patient 37, Patient 37 was admitted as an inpatient to Desert View on January 14, 2019.

299.    Desert View incurred costs as a result of the inpatient services, ancillary services (including various tests), and other services that were provided to Patient 37.  Based on information and belief, these costs were incorporated into Desert View's cost report that was submitted to CMS at the end of the year.

300.    Patient 37 was discharged from Desert View on January 18, 2019.

301.    On January 24, 2019, Desert View submitted an Inpatient Claim Form to Medicare in the amount of $47,268.75 for, among other things, the "ICU/Intermediate" care during Patient 37's inpatient stay.

302.    Noridian, serving as an intermediary for Medicare, paid Desert View $6,189.68 for the inpatient services that were provided to Patient 37 at a cost-based rate of $1,920 per day, after accounting for a $1,364 deductible and a $126.32 sequestration amount.

303.    On February 13, 2019, Desert View submitted an Inpatient Claim Form to CHAMPVA in the amount of $47,268.75 for, among other things, the "ICU/Intermediate" care during Patient 37's inpatient stay.

304.    CHAMPVA paid Desert View $1,364 (an amount equal to the deductible) for the inpatient services that were provided to Patient 37.

305.    Based on information and belief, Vista Health also submitted a Professional Claim Form to Medicare for the professional services that were provided to Patient 37 at Desert View.

306.    Because Patient 37's inpatient admission was not necessary, Defendants' claims for inpatient and professional services to Medicare and CHAMPVA were false, and Medicare and CHAMPVA's payments for those services were a result of Defendants' false claims.

**Patient 38**

307.    Patient 38 was a Medicare beneficiary.

308.    Patient 38 presented to Desert View with symptoms of bronchitis.

309.    There was no medical indication for an inpatient admission of Patient 38, and any certification by the admitting physician that this patient would require hospital care for more than two (2) midnights is false within the meaning of  42 CFR § 412.3(d)(1).

310.    Furthermore, the inpatient admission of Patient 38 did not meet InterQual criteria.

311. Nevertheless, Patient 38 was admitted as an inpatient to Desert View on March 22, 2019.

312. Desert View incurred costs as a result of the inpatient services, ancillary services (including various tests), and other services that were provided to Patient 38. Based on information and belief, these costs were incorporated into Desert View's cost report that was submitted to CMS at the end of the year.

313. Patient 38 was discharged from Desert View on March 24, 2019.

314. Desert View submitted an Inpatient Claim Form to Medicare in the amount of $12,836.17 for the inpatient services provided to Patient Eight.

315. Noridian, serving as an intermediary for Medicare, paid Desert View $3,763.20 for the inpatient services that were provided to Patient 38 at a cost-based rate of $1,920 per day, after accounting for a $76.80 sequestration amount.

316. Based on information and belief, Vista Health also submitted a Professional Claim Form to Medicare for the professional services that were provided to Patient Eight at Desert View.

317. Because Patient 38's inpatient admission to Desert View was medically unnecessary and did not even satisfy the hospital's own admissions criteria, Defendants' claim for inpatient and professional services to Medicare were false, and Medicare's payment for those services was a result of Defendants' false claims.

**Patient 67**

318. Patient 67 was a Medicare beneficiary.

319. Patient 67 was an established congestive heart failure and cirrhosis patient with recurrent ascites (abdominal fluid due to cirrhosis). Upon examination, Patient 67's primary care physician determined that Patient 67 was experiencing an episode of significant abdominal swelling.

320. Patient 67 was sent to Desert View for drainage of swelling, a procedure known as paracentesis, only. This is a 30-60 minute outpatient procedure. Patient 67 had no other symptoms and needed no other treatment.

321.    Despite a clear directive from the primary care physician and absence of any acute symptoms, upon presentation to Desert View, Patient 67 was seen by Dr. Mirza and admitted as an inpatient for three (3) days, starting on May 21, 2019.

322.    There was no medical indication for an inpatient admission of Patient 67, and any certification by the admitting physician that this patient would require hospital care for more than two (2) midnights is false within the meaning of 42 CFR § 412.3(d)(1).

323.    Furthermore, the inpatient admission of Patient 67 did not meet InterQual criteria.

324.    While an inpatient at Desert View, Patient 67 underwent, among others, an echocardiogram, which was not indicated and did not correlate with Patient 67's complaints during the hospitalization. Therefore, such testing was not reasonable, necessary or relevant to the patient's complaints, admission diagnosis or treatment plan.

325.    Desert View incurred costs as a result of the inpatient services, ancillary services (including the unnecessary tests), and other services that were provided to Patient 67.  Based on information and belief, these costs were incorporated into Desert View's cost report that was submitted to CMS at the end of the year.

326.    Patient 67 was discharged from Desert View on May 23, 2019.

327.    On May 28, 2019, Desert View submitted an Inpatient Claim Form to Medicare in the amount of $32,250.14 for the inpatient services provided to Patient 67.

328.    On July 10, 2019, Noridian, serving as an intermediary for Medicare, paid Desert View $962.99 for the inpatient services that were provided to Patient 67.

329.    Based on information and belief, Vista Health also submitted a Professional Claim Form to Medicare for the professional services provided to Patient 67 during Patient 67's inpatient stay at Desert View.

330.    Because Patient 67's inpatient admission was not necessary and did not even satisfy the Desert View's own admission criteria, Defendants' claims for inpatient and professional services to Medicare were false, and Medicare's payments for those services were a result of Defendants' false claims.

///

**Patient 68**

331.     Patient 68 was a Medicare beneficiary.

332.     Patient 68 was admitted to Desert View on January 19, 2020 after presenting with complaints of being dehydrated, being weak and lethargic, not eating or drinking properly for approximately 1 week.  Patient 68's family reported that he recently fell three (3) times including a fall off of a ladder at which time he hit his head.

333.     Patient 68 needed to be treated with intravenous fluids for his dehydration, and an MRI of his brain on an outpatient basis.

334.     Instead, Patient 68 was admitted as an inpatient at Desert View for four (4) days for acute renal failure, dehydration and altered mental status.

335.     There was no medical indication for Patient 68's inpatient admission, and any certification by the admitting physician that this patient would require hospital care for more than two (2) midnights is false within the meaning of 42 CFR § 412.3(d)(1).

336.     Furthermore, Patient 68's inpatient admission did not meet InterQual criteria.

337.     In addition, while an inpatient at Desert View, Patient 68 underwent, among other tests, an echocardiogram and a nuclear stress test that were not indicated and did not correlate with Patient 68's complaints during the hospitalization (Patient 68's oxygen was 98-100%, he reported no chest pain, no shortness of breath, or difficulty breathing). Therefore, such testing was not reasonable, necessary or relevant to the patient's complaints, admission diagnosis or treatment plan.

338.     Desert View incurred costs as a result of the inpatient services, ancillary services (including the unnecessary tests), and other services that were provided to Patient 68.  Based on information and belief, these costs were incorporated into Desert View's cost report that was submitted to CMS at the end of the year.

339.     Patient 68 was discharged from Desert View on January 23, 2020.

340.     Based on information and belief, Desert View submitted an Inpatient Claim Form to Medicare for the inpatient services provided to Patient 68.

341.     Based on information and belief, Noridian, serving as an intermediary for Medicare, paid Desert View for the inpatient services that were provided to Patient 68.

342.     Based on information and belief, Vista Health also submitted a Professional Claim Form to Medicare for the professional services provided to Patient 67 during Patient 67's inpatient stay at Desert View.

343.     Because Patient 67's inpatient admission was not necessary and did not even satisfy the hospital's own admission criteria, Defendants' claims for inpatient and professional services to Medicare were false, and Medicare's payments for those services were a result of Defendants' false claims.

**Patient 69**

344.     Patient 69 was a Medicare beneficiary.

345.     Patient 69 presented to Desert View on December 25, 2019 after choking on a piece of chicken and passing out.  The patient reported no other notable symptoms.

346.     This patient should have been discharged from the emergency department and referred for Esophagogastroduodenoscopy (EGD) for dysphasia on an outpatient basis.

347.     Even Dr. Mirza, the admitting hospitalist, states in his admission history that while in the emergency room Patient 69 "markedly improved speaking in full sentences[,] awake alert without complaints."

348.     Despite his acknowledgment of Patient 69's stable condition, Dr. Mirza admitted Patient 69 as an inpatient for four (4) days at Desert View with the diagnosis of Sepsis, Urinary Tract Infection, and Aspiration.

349.     There was no basis whatsoever for this patient to be diagnosed and admitted for sepsis. In fact, the patient's white cell count was normal at 8400 and the patient had no elevation of temperature on admission.  Furthermore, the patient's blood culture was negative all of which negate the diagnosis of sepsis.

350.     Also, even though there were no complaints or symptoms indicating a urinary tract infection, a urinalysis was done on Patient 69 with an incidental finding of asymptomatic bacteriuria which is normally treated with a prescription for oral antibiotics.  Instead, Patient 69 was treated with intravenous antibiotics.

351.     Subsequently, a urine culture was done on Patient 69 which came back negative, indicating no urinary tract infection.  Moreover, as a result of Patient 69 receiving unnecessary intravenous antibiotics, Patient developed C. Difficile, a hospital-acquired bacterium that causes diarrhea in weakened patients.

