GREGORY R. JONES (admitted *pro hac vice*)
POLSINELLI LLP
2049 Century Park East, Suite 2900
Los Angeles, CA 90067
Telephone: (310) 556-1801
Facsimile:  (310) 556-1802
gjones@polsinelli.com

DAYNA C. LAPLANTE (admitted *pro hac vice*)
POLSINELLI PC
150 N. Riverside Plaza, Suite 3000
Chicago, IL 60606
Telephone:  (312) 819-1900
Facsimile:  (312) 819-1910
dlaplante@polsinelli.com

JOHN H. COTTON (Nevada Bar No. 005268)
KATHERINE L. TURPEN (Nevada Bar No. 008911)
JOHN H. COTTON & ASSOCIATES, LTD.
7900 W. Sahara Ave., Suite 200
Las Vegas, Nevada 89117
Telephone:  (702) 832-5909
Facsimile:  (702) 832-5910
jhcotton@jhcottonlaw.com
kturpen@jhcottonlaw.com

Attorneys for Defendant
DVH HOSPITAL ALLIANCE, LLC

Polsinelli LLP
2049 Century Park Est, Suite 2900
Los Angeles, CA 90067
310.556.1801

## UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| UNITED STATES OF AMERICA ex rel. TALI ARIK, M.D.<br><br>            Plaintiff/Relator,<br><br>        v.<br><br>DVH HOSPITAL ALLIANCE, LLC, d/b/a DESERT VIEW HOSPITAL; VISTA HEALTH MIRZA, M.D. P.C. d/b/a VISTA HEALTH; and IRFAN MIRZA, M.D.,<br><br>            Defendants. | Case No.: 2:19-CV-01560-JAD-VCF<br><br>**MOTION FOR SUMMARY JUDGMENT BY DEFENDANT DVH HOSPITAL ALLIANCE, LLC; MEMORANDUM OF POINTS AND AUTHORITIES; STATEMENT OF UNDISPUTED MATERIAL FACTS**<br><br>ORAL ARGUMENT REQUESTED |

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Polsinelli LLP
2049 Century Park Est, Suite 2900
Los Angeles, CA 90067
310.556.1801

## **MOTION FOR SUMMARY JUDGMENT**

Pursuant to Federal Rule of Civil Procedure 56, defendant DVH Hospital Alliance, LLC dba Desert View Hospital ("Desert View") hereby moves the Court for an order granting summary judgment on the claims for relief asserted under the False Claims Act ("FCA"), 31 U.S.C. § 3729, in the third amended complaint (ECF No. 103) of relator Tali Arik, M.D. ("Arik").

Dated: March 23, 2023                POLSINELLI LLP


By: */s/ Gregory R. Jones*
GREGORY R. JONES
Attorneys for Defendant
DVH HOSPITAL ALLIANCE, LLC

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Polsinelli LLP
2049 Century Park Est, Suite 2900
Los Angeles, CA 90067
310.556.1801

# **TABLE OF CONTENTS**

I.    INTRODUCTION ................................................................. 1

II.   FACTUAL AND PROCEDURAL BACKGROUND ........................................ 3

      A.   Desert View Hospital ............................................... 3

      B.   Desert View Hires Vista Health To Provide Hospitalist Services ........................ 3

      C.   Arik's Privileges Are Suspended For Violating HIPAA,
           And He Then Resigns ............................................... 4

      D.   Arik Files This FCA Action ......................................... 6

III.  RELEVANT STATUTORY AND REGULATORY BACKGROUND ........................... 7

      A.   Medicare, Medicare Advantage, & Medicaid ........................... 7

      B.   The Critical Access Hospital Program ............................... 8

      C.   The Relevant Reimbursement Rules ................................... 8

      D.   Medical Necessity & Inpatient Admission Standards .................. 9

IV.   STATEMENT OF UNDISPUTED MATERIAL FACTS ................................ 10

V.    SUMMARY JUDGMENT STANDARD ............................................. 12

VI.   THE COURT SHOULD GRANT SUMMARY JUDGMENT ON ARIK'S
      FCA CLAIMS BASED ON MEDICALLY UNNECESSARY INPATIENT SERVICES. 13

      A.   The False Claims Act & Medical Necessity ......................... 13

      B.   There Is No Triable Issue Of Fact That Desert View Submitted
           Claims Containing False Certifications Of Medical Necessity .............. 14

           1.   Arik's Medical Expert Testimony Is Neither Admissible Nor Sufficient
                To Raise A Triable Issue Of Fact On The Issue Of Medical Necessity ........ 15

           2.   Arik Has No Other Evidence Demonstrating That The Challenged
                Medical Decisions Were False .................................. 17

      C.   For Independent Reasons, Summary Judgment Should Be
           Granted On Arik's "Failure to Transfer" Theory .................... 19

      D.   Summary Judgment Should Be Granted On Any Alleged False
           Claim For Which Arik Does Not Have A Medical And Billing Record .............. 21

      E.   For Independent Reasons, Summary Judgment Should Be Granted On The
           Medicare Advantage Claims ......................................... 23

      F.   Summary Judgment Should Be Granted Because There Is No Triable
           Issue Of Fact On The Element of Scienter ......................... 24

i

G.    Summary Judgment Should Be Granted On Arik's Unnecessary Medical Testing Allegations ...................................................................................................... 26

VII. THE COURT SHOULD GRANT SUMMARY JUDGMENT ON ARIK'S FCA CLAIMS BASED ON OTHER FRAUDULENT BILLING THEORIES ................. 27

A.    The Court Should Dismiss Arik's Backdated Admissions Theory ........................ 27

B.    The Court Should Dismiss Arik's Inflated Costs Theory ..................................... 28

C.    The Court Should Dismiss Arik's Rebilling Denied Inpatient Claims Theory .................................................................................................... 29

VIII.    CONCLUSION ..................................................................................................... 30

Polsinelli LLP
2049 Century Park Est, Suite 2900
Los Angeles, CA 90067
310.556.1801

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Polsinelli LLP
2049 Century Park Est, Suite 2900
Los Angeles, CA 90067
310.556.1801

## **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Alsadi v. Intel Corp.*,
    No. CV-16-03738, 2019 WL 4849482 (D. Ariz. Sept. 30, 2019) ...........................................15

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986).............................................................................................................12

*Barrows v. Becerra*,
    24 F.4th 116 (2d Cir. 2022) ................................................................................................25

*Celotex Corp. v. Catrett*,
    477 U.S. 317 (1986).............................................................................................................13

*Cretney-Tsosie v. Creekside Hospice II, LLC*,
    No. 2:13-cv-00167, 2016 WL 1257867 (D. Nev. Mar. 30, 2016) .........................................21

*Danganan v. Am. Fam. Mut. Ins. Co.*,
    No. 2:17-cv-02786, 2018 WL 3660198 (D. Nev. Aug. 2, 2018)............................................15

*Dorsey v. NP Santa Fe, LLC*,
    No. 2:19-cv-2070, 2022 WL 1271546 (D. Nev. Mar. 23, 2022) .....................................12, 13

*Ellis v. Corizon, Inc.*,
    No. 1:15-cv-00304, 2018 WL 6268199 (D. Idaho Nov. 30, 2018) .......................................15

*United States ex rel. Cafasso v. Gen. Dynamics C4 Sys., Inc.*,
    637 F.3d 1047 (9th Cir. 2011) ............................................................................................20

*United States ex rel. Campie v. Gilead Scis., Inc.*,
    862 F.3d 890 (9th Cir. 2017) ...............................................................................................13

*United States ex rel. Conroy v. Select Med. Corp.*,
    307 F. Supp. 3d 896 (S.D. Ind. 2018) ..................................................................................22

*United States ex rel. Guardiola v. Renown Health*,
    No. 3:12-CV-00295, 2015 WL 5123375 (D. Nev. Sept. 1, 2015)..........................................22

*United States ex rel. Martin v. Life Care Ctrs. of Am., Inc.*,
    114 F. Supp. 3d 549 (E.D. Tenn. 2014).................................................................................22

*United States ex rel. Martinez v. KPC Healthcare Inc.*,
    No. 8:15-cv-01521, 2017 WL 10439030 (C.D. Cal. June 8, 2017)..................................24, 30

*United States ex rel. Michaels v. Agape Senior Cmty., Inc.*,
    No. CA 0:12-3466, 2015 WL 3903675 (D.S.C. June 25, 2015)............................................22

iii

*United States ex rel. Osinek v. Permanente Med. Grp., Inc.*,
   No. 13-cv-03891, 2022 WL 16925963 (N.D. Cal. No. 14, 2022) ......................................7, 18

*United States ex rel. Riley v. St. Luke's Episcopal Hosp.*,
   355 F.3d 370 (5th Cir. 2004) ...................................................................................................14

*United States ex rel. Scott v. Ariz. Ctr. for Hematology & Oncology, PLC*,
   No. CV-16-03703, 2020 WL 2059926 (D. Ariz. Apr. 29, 2020) ............................................21

*United States ex rel. Silingo v. WellPoint, Inc.*,
   904 F.3d 667 (9th Cir. 2018) ............................................................................................23, 30

*United States ex rel. Wall v. Vista Hospice Care, Inc.*,
   No. 3:07-CV-00604-M, 2016 WL 3449833 (N.D. Tex. June 20, 2016) ..................................22

*United States v. AseraCare, Inc.*,
   938 F.3d 1278 (11th Cir. 2019) ...............................................................................13, 14, 17

*United States v. Corinthian Colls.*,
   655 F.3d 984 (9th Cir. 2011) ...................................................................................................24

*United States v. DaVita Inc.*,
   No. 8:18-cv-01250, 2020 WL 3064771 (C.D. Cal. Apr. 10, 2020).......................13, 14, 18, 19

*United States v. Paulus*,
   894 F.3d 267 (6th Cir. 2018) ...................................................................................................14

*United States v. Prabhu*,
   442 F. Supp. 2d 1008 (D. Nev. 2006).................................................................................14, 17

*United States v. Rite Aid Corp.*,
   No. 2:12-cv-01699, 2020 WL 3970201 (E.D. Cal. July 14, 2020)..........................................21

*United States v. United Healthcare Ins. Co.*,
   848 F.3d 1161 (9th Cir. 2016) ..........................................................................................23, 30

*United States v. UnitedHealthcare Ins. Co.*,
   No. 15-CV-7137, 2018 WL 2933674 (N.D. Ill. June 12, 2018)........................................24, 30

*Universal Health Servs., Inc. v. United States ex rel. Escobar*,
   579 U.S. 176 (2016).................................................................................................................24

*Winter ex rel. United States v. Gardens Regional Hospital & Medical Center*,
   953 F.3d 1108 (9th Cir. 2020) ........................................................1, 7, 13, 14, 16, 17, 24

**Statutes**

31 U.S.C. §§ 3729(a)(1)(A), 3729(a)(1)(B)..................................................................................13

31 U.S.C. § 3729(b)(1) ...................................................................................................................24

Polsinelli LLP
2049 Century Park Est, Suite 2900
Los Angeles, CA 90067
310.556.1801