352.     There was no medical indication for the inpatient admission of Patient 69, and any certification by the admitting physician that this patient would require hospital care for more than two (2) midnights is false within the meaning of 42 CFR § 412.3(d)(1).

353.     The inpatient admission of Patient 69 did not meet InterQual criteria.

354.     In addition, while an inpatient at Desert View, Patient 69 was subjected to a CT scan of the brain with and without contrast, CT of the spine, as well as a chest x-ray and laboratory studies which were not indicated and did not correlate with Patient 69's complaints during the hospitalization. Therefore, such testing was not reasonable, necessary or relevant to Patient 69's complaints, admission diagnosis or treatment plan.

355.     Desert View incurred costs as a result of the inpatient services, ancillary services (including the unnecessary tests), and other services that were provided to Patient 69.  Based on information and belief, these costs were incorporated into Desert View's cost report that was submitted to CMS at the end of the year.

356.     Patient 69 was discharged from Desert View on December 29, 2019.

357.     Based on information and belief, Desert View submitted an Inpatient Claim Form to Medicare for the inpatient services provided to Patient 69.

358.     Based on information and belief, Noridian, serving as an intermediary for Medicare, paid Desert View for the inpatient services that were provided to Patient 69.

359.     Based on information and belief, Vista Health also submitted a Professional Claim Form to Medicare for the professional services provided to Patient 69 during Patient 69's inpatient stay at Desert View.

360.     Because Patient 69's inpatient admission was not necessary and did not even satisfy the hospital's own admission criteria, Defendants' claims for inpatient and professional services to

Medicare were false, and Medicare's payments for those services were a result of Defendants' false claims.

**Patient 73**

361.     Patient 73 presented to Desert View with complaints of progressive weakness over a two-week period and confusion on the day of admission.  Urinalysis was done with abnormal results but there was no clinical evidence of urinary tract infection.  It does not even appear that Patient 73's urine was cultured to confirm the infection.

362.     Patient 73 should have been given antibiotics and discharged from Desert View.

363.     Instead, Patient 73 was admitted to Desert View for a two (2) day observation.

364.     There was no medical indication for an inpatient admission of Patient 73, and any certification by the admitting physician that this patient would require hospital care for more than two (2) midnights is false within the meaning of 42 CFR § 412.3(d)(1).

365.     Furthermore, Patient 73's inpatient admission did not meet InterQual criteria.

366.     In addition, while an inpatient at Desert View, Patient 73 was subjected to an echocardiogram which was not indicated and did not correlate with Patient 73's complaints during the hospitalization. Therefore, such testing was not reasonable, necessary or relevant to the patient's complaints, admission diagnosis or treatment plan.

367.     Desert View incurred costs as a result of the inpatient services, ancillary services (including the unnecessary tests), and other services that were provided to Patient 73.  Based on information and belief, these costs were incorporated into Desert View's cost report that was submitted to CMS at the end of the year.

368.     Based on information and belief, Desert View submitted an Inpatient Claim Form to Medicare for the inpatient services provided to Patient 73.

369.     Based on information and belief, Noridian, serving as an intermediary for Medicare, paid Desert View for the inpatient services that were provided to Patient 73.

370.     Based on information and belief, Vista Health also submitted a Professional Claim Form to Medicare for the professional services provided to Patient 73 during Patient 73's inpatient stay at Desert View.

371.    Because Patient 73's inpatient admission was not necessary and did not even satisfy the hospital's own admission criteria, Defendants' claims for inpatient and professional services to Medicare were false, and Medicare's payments for those services were a result of Defendants' false claims.

**Patient 75**

372.    Patient 75 was a Medicare beneficiary.

373.    Patient 75 presented to Desert View on May 6, 2020 after falling and injuring her elbow. She had difficulty getting out of her bathtub and slipped and fell hurting her left elbow.  She denied hitting her head or loss of consciousness.  No mental status changes or neurologic findings were described on admission.

374.    Patient 75 should have been discharged from the emergency department with a referral for a consultation with an orthopedic surgeon.

375.    Instead, Patient 75 was admitted as an inpatient to Desert View for four (4) days with a diagnosis of acute heart failure even though she had no related complaints and the chest x-ray (which was also unnecessary) had no findings of acute heart failure.  Patient 75 was also diagnosed with a urinary tract infection even though the patient had no symptoms, and both urinalysis and urine culture were negative for infection.

376.    In addition, while at Desert View, Patient 75 underwent a CT of her brain and neck even though she denied hitting her head or losing consciousness.

377.    Also, while at Desert View, Patient 75 underwent an echocardiogram which was not necessary or relevant to the patient's admission diagnosis or treatment plan.

378.    There was no medical indication for an inpatient admission of Patient 75, and any certification by the admitting physician that this patient would require hospital care for more than two (2) midnights is false within the meaning of 42 CFR § 412.3(d)(1).

379.    Furthermore, the inpatient admission of this Patient 75 did not meet InterQual criteria.

380.    In addition, while an inpatient at Desert View, in addition to others tests, Patient 75 underwent a chest x-ray, urinalysis, urine culture, CT of her brain and echocardiogram which were not indicated and did not correlate with Patient 75's complaints during the hospitalization. Therefore, such

testing was not reasonable, necessary or relevant to the patient's complaints, admission diagnosis or treatment plan.

381.    Desert View incurred costs as a result of the inpatient services, ancillary services (including the unnecessary tests), and other services that were provided to Patient 75.  Based on information and belief, these costs were incorporated into Desert View's cost report that was submitted to CMS at the end of the year.

382.    Patient 75 was discharged from Desert View on May 9, 2020.

383.    Based on information and belief, Desert View submitted an Inpatient Claim Form to Medicare for the inpatient services provided to Patient 75.

384.    Based on information and belief, Noridian, serving as an intermediary for Medicare, paid Desert View for the inpatient services that were provided to Patient 75.

385.    Based on information and belief, Vista Health also submitted a Professional Claim Form to Medicare for the professional services provided to Patient 75 during Patient 75's inpatient stay at Desert View.

386.    Because Patient S75's inpatient admission was not necessary and did not even satisfy the hospital's own admission criteria, Defendants' claims for inpatient and professional services to Medicare were false, and Medicare's payments for those services were a result of Defendants' false claims.

**Patient 76**

387.    Patient 76 was a Medicare beneficiary.

388.    Patient 76 presented to Desert View on April 28, 2020 due to having tripped and sprained an ankle.

389.    Patient 76 should have been treated at the emergency department and discharged with a referral to an orthopedist.

390.    Despite having no fever, no shortness of breath, no hypoxia or any other symptoms which would require it, a chest x-ray was performed on Patient 76.   Chest x-ray was inconclusive and a follow up chest x-ray was needed.

391.    Patient 76 was diagnosed with pneumonia and was admitted as an inpatient for five (5) days to Desert View.  During the patient's stay, the recommended follow up chest x-ray was never performed.

392.    Further, while at Desert View, Patient 76 was subjected to a CT of her head as well as an echocardiogram, neither which were reasonable, necessary or relevant to the patient's complaints, admission diagnosis or treatment plan.

393.    There was no medical indication for an inpatient admission of this Patient 76, and any certification by the admitting physician that this patient would require hospital care for more than two (2) midnights is false within the meaning of 42 CFR § 412.3(d)(1).

394.    Furthermore, the inpatient admission of this Patient 76 did not meet InterQual criteria.

395.    In addition, while an inpatient at Desert View, in addition to other tests, Patient 76 underwent a chest x-ray, CT of her head as well as an echocardiogram which were not indicated and did not correlate with Patient 76's complaints during the hospitalization. Therefore, such testing was not reasonable, necessary or relevant to the patient's complaints, admission diagnosis or treatment plan.

396.    Desert View incurred costs as a result of the inpatient services, ancillary services (including the unnecessary tests), and other services that were provided to Patient 76.  Based on information and belief, these costs were incorporated into Desert View's cost report that was submitted to CMS at the end of the year.

397.    Patient 76 was discharged from Desert View on May 2, 2020.

398.    Based on information and belief, Desert View submitted an Inpatient Claim Form to Medicare for the inpatient services provided to Patient 76.

399.    Based on information and belief, Noridian, serving as an intermediary for Medicare, paid Desert View for the inpatient services that were provided to Patient 76.

400.    Based on information and belief, Vista Health also submitted a Professional Claim Form to Medicare for the professional services provided to Patient Seven6 during Patient Seven6's inpatient stay at Desert View.

401.    Because Patient 76's inpatient admission was not necessary and did not even satisfy the hospital's own admission criteria, Defendants' claims for inpatient and professional services to Medicare were false, and Medicare's payments for those services were a result of Defendants' false claims.

**Patient 77**

402.    Patient 77 was a Medicare beneficiary.

403.    Patient 77 presented to Desert View on January 8, 2020 with progressive neurologic issues including left-sided weakness consistent with a stroke.

404.    Patient 77 should have been transferred to a higher level of care stroke facility for appropriate and indicated diagnostics and therapeutics.

405.    Instead, Patient 77 was admitted as an inpatient to Desert View for three (3) days with a diagnosis of Left Sided Numbness and Weakness.

406.    During Patient 77's stay at Desert View, Patient 77 had an MRI study which clearly showed that she had an acute stroke.