42 U.S.C § 1395c....................................................................................................7

42 U.S.C. § 1395i-4................................................................................................8

42 U.S.C. 1395k(a)(H)...........................................................................................7

42 U.S.C. § 1395j...................................................................................................7

42 U.S.C. § 1395w-21 *et seq.*..............................................................................7

42 U.S.C. § 1395w-23 *et seq.* ....................................................................8, 9, 23

42 U.S.C § 1395w-27(a).........................................................................................8

42 U.S.C. § 1395w-28(a)(1) ...................................................................................7

42 U.S.C. § 1395y(a) *et seq.* ..........................................................................9, 13

42 U.S.C. §§ 1396-1 *et seq.* .................................................................................8

**Other Authorities**

42 C.F.R § 412.3(d)(1)......................................................................................9, 22

42 C.F.R § 412.3(d)(1)(i)........................................................................................9

42 C.F.R. §§ 412.3(d)(1)(ii)..................................................................................20

42 C.F.R. § 412.3(d)(3)...........................................................................................9

42 C.F.R. § 412.20(a)..............................................................................................8

42 C.F.R. § 413.1(a)(2)(i)......................................................................................27

42 C.F.R. § 413.1(b)..............................................................................................27

42 C.F.R. §  413.20...........................................................................................8, 27

42 C.F.R. § 413.5.............................................................................................8, 27

42 C.F.R. § 413.50...........................................................................................8, 27

42 C.F.R. § 413.60(a)-(c).......................................................................................27

42 C.F.R. § 413.64(e)......................................................................................8, 27

42 C.F.R. § 413.70.................................................................................................27

42 C.F.R. § 422.100 *et seq.*.................................................................................10

42 C.F.R. § 422.300................................................................................................9

Polsinelli LLP
2049 Century Park Est, Suite 2900
Los Angeles, CA 90067
310.556.1801

42 C.F.R. § 422.304(a)..................................................................................................9, 23

42 C.F.R. § 422.308(c)..................................................................................................9, 23

42 C.F.R. § 422.310.............................................................................................................9

42 C.F.R. § 422.503(b)(4)(vi)........................................................................................9, 23

42 C.F.R. § 422.504(l)....................................................................................................9, 23

42 C.F.R. § 440.2(a)......................................................................................................10, 20

42 C.F.R. § 482.30.............................................................................................................25

42 C.F.R. § 485.601.............................................................................................................8

42 C.F.R. § 485.610(b)-(c).................................................................................................8

42 C.F.R. § 485.620(a)-(b).................................................................................................8

Fed R. Civ. P. 56(a) ..........................................................................................................12

U.S. Const. amend. V........................................................................................................22

Polsinelli LLP
2049 Century Park Est, Suite 2900
Los Angeles, CA 90067
310.556.1801

vi

## MEMORANDUM OF POINTS AND AUTHORITIES

# I.   INTRODUCTION

In this case, Arik alleges that Desert View defrauded the federal government by submitting claims for medically unnecessary hospital services in violation of the FCA.  Last year, the Court denied defendants' motions to dismiss on the grounds that Arik alleged more than just a reasonable disagreement of opinion among physicians regarding the medical necessity of certain inpatient admissions and medical testing provided at Desert View.  As the Ninth Circuit held in *Winter ex rel. United States v. Gardens Regional Hospital & Medical Center*, 953 F.3d 1108, 1118-19 (9th Cir. 2020), proving the falsity of a medical opinion regarding the necessity of patient treatment requires evidence above and beyond physician disagreement about the appropriateness of the medical care.  Allegations are one thing.  Proof is another.  After more than two years of discovery, Arik's medical necessity claim is indisputably missing the latter.  For this reason, and others, the Court should grant summary judgment in this case.

First, Arik does not have sufficient evidence to create a genuine dispute about the falsity of the medical necessity certifications at issue.  Although Arik has pled 37 representative examples of allegedly medically unnecessary care, he did not disclose an affirmative expert to opine about whether that treatment was medically necessary.  Instead, Arik disclosed an affirmative expert only with respect to a sample of inpatient episodes produced in discovery.  As discussed in Desert View's *Daubert* motion, the opinions of Arik's experts must be excluded because, among other issues, they applied the wrong medical necessity standard.  Medicare regulations apply a "two-midnight rule" in determining the medical necessity of inpatient admissions.  This rule does not impose a qualitative standard of care in making admission decisions.  Rather, it requires an admitting physician to have a "clinical expectation" that a patient's documented medical condition necessitates a hospital stay for two midnights.  Arik's experts did not apply this approach in forming their opinions.

Even if not excluded, Arik's expert testimony is insufficient to withstand summary judgment under *Winter*.  To establish the falsity element of an FCA claim based on the absence of medical necessity, a relator must prove not just that the treating physicians' medical necessity

1

Polsinelli LLP
2049 Century Park Est, Suite 2900
Los Angeles, CA 90067
310.556.1801

decisions were wrong, but *fraudulent*.  Arik's experts offer no opinions about that critical issue.  They merely engage in hindsight second-guessing about the admission and testing decisions described in their reports, which the Ninth Circuit has held is inadequate to prove falsity.

The evidence does not show a genuine dispute about the falsity of the specific medical opinions challenged in this case.  It is undisputed that the treating physicians were familiar with the patients' medical conditions to support their clinical decisions and honestly and genuinely believed that the treatment was medically necessary.  It is similarly undisputed that the medical records accurately describe the basis for the treating physicians' decisions.  Desert View did not hire, pressure, or incentivize its hospitalists – who are independently contracted, not employed by the hospital – to *unnecessarily* treat patients.  Further, despite the allegations that the Court found satisfactory under *Winter*, Arik has no proof that the inpatient admissions were inconsistent with InterQual, which is the third-party inpatient admission criteria by which Arik claimed to have identified unnecessary admissions.  In fact, the exact opposite is true:  Desert View's utilization review team concluded in real-time that the inpatient admissions did satisfy InterQual.  Arik's only evidence shows that Desert View contracted with Vista Health based on the belief that using hospitalists with board-certified specialties would allow it to admit more (and transfer fewer) sicker patients, which occurred in 2019, but not 2020.  But this generalized business goal is not probative of fraud against the government.  If it was, every hospital in the country would be susceptible to violating the FCA by simply trying to increase revenue through accommodating additional appropriate patient admissions.  This case fails on falsity grounds.

Evidentiary defects plague other aspects of Arik's medical necessity claim.  First, many of Arik's medical necessity criticisms are based on Desert View's supposed failure to transfer patients who needed to be hospitalized to other facilities.  This is not a triable medical necessity theory under the FCA.  Second, many of Arik's medical necessity criticisms relate to patients whose health insurance is covered under the Medicare Advantage Program.  Arik has no evidence showing that the government overpaid for the medical care provided to any Medicare Advantage patients.  Finally, Arik intends to extrapolate Desert View's liability from the sample of medical records his physician expert reviewed into some broader, unknown universe of claims.  Due

2

process and the lack of any expert to present this theory foreclose such an extrapolation exercise.

Summary judgment is also warranted on Arik's medical necessity claim because he cannot raise a triable issue of fact on the element of scienter. The claims at issue were submitted by Desert View based upon medical decisions made by the Vista Health hospitalists. Thus, Arik must prove scienter on two levels. The first is that the hospitalists knew, or recklessly disregarded or deliberately ignored whether, the admissions and medical testing for the specific patient episodes at issue were medically unnecessary. The undisputed evidence defeats scienter at this level. The second is that Desert View submitted claims for services ordered by the Vista Health hospitalists knowing, or recklessly disregarding or deliberately ignoring whether, they were medically unnecessary. Scienter fails at this level too. Desert View has several layers of oversight to ensure the medical necessity of inpatient services, including a team that reviewed the propriety of the inpatient services in real time. Arik's medical necessity claim also fails on scienter grounds.

Separate from his medical necessity claim, and before Vista Health was hired to provide hospitalist services at Desert View in 2019, Arik alleges that Desert View engaged in three other fraudulent billing practices that resulted in false claims to the federal government. However, Arik has no evidence showing that Desert View submitted false claims based on the alleged conduct. Summary judgment is therefore also warranted for these fraud theories.

## II.   FACTUAL AND PROCEDURAL BACKGROUND

### A.   Desert View Hospital

Desert View is a 25-bed acute care hospital located in the rural community of Pahrump, Nevada. Exhibit 2 of Appendix of Exhibits (ECF No. 173) (*i.e.* "Ex. ##"), ¶ 4. Desert View is a Medicare-designated "critical access hospital" ("CAH"). *Id.* ¶ 5. Desert View is the only hospital in Nye County and serves a population of about 40,000 people, many of which are over the age of 55. *Id.* ¶ 6. The nearest acute care hospital is more than 55 miles away in Las Vegas. *Id.* ¶ 7.

### B.   Desert View Hires Vista Health To Provide Hospitalist Services

Desert View contracts with various physician groups to provide specific services at the hospital, such as emergency medicine and hospitalist services. Ex. 2, ¶ 8. A "hospitalist" is a physician who admits and treats patients in a hospital. *Id.* ¶ 9. At Desert View, the vast majority

Polsinelli LLP
2049 Century Park Est, Suite 2900
Los Angeles, CA 90067
310.556.1801

3

of admitted patients are first seen in the emergency room ("ER").  *Id.* ¶ 10.

In December 2016, Desert View hired Rural Physicians Group ("RPG") to provide hospitalist services.  Ex. 2, ¶ 11.  Over time, Desert View became dissatisfied with RPG's performance, including because:  (1) RPG had difficulty providing consistent hospitalist coverage, especially as RPG increased its efforts to grow and expand its employed physician staff and geographic footprint in Nevada; (2) several of the RPG hospitalists were inexperienced or uncomfortable with practicing medicine in a rural setting or in an acute care environment where they had to manage a high volume of patients; and (3) RPG's hospitalists did not offer any specialty services despite community need.  *Id.* ¶ 12.  Because of these issues, Desert View believed that too many of the patients who presented to its ER were being needlessly transferred more than 55 miles away to other hospitals at great expense and inconvenience to those patients and to the financial detriment of Desert View.  *Id.* ¶ 13.  After consulting with various administrators and employees of the hospital as well as members of the medical staff, Desert View's CEO, Susan Davila, decided to look for a replacement for RPG in 2018.  *Id.* ¶¶ 14-15.

Desert View ultimately hired defendant Vista Health Mirza, M.D. P.C. ("Vista Health") to provide hospitalist services.  Ex. 2, ¶ 19.  Vista Health is the medical practice of defendant Irfan Mirza, M.D. ("Mirza"), who is a board-certified cardiologist and had previously worked at Desert View and with other Desert View employees and physicians at another hospital in Arizona, including Desert View's 2019 Chief of Staff, Dr. Alex Vaisman. Ex. 2, ¶ 16; Ex. 5, ¶¶ 1-6.  Anees Arshad, M.D. was the other physician who was to provide dedicated hospitalist services under the Vista Health contract.  Ex. 2, ¶ 17.  Arshad is a board-certified pulmonologist.  Ex. 6, ¶¶ 2-6.  The various RPG hospitalists who had been assigned to Desert View did not have any such medical specialties.  Ex. 2, ¶ 18.  The decision to hire Vista Health was based on the prior experience, medical specialties, and dedicated presence of Mirza and Arshad.  *Id.* ¶ 20.  Vista Health began providing hospitalist services at Desert View on or about January 10, 2019.  *Id.* ¶ 21.

**C.**   **Arik's Privileges Are Suspended For Violating HIPAA, And He Then Resigns**

Relator Tali Arik, M.D. is a board-certified cardiologist who owned and operated a medical practice in Pahrump from May 2019 through at least March 2022.  Ex. 10, p. 12:6-11, 55:25-

4

Polsinelli LLP
2049 Century Park Est, Suite 2900
Los Angeles, CA 90067
310.556.1801

56:18.[1]  In 2018, Arik served as the Chief of Staff for Desert View. Ex. 2, ¶ 29.  Arik was not re-elected to the position for 2019.  *Id*.