407.    Even though Desert View was not equipped to treat Patient 77, the medical chart reveals that Patient 77 was admitted to Desert View on January 8, 2020.

408.    Patient 77's inpatient admission was not medically necessary because Desert View was not a setting appropriate for the subject patient's medical needs and condition.

409.    In addition, while an inpatient at Desert View, Patient 77 underwent, among other tests, a chest x-ray, and an echocardiogram while exhibiting no symptoms which would indicate said testing. Therefore, such testing was not reasonable, necessary or relevant to the patient's complaints, admission diagnosis or treatment plan.

410.    Desert View incurred costs as a result of the inpatient services, ancillary services (including the unnecessary tests), and other services that were provided to Patient 77.  Based on information and belief, these costs were incorporated into Desert View's cost report that was submitted to CMS at the end of the year.

411.    Patient 77 was discharged from Desert View on January 10, 2020.

412.    Based on information and belief, Desert View submitted an Inpatient Claim Form to Medicare for the inpatient services provided to Patient 77.

413.    Based on information and belief, Noridian, serving as an intermediary for Medicare, paid Desert View for the inpatient services that were provided to Patient 77.

414.    Based on information and belief, Vista Health also submitted a Professional Claim Form to Medicare for the professional services provided to Patient 77 during Patient 77's inpatient stay at Desert View.

415.    Because Patient 77's inpatient admission was not necessary and did not even satisfy the hospital's own admission criteria, Defendants' claims for inpatient and professional services to Medicare were false, and Medicare's payments for those services were a result of Defendants' false claims.

**Patient 78**

416.    Patient 78 was a Medicare beneficiary.

417.    Patient 78 presented to Desert View on May 23, 2020 due to having a pressure-like dull chest discomfort.  Patient 78's cardiac enzymes were negative.  Patient 78's EKG was negative.

418.    According to current cardiology guidelines, Patient 78 should have been discharged from the emergency room with an outpatient cardiology follow-up.

419.    Instead, Patient 78 was admitted as an inpatient to Desert View for three (3) days with a diagnosis for acute coronary syndrome.

420.    There was no medical indication for an inpatient admission of Patient 78, and any certification by the admitting physician that this patient would require hospital care for more than two (2) midnights is false within the meaning of 42 CFR § 412.3(d)(1).

421.    Furthermore, the inpatient admission of Patient 78 did not meet InterQual criteria.

422.    In addition, while an inpatient at Desert View, in addition to others, Patient 78 underwent echocardiogram and a nuclear stress testing which were not indicated and did not correlate with Patient 78's complaints during the hospitalization. Therefore, such testing was not reasonable, necessary or relevant to the patient's complaints, admission diagnosis or treatment plan.

423.   Desert View incurred costs as a result of the inpatient services, ancillary services (including the unnecessary tests), and other services that were provided to Patient 78.  Based on information and belief, these costs were incorporated into Desert View's cost report that was submitted to CMS at the end of the year.

424.   Patient 78 was discharged from Desert View on May 25, 2020.

425.   Based on information and belief, Desert View submitted an Inpatient Claim Form to Medicare for the inpatient services provided to Patient 78.

426.   Based on information and belief, Noridian, serving as an intermediary for Medicare, paid Desert View for the inpatient services that were provided to Patient 78.

427.   Based on information and belief, Vista Health also submitted a Professional Claim Form to Medicare for the professional services provided to Patient 78 during Patient 78's inpatient stay at Desert View.

428.   Because Patient 78's inpatient admission was not necessary and did not even satisfy the hospital's own admission criteria, Defendants' claims for inpatient and professional services to Medicare were false, and Medicare's payments for those services were a result of Defendants' false claims.

## Medicaid Patients

### Patient Two

429.   Patient Two was a Medicaid beneficiary.

430.   Patient Two presented to Desert View with complaints of chest pain and cardiac enzymes diagnostic of myocardial infarction, a heart attack.  Patient Two's presentation was consistent with High-Risk Criteria.

431.    A notation on the nuclear stress test worksheet indicates that Dr. Mirza was aware of Patient Two's elevated cardiac enzyme (troponin), which is evidence of myocardial infarction.

432.   According to Braunwald's Cardiology Practice Standards, patients having a heart attack must be immediately transferred to an acute care hospital that has a cardiac cath lab, which is properly equipped and staffed to provide angiograms and coronary intervention (stents).

433.   Patient Two was nonetheless admitted as an inpatient to Desert View on January 22, 2019.

434.   Patient Two's inpatient admission was not medically necessary because Desert View lacked the capability to treat Patient Two's medical needs and condition.

435.   In addition, Patient Two underwent an unnecessary nuclear stress test, a costly test used to determine whether a patient has coronary artery disease and heart attack risk.  However, according to the medical chart, the subject patient was already diagnosed with a heart attack using a very inexpensive blood test.

436.   Desert View incurred costs as a result of the inpatient services, ancillary services (including the unnecessary test), and other services that were provided to Patient Two.  Based on information and belief, these costs were incorporated into Desert View's cost report that was submitted to CMS at the end of the year.

437.   Patient Two was discharged from Desert View on January 24, 2019.

438.   On January 30, 2019, Desert View submitted an Inpatient Claim Form to Medicaid in the amount of $25,585.54 for the inpatient services provided to Patient 2.

439.   Medicaid paid Desert View $3,416.72 for the inpatient services that were provided to Patient 2.

440.   Based on information and belief, Vista Health also submitted a Professional Claim Form to Medicaid for the professional services that were provided to Patient Two at Desert View.

441.   Because Patient Two's inpatient admission was not necessary, Defendants' claims for inpatient and professional services to Medicaid were false, and Medicaid's payments for those services were a result of Defendants' false claims.

**Patient Four**

442.   Patient Four was a Medicaid beneficiary.

443.   Patient Four presented to Desert View with complaints of NSTEMI-type acute coronary syndrome manifest as heart palpations, abnormal EKG, and shortness of breath with positive cardiac enzymes (a heart attack).  Patient Four's presentation was consistent with High-Risk Criteria.

444.     Dr. Mirza wrote in Patient Four's chart that the patient will "get an echocardiogram, carotid ultrasound, and Lexiscan stress test for a further cardiac workup."

445.     According to Braunwald's Cardiology Practice Standards, patients having a heart attack (like this Patient Four) must be immediately transferred to an acute care hospital that has a cardiac cath lab, which is properly equipped and staffed to provide angiograms and coronary intervention (stents).

446.     However, even though Desert View did not have a cath lab necessary to treat Patient Four, Patient was admitted as an inpatient to Desert View on February 12, 2019.

447.     Patient Four's inpatient admission was not medically necessary because Desert View lacked the capability to treat Patient Four's medical needs and condition.

448.     Patient Four also underwent several unnecessary tests to determine whether Patient Four had coronary artery disease and heart attack risk, which incurred laboratory costs and other related costs.  However, according to the medical chart, the subject patient was already diagnosed with a heart attack using a very inexpensive blood test.

449.     Desert View incurred costs as a result of the inpatient services, ancillary services (including the unnecessary tests), and other services that were provided to Patient Four.  Based on information and belief, these costs were incorporated into Desert View's cost report that was submitted to CMS at the end of the year.

450.     Patient Four was discharged from Desert View on February 14, 2019.

451.     Desert View submitted at least three different Claim Forms to Medicaid for the inpatient services that were provided to Patient Four.  The first claim for $15,718.10 was submitted on February 21, 2019.  A second claim for $3,008.44 was submitted on February 27, 2019.  And a third claim for $18,726.54 was submitted on July 19, 2019.

452.     On April 15, 2019, Medicaid paid Desert View $2,938.91 for the inpatient services that were provided to Patient Four.  And on April 23, 2019, Medicaid paid Desert View $8,130.06 for the inpatient services that were provided to Patient Four.

453.     Based on information and belief, Vista Health also submitted a Professional Claim Form to Medicaid for the professional services that were provided to Patient Four at Desert View.

454.    Because Patient Four's inpatient admission was not necessary, Defendants' claims for inpatient and professional services to Medicaid were false, and Medicaid's payments for those services were a result of Defendants' false claims.

**Patient Nine**

455.    Patient Nine was a Medicaid patient.

456.    Patient Nine presented to Desert View with a diagnosis of cerebrovascular accident, a stroke patient.

457.    According to the "Stroke Guidelines for the Early Management of Patients with Acute Ischemic Stroke," January 31, 2013 (the "Stroke Guidelines"), patients having a stroke (like Patient Nine) must be immediately transferred to a Primary Stroke Center ("PSC") or Comprehensive Stroke Center ("CSC").

458.    However, even though Desert View is not a PSC or CSC necessary to treat this Patient Nine, Patient was admitted to Desert View on January 24, 2019.

459.    Patient Nine's inpatient admission was not medically necessary because Desert View lacked the capability to treat Patient Nine's medical needs and condition.

460.    In addition, according to the medical chart, Patient Nine also underwent unnecessary pulmonary testing, a very costly test/treatment not indicated for a stroke patient.  These tests incurred additional costs.

461.    Desert View incurred costs as a result of the inpatient services, ancillary services (including the unnecessary tests), and other services that were provided to Patient 9.  Based on information and belief, these costs were incorporated into Desert View's cost report that was submitted to CMS at the end of the year.