Before Mirza began providing hospitalist services at Desert View in January 2019, Arik was the only cardiologist practicing in Pahrump. Ex. 10, p. 145:12-146:4, 263:13-17.  Apparently threatened by the presence of another cardiologist in Pahrump, Arik immediately decided (within the first two weeks of Mirza working at Desert View) that Mirza was not consulting him about cardiac-related issues for patients that Mirza treated in the hospital – a practice that Arik characterizes as "patient stealing." Ex. 10, p. 177:18-179:5, 188:21-192:21; Ex. 11, p. 76:4-20; Ex. 9, p. 4-9.  To pursue his suspicion, Arik rummaged through patient files in the hospital and medical records stored in Desert View's electronic health records system.  Ex. 10, p. 220:2-25; Ex. 30, p. 3-5; Ex. 9, p. 5, 7.  On February 12, 2019, Arik's attorney sent letters to Mirza and Arshad, threatening to sue them if they did not stop "attempting to divert" Arik's patients.  Ex. 27; Ex. 11, p. 83:7-85:16, 109:3-6; Ex. 28, p. 2.  Arik believed that Desert View was "conspiring" with Mirza to divert Arik's patients.  Ex. 29, p. 2-3; Ex. 10, p. 211:15-213:19.  Arik felt "marginalized" at Desert View.  Ex. 10, p. 249:10-13; Ex. 12, p. 18:20-19:12 ("they were ghosting me").

Then Arik got caught.  Desert View discovered that Arik had accessed the medical records of hospital patients for whom he was not listed as the treating or consulting physician and, therefore, possibly violated the Health Insurance Portability and Accountability Act ("HIPAA") based on the unauthorized access of protected health information ("PHI").  Ex. 2, ¶ 30.  On February 22, 2019, Desert View sent a letter to Arik informing him that the hospital's Medical Executive Committee ("MEC") – an independent group of peer physicians – was investigating the issue and requested a formal response from him. Ex. 30, p. 3-4.  Through counsel, Arik responded on February 25, admitting that he accessed the medical records but claiming that he was entitled to do so because, even though he was no longer Chief of Staff, Arik was supposedly concerned about "alleged substandard medical care provided to patients at the hospital" and thus "began reviewing selective charts to determine the accuracy of information he was provided and to ensure

---

[1] The cited pagination of deposition testimony is to the page of the transcript.  The cited pagination of all other exhibits refers to the pagination assigned in the ECF filing header.

Polsinelli LLP
2049 Century Park Est, Suite 2900
Los Angeles, CA 90067
310.556.1801

that quality health care was being provided to the hospital's patients." Ex. 31, p. 3-4; Ex. 10, p. 220:2-25, 227:10-19. Notably, Arik's response letter did not mention needing to access medical records because of concerns about government fraud, unnecessary inpatient admissions, or unnecessary medical testing. Ex. 31, p. 2-5. Indeed, Arik never raised concerns about government fraud with anyone associated with Desert View. Ex. 10, p. 229:8-231:10, 260:7-261:22, 262:2-12; *but see id.* at 261:23-262:1.

Ignoring Desert View's HIPAA concerns, Arik continued to access patient medical records without authorization, and as a result, on February 26, 2019, the MEC suspended his privileges at Desert View for 14 days. Ex. 32, p. 3. The MEC was also concerned that Arik's behavior was "creating a hostile work environment." *Id.* at 4. After meeting with Arik on March 22, 2019, the MEC determined that his medical records access "was not justified" and required him to undertake six hours of continuing medical education classes on HIPAA, professionalism, and ethics. Ex. 33, p. 3. In response, Arik resigned his privileges at Desert View on April 8, 2019. Ex. 34; Ex. 10, p. 233:24-235:2. Arik's resignation became effective May 17, 2019. Ex. 35, p. 2.

### D.   **Arik Files This FCA Action**

Arik filed this action on September 6, 2019. ECF No. 1. The United States declined to intervene in the case just over a month later. ECF No. 2.

Arik's fraud allegations and theories have evolved over the course of four complaints. On February 14, 2020, Arik filed his first amended complaint. ECF No. 14. The Court dismissed this complaint, concluding, among other reasons, that the allegations failed to satisfy Rule 9(b) and insufficiently pled a medical necessity fraud theory under the pleading standard set forth by the Ninth Circuit in *Winter*. ECF No. 52, p. 10-17. On November 10, 2020, Arik filed his second amended complaint. ECF No. 53. The Court also dismissed this complaint on the same grounds, though it concluded that certain of Arik's admission criticisms sufficiently stated a medical necessity fraud theory under *Winter*. ECF No. 100, p. 9-14. In doing so, the Court focused on Arik's allegations that "the inpatient admissions 'fail[] to satisfy the hospital's own admission admissions criteria – the InterQual criteria,' … go 'against medical consensus,'" or were "for treatments that the hospital could not provide because it lacked the necessary facilities." *Id.* at 13

6

Polsinelli LLP
2049 Century Park Est, Suite 2900
Los Angeles, CA 90067
310.556.1801

Polsinelli LLP
2049 Century Park Est, Suite 2900
Los Angeles, CA 90067
310.556.1801

(quoting second amended complaint). The Court also recognized that many of the alleged admission criticisms "merely document Arik's disagreements with Mirza's and other staff members' medical decisions, asserting little more than his 'reasonable difference of opinion' on medical care." *Id*. at 14 (quoting *Winter*, 953 F.3d at 1120).

On June 1, 2021, Arik filed his third amended complaint (the operative pleading). ECF No. 103. There, Arik continued to allege that Desert View submitted false claims because it: (1) unnecessarily admitted and/or tested patients (removing 61, *i.e.* 62%, of the previously-pled representative examples of alleged fraud and narrowing the allegations to 37 patient episodes); and (2) engaged in three other fraudulent billing practices (altering inpatient admission times, inflating the costs of certain goods and services, and rebilling denied inpatient claims as outpatient). *Id*. ¶¶ 117-636. On 31, March 2022, the Court denied Desert View's renewed motion to dismiss in its entirety. ECF No. 127.

After several discovery extensions (ECF Nos. 82, 122, 133, 168), fact discovery closed on August 11, 2022 (ECF No. 133) and expert discovery closed on February 6, 2023 (ECF No. 168).

## III.   RELEVANT STATUTORY AND REGULATORY BACKGROUND

### A.   Medicare, Medicare Advantage, & Medicaid

Medicare is a health insurance program administered by the United States Department of Health and Human Services through the Centers for Medicare & Medicaid Services ("CMS"). *See* 42 U.S.C. §§ 1395 *et seq*. Part A of the Medicare Program provides health insurance for inpatient hospital services to eligible beneficiaries. *Id*. § 1395c. Part B provides health insurance for a variety of other health services, including outpatient services. *Id*. §§ 1395j *et seq*., 1395k(a)(H). Parts A and B are known as "traditional" Medicare. *See United States ex rel. Osinek v. Permanente Med. Grp., Inc*., No. 13-cv-03891, 2022 WL 16925963, at *1 (N.D. Cal. No. 14, 2022).

A Medicare-eligible beneficiary can opt out of traditional Medicare and instead enroll in a Medicare Advantage health insurance plan managed by a Medicare Advantage organization ("MAO"), which can be either a commercial entity or a public one. 42 U.S.C. §§ 1395w-21(a)(1), 1395w-28(a)(1). Medicare Advantage is covered under Part C of the Medicare Program. *See id*. §§ 1395w-21 *et seq*. Under the Medicare Advantage Program, CMS pays the MAOs directly

7

Polsinelli LLP
2049 Century Park Est, Suite 2900
Los Angeles, CA 90067
310.556.1801

1    pursuant to written contracts.  *Id*. §§ 1395w-23(a)(1)(A), 1395w-27(a).

2        Medicaid is a state-administered federal health insurance program that provides health

3    benefits for low income and disabled persons.  *See* 42 U.S.C. §§ 1396-1 *et seq.*  Nevada's Medicaid

4    program is jointly administered by CMS and the Nevada Department of Health & Human Services

5    through the Division of Health Care Financing and Policy.  Ex. 39, § 100, p. 5.

6        **B.    The Critical Access Hospital Program**

7        There is a special designation under the Medicare Program for "critical access hospitals"

8    that are located in certain "rural" areas.  *See* 42 U.S.C. § 1395i-4; 42 C.F.R. §§ 485.601,

9    485.610(b), 485.610(c).  Medicare regulations contain a number of "conditions of participation"

10   in the CAH Program, which require the CAH:  (1) be located in either a recognized "rural" area or

11   outside a designated "urban" area; (2) be located more than a 35-mile drive away from the nearest

12   hospital (or in the case of mountainous terrain, a 15-mile drive); (3) have no more than 25 inpatient

13   beds; and (4) report an annual average length of stay for each inpatient of no more than 96 hours.

14   42 C.F.R. §§ 485.610(b)-(c), 485.620(a)-(b).

15       **C.    The Relevant Reimbursement Rules**

16       Under Part A of the Medicare Program, hospitals are typically reimbursed a fee for services

17   provided at predetermined fixed rates under Medicare's prospective payment system ("fee-for-

18   service reimbursement").  42 C.F.R. § 412.20(a).  However, CAHs do not receive fee-for-service

19   reimbursement under Part A.  *Id*. §§ 413.1(a)(2)(i), 413.1(b), 413.5, 413.70.  Rather, CAHs are

20   reimbursed based on the actual, allowable, and reasonable costs they incur for providing inpatient

21   services to Medicare patients ("cost-based reimbursement").  *Id*.  Medicare pays CAHs an interim

22   per diem rate based on their operating costs from the prior year.  *Id*. §§ 413.5, 413.50, 413.60(a)-

23   (c), 413.64(e).  At the end of the year, CAHs submit a cost report to CMS identifying their actual

24   operating costs, which then results in a final settlement that could produce a retroactive credit,

25   debit, or a change in the CAH's per diem rate the next year.  *Id*. §§ 413.5, 413.20, 413.60(a)-(c),

26   413.64(e).  CAHs also receive cost-based reimbursement for inpatient services under Nevada's

27   Medicaid program in a similar manner to Medicare.  Ex. 41, p. 17-18.

28

8

A different reimbursement methodology applies in the context of Medicare Advantage. Unlike the reimbursement methodologies that apply through traditional Medicare (fee-for-service reimbursement) or to CAHs (cost-based reimbursement), Medicare Advantage uses a "capitation" payment system. 42 U.S.C. § 1395w-23; 42 C.F.R. § 422.300. Under this system, MAOs provide health insurance benefits to Medicare-eligible persons (*i.e.*, enrollees) in exchange for a fixed monthly fee from CMS for each enrollee regardless of any actual healthcare services they receive. 42 C.F.R. §§ 422.300, 422.304(a). The MAO retains the difference between the capitation revenue it receives from CMS and the money it pays to healthcare providers, such as Desert View, for the medical care actually provided to enrollees. *Id.* The fixed monthly fee that an MAO receives for each enrollee is predetermined by CMS, but it is later adjusted based on data CMS receives from the MAO on the particular health risks associated with individual enrollees, which is a function of their gender, age, and health status, as determined by their relative diagnoses. *Id.* §§ 422.308(c), 422.310. MAOs are required to implement a compliance program to ensure that the health information they submit to CMS is accurate. *Id*. §§ 422.503(b)(4)(vi), 422.504(l).