462.    Patient Nine was discharged from Desert View on January 31, 2019.

463.    On February 7, 2019, Desert View submitted an Inpatient Claim Form to Medicaid in the amount of $49,962.41 for the inpatient services provided to Patient Nine.

464.    On February 10, 2019, the NDHS (on behalf of Medicaid) paid Desert View $10,962.41 for the inpatient services that were provided to Patient Nine.

465.     Based on information and belief, Vista Health also submitted a Professional Claim Form to Medicaid for the professional services that were provided to Patient 9 at Desert View.

466.     Because Patient Nine's inpatient admission was not necessary, Defendants' claims for inpatient and professional services to Medicaid were false, and Medicaid's payments for those services were a result of Defendants' false claims.

**Patient 63**

467.     Patient 63 was a Medicaid beneficiary.

468.     Patient 63 presented to Desert View on February 9, 2020 with complaints of shortness of breath.  While in the emergency department, Patient 63 was diagnosed with acute exasperation of COPD and high flow oxygen.

469.     Approximately four (4) months prior to presenting to Desert View, Patient 63 underwent a full cardiac workup including stress test and an echocardiogram while an outpatient.

470.     Patient 63 should have received treatment for exasperation of the patient's COPD and discharged.  Instead, the Desert View hospitalist changed Patient 63's diagnosis to acute coronary syndrome, congestive heart failure and COPD.

471.     On February 10, 2020, Patient 63 was admitted as an inpatient at Desert View for four (4) days.

472.     There was no medical indication for an inpatient admission of Patient 63, and any certification by the admitting physician that this patient would require hospital care for more than two (2) midnights is false within the meaning of 42 CFR § 412.3(d)(1).

473.     Furthermore, the inpatient admission of Patient 63 did not meet InterQual criteria.

474.     In addition, while an inpatient at Desert View, Patient 63 underwent, among others, a stress test and an echocardiogram, the same exact tests the patient just recently underwent as an outpatient and which were not indicated and did not correlate with Patient 63's complaints during the hospitalization. Therefore, such testing was not reasonable, necessary or relevant to the patient's complaints, admission diagnosis or treatment plan.

475.     Desert View incurred costs as a result of the inpatient services, ancillary services (including the unnecessary tests), and other services that were provided to Patient 63.  Based on

information and belief, these costs were incorporated into Desert View's cost report that was submitted to CMS at the end of the year.

476.    Patient 63 was discharged from Desert View on February 13, 2020.

477.    Based on information and belief, Desert View submitted an Inpatient Claim Form to Medicaid for the inpatient services provided to Patient 63.

478.    Based on information and belief, Medicaid paid Desert View for the inpatient services that were provided to Patient 63.

479.    Based on information and belief, Vista Health also submitted a Professional Claim Form to Medicaid for the professional services provided to Patient 63 during Patient 63's inpatient stay at Desert View.

480.    Because Patient 63's inpatient admission was not necessary and did not even satisfy the hospital's own admission criteria, Defendants' claims for inpatient and professional services to Medicaid were false, and Medicaid's payments for those services were a result of Defendants' false claims.

**Patient 66**

481.    Patient 66 was a Medicaid beneficiary.

482.    Patient 66 presented to Desert View on September 14, 2019 with complaints of severe neck pain, anxiety and fatigue.  Patient reported no chest pain.  Objective findings included low potassium and magnesium which were treated at the emergency department.

483.    Appropriate treatment for Patient 66 should have been observation or discharge with referral for an outpatient follow up.

484.    Instead Patient 66 was admitted as an inpatient to Desert View for three (3) days with a diagnosis of Acute Coronary Syndrome, Critical Electrolyte Imbalance and Congestive Heart Failure.

485.    There was no medical indication for an inpatient admission of Patient 66, and any certification by the admitting physician that this patient would require hospital care for more than two (2) midnights is false within the meaning of 42 CFR § 412.3(d)(1).

486.    Furthermore, the inpatient admission of Patient 66 did not meet InterQual criteria.

487.   In addition, while an inpatient at Desert View, Patient 66 underwent, among other tests, an echocardiogram, which was not indicated and did not correlate with Patient 66's complaints during the hospitalization. Therefore, such testing was not reasonable, necessary or relevant to the patient's complaints, admission diagnosis or treatment plan.

488.   Desert View incurred costs as a result of the inpatient services, ancillary services (including the unnecessary tests), and other services that were provided to Patient 66.  Based on information and belief, these costs were incorporated into Desert View's cost report that was submitted to CMS at the end of the year.

489.   Patient 66 was discharged from Desert View on September 16, 2020.

490.   Based on information and belief, Desert View submitted an Inpatient Claim Form to Medicaid for the inpatient services provided to Patient 66.

491.   Based on information and belief, Medicaid paid Desert View for the inpatient services that were provided to Patient 66.

492.   Based on information and belief, Vista Health also submitted a Professional Claim Form to Medicaid for the professional services provided to Patient 66 during Patient 66's inpatient stay at Desert View.

493.   Because Patient 66's inpatient admission was not necessary and did not even satisfy the hospital's own admission criteria, Defendants' claims for inpatient and professional services to Medicaid were false, and Medicaid's payments for those services were a result of Defendants' false claims.

**Patient 70 and Patient 71**

494.   Patient 70 and Patient 71 are the same individual (hereinafter, "Patient 70/71").

495.   Patient 70/71 was a Medicaid beneficiary.

496.   Patient 70/71 was an established cirrhosis patient with recurrent ascites (abdominal fluid due to cirrhosis).  Upon examination by Patient 70/71's primary care physician, it was determined that Patient 70/71 was experiencing an episode of significant abdominal swelling.

497.   Patient 70/71 was sent to Desert View for drainage of swelling, a procedure known as paracentesis, only.  This is a 30-60 minute outpatient procedure. Patient 70/71 had no other symptoms and needed no other treatment.

498.   Instead, upon presentation to Desert View on February 28, 2019, Patient 70/71 was admitted as an inpatient at Desert View Hospital for three (3) days.

499.   There was no medical indication for an inpatient admission of Patient 70/71, and any certification by the admitting physician that this patient would require hospital care for more than two (2) midnights is false within the meaning of 42 CFR § 412.3(d)(1).

500.   Furthermore, the inpatient admission of Patient 70/71 did not meet InterQual criteria.

501.   In addition, while an inpatient at Desert View, Patient 70/71 was subjected to a chest x-ray, CT of his abdomen and an MRI which were not indicated and did not correlate with Patient 70's complaints during the hospitalization. Therefore, such testing was not reasonable, necessary or relevant to the patient's complaints, admission diagnosis or treatment plan.

502.   Desert View incurred costs as a result of the inpatient services, ancillary services (including the unnecessary tests), and other services that were provided to Patient 70/71.  Based on information and belief, these costs were incorporated into Desert View's cost report that was submitted to CMS at the end of the year.

503.   Patient 70/71 was discharged from Desert View on March 2, 2020.

504.   On March 6, 2019, Desert View submitted an Inpatient Claim Form to Medicaid in the amount of $11,408.45 for the inpatient services provided to Patient 70/71.

505.   On March 8, 2019, Medicaid paid Desert View $3,179.48 for the inpatient services that were provided to Patient 70/71.

506.   Based on information and belief, Vista Health also submitted a Professional Claim Form to Medicaid for the professional services provided to Patient 70/71 during Patient 70/71's inpatient stay at Desert View.

507.   Because Patient 70/71's inpatient admission was not necessary and did not even satisfy the hospital's own admission criteria, Defendants' claims for inpatient and professional services to

Medicaid were false, and Medicaid's payments for those services were a result of Defendants' false claims.

508.    On March 17, 2019, Patient 70/71 again presented to Desert View for drainage of swelling, a procedure known as paracentesis, only.  This is a 30-60 minute outpatient procedure. Patient 71 had no other symptoms and needed no other treatment.

509.    Instead, Patient 70/71 was again admitted as an inpatient at Desert View.

510.    In addition, during his time as an inpatient at Desert View, Patient 70/71 underwent, among other tests, a CT of his abdomen which was not necessary or relevant to the patient's symptoms.

511.    There was no medical indication for this additional inpatient admission of Patient 70/71, and any certification by the admitting physician that this patient would require hospital care for more than two (2) midnights is false within the meaning of 42 CFR § 412.3(d)(1).

512.    Furthermore, Patient 70/71's inpatient admission did not meet InterQual criteria.

513.    On March 22, 2019, Desert View submitted an Inpatient Claim Form to Medicaid in the amount of $11,924.32 for the inpatient services provided to Patient 70/71.

514.    On March 29, 2019, Medicaid paid Desert View $393.42 for the additional inpatient services that were provided to Patient 70/71.

515.    On March 23, 2019, Patient 70/71 was again admitted as an inpatient at Desert View.

516.    On March 27, 2019, Desert View submitted another Inpatient Claim Form to Medicaid in the amount of $10,565.82.

517.    On April 5, 2019, Medicaid paid Desert View $479.42 for the additional inpatient services that were provided to Patient 70/71.

518.    Based on information and belief, Vista Health also submitted a Professional Claim Form to Medicaid for the professional services provided to Patient 70/71 during Patient 70/71's inpatient stays at Desert View.