**D.**   **Medical Necessity & Inpatient Admission Standards**

**Medicare**. Federal law provides that no payment may be made under Medicare Part A (for inpatient services) or Part B (outpatient services) unless the services are "reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member" (the "Medical Necessity Requirement"). 42 U.S.C. § 1395y(a)(1)(A). Federal regulations specify that an inpatient admission is "generally appropriate for payment under Medicare Part A when the admitting physician *expects* the patient to require hospital care that crosses two midnights" (the "Two-Midnight Rule"). 42 C.F.R § 412.3(d)(1) (emphasis added). Absent such an expectation, inpatient admission still may be appropriate based on the clinical judgment of the admitting physician and supporting medical record. *Id.* § 412.3(d)(3).

Under the Two-Midnight Rule, a physician's "expectation" of a patient requiring care in the hospital is based upon "complex medical factors" such as "patient history and comorbidities, the severity of signs and symptoms, current medical needs and the risk of an adverse event." 42 C.F.R § 412.3(d)(1)(i). CMS acknowledges that "the decision to admit a patient is a complex

Polsinelli LLP
2049 Century Park Est, Suite 2900
Los Angeles, CA 90067
310.556.1801

9

medical judgment which can be made only after the physician has considered a number of factors…."  Ex. 36, § 10, p. 8; Ex. 38, p. 6 (referencing "complex medical factors").

**Medicare Advantage**.  For MAOs, application of the Two-Midnight Rule depends upon the terms of the contract between the MAO and the provider.  *See* 42 C.F.R. §§ 422.100 *et seq.* However, because MAOs must at least provide the same benefits that are covered under Medicare Part A, the Two-Midnight Rule is the minimum threshold, and MAOs can choose to cover inpatient stays with a lesser duration.  *Id.* §§ 422.100(c)(1), 422.101(a).

**Medicaid**.  Nevada's Medicaid Program also contains a Medical Necessity Requirement. *See* Ex. 39, § 103(B), p. 35 (requiring a "Medicaid provider who accepts a Medicaid recipient for treatment ... to make certain the recipient receives all medically necessary Medicaid covered services").  However, Nevada's Medicaid Program does not follow the Two-Midnight Rule. Ex. 40, § 203.1(A), p. 10-11 (defining admission criteria).  Instead, federal law adopts a 24-hour rule to cover inpatient services for Medicaid:  patients who receive, or are expected to receive, "room, board and professional services in the institution for a 24 hour period or longer" qualify as inpatients (the "24-Hour Rule").  42 C.F.R. § 440.2(a).

## IV.   STATEMENT OF UNDISPUTED MATERIAL FACTS

1. For the 43 patient episodes addressed in Arik's expert reports, the Vista Health hospitalists honestly and genuinely believed the inpatient hospitalization and testing services were medically necessary.[2]  Ex. 1; Ex. 5, ¶¶ 11-12, 14-44; Ex. 6, ¶¶ 10-11, 13-18; Ex. 7, ¶¶ 6-7, 9-16.

2. The relevant symptoms, medical conditions, or diagnoses described in the medical records that underlie the clinical decisions for the 43 patient episodes addressed in Arik's expert reports are not inaccurate.  Ex. 1; Ex. 5, ¶¶ 13-44; Ex. 6, ¶¶ 12-18; Ex. 7, ¶¶ 8-16.

3. Desert View did not contract with Vista Health to unnecessarily admit and test patients.  Ex. 2, ¶¶ 25-26; Ex. 10, p. 122:15-129:15.

---

[2]  In compliance with HIPAA and the protective order entered in this case (ECF No. 120), Desert View has redacted PHI from the exhibits filed in support of this motion and refers to the de-identified "Patient ##" for purposes of tracking relevant patient episodes.  An unredacted version of Exhibit 1, which contains an index all relevant patient episode information, has been provisionally filed under seal with Desert View's accompanying motion to seal.  ECF No. 174.

Polsinelli LLP
2049 Century Park Est, Suite 2900
Los Angeles, CA 90067
310.556.1801

4.      Desert View did not direct, pressure, or incentivize the Vista Health hospitalists to unnecessarily admit or test patients.  Ex. 2, ¶¶ 25-26; Ex. 5, ¶ 12; Ex. 25, §§ 2.10, 2.13, 2.15, 5.2, 5.3, 8.3, p. 4-19; Ex. 26, § II, p. 4-9.

5.      Desert View did not have a policy for increasing inpatient admissions or testing, let alone one that directs physicians to do so unnecessarily.  Ex. 2, ¶ 27; Ex. 26, § II, p. 4-9.

6.      InterQual inpatient admission criteria were satisfied for each of the inpatient admissions challenged in Arik's expert reports.  Exs. 1, 20, 22; Ex. 3, ¶¶ 4-13; Ex. 19, p. 10-11.

7.      For the 20 inpatient episodes Arik's experts characterize as "failure to transfer" cases, Arik's experts agree that these patients medically needed to be hospitalized as inpatients.  Exs. 1, 20, 22; *e.g.*, Ex. 16, p. 155:6-15; Ex. 17, p. 85:17-86:2.

8.      For the 20 inpatient episodes Arik's experts characterize as "failure to transfer" cases, it is unknown whether any of the patients would have consented to a physician's transfer recommendation.  Exs. 1, 20, 22; *e.g.*, Ex. 16, p. 163:9-165:9; Ex. 17, p. 95:13-96:12.

9.      It is unknown whether any of Arik's experts' medical necessity findings are statistically significant.  Exs. 20, 22.

10.     For the 18 patient episodes addressed in Arik's expert reports that involved claims submitted to MAOs, there is no evidence that the diagnosis information provided by Desert View to the MAOs was inaccurate or unsupported.  Ex. 1; Ex. 4, ¶ 7; Ex. 8 (Nos. 9-13), p. 18-24.

11.     For the 18 patient episodes addressed in Arik's expert reports that involved claims submitted to MAOs, there is no evidence that the MAOs received additional reimbursement from CMS based on any inaccurate or unsupported information from Desert View.  Ex. 1; Ex. 4, ¶ 7; Ex. 8 (Nos. 9-13), p. 18-24.

12.     In 2019 and 2020, Desert View held daily interdisciplinary team meetings among the on-duty hospitalist, nurses, technicians, department managers, and various members of hospital administration to collaboratively discuss the current census of admitted patients, their plan of treatment, and their discharge plan.  Ex. 2, ¶ 37.

13.     In 2019 and 2020, Desert View used case managers to review the medical records of the hospital's inpatients in real-time to evaluate the medical necessity of their admission status

11

Polsinelli LLP
2049 Century Park Est, Suite 2900
Los Angeles, CA 90067
310.556.1801

and discharge plan.  Ex. 2, ¶ 38; Ex. 3, ¶¶ 4-11.

14.     In 2019 and 2020, a utilization review team monitored the medical records of Desert View's admissions in real-time to evaluate whether, among other things, their inpatient admission status was consistent with InterQual criteria.  Ex. 3, ¶¶ 4-11.

15.     During the relevant time period, Desert View did not submit any claims to a government-funded payor whereby the inpatient admission time was backdated before the admission order was signed such that Desert View was able to bill and recoup payment for additional hospital days.  Ex. 2, ¶¶ 39-40; Ex. 8 (Nos. 14-15), p. 24-26; Ex. 10, p. 302:8-306:15; Ex. 13, p. 17:10-19:8, 99:24-111:22.

16.     During the relevant time period, Desert View did not submit any claims to any government-funded payor whereby Desert View inflated the unit cost of any "one-per-day" service/item to capture all of the services/items provided to the patient.  Ex. 2, ¶ 41; Ex. 8 (Nos. 20-21), p. 31-33; Ex. 10, p. 307:19-308:22; Ex. 14, p. 20:8-15, 28:6-29:6, 46:18-20, 54:14-21, 89:7-111:7.

17.     During the relevant time period, Desert View did not rebill denied inpatient claims at a lower level of service (outpatient or observation) to Medicare, Medicaid, or any other direct government payor.  Ex. 4, ¶ 9; Ex. 15, p. 84:6-16, 111:2-12; Ex. 8 (Nos. 16-19), p. 26-31.

18.     For the denied Medicare Advantage inpatient claims that Desert View rebilled to MAOs at a lower level of service (outpatient or observation), Desert View did not submit any inaccurate or unsupported information to the MAO.  Ex. 4, ¶ 9; Ex. 8 (Nos. 16-19), p. 26-31.

## V.     SUMMARY JUDGMENT STANDARD

Summary judgment is warranted when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed R. Civ. P. 56(a).  "A fact is material if it could affect the outcome of the case."  *Dorsey v. NP Santa Fe, LLC*, No. 2:19-cv-2070, 2022 WL 1271546, at *2 (D. Nev. Mar. 23, 2022) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)).  "[W]hen the moving party does not bear the burden of proof on the dispositive issue at trial, it is not required to produce evidence to negate the opponent's claim – its burden is merely to point out the evidence showing the absence of a genuine material factual issue."  *Dorsey*,

Polsinelli LLP
2049 Century Park Est, Suite 2900
Los Angeles, CA 90067
310.556.1801

12

1   2022 WL 1271546, at *2 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).  "The movant

2   need only defeat one element of a claim to garner summary judgment on it because 'a complete

3   failure of proof concerning an essential element of the nonmoving party's case necessarily renders

4   all other facts immaterial'."  *Dorsey*, 2022 WL 1271546, at *2 (quoting *Celotex*, 477 U.S. at 322).

5   **VI.   THE COURT SHOULD GRANT SUMMARY JUDGMENT ON ARIK'S FCA**

6   **CLAIMS BASED ON MEDICALLY UNNECESSARY INPATIENT SERVICES**

7   **A.   The False Claims Act & Medical Necessity**

8   The FCA imposes liability on anyone who (A) submits "a false or fraudulent claim for

9   payment or approval" to the federal government or (B) "makes, uses, or causes to be made or used,

10   a false record or statement material to a false or fraudulent claim." 31 U.S.C. §§ 3729(a)(1)(A),

11   3729(a)(1)(B).  To establish liability under the FCA, a plaintiff must prove "(1) a false statement

12   or fraudulent course of conduct, (2) made with scienter, (3) that was material, causing (4) the

13   government to pay out money or forfeit moneys due." *United States ex rel. Campie v. Gilead*

14   *Scis., Inc.*, 862 F.3d 890, 899 (9th Cir. 2017).

15   The knowing or reckless submission of a claim for medical services that were not

16   "reasonable and necessary" in violation of the Medicare Medical Necessity Requirement (42

17   U.S.C. § 1395y(a)) can constitute an FCA violation under a false certification theory. *See Winter*,

18   953 F.3d at 1113, 1118-19.  However, because a physician's clinical judgment is inherently

19   subjective, a defendant cannot be liable under the FCA based on only "a reasonable difference of

20   opinion among physicians reviewing medical documentation *ex post*." *United States v. AseraCare*,

21   *Inc.*, 938 F.3d 1278, 1297 (11th Cir. 2019).  As one district court has observed, "'physicians

22   applying their clinical judgment about a patient ... could disagree' and yet it could still be true that

23   neither is wrong." *United States v. DaVita Inc.*, No. 8:18-cv-01250, 2020 WL 3064771, at *8

24   (C.D. Cal. Apr. 10, 2020) (quoting *AseraCare*, 938 F.3d at 1296)).