519.    Because Patient 70/71's inpatient admissions to Desert View were not necessary and did not even satisfy the hospital's own admission criteria, Defendants' claims for inpatient and

professional services to Medicaid were false, and Medicaid's payments for those services were a result of Defendants' false claims.

**Medicare Advantage Patients**

**Patient 25**

520.    Desert View used the same methodologies to cause false claims to be submitted to Medicare Advantage organizations.  For example, Patient 25 was a Medicare beneficiary insured by Humana (a Medicare Advantage organization).

521.    Patient 25 presented to Desert View with weakness and shortness of breath due to a left molar tooth infection.

522.    There was no medical indication for an inpatient admission of this Patient 25, and any certification by the admitting physician that this patient would require hospital care for more than two (2) midnights is false within the meaning of 42 CFR § 412.3(d)(1).

523.    Furthermore, Patient 25's inpatient admission did not meet InterQual criteria.

524.    Nevertheless, Patient 25 was admitted to Desert View on April 13, 2019.

525.    Patient 25, who had presented with a tooth infection, was also subjected to an echocardiogram, which was not indicated and did not correlate with the patient's complaints in the medical chart, and was subjected to other tests.

526.    Desert View incurred costs as a result of the inpatient services, ancillary services (including the unnecessary tests), and other services that were provided to Patient 25.  Based on information and belief, these costs were incorporated into Desert View's cost report that was submitted to CMS at the end of the year.

527.    Patient 25 was discharged from Desert View on April 15, 2019.

528.    On April 19, 2019, Defendants submitted an Inpatient Claim Form to Humana in the amount of $16,330.02 for the inpatient services provided to Patient 25.

529.    The Claim Form submitted on behalf of Patient 25 included the following diagnosis codes:  K047 (Periapical abscess without sinus), R531 (Weakness), E119 (Type 2 diabetes mellitus without complications), Z794 (Long term (current) use of insulin), G2581 (Restless legs syndrome), E785 (Hyperlipidemia, unspecified), R0602 (Shortness of breath), R000 (Tachycardia, unspecified),

I2510 (Atherosclerotic heart disease of native coronary artery without angina pectoris), Z98890 (Other specified postprocedural states), B373 (Candidiasis of vulva and vagina), Z87891 (Personal history of nicotine dependence), and Z79049 (Acquired absence of other specified parts of digestive tract).

530.    Humana paid Desert View $4,976 for the inpatient services that were provided to Patient 25.

531.    Based on information and belief, Vista Health also submitted a Professional Claim Form to Humana for the professional services provided to Patient 25 during Patient 25's inpatient stay at Desert View.

532.    Because Patient 25's inpatient admission to Desert View was medically unnecessary and failed to satisfy even the hospital's own admission criteria, Defendants' claim for inpatient services to Humana was false, and Humana's payment for those inpatient services was a result of Defendants' false claim.

533.    Based on information and belief, Defendants also caused Humana to pass the diagnosis-related information contained on Patient 25's Claim Form to CMS, and that diagnosis-related information was used to calculate the rate at which CMS would pay Humana to provide patients like Patient 25 with inpatient services.

**Patient 28**

534.    Patient 28 was a Medicare beneficiary insured by Humana (a Medicare Advantage organization).

535.    Patient 28 presented to Desert View on August 8, 2019 because of atrial fibrillation. This was 1 of at least 4 admissions for the same diagnosis in the past two (2) months at Desert View.

536.    Despite having had multiple echocardiograms in the previous two (2) months, including one at Summerlin Hospital to which this patient had been transferred in the interim for atrial fibrillation ablation and insertion of a pacemaker as set forth in the medical chart, Patient 28 underwent yet another echocardiogram on August 10, 2019.

537.    In Patient 28's medical chart, Muhammad Syed, M.D. (Patient 28's attending physician) clearly stated as follows: "Since patient recently had an extensive cardiac workup done at

Summerlyn [sic], will not repeat cardiac workup at this time, will just monitor heart rate and cardiac enzymes."

538.     However, despite Dr. Syed's findings and acknowledging in the medical chart that a TEE (a more in-depth echocardiogram) was done two weeks prior, Dr. Mirza ordered and Patient 28 underwent another echocardiogram.

539.     The test was not indicated due to recent multiple echocardiograms performed on Patient 28.

540.     Desert View incurred costs as a result of the inpatient services, ancillary services (including the unnecessary tests), and other services that were provided to Patient 28.   Based on information and belief, these costs were incorporated into Desert View's cost report that was submitted to CMS at the end of the year.

541.     Patient 28 was discharged from Desert View on August 11, 2019.

542.     On August 16, 2019, Defendants submitted an Inpatient Claim Form to Humana in the amount of $47,698.26 for the inpatient services provided to Patient 28.

543.     The Claim Form submitted on behalf of Patient 28 contained the following diagnosis codes:  I482 (Chronic atrial fibrillation), Z7901 (Long term (current) use of anticoagulants), Z950 (Presence of cardiac pacemaker), J449 (Chronic obstructive pulmonary disease, unspecified), I509, (Heart failure, unspecified), E118 (Type 2 diabetes mellitus with unspecified complications), Z8673 (Personal history of transient ischemic attack (TIA), and cerebral infarction without residual deficits), I110 (Hypertensive heart disease with heart failure), I4891 (Unspecified atrial fibrillation), R0789 (Other chest pain), E119 (Type 2 diabetes mellitus without complications), and Z7901 (Acquired absence of breast and nipple).

544.     Humana paid Defendants $9,952 for the inpatient services provided to Patient 28.

545.     Based on information and belief, Vista Health also submitted a Professional Claim Form to Humana for the professional services provided to Patient _ during Patient _'s inpatient stay at Desert View.

546.     Based on information and belief, Defendants also caused Humana to pass the diagnosis-related information contained on Patient 28's Claim Form to CMS, and that diagnosis-

related information resulted in modification of Patient 10's capitation rate, to the detriment of the United States.

**Patient 32**

547.    Patient 32 was a Medicare beneficiary insured by Humana (a Medicare Advantage organization).

548.    Patient 32 presented to Desert View with notation in the admission history that there was chest pain that had resolved by the time the patient arrived in the emergency room.   Patient 32's EKG and cardiac enzymes showed no evidence of myocardial infarction.

549.    Patient 32 was diagnosed as Acute Coronary Syndrome ("ACS").  However, Patient 32 did not meet the criteria for this diagnosis.

550.    Nonetheless, Patient 32 was admitted as an inpatient to Desert View on June 26, 2019.

551.    There was no medical indication for an inpatient admission of Patient 32, and any certification by the admitting physician that this patient would require hospital care for more than two (2) midnights is false within the meaning of  42 CFR § 412.3(d)(1).

552.    Furthermore, the inpatient admission of Patient 32 did not meet InterQual criteria.

553.    Patient 32 also underwent an echocardiogram and a nuclear stress test.  However, the echocardiogram was not necessary because Patient 32 had recently had an echocardiogram.

554.    In addition, while at Desert View, Patient 32 also underwent multiple other tests including a CT angiogram of the chest with history noted to be fever and cough, which patient did not have according to the admission history, a CT scan of the abdomen and pelvis with and without contrast even though Patient 32 was admitted with chest pain, and an abdominal ultrasound two (2) days in a row even though nothing was mentioned in the admission history about abdominal symptoms.

555.    None of these tests were indicated and did not correlate with Patient 32's complaints during the hospitalization.

556.    Desert View incurred costs as a result of the inpatient services, ancillary services (including the unnecessary tests), and other services that were provided to Patient 32.  Based on

information and belief, these costs were incorporated into Desert View's cost report that was submitted to CMS at the end of the year.

557.   Patient 32 was discharged from Desert View on June 28, 2019.

558.   On September 3, 2019, Defendants submitted an Inpatient Claim Form to Humana in the amount of $19,001.68 for the inpatient services that were provided to Patient 32.

559.   The Claim Form submitted on behalf of Patient 32 contained the following diagnosis codes:   K819 (Cholecystitis, unspecified), A419 (Sepsis, unspecified organism), I249 (Acute ischemic heart disease, unspecified), E872 (Acidosis), R0789 (Other chest pain), R1013 (Epigastric pain), I10 (Essential (primary) hypertension), E785 (Hyperlipidemia, unspecified), F419 (Anxiety disorder, unspecified), D72829 (Elevated white blood cell count, unspecified), and R0602 (Shortness of breath).

560.   Humana paid Defendants $4,876 for the inpatient services provided to Patient 32.

561.   Based on information and belief, Vista Health also submitted a Professional Claim Form to Humana for the professional services provided to Patient 32 during Patient 32's inpatient stay at Desert View.

562.   Because Patient 32's inpatient admission to Desert View was medically unnecessary and failed to satisfy even the hospital's own admission criteria, Defendants' claim for inpatient services to Humana was false, and Humana's payment for those inpatient services was a result of Defendants' false claim.

563.   Based on information and belief, Defendants also caused Humana to pass the diagnosis-related information contained on Patient 32's Claim Form to CMS, and that diagnosis-related information resulted in modification of Patient 10's capitation rate.

**Patient 33**

564.   Patient 33 was a Medicare beneficiary insured by Humana (a Medicare Advantage organization).

565.   Patient 33 presented to Desert View with syncope/fainting and was admitted as an inpatient on February 10, 2019.

566. In the admission history, it was documented that Patient 33 was in no distress and, in the emergency room, she already underwent a brain CT scan that showed no significant abnormality.