25   In *Winter*, the Ninth Circuit held that a relator cannot establish a medical necessity claim

26   under the FCA solely based on a reasonable disagreement between physicians "*with no other*

27   *evidence* to prove the falsity of the [clinical judgment]." 953 F.3d at 1118-19 (quoting *AseraCare*,

28   938 F.3d at 1281 and adding emphasis).  This requires proving that the physician's subjective

Polsinelli LLP
2049 Century Park Est, Suite 2900
Los Angeles, CA 90067
310.556.1801

13

Polsinelli LLP
2049 Century Park Est, Suite 2900
Los Angeles, CA 90067
310.556.1801

clinical judgment was not just *wrong*, but *fraudulent*. *DaVita*, 2020 WL 3064771, at \*8; *see also United States ex rel. Riley v. St. Luke's Episcopal Hosp.*, 355 F.3d 370, 376 (5th Cir. 2004) (recognizing in the medical necessity context that "a lie is actionable but not an error"). A physician's subjective clinical judgment can be false if the relator can establish that the physician did not honestly believe the medical treatment was necessary for the patient or "if it implies the existence of facts … that do not exist."[3] *Winter*, 953 F.3d at 1119; *AseraCare*, 938 F.3d at 1297; *see, e.g.*, *United States v. Paulus*, 894 F.3d 267, 275-76 (6th Cir. 2018) (physician misrepresented test results to perform unnecessary procedures).

Further, "[i]n determining medical necessity, courts employ what is known as the 'treating physician' rule, which provides that with respect to medical necessity, the judgment of the treating physician should be given 'extra weight' or 'a reasoned basis … [should be supplied] for declining to do so.'" *United States v. Prabhu*, 442 F. Supp. 2d 1008, 1032 (D. Nev. 2006) (citations omitted) (granting summary judgment based on alleged medically unnecessary tests).

**B.**      **There Is No Triable Issue Of Fact That Desert View Submitted Claims Containing False Certifications Of Medical Necessity**

During discovery, Arik did not disclose an affirmative expert to opine on the medical necessity of the services provided to 35 of the 37 patient episodes alleged in the third amended complaint (the "Complaint Episodes"). *See* Exs. 1, 20. Instead, Arik affirmatively disclosed an expert (Dr. Rodney Armstead) who purported to opine about the lack of medical necessity of certain services provided to 17 patients in a probe sample of 50 inpatient episodes (the "Probe Sample Episodes"), two of which overlap with the Complaint Episodes. Ex. 20, p. 10-24; Ex. 1. It was only in *rebuttal* to the opinions of defendants' experts (Dr. Kathleen Bowen and Dr. Shivesh Kumar) that Arik disclosed an expert (Dr. Daniel Woodward) to opine about the medical necessity of the Complaint Episodes. Ex. 22, p. 2. Even Arik's rebuttal expert agreed that a meaningful number of the Complaint Episodes were appropriate; Woodward only agreed with Arik's medical

---

[3] A physician's certification of medical necessity also can be false if the relator can establish that the physician did not actually review the patient's medical records or otherwise familiarize themselves with the patient's medical condition. *See AseraCare*, 938 F.3d at 1297. Arik has not asserted such allegations in this case.

necessity allegations for 28 of the 37 Complaint Episodes.  *Id*. at 6-39.  Arik also did not designate himself as an expert to opine on the issue of medical necessity.  Arik's medical necessity claim fails because his expert testimony raises no more than a mere disagreement between physicians and he has no other evidence that the treating physicians' opinions were fraudulent.

1.   *Arik's Medical Expert Testimony Is Neither Admissible Nor Sufficient To Raise A Triable Issue Of Fact On The Issue Of Medical Necessity*

As discussed in Desert View's concurrently-filed *Daubert* motion, which is expressly incorporated herein, Arik does not have any admissible or affirmative expert testimony to present to the jury on the issue of medical necessity.  ECF No. 172.  None of Arik's experts applied the correct or consistent medical necessity standards in reviewing the medical records and treatment decisions at issue.  *Id*. at 12-19.  This defect alone requires the exclusion of their opinions.  Moreover, Armstead's hopelessly flawed and improperly delegated process for reaching "his" medical necessity opinions is another basis to exclude his testimony.  *Id*. at 9-12.

Absent Armstead's testimony, Arik does not have a medical necessity expert that he can use to avoid summary judgment in this case.  Again, Woodward was disclosed solely as a rebuttal expert in response to the medical necessity opinions of defendants' experts.  Ex. 22, p. 2.  As such, Arik cannot rely on – and the Court cannot consider – Woodward's rebuttal opinions to oppose summary judgment on the issue of falsity.  *See Danganan v. Am. Fam. Mut. Ins. Co.*, No. 2:17-cv-02786, 2018 WL 3660198, at *3 (D. Nev. Aug. 2, 2018) (a rebuttal expert cannot testify in party's case-in-chief); *Alsadi v. Intel Corp.*, No. CV-16-03738, 2019 WL 4849482, at *12-14 (D. Ariz. Sept. 30, 2019) (refusing to consider plaintiffs' rebuttal expert testimony in opposition to defendants' motion for summary judgment); *Ellis v. Corizon, Inc.*, No. 1:15-cv-00304, 2018 WL 6268199, at *4 (D. Idaho Nov. 30, 2018) (same because "Rule 56 motions are designed to test the sufficiency of the non-moving party's case-in-chief, and weed out cases which cannot be successfully presented at trial," and the "purpose of Rule 56 is best served by only considering evidence which the non-moving party could properly submit as part of its case-in-chief").

Even if the Court does not exclude, and still considers, the opinions of Arik's experts, summary judgment is still warranted because the evidence – at best – reflects a mere disagreement

Polsinelli LLP
2049 Century Park Est, Suite 2900
Los Angeles, CA 90067
310.556.1801

Polsinelli LLP
2049 Century Park Est, Suite 2900
Los Angeles, CA 90067
310.556.1801

among physicians about whether a particular patient's admission or tests were medically necessary.  Arik bears the burden of proving that the complex, subjective, and individualized hospitalization decisions made by the Vista Health hospitalists were not just wrong, but false. *Winter*, 953 F.3d at 1118-19.  However, the opinions of Arik's experts, even if admissible, merely reveal that they retrospectively disagree with the contemporaneous clinical judgment of the treating physicians (Mirza, Arshad, and Dr. Muhammad Syed) and the retrospective opinions of defendants' own experts.  Just because physicians disagree about the appropriate course of treatment for a patient does not mean that one of their clinical assessments of the medical care required is unnecessary or unreasonable.  *See* Ex. 16, p. 140:7-142:16; Ex. 17, p. 73:14-25.

This "reasonable disagreement" problem is highlighted by the fact that Arik's experts did not always agree with each other, let alone with Arik's medical necessity allegations.  For example, Woodward and Armstead both reviewed the medical records for Patient 1047 and reached different opinions as to whether her inpatient admission and Lexiscan stress test were medically necessary. Ex. 17, p. 206:20-210:8 (acknowledging "discrepancy of opinion" and a "difference of opinion there"); Ex. 16, p. 233:18-238:9 ("Dr. Woodward and I differed on this one").  Nevertheless, because Armstead signed the report, his opinion prevailed, and the inpatient admission and stress test for Patient 1047 were described as medically unnecessary. Ex. 20, p. 18-19; Ex. 1.  However, at his deposition, Armstead ultimately agreed to withdraw his opinion for this patient based on his disagreement with Woodward, as revealed in the following exchange:

> Q.     … [H]ow do you account for the difference in opinions between you and Dr. Woodward for Patient [1047]?
>
> A.     … I didn't talk to him about the difference.  I think the difference was – again, the difference is not on the admission.  The difference is, you know, I would have basically said push the patient to a higher level of care.  That's the difference.  So we got to the same conclusion that inpatient care was needed.  I just thought a higher level.  So that's why I'm saying it's a close call in that regard.  I'll – I'll change my position in regards to the close call.

Ex. 16, p. 238:14-239:5; Ex. 1.  Woodward's disagreements with Arik's medical necessity allegations are even more pronounced.  *See* Ex. 17, p. 92:9-23, 112:14-113:8, 115:20-116:7, 125:20-126:2, 139:1-12, 140:9-21, 142:21-143:2, 161:10-14, 173:20-174:12, 176:16-23.

Under *Winter*, a mere disagreement between physicians cannot establish liability for a medical necessity claim under the FCA. 953 F.3d at 1118-19. The FCA requires "*other evidence to prove the falsity of the [clinical judgment].*" *Id.* (quoting *AseraCare*, 938 F.3d at 1281; adding emphasis). As discussed below, Arik does not have any other evidence showing that the challenged medical decisions were fraudulent. Moreover, the physician disagreements at issue are not just between Arik and his own experts, they also include the medical judgment of the treating physicians. Those physicians stand by the clinical decisions challenged by Arik.[4] Ex. 5, ¶¶ 14-44; Ex. 6, ¶¶ 13-18; Ex. 7, ¶¶ 9-16. Under the treating physician rule, their clinical judgments are given "extra weight" in determining medical necessity. *Prabhu*, 442 F. Supp. 2d at 1032.

2.     *Arik Has No Other Evidence Demonstrating That The Challenged Medical Decisions Were False*

The Vista Health hospitalists honestly and genuinely believed that the inpatient hospitalization and testing services at issue were medically necessary. Ex. 5, ¶¶ 12-44; Ex. 6, ¶¶ 11-18; Ex. 7, ¶¶ 7-16. They were sufficiently familiar with the patients' medical conditions to support their clinical decisions. *Id.* There is no evidence that any of the patients' symptoms, medical conditions, or diagnoses as described in the medical records were inaccurate or otherwise falsified. Ex. 5, ¶ 13; Ex. 6 ¶ 12; Ex. 7 ¶ 8. Desert View did not hire Vista Health to *unnecessarily* admit or test patients. Ex. 2, ¶ 25; Ex. 10, p. 122:15-129:15. Desert View did not force, pressure, or incentivize the Vista Health hospitalists to *unnecessarily* admit or test patients. Ex. 2, ¶¶ 25-26; Ex. 5, ¶ 12; Ex. 25, §§ 2.10, 2.13, 2.15, 5.2, 5.3, 8.3, p. 4-19; Ex. 26, § II, p. 4-9. Indeed, under its contract with Desert View, Vista Health did not receive any additional compensation for admitting patients or ordering additional tests. Ex. 25, § 5.3, p. 15 (fixed monthly fee). Desert View did not have any policy for increasing inpatient admissions or medical testing, let alone one that directs physicians to do so *unnecessarily*. Ex. 2, ¶ 27. Arik has no evidence to the contrary.

Arik's proof deficit is even more prominent for the critical allegations that led the Court to conclude that Arik had satisfied the medical necessity fraud pleading standard set forth in *Winter*.

---

[4] Arik deposed Mirza and Arshad but did not question them about any of the specific medical decisions at issue in this case. Arik did not even attempt to depose Syed.