567. Despite the unremarkable brain CT scan, Patient 33 underwent another brain MRI scan. On admission, Dr. Mirza inappropriately pre-determined that Patient 33 would be admitted as an inpatient for 2-3 days.

568. However, there was no medical indication for an inpatient admission of Patient 33, and any certification by the admitting physician that this patient would require hospital care for more than two (2) midnights is false within the meaning of 42 CFR § 412.3(d)(1).

569. Furthermore, the inpatient admission of Patient 33 did not meet InterQual criteria.

570. While at Desert View, Patient 33 underwent multiple tests including an echocardiogram even though the physical exam documented no abnormality of the heart. Patient 33 also underwent a nuclear medicine stress test, which was not indicated by the medical chart.

571. Desert View incurred costs as a result of the inpatient services, ancillary services (including the unnecessary tests), and other services that were provided to Patient 33. Based on information and belief, these costs were incorporated into Desert View's cost report that was submitted to CMS at the end of the year.

572. Patient 33 was discharged from Desert View on February 13, 2019.

573. On February 19, 2019, Defendants submitted an Inpatient Claim Form to Humana in the amount of $31,103.07 for the inpatient services provided to Patient 33.

574. On February 27, 2019, Defendants submitted an additional Inpatient Claim Form to Humana in the amount of $3,008.44 for pharmacy services that were provided during Patient 33's inpatient stay.

575. Both Inpatient Claim Forms submitted on behalf of Patient 33 included the following diagnosis codes: R000 (Tachycardia, unspecified), N329 (Bladder disorder, unspecified), J449 (Chronic obstructive pulmonary disease, unspecified), R55 (Syncope and collapse), I998 (Other disorder of circulatory system), I10 (Essential (primary) hypertension), E785 (Hyperlipidemia, unspecified), R9431 (Abnormal electrocardiogram), I480 (Paroxysmal atrial fibrillation), and Z98890 (Other specified postprocedural states).

576. Humana paid Defendants $7,464 for the inpatient services provided to Patient 33.

577. Based on information and belief, Vista Health also submitted a Professional Claim Form to Humana for the professional services provided to Patient 33 during Patient 33's inpatient stay at Desert View.

578. Because Patient 33's inpatient admission to Desert View was medically unnecessary and failed to satisfy even the hospital's own admission criteria, Defendants' claim for inpatient services to Humana was false, and Humana's payment for those inpatient services was a result of Defendants' false claim.

579. Based on information and belief, Defendants also caused Humana to pass the diagnosis-related information contained on Patient 33's Claim Form to CMS, and that diagnosis-related information resulted in modification of Patient 10's capitation rate.

**Patient 74**

580. Patient 74 was a Medicare beneficiary insured by Humana (a Medicare Advantage organization).

581. Patient 74 presented to Desert View on May 6, 2020 due to a new onset of seizures associated with a fracture of the arm.

582. Although exhibiting no symptoms that would warrant it, Patient 74 was subjected to a chest x-ray which was negative for pneumonia.  Patient did not have elevated fever and the heart rate was normal.

583. Patient 74 should have been transferred to a higher level of care facility due to a new onset of seizures and a fracture for an evaluation and treatment by neurology and an orthopedist.

584. Instead, Patient 74 was admitted as an inpatient to Desert Valley for four (4) days with diagnosis of pneumonia, sepsis, and syncope which had no symptomatic or diagnostic support.

585. Even though Desert View was not equipped to treat Patient 74, Patient 74 was admitted to Desert View on May 6, 2020.

586. Patient 74's inpatient admission was not medically necessary because Desert View lacked the capability to treat Patient 74's medical needs and condition.

587.    In addition, while an inpatient at Desert View, Patient 74 was subjected to a CT of abdomen which was not indicated and did not correlate with Patient 74's complaints during the hospitalization. Therefore, such testing was not reasonable, necessary or relevant to the patient's complaints, admission diagnosis or treatment plan.

588.    Desert View incurred costs as a result of the inpatient services, ancillary services (including the unnecessary tests), and other services that were provided to Patient 74.  Based on information and belief, these costs were incorporated into Desert View's cost report that was submitted to CMS at the end of the year.

589.    Patient 74 was discharged from Desert View on May 7, 2020.

590.    Shortly after discharge, Patient 74 had another seizure.

591.    Based on information and belief, Desert View submitted an Inpatient Claim Form to Humana for the inpatient services provided to Patient 74.

592.    Based on information and belief, Humana paid Desert View for the inpatient services that were provided to Patient 74.

593.    Based on information and belief, Vista Health also submitted a Professional Claim Form to Humana for the professional services provided to Patient 74 during Patient 74's inpatient stay at Desert View.

594.    Because Patient 74's inpatient admission was not necessary, Defendants' claims for inpatient and professional services to Humana were false, and Humana's payments for those services were a result of Defendants' false claims.

595.    Based on information and belief, Defendants also caused Humana to pass the diagnosis-related information contained on Patient 33's Claim Form to CMS, and that diagnosis-related information resulted in modification of Patient 33's capitation rate.

///

///

///

///

///

**Patient One**

596.   Patient One was a Medicare beneficiary insured by Humana (a Medicare Advantage organization).

597.   Patient One presented to Desert View with complaints of chest pain and cardiac enzymes diagnostic of myocardial infarction, a heart attack.   Patient One's presentation was consistent with the High-Risk-Criteria.

598.   Dr. Mirza wrote in Patient One's chart, "stable for Lexiscan.  I m [sic] aware of elevated enzymes." Dr. Mirza's notation is consistent with a patient experiencing a heart attack.

599.   According to Braunwald's Cardiology Practice Standards, patients having a heart attack must be immediately transferred to an acute care hospital that has a cardiac cath lab, which is properly equipped and staffed to provide angiograms and coronary intervention (stents).

600.   Patient One nonetheless was admitted as an inpatient to Desert View on January 19, 2021.

601.   Patient One's inpatient admission was not medically necessary because Desert View lacked the capability to treat Patient One's medical needs and condition.

602.   In addition, according to the medical chart, Patient One underwent an unnecessary nuclear stress test, a very costly test used to determine whether a patient has coronary artery disease and heart attack risk.  However, according to the medical chart, the subject patient was already diagnosed with a heart attack using a very inexpensive blood test.

603.   Desert View incurred costs as a result of the inpatient services, ancillary services (including the unnecessary tests), and other services that were provided to Patient One.  Based on information and belief, these costs were incorporated into Desert View's cost report that was submitted to CMS at the end of the year.

604.   Patient One was discharged from Desert View on January 21, 2019.

605.   On January 28, 2019, Desert View submitted an Inpatient Claim Form to Humana in the amount of $20,854.10 for the inpatient services provided to Patient One.

606.   The Inpatient Claim Form submitted on behalf of Patient One included the following diagnosis codes:  I214 (Non-ST elevation (NSTEMI) myocardial infarction), I471 (Supraventricular

tachycardia), N179 (Acute kidney failure, unspecified), I10 (Essential (primary) hypertension), E785 (Hyperlipidemia, unspecified), R748 (Abnormal levels of other serum enzymes), E781 (Pure hyperglyceridemia), R079 (Chest pain, unspecified), R0602 (Shortness of breath), Z98890 (Other specified postprocedural states), and N289 (Disorder of kidney and ureter, unspecified).

607.    Humana paid Desert View $4,875.00 for the inpatient services that were provided to Patient One.

608.    Based on information and belief, Vista Health also submitted a Professional Claim Form to Humana for the professional services provided to Patient 1 during Patient 1's inpatient stay at Desert View.

609.    Because Patient One's inpatient admission was medically unnecessary, Defendants' claims for inpatient and professional services to Humana were false, and Humana's payment for those services was a result of Defendants' false claims.

610.    On information and belief, Defendants caused Humana to pass the diagnosis-related information contained on Patient One1's Inpatient Claim Form to CMS, and that diagnosis-related information was used to modify Patient One's Risk Adjustment Score, which in turn changes the monthly rate which CMS paid Humana on account of Patient One.

**Patient 10**

611.    Patient 10 was a Medicare beneficiary insured by Humana's Medicare Advantage organization.

612.    Patient 10 presented to Desert View with a diagnosis of "TIA with left-sided weakness resolved with some numbness on the left side of the face."

613.    According to the Stroke Guidelines, patients having a stroke must be immediately transferred to a Primary Stroke Center ("PSC") or Comprehensive Stroke Center ("CSC").

614.    Although Desert View is not a PSC or CSC, Patient 10 was admitted to Desert View on August 14, 2019.

615.    Patient 10's inpatient admission was not medically necessary because Desert View lacked the capability to treat Patient 10's medical needs and condition.

616.    Desert View incurred costs as a result of the inpatient services, ancillary services, and other services that were provided to Patient 10.  Based on information and belief, these costs were incorporated into Desert View's cost report that was submitted to CMS at the end of the year.

617.    Patient 10 was discharged from Desert View on August 15, 2019.

618.    On October 31, 2019, Desert View submitted an Inpatient Claim Form to Humana in the amount of $24,918.63 for the inpatient services provided to Patient 10.