Polsinelli LLP
2049 Century Park Est, Suite 2900
Los Angeles, CA 90067
310.556.1801

Polsinelli LLP
2049 Century Park Est, Suite 2900
Los Angeles, CA 90067
310.556.1801

In upholding his medical necessity claim under *Winter*, the Court specifically identified Arik's allegations that the Complaint Episodes did not satisfy InterQual or Desert View's own admission criteria.  ECF No. 100, p. 13; ECF No. 127, p. 5-6.  But Arik has no evidence showing that the inpatient admissions were inconsistent with InterQual.  *See* Ex. 8 (No. 8), p. 17-18; Ex. 20 (no InterQual findings); Ex. 22 (no adverse InterQual findings).  To the contrary, InterQual criteria were *satisfied* for the inpatient episodes criticized in Arik's expert reports.  Ex. 1; Ex. 3, ¶¶ 12-13; Ex. 19, p. 10-11.  Nor did Arik's affirmative medical expert review Desert View's internal inpatient admission criteria, let alone assess compliance with such criteria.  Ex. 20, p. 5-7, 10-12; Ex. 16, p. 116:16-18.  Even Arik's rebuttal expert only identified two inpatient admissions that were purportedly inconsistent with Desert View's admission criteria.[5]  Ex. 22, p. 18-19, 25-26.

None of Arik's evidence is sufficient to create a triable issue of fact on the element of falsity.  In his relevant interrogatory responses, Arik identifies various documents and testimony showing that:  (1) in 2018, Desert View believed that it was financially underperforming and not adequately serving the medical needs of its community because the hospital's admissions were too low and transfers to other facilities were too high; (2) Desert View's CEO (Susan Davila) wanted to increase admissions and decrease transfers by hiring hospitalists with board-certified specialties that would allow the hospital to admit more (and transfer less) sicker patients; (3) that Vista Health was specifically hired to accomplish that goal; and (4) the hospital's admissions were higher in 2019 than 2018 because of the Vista Health hospitalists.  Ex. 8 (Nos. 1, 3-4), p. 3-5, 7-10.  Viewing the facts most favorably to Arik, they do not suggest that Desert View hired Vista Health for the purpose of *unnecessarily* admitting or testing patients, of which there is no proof.  Ex. 10, p. 122:15-129:15.  Having a goal to increase revenue by increasing medically necessary admissions is not unlawful or sufficient to infer fraudulent intent.  *See Osinek*, 2022 WL 16943886, at *6 ("[l]ooking for ways to increase revenue is not in and of itself illegal," as the key inquiry is approval of wrongful conduct); *see also DaVita*, 2020 WL 3064771, at *9 (concluding that relator's failure to plead medical necessity also results in a failure to plead the knowing provision

---

[5] For one of the patients, Arik's expert concluded that the "patient certainly met the InterQual criteria." Ex. 22, p. 19.  Indeed, both inpatient episodes satisfied InterQual.  Ex. 3, ¶¶ 12-13.

Polsinelli LLP
2049 Century Park Est, Suite 2900
Los Angeles, CA 90067
310.556.1801

of medically unnecessary services to increase profit); *see also* Ex. 11, p. 23:8-25 ("If you want increased patient volume, that's … neither nefarious nor non-nefarious.  It just is.").[6]

Ultimately, the only affirmative, relevant evidence Arik has to support the falsity element of his medical necessity claim is Armstead's expert opinion, which is inadmissible for the reasons discussed in Desert View's *Daubert* motion.  *Winter* requires more.  Summary judgment should be granted on Arik's medical necessity claim because there is no triable issue of fact on falsity.

**C.**     **For Independent Reasons, Summary Judgment Should Be Granted On Arik's "Failure to Transfer" Theory**

Arik's experts criticize the medical necessity of the admission decisions for 36 of the 43 patient episodes addressed in their reports.  *See* Exs. 1, 20, 22.  Their admission criticisms fall into two categories:  16 patients who were not sick enough to be admitted as inpatients (or should not have been admitted at all); and 20 patients who were so sick that they needed to be hospitalized on an inpatient basis, but should have been transferred to a facility other than Desert View.  *Id*.  For the latter, Arik's experts conclude that the inpatient admissions were "medically unnecessary" because they should have been transferred prior to admission at Desert View to some other hospital with a higher level of care.  *See* Exs. 20, 22.  Summary judgment should be granted on Arik's FCA claims based on his experts' "failure to transfer" opinions for two reasons.

First, Desert View is unaware of any court that has recognized the validity of a medical necessity claim based on a "failure to transfer" theory under the FCA.  From a medical necessity standpoint, this claim fails because there is no dispute that the Medical Necessity Requirement for inpatient admission was satisfied for the 20 patients at issue.  Arik's experts both agree that these patients had a medical need to be hospitalized on an inpatient basis. Exs. 20, 22; Ex. 16, p. 155:6-15, 238:14-239:5 ("we got to the same conclusion that inpatient care was needed" for Patient 1047); Ex. 17, p. 85:17-86:2.  However, they believe that the "standard of care" required the treating ER physicians (not the hospitalists) to transfer them to another hospital from the ER (or

---

[6] Desert View expects Arik to respond with numerous irrelevant points, such as disciplinary actions taken against one or more of the Vista Health hospitalists, staff complaints about their behavior, and uncouth text exchanges between them.  None of this evidence is probative of the falsity of the medical necessity of the specific clinical decisions at issue.

Polsinelli LLP
2049 Century Park Est, Suite 2900
Los Angeles, CA 90067
310.556.1801

in some instances, after admission).  Ex. 16, p. 256:18-257:3, 262:1-8; Ex. 20, p. 12; Ex. 22, p. 12, 15-16, 20, 26, 39; Ex. 17, p. 109:14-110:24.  Such a criticism is not actionable in this context because the medical necessity of inpatient admissions is governed by the Two-Midnight Rule (or 24-Hour Rule), which is framed solely in terms of the patient's "current medical needs" for hospital care regardless of any potential "transfer" to another facility.  42 C.F.R. §§ 412.3(d)(1)(ii), 440.2(a).  Whether a patient *should* be transferred to another facility to receive more sophisticated care involves a qualitative judgment that exceeds the parameters for inpatient admission under these rules.  *Id.*  Desert View cannot be liable under the FCA for admitting and not transferring patients who medically needed to be hospitalized.

Second, Arik's "failure to transfer" theory is also fatally defective because it is impermissibly based on a chain of speculative inferences for which there is no factual support. Both of Arik's medical experts acknowledge that numerous conditions must be met before a patient can be transferred to another hospital, such as obtaining the patient's consent, the accepting hospital having a bed available for the patient, a specialist available to treat the patient's needs, and the availability of suitable transportation.  Ex. 17, p. 94:13-96:9; Ex. 16, p. 162:22-166:14. Neither of Arik's experts know whether those conditions would have been met for the "failure to transfer" patients.  *E.g.*, Ex. 17, p. 95:13-96:12; Ex. 16, p. 163:9-165:9.  Indeed, for at least two of the patients, the treating physicians actually recommended that the patients be transferred from Desert View to another hospital, but the patients refused such transfer.  Ex. 18 p. 14-15, 48-49.

Accordingly, the critical problem with Arik's "failure to transfer" theory is that his experts' medical necessity determinations for these patient admissions depend entirely on whether the patients would have consented to a transfer to a hospital that was willing and able to treat them. *See, e.g.*, Ex. 17, p. 90:9-12 (conceding "if that patient declined to be transferred, then admission at Desert View was appropriate").  In other words, their medical necessity opinions hinge on pure speculation, which is insufficient to create a triable issue of fact as to the falsity of the medical necessity certifications for these 20 patients.  *See United States ex rel. Cafasso v. Gen. Dynamics C4 Sys., Inc.*, 637 F.3d 1047, 1061 (9th Cir. 2011) ("To survive summary judgment, a plaintiff must set forth non-speculative evidence of specific facts, not sweeping conclusory allegations.").

20

1    Thus, summary judgment should be granted on Arik's a "failure to transfer" theory.

2    **D.    Summary Judgment Should Be Granted On Any Alleged False Claim For**

3    **Which Arik Does Not Have A Medical And Billing Record**

4    Arik only obtained the medical and billing records for the 37 Complaint Episodes and the

5    50 Probe Sample Episodes, not any other patient episodes.  *See* ECF No. 140, p. 20-22; ECF No.

6    168.  Arik's experts only issued opinions on these patient episodes.  *See* Ex. 20, p. 5; Ex. 22, p. 4.

7    Even though Arik does not have any evidence that Desert View submitted specific claims to

8    government-funded payors for medically unnecessary services beyond the patient episodes

9    addressed in his experts' reports, he intends to prove to the jury that Armstead's findings from the

10   Probe Sample Episodes are statistically significant and should be "extrapolated" to expand Desert

11   View's liability under the FCA.  *See* ECF No. 142, p. 3 n.2.  Arik's attempt to extrapolate through

12   statistical sampling fails for multiple reasons.

13   First, Arik has not disclosed any expert who would present a valid extrapolation model to

14   the jury based on the statistical significance of Armstead's medical necessity findings.  The Ninth

15   Circuit has not squarely addressed whether or in what circumstances a relator can prove

16   extrapolated liability or damages based on statistical evidence in an FCA case.  The few district

17   courts that have addressed the issue did not categorically prohibit the use of statistical evidence

18   under the FCA, but they did conclude, or at least implicitly acknowledged, that any attempt to

19   prove liability and/or damages in such a manner must be supported by reliable expert testimony.

20   *See United States ex rel. Scott v. Ariz. Ctr. for Hematology & Oncology, PLC*, No. CV-16-03703,

21   2020 WL 2059926, at *7-11 (D. Ariz. Apr. 29, 2020) (denying summary judgment on

22   extrapolation theory because "statistical evidence may be admitted to prove [relator's] claims in

23   this FCA case" "[i]f sufficiently reliable to be admitted under Rule 702"); *United States v. Rite*

24   *Aid Corp.*, No. 2:12-cv-01699, 2020 WL 3970201, at *7, 10-15 (E.D. Cal. July 14, 2020) (denying

25   motion to exclude extrapolation theory because such an approach is permissible "[a]s long as a

26   proposed sample meets the reliability standards of Rule 702"); *Cretney-Tsosie v. Creekside*

27   *Hospice II, LLC*, No. 2:13-cv-00167, 2016 WL 1257867, *5-6 (D. Nev. Mar. 30, 2016) (precluding

28   government from proving liability through extrapolation based on statistical evidence where such

Polsinelli LLP
2049 Century Park Est, Suite 2900
Los Angeles, CA 90067
310.556.1801

Polsinelli LLP
2049 Century Park Est, Suite 2900
Los Angeles, CA 90067
310.556.1801

evidence was not timely disclosed through experts); *United States ex rel. Guardiola v. Renown Health*, No. 3:12-CV-00295, 2015 WL 5123375, at *1-7 (D. Nev. Sept. 1, 2015) (discovery order defining scope of "data universe" for statistical sampling experts).  Desert View is not aware of any authority allowing a relator to prove extrapolated liability under the FCA based on statistical evidence without reliable expert testimony.