619.    The Inpatient Claim Form submitted on behalf of Patient 10 included the following diagnosis codes:  G459 (Transient cerebral ischemic attack, unspecified), I10 (Essential (primary) hypertension), E785 (Hyperlipidemia, unspecified), I2510 (Atherosclerotic heart disease of native coronary artery without angina pectoris), E118 (Type 2 diabetes mellitus with unspecified complications), Z7982 (Long term (current) use of aspirin), R29810 (Facial weakness), R531 (Weakness), R4781 (Slurred speech), N400 (Benign prostatic hyperplasia without lower urinary tract symptoms), E109 (Type 1 diabetes mellitus without complications), and Z794 (Long term (current) use of insulin).

620.    Humana paid Desert View $6,400.00 for the inpatient services that were provided to Patient 10.

621.    Based on information and belief, Vista Health also submitted a Professional Claim Form to Humana for the professional services provided to Patient 10 during Patient 10's inpatient stay at Desert View.

622.    Because Patient 10's inpatient admission was medically unnecessary, Defendants' claims for inpatient and professional services to Humana were false, and Humana's payment for those services was a result of Defendants' false claims.

623.    Based on information and belief, Defendants also caused Humana to pass the diagnosis-related information contained on Patient 10's Inpatient Claim Form to CMS, and that diagnosis-related information resulted in modification of Patient 10's capitation rate.

///

///

///

**Patient 18**

624.   Patient 18 was a Medicare beneficiary insured by Humana (a Medicare Advantage organization).

625.   Patient 18 presented to Desert View with a diagnosis of acute renal failure and altered mental status.

626.   Patients having renal failure (such as Patient 18) must be immediately transferred to a higher level facility to obtain critical care evaluation and treatment.

627.   However, even though Desert View did not have an ICU to deal with Patient 18's serious multiple medical comorbidities, Patient 18 was admitted as an inpatient to Desert View on January 29, 2019.

628.   Patient 18's inpatient admission was not medically necessary because Desert View lacked the capability to treat Patient 18's medical needs and condition.

629.   Desert View incurred costs as a result of the inpatient services, ancillary services, and other services that were provided to Patient 18.  Based on information and belief, these costs were incorporated into Desert View's cost report that was submitted to CMS at the end of the year.

630.   Patient 18 was discharged from Desert View on February 4, 2019.

631.   On February 12, 2019, Desert View submitted an Inpatient Claim Form to Humana in the amount of $46,950.90 for the inpatient services provided to Patient 18.

632.   The Inpatient Claim Form submitted on behalf of Patient 10 included the following diagnosis codes:  N179 (Acute kidney failure, unspecified), E782 (Mixed hyperlipidemia), I5030 (Unspecified diastolic (congestive) heart failure), E119 (Type 2 diabetes mellitus without complications), R531 (Weakness), R627 (Adult failure to thrive), and I10 (Essential (primary) hypertension).

633.   Humana paid Desert View $14,718.00 for the inpatient services provided to Patient 18.

634.   Based on information and belief, Vista Health also submitted a Professional Claim Form to Humana for the professional services provided to Patient 18 during Patient 18's inpatient stay at Desert View.

635.    Because Patient 18's inpatient admission was medically unnecessary, Defendants' claims for inpatient and professional services to Humana were false, and Humana's payment for those services was a result of Defendants' false claims.

636.    Based on information and belief, Defendants also caused Humana to pass the diagnosis-related information contained on Patient 18's Inpatient Claim Form to CMS, and that diagnosis-related information resulted in modification of Patient 10's capitation rate.

**B.    Altered Inpatient Admission Times**

637.    Dr. Arik is aware that since Valley Health's acquisition of Desert View in August 2016, Desert View falsely altered inpatient admissions times in order to increase revenue from Medicare, Medicaid, and other government subsidized insurers.

638.    Specifically, the ER doctor would call and request an evaluation by the hospitalist whether a patient meets the criteria for inpatient admission.  At that time, usually within one or two hours (but sometimes as long as eight hours or more, depending on census and work load a patient would be evaluated by the hospitalist by looking at labs, reports, and in person evaluation to determine if an inpatient admission is appropriate.  If appropriate, the patient would be examined, a history taken, and admission orders are placed by the hospitalist.  This is done in writing (date/time written) and medications and nurse orders are also placed. Some basic orders are written out, while other orders are placed directly in the Electronic Health Records ("EHR").

639.    However,  house supervisors, at the direction of Desert View  management, would ask the hospitalist to change the inpatient admission order to an earlier time from when they saw the patient to increase the patient's length of stay, and thus, Desert View's reimbursement

640.    Even though the hospitalist (Dr. Marianne Hazelitt) warned the house supervisors that doing so would be fraudulent and refused to engage in such conduct, the house supervisors would alter the inpatient admission time to reflect an earlier inpatient admission time in disregard of the actual admission time on the hospitalists' inpatient admission order.

641.    Desert View knowingly submitted claims for payment to Medicare, Medicaid, and other Government-funded healthcare programs for additional days of inpatient services not provided based on the express false certification that the patient met "inpatient" criteria when the patient was

1   actually in "observation" status in violation of (among other things) 42 U.S.C. § 1395f(a)(3), 42

2   U.S.C. § 1395y(a)(1)(A), and the False Claims Act.

3        642.   Defendants knowingly submitted the subject false claims to government funded

4   insurers and contractors.

5        643.   Defendants knew that their claims for payment to the federally funded insurers and

6   contractors were false, or had deliberately ignored its falsity, or had recklessly disregarded its falsity,

7   in violation of the False Claims Act.

8        644.   Desert View and the Vista Health Defendants were paid by the federally funded

9   insurers based on the false certifications of time of the inpatient admissions.

10       645.   Had the federally funded insurers and contractors known that the time of the admissions

11   were falsified to increase an inpatient length of stay, the federally funded insurers and contractors

12   would not have paid on the subject claims.

13       **C.   <u>Altered Billing Codes</u>**

14       646.   Since Valley Health's acquisition of Desert View in August 2016, Desert View falsely

15   altered billing codes in order to increase revenue from Medicare, Medicaid, and other government-

16   funded healthcare programs.  Claims with such alterations are ineligible for payment, and, when

17   knowingly submitted, violate the False Claims Act.

18       647.   When a public-insurance beneficiary is admitted into a hospital as an "inpatient," his

19   or her "inpatient" status can only be changed by the hospital to "observation" status when (among

20   other things) the treating physician approves of the change and prior to the individual's discharge

21   from the hospital.

22       648.   Since in or around August 2016, many patients were admitted to Desert View as

23   inpatients, but claims for services provided to them were denied because the patient's condition did

24   not satisfy the requirements for inpatient admission.

25       649.   After discharge, Desert View billed for inpatient services.

26       650.   However, at times, the claim would be denied by the government-funded healthcare

27   program (such as Medicare/Medicare Advantage) because the patient did not meet "inpatient"

28   admission criteria.

651.    In or around early 2018, Bonnie Havel, a billing manager at Desert View/Valley Health System/Universal Health, and Tina McKintosh, an assistant director of billing at Valley Health System/Universal Health expressed deep concern that claims were being denied by Medicare programs because the patients did not satisfy the criteria for inpatient admission.

652.    Billing personnel were instructed to appeal all such denials, and were further instructed that, if the denial was upheld they were to change the Bill Type, Revenue Code and CPT Code on the Claim Form and re-bill the claim for "outpatient" services so that Desert View could obtain at least partial reimbursement.

653.    Ms. Havel advised that these orders were from "Corporate," meaning Valley Health and/or Universal Health, and was mandatory.

654.    Melissa Milk, one of the billers at Desert View, responded to Ms. Havel and Ms. McKintosh that she would not engage in such conduct as doing so would be wrong, fraudulent, and against the law because altering the billing codes would not be supported by the medical records and that only a physician can change the patient's status criteria (inpatient v. outpatient), which Ms. Havel and Ms. McKintosh did not appear to be concerned about.

655.    Ms. Milk further told Ms. Havel and Ms. McKintosh that since the subject patients have already been discharged from Desert View, their "inpatient" status could not legally be changed to "outpatient" per Medicare regulations and that the hospital must write off the charges as required by law.

656.    In response, Ms. Havel and Ms. McKintosh demanded that Ms. Milk train Lydia Hunt, another biller, on how to alter the Claim Form and re-bill the numerous denied claims for failure to meet the "inpatient" criteria.

657.    Ms. Milk became very concerned and immediately went to speak with the Desert View coders to inquire whether they will engage in such fraudulent conduct.  The coders advised Ms. Milk that it would not be lawful and they wanted nothing to do with changing any codes in order to allow Desert View to receive payment on a previously denied claim.

658.     Thereafter, Ms. Milk printed Noridian Medicare "Inpatient to Outpatient Status Change," shared it with Ms. Hunt, and advised Ms. Hunt that what Desert View was requesting is wrong, unlawful, and fraudulent.

659.     Despite Ms. Milk's objection and her cautioning to Desert View to not participate in such a fraudulent billing scheme, Defendants knowingly submitted numerous altered claims to government funded programs (including Medicare) for payment, and the Medicare-funded programs did make payments on those claims.