Second, allowing Arik to extrapolate liability or damages in this case would result in a violation of Desert View's due process rights.  *See* U.S. Const. amend. V.  Under the Two-Midnight Rule, a physician's subjective "expectation" that a patient will need a two-midnight stay at the hospital is based on "complex medical factors" that are inherently patient-specific, such as their "history and comorbidities, the severity of signs and symptoms, current medical needs and the risk of an adverse event."  42 C.F.R § 412.3(d)(1); Ex. 36, § 10, p. 7-8; Ex. 38, p. 6.  In FCA cases where liability turns on complex, individualized medical necessity determinations, district courts have precluded relators from proving liability through extrapolation.  *See United States ex rel. Wall v. Vista Hospice Care, Inc*., No. 3:07-CV-00604-M, 2016 WL 3449833, *12-13 (N.D. Tex. June 20, 2016) (excluding relator's statistical expert because the underlying determination of hospice eligibility is inherently subjective, patient-specific, and dependent on the judgment of treating physicians); *United States ex rel. Michaels v. Agape Senior Cmty., Inc.*, No. CA 0:12-3466, 2015 WL 3903675, at *6-8 (D.S.C. June 25, 2015) (rejecting extrapolation in "highly fact-intensive" medical necessity FCA case "involving medical testimony after a thorough review of the detailed medical cart of each individual patient"); *see also United States ex rel. Conroy v. Select Med. Corp.*, 307 F. Supp. 3d 896, 900 (S.D. Ind. 2018) (same).

Desert View acknowledges that there is case authority permitting relators to extrapolate in certain types of medical necessity cases under the FCA.  But in those cases, the courts determined that the defendants' due process rights were not violated because of their ability to challenge the reliability and qualifications of relator's statistical experts, cross-examine them at trial, and present their own rebuttal statistical experts.  *See, e.g., United States ex rel. Martin v. Life Care Ctrs. of Am., Inc.*, 114 F. Supp. 3d 549, 570 (E.D. Tenn. 2014) (permitting statistical sampling and concluding extrapolation would not violate defendant's rights for the aforementioned reasons).

1   Desert View has had no such opportunity in this case.  Thus, the Court should grant summary

2   judgment and preclude Arik from trying to extrapolate liability based on statistical evidence.

3       **E.**       **For Independent Reasons, Summary Judgment Should Be Granted On The**
4                    **Medicare Advantage Claims**

5           As discussed previously, under the Medicare Advantage Program's capitation system, the

6   government reimburses MAOs a capitated rate (a fixed monthly fee) for each person enrolled in

7   the program, and the MAOs are responsible for paying claims for medical services provided to

8   their enrollees.  42 U.S.C. § 1395w-23; 42 C.F.R. §§ 422.300, 422.304(a).  The capitation rate

9   fluctuates depending on the severity of enrollees' medical diagnoses and are subject to specific

10  risk adjustment rules and obligations, such as the MAO implementing a compliance program to

11  ensure the data provided to CMS is justified.   42 C.F.R. §§ 422.308(c), 422.503(b)(4)(vi),

12  422.504(l).   Thus, to establish a false claim under the Medicare Advantage Program, the

13  downstream provider must submit inaccurate (or unsupported) diagnosis information that goes

14  undetected by the MAO, is passed along to CMS as "risk adjustment data," and causes the MAO

15  to receive higher capitation payments from the government.  *See generally United States ex rel.*

16  *Silingo v. WellPoint, Inc.*, 904 F.3d 667, 678-79 (9th Cir. 2018); *United States v. United*

17  *Healthcare Ins. Co.*, 848 F.3d 1161, 1173-79 (9th Cir. 2016).

18          In this case, Arik claims that Desert View violated the FCA in connection with the

19  unnecessary hospitalization and/or medical testing of 18 Medicare Advantage enrollees.  Exs. 1,

20  20, 22; Ex. 4, ¶ 7.  For these patients, Arik alleges that Desert View "caused [the MAO] to pass

21  the diagnosis-related information contained on Patient [#]'s Claim Form to CMS, and that

22  diagnosis-related information resulted in modification of Patient [#]'s capitation rate."  ECF No.

23  103, ¶¶ 546, 563, 579, 595, 623, 636.

24          Arik has no evidence to support this allegation for any of the 18 Medicare Advantage

25  patients at issue in this case.  *See* Ex. 8 (Nos. 9-13), p. 18-24.  First, he has no expert testimony

26  establishing that Desert View submitted inaccurate or unsupported diagnosis information on

27  claims to the MAOs at issue (Aetna, Anthem, Humana, and United).  *See id.*; *see generally* Ex. 20

28  (no review of diagnosis information included on MAO claims); Ex. 22 (same).  Second, Arik has

Polsinelli LLP
2049 Century Park Est, Suite 2900
Los Angeles, CA 90067
310.556.1801

23

Polsinelli LLP
2049 Century Park Est, Suite 2900
Los Angeles, CA 90067
310.556.1801

no evidence from Aetna, Anthem, Humana, or United showing that they submitted any inaccurate information from Desert View to CMS as risk adjustment data and that such data caused these MAOs to receive higher capitation payments from CMS. *See* Ex. 8 (Nos. 9-13), p. 18-24. These are critical requirements for proving an FCA violation under the Medicare Advantage Program. *See, e.g.*, *United States v. UnitedHealthcare Ins. Co*., No. 15-CV-7137, 2018 WL 2933674, at *7 (N.D. Ill. June 12, 2018) (dismissing claim because relator did not allege that the MAO "submitted false data" to CMS); *United States ex rel. Martinez v. KPC Healthcare Inc.*, No. 8:15-cv-01521, 2017 WL 10439030, at *5 (C.D. Cal. June 8, 2017) (dismissing claim because relator failed to allege how hospital's false bills to MAO affected CMS's payments to MAO). There is no genuine dispute of material fact regarding these required elements of proof, and summary judgment should be granted on any alleged medically unnecessary claims submitted to MAOs.

**F.      Summary Judgment Should Be Granted Because There Is No Triable Issue Of Fact On The Element of Scienter**

Under the FCA's scienter requirement, "innocent mistakes, mere negligent misrepresentations and differences in interpretations will not suffice to create liability." *United States v. Corinthian Colls.*, 655 F.3d 984, 996 (9th Cir. 2011) (citations omitted). For an FCA claim based on a false certification of medical necessity, a relator must prove that the defendants either "[knew] the treatment was not medically necessary, or act[ed] in deliberate ignorance or reckless disregard of whether the treatment was medically necessary." *Winter*, 953 F.3d at 1114 (citing 31 U.S.C. § 3729(b)(1)). The scienter requirement is both "rigorous" and the subject of "strict enforcement." *Universal Health Servs., Inc. v. United States ex rel. Escobar*, 579 U.S. 176, 192 (2016); *Winter*, 953 F.3d at 1117 (quoting same).

Because Arik's FCA claims are based on the absence of medical necessity for clinical decisions made by the Vista Health hospitalists, there are two levels of scienter that Arik must prove to establish liability against Desert View. The first is proof that the Vista Health hospitalists must have either (a) known that the admissions and medical testing for the specific patient episodes at issue were medically unnecessary or (b) recklessly disregarded or deliberately ignored whether such treatments were medically necessary. *Winter*, 953 F.3d at 1114. Arik cannot establish a

24

Polsinelli LLP
2049 Century Park Est, Suite 2900
Los Angeles, CA 90067
310.556.1801

triable issue of fact about scienter at this level.  The Vista Health hospitalists honestly and genuinely believed that the inpatient hospitalization and testing services were medically necessary, and their treatment decisions are supported by accurate information contained in the relevant medical records.  Ex. 5, ¶¶ 11-44; Ex. 6, ¶¶ 10-18; Ex. 7, ¶¶ 6-16; *see also* Exs. 18-19, 21.  Arik has no contradictory scienter evidence for the Vista Health hospitalists.

The second level of scienter is proving that Desert View submitted claims to the federal government for inpatient services and medical testing ordered by the Vista Health hospitalists that the hospital either (a) knew were medically unnecessary or (b) deliberately ignored or recklessly disregarded whether they were medically necessary.  As discussed previously, the undisputed evidence shows that Desert View did not:  hire Vista Health to *unnecessarily* admit and test patients; force, pressure, or incentivize the Vista Health hospitalists to *unnecessarily* admit or test patients; or have any policy for increasing inpatient admissions or medical testing, let alone one that directs physicians to do so *unnecessarily*.  Ex. 2, ¶¶ 25-27; Ex. 25, §§ 2.10, 2.13, 2.15, 5.2, 5.3, 8.3, p. 4-19; Ex. 26, § II, p. 4-9.  Arik cannot prove that Desert View knew, or recklessly disregarded, that any of the claims at issue involved medically unnecessary services.

Moreover, during the relevant time period (2019 to 2020), Desert View used several levels of review to ensure that patients were appropriately admitted, treated, and discharged at the hospital.  First, Desert View held daily interdisciplinary team meetings among the on-duty hospitalist, nurses, technicians, managers, and various members of hospital administration to collaboratively discuss the current roster of inpatients, their plan of treatment, and their discharge plan.  Ex. 2, ¶ 37.  Second, a utilization review ("UR") team comprised of case managers who are licensed nurses to monitor Desert View's inpatient admissions in real-time and evaluate whether, among other things, the patients' admission status was consistent with InterQual criteria.  Ex. 2, ¶ 38; Ex. 3, ¶¶ 4-11.  Hospitals are required to have UR teams evaluate the medical necessity of inpatient admissions as a condition of participation in the Medicare program.[7]  42 C.F.R. § 482.30.

---

[7] Desert View's UR team uses InterQual as an evaluation tool, but CMS does not require hospitals to use any particular admission criteria.  Ex. 38, p. 8-9; Ex. 37, p. 24.  *See generally Barrows v. Becerra*, 24 F.4th 116, 125-26 (2d Cir. 2022) (recognizing UR function at hospitals and that utilization review staff may use the same commercial screening tools as Medicare contractors).

Polsinelli LLP
2049 Century Park Est, Suite 2900
Los Angeles, CA 90067
310.556.1801

These layers of review exist to ensure only medically necessary services are rendered to patients at the hospital. Ex. 2, ¶¶ 37-38; Ex. 3, ¶¶ 4-11. Arik has no evidence showing that Desert View did not use or deviated from these processes or, alternatively, that the UR team identified a medical necessity issue that the hospital ignored for any of the inpatient admissions at issue in this case.

Nor does Arik have sufficient evidence to create a triable issue of fact that Desert View recklessly disregarded whether such claims involved medically unnecessary services. In his discovery responses, Arik pointed to the following facts as probative of scienter: (1) the absence of medical necessity for the patient episodes; (2) his February 11, 2019 meeting with Dr. Daniel McBride reporting his concerns about "Desert View's schedule to defraud Medicare"; (3) perceived pressure that Dr. Hazelitt felt from hospital administration to "unnecessarily admit patients"; and (4) Desert View hiring Mirza despite adverse disciplinary action against him for providing medically unnecessary services. Ex. 8 (No. 6), p. 12-14. These purported facts, alone or together, do not raise a genuine dispute on the issue of scienter because: (1) Arik cannot prove any false certifications of medical necessity for the claims at issue; (2) during his February 2019 meeting with McBride, Arik discussed his concerns about "patient safety issues" but not that he believed the Vista Health hospitalists were "unnecessarily admitting patients" or defrauding the federal government; (3) the "pressure" that Hazelitt supposedly felt to admit more patients is something she ignored (*i.e.*, she did not unnecessarily admit patients) and pre-dates any alleged fraud that began when the Vista Health hospitalists started working at Desert View; and (4) Mirza's disciplinary history was considered and vetted by Desert View prior to his engagement. Ex. 10, p. 229:3-231:10, 260:7-262:12; Ex. 13, p. 45:6-18, 51:1-55:5, 134:5-23; Ex. 2, ¶¶ 22-24.

Based on the evidence, there is no triable issue of fact about scienter in this case. Therefore, the Court should grant summary judgment on Arik's medical necessity claims under the FCA.