660.     Copies of various emails illustrating the practice of submitting false claims to government funded programs (including Medicare) by Defendant Desert Valley Hospital in conspiracy with Valley Health/Universal Health were produced to the defendants as a part of Relator's Initial Witness and Document Disclosures Pursuant to Rule 26, Fed. R. Civ. P. and Local Rule 26-1.

661.     Desert View knowingly submitted the subject false claims to Government-funded healthcare programs.

662.     Desert View and the Vista Health Defendants knew that their claims for payment to the Government-funded healthcare programs were false, or had deliberately ignored its falsity, or had recklessly disregarded its falsity, in violation of the False Claims Act.

663.     Desert View sought and retained money from federally- funded insurers based on altered CPT and Revenue Codes (the false certifications).  Had those payers known the truth, they would not have paid the false claims.

**D.     Inflated Billing for Outpatient/ER Patients**

664.     Dr. Arik is aware that (since Valley Health's acquisition of Desert View in August 2016), Desert View falsely billed Medicare, Medicaid, and other government subsidized insurers as follows.

665.     Medicare, Medicaid and other government-funded programs have a limit on certain services/items per day which are reimbursable, such as blood draws.

666.     For example, at times, a patient would require blood draws greater than what is reimbursable.  As a result, if Desert View would have billed the accurate number of blood draws the

patient received, some, or most of the blood draws, would not be reimbursed since the government-funded program only pays for a set maximum number.

667.    To ensure payment for ALL blood draws, including those that would have been excluded from reimbursement, Desert View had a pattern and practice of knowingly and fraudulently billing for the exact number of blood draws allowed by the government-funded programs but increasing the price of the service to encompass all of the blood draws performed on the patient.

668.    Specifically, if at the time, Medicare allowed one blood draw per day that was billed at $36.00 and there were five (5) blood draws performed, Desert View would bill for one (1) blood draw but would price it at an inflated, fraudulent rate of $180.00, which Medicare and other government-funded programs paid.

669.    This type of fraudulent billing practice was commonly used (and based on information and belief continues to be used) by Desert View for billing Medicare and other government programs for medications, IV solution, and radiology services.

670.    Desert View knowingly submitted the subject false claims to government-funded healthcare programs and contractors in an amount to be determined through discovery.

671.    Desert View and the Vista Health Defendants knew that their claims for payment to the government-funded healthcare programs and contractors were false, or had deliberately ignored its falsity, or had recklessly disregarded its falsity, in violation of the False Claims Act.

672.    Desert View was paid by federally funded insurers for the subject false claims.

673.    Had the government-funded healthcare programs and contractors known of the inflated charges as described herein, the government-funded healthcare programs and contractors would not have paid on the subject claims.

///
///
//
///
///
///

**FIRST CLAIM FOR RELIEF**

**Violations of the Federal False Claims Act, 31 U.S.C. § 3729(a)(1)(A)**

674.    Relator incorporates paragraphs 1 through 673 of this Complaint as though fully set forth herein.

675.    The False Claims Act, 31 U.S.C. § 3729(a)(1)(A), imposes liability upon those who knowingly present or cause to be presented false claims for payment or approval.

676.    By virtue of the acts described above (*i.e.*, the medically unnecessary and non-economical inpatient admissions and testing; the altered inpatient admission times; the altered billing codes; and the and inflated billing for Outpatient/ER Patients), Defendants Desert View, Vista Health, and Dr. Mirza knowingly presented or caused to be presented false or fraudulent claims for payment or approval to Government-funded healthcare programs, in violation of the False Claims Act, 31 U.S.C. § 3729(a)(1)(A).

677.    As alleged herein, Defendants Desert View's, Vista Health's and Dr. Mirza's claims for payment or approval to the Government-funded healthcare programs were false.

678.    Defendants' actions, if known, would have affected the Government-funded healthcare programs' decisions to pay the resulting claims.

679.    The Government-funded healthcare programs, unaware of the falsity of the claims made or submitted by Defendants Desert View, Vista Health and Dr. Mirza, paid and continue to pay for claims that would not be paid if the true facts were known.

As a proximate cause of Defendants Desert View's, Vista Health's and Dr. Mirza's false claims, the United States of America has been damaged in an amount exceeding the jurisdictional limit, and to be proven at trial.

///

///

///

///

///

///

**SECOND CLAIM FOR RELIEF**

**Violations of the Federal False Claims Act, 31 U.S.C. § 3729(a)(1)(B)**

680.    Relator incorporates paragraphs 1 through  673 of this Complaint as though fully set forth herein.

681.    The False Claims Act, 31 U.S.C. § 3729(a)(1)(B), imposes liability upon those who knowingly make or use, or cause to be made or used, false records or statements material to a false claim.

682.    By virtue of the acts described above (*i.e.*, the medically unnecessary and non-economical inpatient admissions and testing; the altered inpatient admission times; the altered billing codes; and the inflated billing for Outpatient/ER Patients), Defendants Desert View, Vista Health and Dr. Mirza knowingly made or used, or caused to be made or used, a false record or statement (including, but not limited to, the Claim Forms and Cost Reports submitted to Government-funded healthcare programs) to get a false or fraudulent claim paid or approved by Government-funded healthcare programs in violation of the False Claims Act, 31 U.S.C. § 3729(a)(1)(B).

683.    Defendants Desert View, Vista Health and Dr. Mirza knowingly made or used or caused to be made or used false claim forms and supporting materials, such as false certifications of the truthfulness and accuracy of the claims submitted and medical necessity, to get false or fraudulent claims paid or approved by Government-funded healthcare programs.

684.    Defendants' actions, if known, would have affected the Government-funded healthcare programs' decisions to pay the resulting claims.

685.    The Government-funded healthcare programs, unaware of the falsity of the statements or records material to the false claims made or submitted by Defendants Desert View, Vista Health and Dr. Mirza, paid and continue to pay for claims that would not have been paid if the facts were disclosed to them by the claimants.

686.    As a result Defendants Desert View's, Vista Health's and Dr. Mirza's false claims, the United States of America has been damaged in an amount exceeding the jurisdictional limit, and to be proven at trial.

**WHEREFORE**, Relator prays for judgment against Defendants, jointly and severally, as follows:

1.      Defendants shall to pay to the United States an amount equal to three times the amount of damages the United States has sustained because of the Defendants' actions, plus a civil penalty in accordance with law for each false claim or false document;

2.      Relator shall be awarded the maximum allowed pursuant to 31 U.S.C. § 3730(d);

3.      Relator shall be awarded all costs of this action, including attorney fees, expenses, and costs pursuant to 31 U.S.C. § 3730(d); and

4.      The United States and Relator shall be granted all such other relief as the Court deems just and proper.

DATED this 1st day of June, 2021.

JESSE SBAIH & ASSOCIATES, LTD.

By /s/ Jesse M. Sbaih_____
   Jesse M. Sbaih (#7898)
   Ines Olevic-Saleh (#11431)
   The District at Green Valley
   170 South Green Valley Parkway, Suite 280
   Henderson, Nevada 89012

MORGAN VERKAMP, LLC

By /s/ Sonya A. Rao
   Sonya A. Rao, *pro hac vice*
   35 East Seventh Street
   Cincinnati, Ohio  45202

*Attorneys for Relator*

///

///

///

///

///

1    **<u>RELATOR'S DEMAND FOR JURY TRIAL</u>**

2         Relator, by and through the law firm of Jesse Sbaih & Associates, Ltd., hereby demands a jury

3    trial of all issues in the above-captioned matter.

4         DATED this 1st day of June, 2021.

5                                                   JESSE SBAIH & ASSOCIATES, LTD.

6

7                                                   By /s/ Jesse M. Sbaih_____
                                                      Jesse M. Sbaih (#7898)
8                                                     Ines Olevic-Saleh (#11431)
                                                      The District at Green Valley
9                                                     170 South Green Valley Parkway, Suite 280
                                                      Henderson, Nevada 89012
10

11                                                   *Attorneys for Relator*

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

## **CERTIFICATE OF SERVICE**

2

3

 Pursuant to FRCP Rule 5(b), I certify that I am an employee of the law firm of Jesse Sbaih &

Associates, Ltd., and that on this 1st day of June 2021, I caused **THIRD AMENDED COMPLAINT**

4

**FOR VIOLATIONS OF THE FEDERAL FALSE CLAIMS ACT JURY TRIAL DEMANDED**

5

to be served via electronic service to the following:

6

7
  John H. Cotton, Esq.
  JOHN H. COTTON & ASSOCIATES, LTD.

8
  7900 West Sahara, Suite 200
  Las Vegas, NV 89117

9
  jhcotton@jhcottonlaw.com

10
   *Attorneys for Defendants*

11
  Gregory R. Jones, Esq.
  McDERMOTT WILL & EMERY, LLP

12
  2049 Century Park East, Suite 3200
  Los Angeles, CA 90067

13
  gjones@mwe.com

14
   *Attorneys for Defendants*

15
  Lindsay Ager, Esq.
  U.S. ATTORNEY'S OFFICE

16
  501 Las Vegas Boulevard South, Suite 1100
  Las Vegas, NV 89101

17
  roger.wenthe@usdoj.gov

18
   *Attorneys for the United States*

19

20

21
    \_\_\_\_\_/s/ Ines Olevic-Saleh_____
    An employee of Jesse Sbaih & Associates, Ltd.

22

23

24

25

26

27

28