G.     **Summary Judgment Should Be Granted On Arik's Unnecessary Medical Testing Allegations**

Arik's experts claim that 24 of the 43 patient episodes addressed in their reports involve medically unnecessary tests ordered by the Vista Health hospitalists. Ex. 1; Ex. 20; Ex. 22. For several reasons, summary judgment is warranted on Arik's unnecessary medical testing

26

allegations.  First, these allegations fail on falsity grounds, as discussed previously.  Second, fourteen of the medical testing criticisms involved claims submitted to MAOs.  Ex. 1; Ex. 4, ¶ 7. Again, Arik cannot prove an FCA violation based on any claims Desert View submitted to an MAO.  Third, nine of the ten remaining medical testing criticisms involved claims submitted to Medicare or Medicaid.  Ex. 1; Ex. 4, ¶ 8.  However, under those programs, Desert View was directly reimbursed for the days that the patients spent in the hospital and not for any medical tests provided to them.  42 C.F.R. §§ 413.1(a)(2)(i), 413.1(b), 413.5, 413.50, 413.60(a)-(c), 413.64(e), 413.70; Ex. 41, p. 17-18.  Desert View was then possibly later reimbursed for the costs associated with those tests through the cost report settlement process (see 42 C.F.R. §§ 413.5, 413.20, 413.60(a)-(c), 413.64(e); Ex. 41, p. 17-18), but Arik cannot prove that Desert View actually obtained any additional reimbursement through that process for the nine patient episodes.  There is no medical testing evidence to support a triable FCA violation.

## VII.   THE COURT SHOULD GRANT SUMMARY JUDGMENT ON ARIK'S FCA CLAIMS BASED ON OTHER FRAUDULENT BILLING THEORIES

Separate from his medical necessity FCA claim, and before Vista Health was contracted to provide hospitalist services at Desert View in 2019, Arik alleges that Desert View engaged in three additional billing practices that resulted in false claims submitted to the federal government: (1) backdating inpatient admission times; (2) inflating the cost of items and services that government payors only reimburse on a "one-per-day" basis; and (3) rebilling denied inpatient claims as outpatient.  ECF No. 103, ¶¶ 637-73.  Arik does not have sufficient evidence to create a triable issue of material fact for any of these alleged fraudulent billing practices.

### A.    The Court Should Dismiss Arik's Backdated Admissions Theory

Arik alleges that since August 2016, Desert View has submitted claims to government-funded payors that misidentified the patient's "admission time" as when they were seen by an ER doctor rather than when the hospitalist wrote the admission order.  ECF No. 103, ¶¶ 637-45.  Arik alleges that such claims contained "false certifications of time of the inpatient admissions" and allowed Desert View to bill for "additional days of inpatient services not provided."  *Id.* ¶¶ 641, 644.  Arik's backdated admissions theory must be dismissed for multiple reasons.

Polsinelli LLP
2049 Century Park Est, Suite 2900
Los Angeles, CA 90067
310.556.1801

Polsinelli LLP
2049 Century Park Est, Suite 2900
Los Angeles, CA 90067
310.556.1801

First, Desert View did not engage in the backdating practice described by Arik's allegations.  Ex. 2, ¶¶ 39-40.  Arik does not have any admissible evidence to dispute this fact or to support his allegations.  Arik has no personal knowledge of backdating ever happening at Desert View.  Ex. 10, p. 302:8-306:15.  The only source for Arik's backdating allegations is the testimony of Dr. Marianne Hazelitt.  Ex. 10, p. 303:21-304:18; Ex. 8 (Nos. 14-15), p. 24-26.  Hazelitt, who worked for RPG as a hospitalist at Desert View from August 2017 to December 2018, testified that a single house supervisor nurse ("Kristy" or "Christy") tried to get Hazelitt to backdate her inpatient admission orders a "half dozen times" in "late 2018" but she *refused to do it*.  Ex. 13, p. 17:10-19:8, 99:24-111:22.  Beyond her affirmative denial of ever backdating admission times, Hazelitt is unable to provide any non-speculative or non-hearsay testimony about whether other RPG hospitalists backdated admission times or whether it was done at the direction of the hospital's management.  Ex. 13, p. 110:2-111:17 ("Q. … do you know if this was occurring with any other RPG hospitalist? A. I don't know.").  Second, Desert View has not submitted any claims to government payors that backdated the inpatient admission time to before the admission order was signed such that the hospital was able to bill and recoup payment for additional hospital days.[8] Ex. 2, ¶ 40.  Unsurprisingly, Arik does not have any evidence of a single claim submitted by Desert View to a government payor where this occurred.  Ex. 8 (No. 15), p. 25-26.  Therefore, summary judgment should be granted on Arik's FCA claims based on a backdated admissions theory.

## B.    The Court Should Dismiss Arik's Inflated Costs Theory

Arik also alleges that since August 2016, Desert View submitted false claims that inflated the cost for certain "services/items" provided to patients.  ECF No. 103, ¶¶ 664-73.  Arik alleges that Desert View did this to thwart reimbursement rules that "have a limit on services/items per day which are reimbursable."  *Id.* ¶¶ 665, 667.  The lone example pled is that if "Medicare allowed one blood draw per day that was billed at $36.00 and there were five (5) blood draws performed, Desert View [] would bill for one (1) blood draw but would price it at an inflated, fraudulent rate of $180.00."  *Id.* ¶ 668.  Arik's inflated costs theory must be dismissed for multiple reasons.

---

[8] Desert View's bills for inpatient services do not identify the time of admission; only the total number of days (as measured by midnights) for the inpatient stay.  Ex. 2, ¶ 40.

28

Polsinelli LLP
2049 Century Park Est, Suite 2900
Los Angeles, CA 90067
310.556.1801

First, Desert View did not engage in the practice described by Arik's allegations for any type of item or service.  Ex. 15, p. 7:2-10, 14:11-18, 20:11-21:7, 48:1-52:3.  Arik does not have any admissible evidence to dispute this fact or to support his allegations.  Arik has no personal knowledge of this practice ever occurring at Desert View.  Ex. 10, p. 307:19-308:22.  The only source for Arik's inflated costs allegations is the testimony of Melissa Milk.  Ex. 10, p. 308:11-15; Ex. 8 (Nos. 20-21), p. 31-33.  Milk, who worked for Desert View in the billing department from February 2016 to August 2018 and was responsible for billing claims submitted to MAOs, testified that her manager instructed her in "late '16, '17" to bill in that manner but she *refused to do it*.  Ex. 14, p. 20:8-15, 28:6-29:6, 46:18-20, 54:14-21, 89:7-111:7.  Beyond her affirmative denial of inflated costs on bills, Milk is unable to provide any non-speculative or non-hearsay testimony about whether other billers inflated the costs for certain "one-per-day" items or services, let alone any particular items or services that were inflated.  Ex. 14, p. 94:21-96:12, 98:8-100:25, 101:23-102:14, 105:11-107:25.  Second, Arik does not have any evidence of a single claim Desert View submitted where this occurred.  Ex. 8 (No. 21), p. 31-33.  Thus, summary judgment should be granted on Arik's FCA claims based on an inflated costs theory.

**C.      The Court Should Dismiss Arik's Rebilling Denied Inpatient Claims Theory**

Finally, Arik alleges that since August 2016, Desert View defrauded the government because "Medicare programs" would deny claims for inpatient services for lack of medical necessity, and after unsuccessfully appealing those denials, Desert View would then "re-bill the claim for 'outpatient' services so that Desert View could obtain at least partial reimbursement," which he alleges is prohibited by "Medicare regulations."  ECF No. 103, ¶¶ 646-63.  Arik's rebilling denied inpatient claims theory also must be dismissed.

First, Desert View has not rebilled denied inpatient claims at a lower level of service (outpatient or observation) for Medicare, Medicaid, or any other direct government payor.  Ex. 4, ¶ 9; Ex. 15, p. 84:6-16, 111:2-12.  During the relevant timeframe (2017-2020), Desert View only engaged in this practice for a limited number of patients whose health benefits were covered under the Medicare Advantage Program through an MAO.  Ex. 4, ¶ 9; Ex. 15, p. 94:25-95:10; *compare* Ex. 14, p. 46:18-20, 58:1-59:3.  Second, for the Medicare Advantage claims that were rebilled by

29

1   Desert View, Arik cannot prove that those claims were false in any way.  Arik cannot establish

2   that any of those rebilled claims were factually false because he does not have any of the

3   underlying claim documentation.  Ex. 8 (Nos. 16-19), p. 26-31.  Nor can Arik establish that those

4   claims were legally false because they were submitted in violation of some applicable law or

5   regulation.  *See, e.g.*, Ex. 15, p. 73:13-77:3, 107:20-108:15.  Moreover, because Desert View only

6   did this for claims covered by the Medicare Advantage Program, Arik's theory also fails because

7   he cannot prove that Desert View submitted inaccurate medical information for patients that

8   caused the government to pay more money to the MAO.  *See Silingo*, 904 F.3d at 678-79; *United*

9   *Healthcare*, 848 F.3d at 1173-79; *UnitedHealthcare*, 2018 WL 2933674, at *7; *Martinez*, 2017

10   WL 10439030, at *5.  Therefore, summary judgment should be granted on Arik's FCA claims

11   based on a rebilling denied inpatient claims theory.

## VIII.   CONCLUSION

13       For the foregoing reasons, Desert View respectfully requests that the Court grant summary

14   judgment on the claims asserted in this action.

16   Dated: March 23, 2023          POLSINELLI LLP

18          By: */s/ Gregory R. Jones*

19          GREGORY R. JONES
Attorneys for Defendant
DVH HOSPITAL ALLIANCE, LLC

Polsinelli LLP
2049 Century Park Est, Suite 2900
Los Angeles, CA 90067
310.556.1801

1

## **CERTIFICATE OF SERVICE**

2    Pursuant to Federal Rule of Civil Procedure 5(b), I hereby certify that on March 23, 2023,

3  I caused the foregoing to be served through the Court's CM/ECF system addressed to:

4
Jesse M. Sbaih
Ines Olevic-Saleh
5
Jesse Sbaih & Associates, Ltd.
The District at Green Valley Ranch
6
170 South Green Valley Parkway, Suite 280
Henderson, NV 89012
7
(702) 896-2529
jsbaih@sbaihlaw.com
8
*Attorneys for Relator*

9

Frederick M. Morgan, Jr.
10
Sonya A. Rao
Jillian L. Estes
11
Morgan Verkamp, LLC
35 East Seventh Street
12
Cincinnati, OH 45202
rick.morgan@morganverkamp.com
13
sonya.rao@morganverkamp.com
jillian.estes@morganverkamp.com
14
*Attorneys for Relator*

15

Crane M. Pomerantz
16
Nadia Ahmed
Clark Hill LLP
17
1700 S. Pavilion Center Drive, Suite 500
Las Vegas, NV 89135
18
cpomerantz@clarkhill.com
nahmed@clarkhill.com
19
*Attorneys for Defendants Irfan Mirza, M.D. and*
*Vista Health Mirza, M.D. P.C.*
20

21
Troy K. Flake
Assistant United States Attorney
22
501 Las Vegas Boulevard South, Suite 1100
Las Vegas, NV 89101
23
(702) 388-6336
troy.flake@usdoj.gov
24
*Attorneys for United States*

25

26                                          */s/ Gregory R. Jones*
                                          GREGORY R. JONES
27

28

Polsinelli LLP
2049 Century Park Est, Suite 2900
Los Angeles, CA 90067
310.556.1801

31