Jesse Sbaih & Associates, Ltd.
Jesse M. Sbaih (#7898)
Ines Olevic-Saleh (#11431)
The District at Green Valley Ranch
170 South Green Valley Parkway, Suite 280
Henderson, Nevada 89012
Tel.:    (702) 896-2529
Fax:    (702) 896-0529
Email: jsbaih@sbaihlaw.com

Morgan Verkamp LLC
Frederick M. Morgan, Jr. (*pro hac vice*)
Jillian L. Estes (*pro hac vice*)
Sonya A. Rao (*pro hac vice*)
4410 Carver Woods Dr., Suite 200
Cincinnati, OH 45242
Tel.:    (513) 651-4400
Fax:    (513) 651-4405
Email: rick.morgan@morganverkamp.com
           jillian.estes@morganverkamp.com
           sonya.rao@morganverkamp.com

*Attorneys for Plaintiff-Relator*

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEVADA**

| | |
|---|---|
| UNITED STATES OF AMERICA *ex rel.* TALI ARIK, M.D., <br><br> Plaintiff, <br><br> v. <br><br> DVH HOSPITAL ALLIANCE, LLC, d/b/a, DESERT VIEW HOSPITAL; VISTA HEALTH MIRZA, M.D. P.C. d/b/a VISTA HEALTH; and IRFAN MIRZA, M.D. <br><br> Defendants. | Case No.:  2:19-cv-01560-JAD-VCF <br><br> **RELATOR'S RESPONSE IN OPPOSITION TO DEFENDANT DVH HOSPITAL ALLIANCE'S MOTION FOR SUMMARY JUDGMENT AND DEFENDANTS IRFAN MIRZA'S AND VISTA HEALTH'S JOINDER** |

MORGAN VERKAMP, LLC

## I.      INTRODUCTION

The foundational facts of this case are not in dispute, but are conspicuously absent from Defendants' summary judgment motion (ECF 171, "the SJ Motion"[1]): Desert View Hospital ("DVH") is a critical access hospital ("CAH") in Pahrump, Nevada, designated by the Centers for Medicare & Medicaid Services ("CMS") to provide healthcare services to a rural community in exchange for preferential *per diem* reimbursement for inpatient admissions. After DVH's CEO Susan Davila was criticized for needing to make its owners a return on their investment, DVH fired its well-established hospitalist group, and instead hired Vista Health – made up of two out-of-state doctors, one (Defendant Dr. Irfan Mirza) with a documented history of performing medically unnecessary procedures – on their promise to increase admissions significantly enough to impact DVH's financial reports. After Vista Health took over the hospitalist role, admissions to DVH increased, and DVH's revenue followed suit. The Vista Health doctors were, in turn, paid millions of dollars pursuant to their contract with DVH, and then collected even more from CMS in the form of Part B claims for hospitalist services and for ordering and reading the tests that they ordered while the patients were at DVH.

The rest of the story around those contours, however, varies in extremes. Defendants' motion paints a picture of a local hospital just wanting to keep patients in their community by bringing in specialists to treat more conditions than it could with the former hospitalists, and is under attack from a jealous competitor.[2] The motion is supported almost entirely by self-serving declarations and

---

[1] Defendants Vista Health and Mirza (collectively, the "Vista Defendants") filed a two-paragraph "joinder" seeking to subscribe to the arguments made in the SJ Motion. ECF 176. If the Court determines that "joinder" is an appropriate vehicle for the Vista Defendants to make arguments concerning summary judgment, Relator requests that all points and arguments made in this Opposition be construed against the Vista Defendants, too. If the Court seeks a separate filing in response to the Vista Defendants' "joinder" motion, Relator respectfully requests leave to file the same.

[2] DVH's assertions about Dr. Arik are not relevant to their motion; the claims at issue here belong to the United States, not Relator. But, Defendant's representations, which are flatly controverted by their own witnesses, are emblematic of the facts set forth in their entire motion – incomplete and only successful if a blind eye is turned to the totality of the information. Succinctly, Dr. Arik did not "get caught" for anything. Maria Wilson, DVH's HIPAA Officer, was tasked with conducting an investigation by Davila, something she had never been directed to do for any other physician before or since. Ex. 43, Wilson Depo. at 31:17-32:18. Although DVH's HIPAA expert, Wilson had no knowledge of the HIPAA exception for whistleblowers gathering information to share with their counsel, and Davila never told her what she knew about Dr. Arik's basis for reviewing the medical records. Ex. 43 at 81:19-82:25. If she had the full knowledge, Wilson, as DVH's HIPAA Officer, would have concluded that Arik did not, in fact, commit a HIPAA breach. Ex. 43 at 105:4-11. What the SJ Motion should

MORGAN VERKAMP, LLC

selected snippets of deposition testimony from DVH's own witnesses. But even the limited facts on which DVH rests do not bear out that conclusion. Rather, the rest of the evidence (including internal hospital documents, emails, policies, state investigations of DVH, disciplinary records of the hospitalists, medical expert review of a sample of charts, and deposition and declaration testimony of both Relator's and Defendants' witnesses) paint a vastly different picture: one of a financially-imperiled hospital under so much pressure from its corporate owner to generate a successful return on its investment that it hired a beleaguered doctor who made good on his promise to increase referrals and revenue by admitting patients with abandon, keeping patients with minor conditions as inpatients for days longer than needed and failing to transfer critically ill patients who needed services far beyond what DVH was equipped to handle.

There are two counts of fraud alleged in Relator's Third Amended Complaint ("TAC"): one count for violations of 31 U.S.C. 3729(a)(1)(A) alleging that Defendants knowingly presented or caused to be presented false claims for payment or approval, and one for violations of 31 U.S.C. 3739(a)(1)(B) alleging that Defendants knowingly made or used, or caused to be made or used, false records or statements material to false claims. There is no interpretation of the evidence that compels summary judgment based on a lack of triable fact as to either of these counts. Instead, Defendants effectively ask the Court to limit the scope of the case on a false-claim-by-false-claim basis; these arguments fail as a matter of law, but even if meritorious, would be more suitable for liminal motions rather than summary judgment.

Relator has marshalled ample evidence from which a jury may find that Defendants, in order to meet corporate financial demands that prized profit above all else, knowingly and willfully deviated from the Medicare rules and regulations that demand the delivery of reasonable and necessary medical services. As set forth herein, DVH's SJ motion fails in its entirety, and this case should be set for trial.

## II.    RULE 56.1 STATEMENTS

### A.    Relator's Response to DVH's Local Rule 56-1 Statement

Pursuant to Local Rule 56-1, a party moving for summary judgment is required to set forth "a

---

have said is that Dr. Arik raised concerns and was retaliated against, just like the other staff members who spoke out. Ex. 26; Ex. 27; Ex. 11 at 124:1-126:15.

concise statement setting forth each fact material to the disposition of the motion that the party claims is or is not genuinely in issue…." But the facts that DVH sets forth as "Undisputed Material Facts" ("UMFs") are far from that. Rather, only three of the 18 "facts" listed are undisputed: UMF Nos. 7, 8, and 10. UMF No. 9 cannot be responded to as written because a medical necessity finding cannot be or not be statistically significant. Every other UMF is disputed because it is either (1) inconsistent with the discovery produced in this case,[3] (2) requires clarification to be complete,[4] or (3) is an inaccurate characterization of the evidence on which it purports to rely.[5]

### B.   Relator's Local Rule 56-1 Statement of Material Facts

Relator sets forth the following facts, which are material to the disposition of this motion.

### 1.   Desert View Hospital Before Vista Health

DVH is a 25-bed hospital with an emergency department ("ED"), but does not have an intensive care unit ("ICU"), advanced cardiac care unit, or stroke or neurosurgery center.[6] Routine

---

[3] **UMF No. 1** (inconsistent with evidence set forth, *infra*, related to falsity and scienter); **UMF No. 2** (inconsistent with evidence set forth regarding copy-and-pasting charts, putting false conditions in charts to support unnecessary testing); **UMF No. 3** (inconsistent with evidence set forth, *infra*, related to falsity and scienter, and also misrepresents testimony in which Arik explains context of conversation with Davila); **UMF No. 4** (inconsistent with evidence set forth, *infra*, related to falsity and Davila's history of telling hospitalists to disregard regulations to admit patients and perform tests); **UMF No. 6** (patients admitted as in-patients but should have been observation or discharged and do not meet InterQual criteria); **UMF No. 12** (the interdisciplinary meetings were not collaborative and nurses' input was disregarded).

[4] **UMF No. 5** (it is undisputed that DVH did not have a *written* policy for increasing admissions or testing, but whether there was an unwritten policy that governed is very much in dispute); **UMF No. 11** (there is no evidence that the Medicare Advantage Organizations ("MAOs") received additional reimbursement based on increased risk score, but DVH did receive additional reimbursement from counting improper admission days in their cost reports, which influenced annual payment rates); **UMF No. 13 and 14** (case managers and utilization review team may have performed the reviews, but the declarations make clear that the process would not result in saying that an admission was improper; final decision was in hands of CEO and hospitalist (as part of the Medial Executive Committee) who were complicit in fraud); **UMF No. 17** (statement does not define "Medicare" and can be interpreted to include both traditional Medicare and Medicare Advantage; the evidence relating to this claim relates to Medicare Advantage); **UMF No. 18** (Relator does not dispute that there is no evidence that DVH submitted inaccurate or unsupported diagnosis codes, but DVH did submit inaccurate or unsupported information to the extent it made claims for reimbursement that was calculated by counting improper admission days in their cost reports).

[5] **UMF No. 15** (Hazelitt's cited deposition testimony describes in detail how she was asked to change the records, who directed her to do so, and the frequency with which the requests occurred over time); **UMF No. 16** (Milk's cited deposition testimony describes how she was instructed on how to falsely bill and that she knows the other Medicare biller – who instructs new hires – did it that way).

[6] Ex. 1, Mirza Depo. at 30:15-20.

3

cardiac care was provided by Dr. Tali Arik ("Relator:"), a cardiologist who was not employed by DVH but who practiced in Pahrump and rounded at the hospital.[7] Before 2016, DVH was owned by Rural Health Group and operated under the leadership of CEO Kelly Adams; it was purchased in August 2016 by Universal Health Services, Inc. and operated under UHS's subsidiary, Valley Health System.[8]

DVH contracted with hospitalists, i.e. physicians that provide on-site admissions decisions and care to DVH's patients. On Dec. 1, 2016, Rural Physician Group ("RPG") began providing hospitalist services to DVH subject to a Hospitalist Services Agreement ("HSA").[9] RPG, owned by Dr. Sukhbir Pannu, is an "expansive physician network of rural-focused hospitalists, [surgeons], and APPs that are passionate about helping rural hospitals meet the needs of the communities they serve."[10] Between 2016 and 2019, RPG provided in-house hospitalist services 24 hours a day, 365 days a year.[11] RPG received ▮▮▮▮▮ per month for the services, plus ▮▮▮▮▮▮▮▮▮▮▮▮▮▮.[12] Under the HSA, DVH could raise complaints if RPG was not meeting its contracted obligations[13]

In Sept. 2016, Susan Davila became CEO of DVH.[14] Davila's performance reviews reflect persistent pressure by her UHS superiors to increase DVH's financial performance: ▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮"[15] Davila testified that the financial expectations and "what was expected out of [a CAH]" were unreasonable, "because remember…we

---

[7] Ex. 2, Arik Depo. at 147:14-22; Ex. 1, Mirza Depo. at 133:16-24.
[8] https://pvtimes.com/news/its-official-desert-view-hospital-sold-ceo-adams-to-be-replaced/ (last accessed May 4, 2023)
[9] Ex. 3, HSA between DVH and RPG.
[10] https://ruralphysiciansgroup.com/about/ (last accessed May 4, 2023)
[11] Ex. 3, at ¶¶ 2.1, 2.2; Ex. 4, Davila Depo. at 100:23-101:14.
[12] Ex. 3, at ¶¶ 5.3, 5.4.
[13] Ex. 3, at ¶¶ 7.2, 7.4, 7.5.
[14] Ex. 4, Davila Depo. at 18:24-19:3. Davila had previously been CEO from 2007 to 2012, when she was terminated by DVH administration. Ex. 4, Davila Depo. at 19:14-20:3.
[15] Ex. 5, Davila 2020 Performance Review (DVH00041603); Ex. 6, Davila 2019 Performance Review ▮▮▮▮▮ ▮▮▮▮▮▮▮); Ex. 7, Davila 2018 Performance Review ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

MORGAN VERKAMP, LLC

MORGAN VERKAMP, LLC

1   are the only [CAH] in rural experience that UHS has."[16] UHS had such high financial expectations

2   because it largely operated in the "[prospective payment systems] world."[17]

3       Yielding to UHS's intense pressure, Davila pressured RPG hospitalists to admit more patients

4   to DVH and maximize their length of stay.[18] When RPG did not do as she instructed, Davila set her

5   sights on replacing the RPG hospitalists with more compliant doctors. While Davila asserted in her

6   deposition that there were performance issues with RPG, this is unsupported by *any* documents or

7   correspondence raising *any* concerns about RPG's contract performance to *anyone*, conspicuously to

8   the exclusion of any internal documentation seeking to terminate the RPG contract for cause.

9       **2. Recruiting Vista Health to Provide Hospitalist Services**

10       No documentation provided in this case reflects that any genuine search for a replacement

11   hospitalist group occurred: There are no emails reflecting the formation of a search group, no requests

12   for proposals, no job or contract listings, and no correspondence with any other hospitalist groups that

13   operate and provide services in the Las Vegas region.[19]

14       Instead, DVH directly recruited Drs. Mirza and Arshad without ever even inquiring if they had

15   experience as hospitalists.[20] In fact, only one document memorializes DVH's recruitment effort: In a

16   Sept. 26, 2018, email with the subject line, "Letter of Intent/Hospitalist Services," Arshad sent a letter

17   (addressed to Davila and signed by Mirza) to James Oscarson, DVH's Director of Business

18   Development; the letter proposed services that Vista Health would provide to DVH (i.e. "24/7

19   Hospitalist coverage").[21]   In the email, Arshad – acting on behalf of Vista Health[22] – explicitly stated

20   the benefit of contracting with him and Dr. Mirza: "[W]e will ***increase the current volume of***

21

22   [16] Ex. 4, Davila Depo. at 339:17-341:6.

    [17] Ex. 4, Davila Depo. at 340:24-341:6; Ex. 2, Arik Depo. at 123:9-19 ("She said that her job was on the line,

23   and she needed the hospital to make money…. [I]f the hospital didn't make money, she was going to lose her
job").

24   [18] Ex. 8, Declaration of Marianne Hazelitt at ¶¶ 13-17.

    [19] Though not reflected in any documents, Davila testified that she spoke with Platinum Health, a group which

25   provides hospitalist services at other Valley Health locations. Davila engaged in no follow-up with Platinum
    after the preliminary meeting set by Valley Health. She also stated that she "reached out to" Envision, a

26   company that provides rural hospitalist services, but she never made any effort to follow-up on or negotiate a
    proposal they sent. Ex. 4, Davila Depo. at 174:12-182:8.

27   [20] Ex. 4, Davila Depo. at 194:16-195:1.

    [21] Ex. 9, Arshad Email to Oscarson.

28   [22] Ex. 10, Arshad Depo. at 137:18-138:5.

**admissions through the ER substantially and will be reflected in the quarterly report**."[23] The promise worked: Davila told Dr. Marianne Hazelitt, an RPG hospitalist, that Davila was replacing RPG with Vista because Mirza said he would admit patients the way she wanted it done and that he would fill up the hospital.[24]

There are no records reflecting any contract negotiations or practical discussions as to how Vista Health's two doctors would fill a 24-hour-a-day, 365-day-a-year position while both maintained full-time practices in another state *and* worked shifts at other hospitals.[25] The only documentary evidence that DVH did any sort of vetting of Vista Health comes in the form of a "███████████" performed by DVH's ███████████" Kim Broadhead on two doctors and three potential staff members identified by Arshad as "███████████" that Vista would bring to DVH.[26] The results of that background check reflected that ███████████

███████████

███████████"[27] It also reflected that ███████████

███████████

███████████.[28] No evidence indicates that DVH discussed these results internally or with Mirza or Cash.[29]

Despite the red flags, DVH entered into an HSA with Vista Health.[30] There are no records reflecting any contract negotiations, and there is no indication of how the monthly payment for the hospitalists' services was determined.[31] The HSA required, *inter alia*: ███████████

███████████

---

[23] Ex. 9, Arshad Email to Oscarson (emphasis supplied).
[24] Ex. 11, Hazelitt Depo. at 130:8-131:14.
[25] Ex. 10, Arshad Depo. at 17:17-18:16 (worked every day at his private practice in Bullhead City, AZ and continued to work at three other hospitals while working at DVH); Ex. 1, Mirza Depo. at 109:9-12 (working at DVH and in his clinic in Bullhead City, AZ), at 209:15-211:3 (working hospitalist shifts at Mesa View but did not disclose that to DVH).
[26] Ex. 12, Broadhead Email to Oscarson, Davila.
[27] Ex. 13, at DVH00050433-449.
[28] Ex. 14, at DVH00050450-463.
[29] Remarkably, Mirza and Arshad disavowed knowing Cash, despite the email in which Arshad provided her name and information to DVH. Ex. 10, Arshad Depo. at 129:12-131:5; Ex. 1, Mirza Depo. at 132:13-21.
[30] Ex. 15, HSA between DVH and Vista Health Mirza, MD PC d/b/a Vista Health.
[31] Ex. 10, Arshad Depo. at 39:25-40:6.

MORGAN VERKAMP, LLC

MORGAN VERKAMP, LLC

1  ████████████████████████████████████████████████████

2  ████████████████████████████████ [32] Under the HSA terms, a physician ████████████

3  ████████████████████████████████████████████████████

4  ████████████████████████████████████████" [33]

5       At all times, DVH has known that Mirza was in breach of the contract requirements. Indeed,

6  his application for privileges disclosed some of the disciplinary actions against him, [34] and other actions

7  are publicly available on the medical board websites of Nevada, Arizona, and California. [35] Although

8  DVH knew that Mirza did not meet the professional qualifications of the HSA and no one at DVH

9  received permission to waive those terms, Vista Health was nevertheless granted the hospitalist

10 contract, and Mirza was issued privileges at DVH. [36]

11             **3. Vista Health as a Hospitalist Group**

12      Vista Health began providing hospitalist services to DVH on January 10, 2019. [37] For the first

13 19 days, Dr. Mirza alone supposedly provided round-the-clock hospitalist services to DVH; then he

14 left the country, leaving Dr. Arshad alone to provide 24-hour-a-day hospitalist services for

15 approximately the next two weeks. [38] In that first month and those that followed, the two doctors made

16 good on their promise to increase admissions. [39] DVH's Monthly Operating Report for January 2019

17 reflected that DVH increased admissions from its ER more than ████ over the prior year, and ████

18 its average daily census (exceeding the hospital's own expectations by ████ over budget). [40] By the

19 end of Feb. 2019 (the first full month in which Vista provided hospitalist services), DVH was ████

20 over budget for year-to-date ("YTD") admissions from the ER, even though ER visits were under

21 _____

22 [32] Ex. 15, at ¶ 3.2(a).
   [33] Ex. 15, at ¶ 3.2(q).

23 [34] Ex. 16, Mirza Application for Privileges, at DVH00049878-80 (checking ████████

24 ████████.

25 [35] Nevada: https://tinyurl.com/ymavede2
      Arizona: https://tinyurl.com/35mu5zam
      California: https://tinyurl.com/4fbneb62

26 [36] Ex. 4, Davila Depo. at 226:16-22; Ex. 1, Mirza Depo. at 89:17-92:12.
   [37] Ex. 15, HSA between DVH and Vista Health.

27 [38] Ex. 2, Arik Depo. at 177:1-178:9.
   [39] Ex. 18, MOR for January 2019; Ex. 19, MOR for February 2019; Ex. 20, MOR for March 2019.

28 [40] Ex. 21, Portion of January 2019 MOR.

budget by ███.[41] The new admissions also stayed longer: There was an increase in length of stay to ███ nights, from ███ nights the prior YTD. The Monthly Operating Report ("MOR") acknowledged, "████████████████████████████████████████

DVH intends to call an expert who attributes the increase in admission to additional inpatient surgeries.[42] But the contemporaneous DVH documents do not reflect this explanation and instead attribute the increases solely to the new hospitalists: ██████████████

████████████████████████████████████████████████
████████████████████████████████████████████"[43] Furthermore, in a listing of all (approximately 1,390) admissions from 2019 to 2020, a surgeon was not listed as the admitting physician for a single patient.[44]

DVH's assertion that a primary reason it replaced RPG with Vista Health was to avail its patients of more specialties does not pass muster.[45] First, DVH already had cardiac care available from Dr. Arik, so bringing in a cardiologist did not add any new services.[46] Dr. Mirza also testified that there were no new tests, procedures, or cardiac services available at DVH after his arrival that were not previously available.[47] DVH may argue that Dr. Arshad brought pulmonology services to DVH, but this contention is undermined by the fact that DVH acquired no new or additional equipment or laboratory tests to support an expanding pulmonary practice, so DVH gained nothing by contracting Arshad as a hospitalist that it could not have attained simply by offering him staff privileges.

DVH medical staff noticed immediately that the hospital was filled to capacity, often by patients with far more acute conditions than had been previously seen at DVH.[48] The Vista Health hospitalists no longer conferred with the nursing staff about patient admissions (like RPG had); rather, they were dismissive of the nurses' input.[49] The admissions surged so much that, at times, patients had

[41] Ex. 22, Portion of February 2019 MOR.
[42] Ex. 23, Shell Depo. at 128:9-129:16
[43] Ex. 24, Portion of January 2019 MOR.
[44] Ex. 25, Pivot Table of Admissions Provided by DVH Counsel.
[45] Davila Declaration, ECF 173-2 at ¶ 12.
[46] Ex. 2, Arik Depo. at 147:14-22.
[47] Ex. 1, Mirza Depo. at 134:8-19; Ex. 4, Davila Depo. at 226:23-227:14.
[48] Ex. 26, Declaration of Lisa Smith, at ¶ 8; Ex. 27, Declaration of Nora Fletcher, at ¶ 8 .
[49] Ex. 26, Declaration of Lisa Smith, at ¶¶ 4, 10.

8

MORGAN VERKAMP, LLC

1   to be placed in temporary beds in the hallways or in areas of the hospital not equipped for patient care

2   (thus putting the patients at risk if they crashed and the right equipment could not be timely brought

3   to them).[50] The nursing staff ratios were stretched beyond norms, and nurses were strained in their

4   ability to provide adequate care to their patients.[51] Worse yet, the new doctors were hostile, belittling

5   and rude to the nursing staff.[52] And the function of the Med/Surg floor was even more compromised

6   because the Vista Health doctors failed in their basic responsibilities: their coverage was "sporadic"

7   (leaving DVH without a hospitalists for days at a time, and leaving for hours even when on shift), they

8   did not adequately or timely complete medical charts, used "clip & paste" for notes with "no progress

9   of care denoting medical necessity," and did not round with patients as required.[53] Beholden to its new

10  hospitalists, DVH administration retaliated against anyone who risked speaking out about the Vista

11  Health hospitalists' practices or the ramifications of the increased admissions.[54]

12        The surge in inpatient admissions came from the Vista Health doctors' complete abdication of

13  any gate-keeping function, instead admitting patients regardless of their condition or needs. Patients

14  who were not sick enough to need inpatient admission were admitted as inpatients,[55] and patients who

15  were far too sick to be at DVH were not transferred to higher levels of care.[56] In Sept. 2019, months

16  into Vista Health's engagement, April Hamilton, a DVH Med-Surg Manager,  had a conversation with

17  CEO Davila about which she followed-up in an email, reporting to Davila that Arshad told her that he

18  and Mirza had decided to admit anyone the ER doctors asked them to, ***even when the patients were***

19  ***too sick to be appropriately cared for at DVH***.[57] Hamilton reported that Arshad told her this when she

20  called him about an admission decision to make sure he was aware of the patient's clinical condition.

21  As to the patient that Hamilton called about, Arshad told her that he had informed Dr. David Watson,

22  a DVH ED physician, that "This is an ICU patient" (meaning the patient needed to be transferred

---

23  [50] Ex. 27, Declaration of Nora Fletcher, at ¶ 10.

24  [51] Ex. 26, Declaration of Lisa Smith, at ¶¶ 8, 12;

25  [52] Ex. 26, Declaration of Lisa Smith, at ¶¶ 8, 11; Ex. 28, COES related to Arshad; Ex. 29, COEs related to Mirza.

    [53] Ex. 42, Hospitalist Discussion Points.

26  [54] Ex. 27, Declaration of Nora Fletcher, at ¶¶ 17-21; Ex. 26, Declaration of Lisa Smith, at ¶ 16; Ex. 11, Hazelitt Depo. at 124:1-126:15.

27  [55] Ex. 27, Declaration of Nora Fletcher, at ¶ 11; Ex. 26, Declaration of Lisa Smith, at ¶ 13.

    [56] Ex. 27, Declaration of Nora Fletcher, at ¶¶ 8-10; Ex. 26, Declaration of Lisa Smith, at ¶ 12.

28  [57] Ex. 30, Hamilton Email to Davila (emphasis supplied).

because DVH does not have an ICU), but Watson said the patient could be admitted to DVH, so Arshad had admitted the patient to DVH. Arshad told her of his and Mirza's decision:

> Dr. Mirza and [Dr. Arshad] had decided that they would accept patient that the ED physicians informed them was safe for admission, even when they believed the patient needed transferred for an IMC or ICU. Dr. Arshad stated that they are tired of having to argue with the ED physician and tired of being accused of refusing to admit 'anyone.' **Dr. Arshad did state that he felt many of these patients were not a 'safe' admission, but felt he had no choice but to admit. This failure to trust the hospitalist opinion and experience, and the failure of the hospitalists to stand firm, potentially places our patients at risk**.

(Emphasis supplied.) Remarkably, no documented response from Davila has been produced and there is no indication of any follow-up (i.e. submission of a COE (the internal issue-reporting form), self-reporting of improper admissions, or disciplinary actions). There is no indication that anything was investigated by DVH, much less changed.

In fact, the evidence shows that, years after Hamilton's report to Davila, Mirza was still operating exactly as Arshad had reported in Sept. 2019. For example, through at least 2022, Dr. Mirza routinely agreed to admissions from Watson and Dr. James Hayes (another DVH ED doctor) that were texted to him (on Mirza's personal cell phone with no HIPAA encryption).[58] The texts contained no information other than a patient's name and medical condition. Out of 87 text requests for admission from Watson between Nov. 17, 2020, and Apr. 12, 2022, Mirza assented to the admission request within 60 seconds almost half of the time; 59% of the time, his agreement came under 120 seconds.[59] (The quickest response was in just six seconds; the longest took just over an hour.[60]) There are no texts in which Mirza denied an admission request.

Consistently, in their personal text communications, Mirza and Arshad exchanged messages about admitting "everybody" to DVH. For example, on Oct. 6-7, 2021, Arshad texted Mirza,[61]

> admitting everybody
> bhain [translated loosely to "brother"]
> gen weakness
> presyncope

MORGAN VERKAMP, LLC

---

[58] Ex. 31, Texts between Mirza and Watson; Ex. 32, Texts between Mirza and Hayes.
[59] Ex. 31, Texts between Mirza and Watson.
[60] Ex. 31, at VISTA001204 and VISTA001194 (6 seconds each); at VISTA001213 (1 hour).
[61] Ex. 33, Texts between Mirza and Arshad, at VISTA001816-1817.

> 5 admits in 10 min
> …
> 10 admits so far
> who ever enters getting admitted.

Also via text, Arshad accused Mirza of improperly admitting patients to DVH (including critically ill patients during the Covid-19 pandemic) even though DVH lacked resources to meet the patients' needs. For example, between Nov. 3 and Nov. 4, 2021, Arshad texted Mirza about Covid patients who had crashed after being on 100% high flow oxygen.[62] Mirza wrote back "What am I supposed to do transfer everyone out?? … Each day transferring 4-5 patients out takes whole day and you know that." As the exchange continued and Arshad pointed out more patients that were in critical condition, he wrote to Dr. Mirza:

> what are ur expectations??
> policy is to transfer earlier no high flow ambulance service available
> i think these pts are enough to keep ur eyes open
> out of these 3 goingbto [sic] flown out if bed available, otherwise intubated
> How u justify these pts on med surg floor,
> i hope you don't have to answer on these

Less than an hour later, Arshad texted again,

> what have u done
> u dictated a template and put same on every pt
> thats why u r 4 places at 12
> i m telling u
> u will get caught again

Mirza never responded to that text from Arshad, and from the day Vista started at DVH through the present, he never changed course. In May 2020, the Nevada Department of Health and Human Services completed an investigation into an incident in which a patient with extremely elevated troponins (exceeding maximum levels in DVH's admissions policy) was admitted to DVH by Mirza, who then left the hospital instead of actively monitoring the patient's critical condition; the patient died on the Med/Surg floor while Mirza was away.[63] The state investigation found, *inter alia*, ███

████████████████████████████████████████████████████████████████████████

---

[62] Ex. 33, Texts between Mirza and Arshad, at VISTA001845-1849.
[63] Ex. 34, Report of Nevada Department of Health and Human Services; Ex. 27, Declaration of Nora Fletcher, at ¶¶ 12-15.

MORGAN VERKAMP, LLC

[64] In 2022, the Arizona Medical Board issued a Letter of Reprimand to Dr. Mirza in connection with an allegation of inappropriate prescribing of controlled substances.[65] Mirza consented to the list of grievances, which included the allegation that Mirza had bribed a patient to send a letter in support of Mirza to the Medical Board in exchange for a prescription of a controlled substance.[66] Most recently, in February 2023, the Arizona Medical Board and Mirza entered into an Interim Consent Agreement for Practice Restriction under which Mirza relinquished his ability to practice medicine in Arizona. The agreement arose from myriad allegations of professional misconduct and violations of the standards of car, the most critical of which resulted in the deaths of at least two patients and serious injury to two others.[67] At least three of the issues investigated by Arizona and addressed in the Interim Consent Agreement occurred during the time period that Mirza has been providing hospitalist services at DVH.

## III.   RELEVANT STATUTES AND REGULATIONS

### A.   The False Claims Act ("FCA")

The FCA, 31 U.S.C. § 3729 *et seq.*, imposes liability upon those who knowingly present or cause to be presented false claims for payment or approval, and those who make or use, or cause to be made or used, false records or statements material to a false claim. It is the primary remedial statute designed to deter fraud upon the United States and reflects Congress's intent to "enhance the Government's ability to recover losses as a result of fraud against the Government." S. Rep. 99-345 at 1, *as reprinted in* 1986 U.S.C.C.A.N. 5266.

To establish liability under § 3729(a)(1)(A), Relator must show that Defendants presented, or caused to be presented, to the Government for payment or approval: "(1) a false or fraudulent claim (2) that was material to the [Government's] decision-making process (3) which [D]efendant[s] presented, or caused to be presented, to the United States for payment or approval (4) with knowledge that the claim was false or fraudulent." *U.S. ex rel. Hartpence v. Kinetic Concepts, Inc.*, 44 F.4th 838, 845-46 (9th Cir. 2022), *quoting U.S. ex rel. Hooper v. Lockheed Martin Corp.*, 688 F.3d 1037, 1047

---

[64] Ex. 34, Report of Nevada Department of Health and Human Services, at DVH00068138.
[65] Ex. 35, Letter of Reprimand, https://tinyurl.com/2ne4f5vw (last accessed May 4, 2023)
[66] *Id.* at ¶ 16.
[67] Ex. 36, Interim Consent Agreement for Practice Restriction.

MORGAN VERKAMP, LLC

(9th Cir. 2012). Similarly, to establish liability under § 3729(a)(1)(B), a relator must show that Defendants "knowingly made, used, or caused to be made or used, a false record or statement material to a false or fraudulent claim." *Hooper*, 688 F.3d at 1048.

Under the FCA, the terms "knowing" and "knowingly" encompass both actual knowledge and deliberate ignorance or reckless disregard of the truth or falsity of information. 31 U.S.C. § 3729(b)(1)(A). No proof of specific intent to defraud is required. 31 U.S.C. § 3729(b)(1). The FCA was specifically designed to "reach what has become known as the ostrich type situation where an individual has buried his head in the sand and failed to make simple inquiries which would alert him that false claims are being submitted." *U.S. v. Bourseau*, 531 F.3d 1159, 1168 (9th Cir. 2008), *quoting* S. Rep. No. 99-345 at 21 (1986), *as reprinted in* 1986 U.S.C.C.A.N. 5266, 5286.

A "claim" includes any request or demand for money or property that is made to the United States, as well as any request or demand for money or property that is made to a party that spends money or uses property on the Government's behalf. 31 U.S.C. § 3729(b)(2). The term "material" means that a false claim or statement has a "natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." 31 U.S.C. § 3729(b)(4).

### B. The Medical Necessity Rule and the Two Midnight Rule

Defendants acknowledge that claims resulting from an inpatient admission are payable only if the service is "reasonable and necessary." ECF 171 at 17,[68] *citing* 42 U.S.C. § 1395y(a)(1)(A) (hereinafter, the "Medical Necessity Rule"). While the term "medical necessity" is colloquially used as shorthand for the Medical Necessity Rule, the statutory provision is clearly written conjunctively, not alternatively: A service must be reasonable *and* necessary, not reasonable *or* necessary, in order to be reimbursable.[69] This case illustrates how, for certain patients, inpatient admissions may be necessary, but such admission to DVH may be unreasonable.

---

[68] For clarity, Relator cites to the page number assigned by ECF for reference, not the page number at the bottom of the brief.

[69] "[W]e must strive to 'give effect to each word and make every effort not to interpret a provision in a manner that renders other provisions of the same statute inconsistent, meaningless or superfluous" *R.J. Reynolds Tobacco Co. v. Cty. of L.A.,* 29 F.4th 542, 553 (9th Cir. 2022), *quoting Shelby v. Bartlett*, 391 F.3d 1061, 1064 (9th Cir. 2004).

MORGAN VERKAMP, LLC

Defendants posit that the "Two Midnight Rule" is the sole barometer by which medical necessity of an inpatient admission should be gauged and argue that if an inpatient admission was expected to last for two midnights, the admission was *a fortiori* "reasonable and necessary." ECF 171 at 17. This misstates the law. In 2013, CMS set out to develop a "benchmark for the purposes of medical review of hospital inpatient admissions, based on how long the beneficiary is expected to remain in the hospital." 78 F.R. 50496, 50908. To that end, Medicare created a presumption, known as the "Two Midnight Rule," that "inpatient admissions are *generally* reasonable and necessary for beneficiaries who are expected to require more than 1 Medicare utilization day (defined by encounters crossing 2 'midnights') in the hospital receiving medically necessary services." *Id.* (emphasis added).

By its plain language, the Two Midnight Rule is one tool to assess compliance with the Medical Necessity Rule, not a definitive metric that conclusively determines that the Rule is satisfied. *U.S. ex rel. Graziosi v. R1 RCM, Inc*., 2020 U.S. Dist. LEXIS 223086, at *8 (N.D. Ill. Nov. 30, 2020) ("A patient's length of stay is not determinative of the correct status, even under the Two Midnight Rule"). "[I]f a hospital is found to be abusing this 2-midnight presumption for nonmedically necessary inpatient hospital admissions and payment…CMS review contractors would disregard the 2-midnight presumption when conducting review of that hospital." 78 F.R. 50496. In circumstances suggesting the occurrence of abuse (as the circumstances of this case do), the Two Midnight Rule is disregarded and other means are used to determine whether an inpatient admission is *actually* medically necessary and reasonable.

In explaining the basis for and application of the Two Midnight Rule, CMS directed that guidance was already in place to establish how the actual medical necessity assessment is made: "We have stated in our manual guidance that the inpatient admission decision is a complex medical judgment that should take into consideration many factors…described in the [Medicare Benefit Policy Manual, "MBPM"]." 78 FR 27486, 27645. The instructive language of the MBPM, including hospital-

MORGAN VERKAMP, LLC

MORGAN VERKAMP, LLC

1  specific factors to be considered when making inpatient admission decisions, is set forth in detail in

2  Relator's *Daubert* Opposition (ECF 181 at 13-14) and in Chapter 1 of the MBPM. [70]

3  **C.    Reimbursement for Observation Patients**

4  Defendants do not address the reimbursements for patients admitted to observation care, which

5  provides critical context as to DVH's incentive to admit patients as inpatients for whom only an

6  observation care admission was reasonable and necessary. In a CAH, observation care charges are

7  calculated using a "cost-to-charge" methodology in which a cost-to-charge ratio ("CCR") is calculated

8  by dividing the total allowable costs associated with outpatient care by the total charges. [71] For

9  example, if the CAH had $1 million in total allowable costs and $2 million in total charges, the CCR

10  would be .5 or 50%. The CCR is then applied to the provider's charge for each outpatient service, and

11  the result is the amount that the provider is permitted to bill Medicare. [72] Typically, in a CAH, the

12  patient is responsible for the first 20% of the observation care charge, and if there is a delta between

13  20% and the CCR, Medicare pays the remaining amount to the provider. [73] In this example, if a CAH

14  charged $500 for a service, the Medicare billable amount would be $250 (applying a .5 CCR), of which

15  $100 (20% of the $500 charge) would be paid by the patient, and $150 (the remaining 30% between

16  20% and the CCR of 50%) would be paid by Medicare.

17  DVH, however, is different than every other CAH in the country when it comes to the

18  observation reimbursements. [74] That is, DVH's CCR is always lower than 20%, meaning that there is

19  never a delta between what it can charge to the patient and what it would collect from Medicare. [75] In

20  other words, DVH can try to collect a patient's 20% copay and still submit claims to Medicare for the

21

22

23  [70] Medicare Benefit Policy Manual, Chapter 1, "Inpatient Hospital Services Covered Under Part A," Section
24  10, definition of "inpatient" (revised Aug. 6, 2021). https://www.cms.gov/Regulations-and-Guidance/Guidance/Manuals/downloads/bp102c01.pdf (last accessed May 4, 2023).

25  [71] Ex. 23, Shell Depo. at 90:10-92:4. The observation care ratio is determined by using a hospital's prior year
26  Cost Report. Ex. 37, Kelly Depo. at 102:9-13.

27  [72] Ex. 37, Kelly Depo. at 102:23-7.
   [73] Ex. 37, Kelly Depo. at 104:15-105:2.
28  [74] Ex. 37, Kelly Depo. at 103:8-105:13.
   [75] Ex. 37, Kelly Depo. at 105:11-13.

1   remaining 80% of its charges, but it will not receive anything from Medicare for those claims.[76] As a

2   result, DVH is uniquely incentivized not to admit patients to observation care.

3   **IV.   SUMMARY JUDGMENT STANDARD**

4       "[S]ummary judgment is only appropriate if the evidence, read in the light most favorable to

5   the nonmoving party, demonstrates that there is no genuine issue of material fact, and that the moving

6   party is entitled to judgment as a matter of law." *Jones v. Williams,* 791 F.3d 1023, 1030 (9th Cir.

7   2015) (citing Fed. R. Civ. P. 56(c)). A genuine issue exists where the evidence is such that "reasonable

8   jury could find in favor of the non-moving party." *ABS Entm't, Inc. v. CBS Corp.*, 900 F.3d 1113,

9   1122 (9th Cir. 2018), *citing U.S. Auto Parts Net., Inc. v. Parts Geek, LLC*, 692 F.3d 1009, 1014 (9th

10  Cir. 2012) (internal citation omitted).

11      In determining whether to grant a motion for summary judgment, the "court must view the

12  evidence in the light most favorable to the non-moving party and draw any reasonable inferences in

13  the non-moving party's favor." *Provenz v. Miller*, 102 F.3d 1478, 1483 (9th Cir. 1996). "Credibility

14  determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts

15  are jury functions, not those of a judge, whether he is ruling on a motion for summary judgment or for

16  a directed verdict. The evidence of the nonmovant is to be believed…." *Anderson v. Liberty Lobby,*

17  *Inc.*, 477 U.S. 242, 255 (1986).

18  **V.   ARGUMENT**

19          **A.  There are triable questions regarding whether Defendants submitted, or caused**
20          **to be submitted, false certifications of medical necessity.[77]**

21      False certification of the medical necessity of a patient admission or medical procedure is

22  actionable under the FCA. *Winter ex rel. United States v. Gardens Reg'l Hosp. & Med. Ctr.*, *Inc.,* 953

23  F.3d 1108, 1113 (9th Cir. 2020) ("A doctor, like anyone else, can express an opinion that he knows to

24  be false, or that he makes in reckless disregard of its truth or falsity"); *U.S. v. Paulus*, 894 F.3d 267,

25

26  [76] Ex. 37, Kelly Depo. at 105:14-107:5.
    [77] Relator's complaint alleges three additional theories of liability: (1) backdated admissions; (2) inflated costs;
    and (3) rebilling denied inpatient claims as outpatient. Relator disputes DVH's assertion that there are not triable
27  issues of fact related to each of these schemes from which a reasonable jury could find liability. However,
    because the primary allegation in this case is the submission of claims for admissions and services that were
28  not reasonable and necessary, Relator elects not to pursue these additional theories at trial.

MORGAN VERKAMP, LLC

275 (6th Cir. 2018) (a doctor's "opinions are not, and have never been, completely insulated from scrutiny" and "may trigger liability for fraud when they are not honestly held"). A false certification is material to a claim for payment because compliance with the Medical Necessity Rule is a statutory prerequisite to Medicare reimbursement. 42 U.S.C. § 1395y(a)(1)(A); *Winter*, 953 F.3d at 1113.

DVH correctly recognizes that "a physician's subjective clinical judgment can be false if the relator can establish that the physician did not honestly believe the medical treatment was necessary for the patient or 'if it implies the existence of facts…that do not exist'" and that a "physician's certification of medical necessity also can be false if the relator can establish that the physician did not actually review the patient's medical records or otherwise familiarize themselves with the patient's medical condition." ECF 171 at 22, and n.3. The Ninth Circuit recognizes liability in the medical necessity context: "Under the plain language of the statute, the FCA imposes liability for all 'false or fraudulent claims' – it does not distinguish between 'objective' and 'subjective' falsity or carve out an exception for clinical judgments and opinions." *Winter*, 953 F.3d at 1117.

Defendants' claim that the opinions of the admitting physicians presumptively establish medical necessity is both important to their argument and expressly contradicted by the Ninth Circuit. *Winter*, 953 F.3d at 1114 ("[T]he regulations consider medical necessity a question of fact: '***No presumptive weight shall be assigned to the physician's order*** under § 412.3 or the physician's certification…in determining the medical necessity of inpatient hospital services…. A physician's order or certification will be evaluated in the context of the evidence in the medical record") (emphasis supplied); *accord* 42 C.F.R. § 412.46(b).

There is abundant evidence that Defendants submitted, and caused to be submitted, both objectively and subjectively false medical necessity certifications.[78] Summary judgment on the issue of falsity should thus be denied, because there are issues to be determined by the jury. *See Winter*, 953 F.3d at 1114 ("[T]he regulations consider medical necessity a question of fact…").

### 1.    Patient records show false certifications.

[78] DVH avers that Relator's only evidence of falsity as to medical necessity certifications comes in the form of his experts' testimony, making the issue a battle of the experts. ECF 171 at 22-23. This is patently untrue. As described *infra*, there is ample evidence beyond expert testimony.

MORGAN VERKAMP, LLC

1   DVH asserts that there is not a triable issue of fact as to the falsity of medical necessity
2   certifications for the patient examples in the complaint or for the patients in the representative sample.
3   ECF 171 at 22-25. DVH's argument puts the cart well ahead of the horse, as it presumes that the Court
4   will disallow the testimony of Relator's experts, Dr. Rodney Armstead and Dr. T. Daniel Woodward.
5   For the reasons set forth in Relator's *Daubert* Opposition (ECF 181), both Drs. Armstead and
6   Woodward are qualified to offer reliable and relevant testimony concerning the medical necessity of
7   inpatient admissions to DVH and the treatments provided during those admissions.[79]

8   DVH also posits that Dr. Armstead's and Dr. Woodward's opinions offer "a mere disagreement
9   among physicians about whether a particular patient's admission or tests were medically necessary."
10  ECF 171 at 24. But both testified that they did not ascribe falsity where there was a mere disagreement
11  among physicians; they identified falsity only when their opinion was that no reasonable physician
12  could find that the patient's admission to DVH or the services rendered to the patient were reasonable
13  and necessary. ECF 173-20 at 12; ECF 173-22 at 6.[80] Such evidence is sufficient to block summary
14  judgment as to falsity. *Winter*, 935 F.3d at 1119 ("A physician's certification that inpatient
15  hospitalization was 'medically necessary' can be false or fraudulent for the same reasons any opinion
16  can be false or fraudulent. These reasons include if the opinion is not honestly held, or if it implies the
17  existence of facts – namely, that inpatient hospitalization is needed to diagnose or treat a medical
18  condition, in accordance with accepted standards of medical practice – that do not exist").

19

20  [79] To avoid repetition, Relator incorporates by reference the arguments made in his *Daubert* Opposition.

21  [80] DVH misrepresents the significance of Dr. Armstead's testimony regarding a patient for whom he felt was
22  not a "close call" patient. When reviewing for his deposition, Dr. Armstead determined that Dr. Woodward
    both thought the admission was improper but was willing to give the benefit of the doubt. To hold true to only
23  identifying falsity in cases in which no reasonable physician could find that the admission or services were
    reasonable and necessary, Dr. Armstead removed that patient from the list of patients with whom he ascribed a
24  lack of medical necessity. If anything, the subsequent correction bolsters Dr. Armstead's credibility with respect
    to the remaining patients for whom he found the admissions and/or tests not to be medically necessary or
25  reasonable. DVH's discussion of Dr. Woodward's disagreements with the allegations in the complaint is also a
    red herring. Dr. Arik's allegations were based on information known at the time of filing his complaints, while
26  Dr. Woodward had the benefit of the full medical record from which he could make a final conclusion on
    medical necessity and reasonableness. Dr. Woodward never testified that Dr. Arik was wrong or that inpatient
27  admissions or testing were proper; he only answered that, with the full context of a complete medical record
    (produced by Defendants during discovery), a particular example may be a "close call" and therefore was not
28  included under the aforementioned conservative approach. ECF 173-22 at 6, n.1.

MORGAN VERKAMP, LLC

18

Moreover, Defendants' argue that Relator has no evidence regarding the medical necessity of the complaint examples because Dr. Woodward is a rebuttal expert. But that disregards the origination of those examples: Each one is or was a patient of Dr. Arik or Dr. Marianne Hazelitt, who are fact witnesses that can testify about their observations and opinions they formed as treating physicians. *Scolaro v. Vons Cos.*, 2019 U.S. Dist. LEXIS 221547, at *5-6 (D. Nev. Dec. 27, 2019).[81]

### 2.  Additional evidence supports that the certifications are false.

In addition to the testimony of Drs. Arik, Hazelitt, Armstead, and Woodward, there is also documentary evidence supporting the falsity of physician certifications attesting to the medical necessity and reasonableness of inpatient admissions and testing provided during those hospital stays, including:

- Hospitalists working for the Vista Defendants were hired based on their promise to increase inpatient admissions to DVH, and they bragged about the number of admissions. Ex. 9; Ex. 2, Arik Depo. at 12:19-14:1 (Nov. 16, 2022).

- Inpatient admissions at DVH increased by more than ▮▮▮▮ year-over-year (even while overall ED encounters decreased) immediately after Vista began its contract. Exs. 18, 19, 20.

- Arshad admitted to a DVH supervisor (who subsequently notified DVH's CEO) that he would admit any patient that DVH's ED physicians asked to be admitted, even if he knew that admission to DVH was not medically reasonable or necessary. Ex. 30.

---

[81] Even if this Court finds that Dr. Arik and Dr. Hazelitt's testimony as to their observations as treating physicians would have been appropriate for disclosure as non-retained expert witnesses, the error is harmless under Rule 37(c)(1) and their testimony should be permitted. Dr. Arik and Dr. Hazelitt were both identified in Relator's original and amended Rule 26 disclosures. Ex. 38; Relator's original and amended Rule 26 disclosures. Both were deposed at length in this case. Ex. 11, Hazelitt Depo. 112:18-118:5; DVH specifically asked Dr. Hazelitt about the chart review that she had performed related to Patients 1 through 52 in the Second Amended Complaint, and her testimony that she agreed with the conclusions set forth regarding those patients. All of the patients in the Third Amended Complaint were in the Second Amended Complaint; Ex. 2, Arik 249:17-256:20; DVH specifically asked Dr. Arik about the basis for his opinions of the medical necessity of the patients identified in the complaints). And, Defendants have retained testifying experts to counter their testimony. ECF 173-18 at 12 (identifying patients by number in Third Amended Complaint). *Sook Ja Park v. Haw. Med. Serv. Ass'n*, 2022 U.S. Dist. LEXIS 41473, at *33-34 (D. Haw. Mar. 9, 2022) (denying summary judgment based on testimony of undisclosed treating physicians because non-disclosure was harmless where defendants had been notice that testimony of the treating physicians may be used and treating physicians had been named as witnesses in the initial disclosures); *Durham v. Maui, et al.*, 2011 U.S. Dist. LEXIS 72118, at *19 (D. Haw. June 23, 2011) (finding that opposing party would not be prejudiced if non-disclosed physician testified at trial where the parties "have known and prepared for quite some time that [the physician] would be a witness as trial" and noting that the physician has been repeatedly named as a potential witness in disclosures and pretrial statements, the witness had been deposed, and opposing party already had their own expert witness to counter the proposed testimony).

MORGAN VERKAMP, LLC

- Arshad and Mirza texted about admitting every ER patient, and Mirza admitted patients based on texts from ER doctors that merely contained the patient's name and clinical diagnosis (but no other supporting information). Exs. 31, 32, 33.

- An investigation into a patient death at DVH revealed that the patient had been admitted to DVH by Mirza, but should have been transferred to another facility for care and treatment that DVH could not provide. Exs. 27, 34.

- DVH medical staff were retaliated against or ignored when they complained that patients were unnecessarily and unreasonably being admitted to DVH instead of a higher-acuity hospital. Ex. 11, at 124:1-126:15; Ex. 26, 27.

- Mirza has a documented and recurring history of violating the Medical Necessity Rule, including by performing medically unnecessary and unreasonable procedures and failing to timely initiate patient transfers to higher-acuity facilities. Ex. 16; see also FN 34, *supra.*

Although the Ninth Circuit's *Winter* standard does not require more than a difference in opinions of physicians to establish a question of fact as to falsity, these facts are precisely the sort of additional facts from which a reasonable jury could find falsity in the Defendants' certifications of medical necessity. For example, falsity can be established if the evidence shows that "the doctor does not actually hold that opinion" (such as when the hospitalists agreed to admit patients too sick to be at DVH just to avoid a fight with the ER doctors) or if the doctor "rubber-stamps whatever file was put in front of him" (such as making admission decisions by text without any context or supporting information). *Winter*, 935 F.3d at 1119, n.7, *citing AseraCare*, 938 F.3d at 1302.

The declarations that DVH provides in support of its SJ Motion demonstrate that there are material facts at issue. These self-serving declarations by Defendants' hospitalists aver that the physicians were "sufficiently familiar with the patients' medical conditions to support their clinical decisions." But those statements are inconsistent with the inpatient admission decisions made within seconds of receiving a patient name and diagnosis (and no other information) via text from ER doctors. Exs. 31 and 32. Similarly, the statement that "Vista Health did not receive any additional compensation for admitting patients or ordering additional tests" is inaccurate: The ability of the Vista Defendants to earn *any* income (including the monthly ███ paid by DVH under the HSA) while undergoing lengthy disciplinary actions was indeed a valuable opportunity, and more admissions created more opportunity for the Vista Defendants to bill Medicare for Mirza's services when he ordered and

1    interpreted unnecessary and unreasonable tests. These factual statements are ripe for consideration by

2    a jury; summary judgment should be denied.

3        **B.    Relator's "failure to transfer" claims readily survive summary judgment.**

4        DVH asserts that summary judgment is appropriate on the "failure to transfer" claims (meaning

5    patients who should have been transferred from DVH to another facility that could provide a higher-

6    acuity level of care) for several reasons, all of which are devoid of legal support. At the outset, DVH

7    argues that it is unaware that any other hospital has been alleged to have committed similar fraud. That

8    argument is not appropriate for a summary judgment motion: It neither addresses any material facts

9    nor makes an argument that Defendants are entitled to judgment as a matter of law.

10        **1.   Defendants cannot read the "reasonable" requirement out of the statute.**

11        DVH incorrectly asserts that "there is no dispute" that inpatient admission was medically

12    necessary for the patients who are encompassed by Relator's "failure to transfer" claims (hereinafter,

13    the "'failure to transfer patients"). ECF 171 at 27. This ignores the fundamental principle of the

14    Medical Necessity Rule: in order to be payable by Medicare, inpatient admission and rendered

15    treatment must be both necessary *and* reasonable. While there may be no dispute that inpatient

16    hospitalization was *necessary* for the "failure to transfer" patients, the evidence does not establish that

17    inpatient admission to DVH – which was not equipped to provide higher-acuity care – was *reasonable*.

18        The Two Midnight Rule has no role in this analysis. As set forth in Section III(B), *supra*, CMS

19    demands that an admitting physician must consider a number of factors including, *inter alia*, the types

20    of available inpatient and outpatient facilities, a hospital's bylaws and admissions policies, the severity

21    of the patient's symptoms, the medical predictability of the occurrence of a patient adverse event, and

22    the availability of diagnostic procedures at the facility. The inclusion of hospital- and location-specific

23    factors makes clear that, when making an inpatient admission decision, the admitting provider's

24    inquiry does not stop at whether there is a need for inpatient admission; the doctor's analysis must also

25    factor in the reasonableness of admission to a specific hospital facility.

26

27        **2.   Liability for failing to transfer patients needing a higher level of care is
         not speculative.**

28

MORGAN VERKAMP, LLC

21

MORGAN VERKAMP, LLC

DVH's conclusory assertion that Relator's "failure to transfer" claims are based on "pure speculation" because Relator cannot retroactively show that a patient would have agreed to a transfer if one was offered is specious. A decision to transfer (or not to transfer) is no different than any other medical decision which could be requested or refused by the patient; by DVH's argument, every medical necessity case would be foreclosed as "pure speculation" unless a patient was asked about every possible treatment or medical course. Defendants cite no law for the notion that a physician selecting an improper course of care over a proper one is too speculative to be the basis for an FCA violation, simply because a patient *might* have rejected it *if* she was offered a choice.

Defendant's arguments also ignore evidence that suggests that Defendants' hospitalists made essentially automatic, non-patient-specific decisions to admit patients to DVH whose health conditions mandated transfer to a facility with higher-acuity services than DVH was equipped to provide[82] and that the hospitalists routinely failed to educate patients on the need to be transferred and the risks of staying at DVH.[83] The Court should reject Defendant's specious argument. Relator's "failure to transfer" claims are not speculative; there is evidence establishing that Defendants failed to engage in the individualized review required to determine if admission to DVH, as opposed to transfer to another hospital, was reasonable *and* necessary.

## C. There is sufficient evidence from which a jury can calculate damages from Defendants' false claims.

The Court should reject DVH's contention that summary judgment should be granted on any claims for which Relator does not have a medical or billing record because Relator did not retain a statistical expert to testify about sampling. ECF 171 at 29. DVH ignores the caselaw that permits sampling and extrapolation in False Claims Act cases[84] and offers no cases that demands a relator

---

[82] Ex. 11, Hazelitt Depo.at 52:1-53:1, 68:9-17, 111:23-112:13; Ex. 30, Hamilton Email; Ex. 27, Declaration of Nora Fletcher.

[83] Ex. 26, Declaration of Lisa Smith, at ¶ 5; *see also* Ex. 39, Armstead Depo. at 180:4-182:20 (describing that he has never had the experience of sitting and explaining the circumstances as to why transfer is recommended and had the patient refuse).

[84] *See Ratanasen v. Cal. Dep't. of Health Servs.*, 11 F.3d 1467, 1471 (9th Cir. 1993) ("We now join other circuits in approving the use of sampling and extrapolation as part of audits in connection with Medicare…");

1   have a statistical expert present the results of chart review from a random sample of patients for

2   consideration in damage calculations.[85]

3       DVH's arguments about Relator's intentions with respect to the sample results are incorrect,

4   and the context in which they arise is important to the posture of the SJ Motion. In late 2021, the

5   parties began to confer about whether there could be consensus on a middle ground between Relator's

6   request for patient records for all admitted patients to DVH, and DVH's preference to only produce

7   records for the complaint examples. *See* ECF 140-4. The parties ultimately agreed to DVH initially

8   producing records for a 50-patient randomized probe sample of patients drawn from a list of all

9   admissions in 2019 and 2020; after review of the probe sample, the parties planned to set terms for the

---

12  *Ill. Phys. Union v. Miller*, 675 F.2d 151, 156 (7th Cir. 1982) ("[T]he use of sampling and extrapolation is proper provided there is an opportunity to rebut the initial determination of overpayment…"); *U.S. ex rel. Martin v. Life Care Ctrs. of Am., Inc.*, 114 F. Supp. 3d 549, 571 (E.D. Tenn. 2014) (finding statistical extrapolation permissible in FCA cases).

15  [85] The cases upon which DVH relies are inapposite and *do not* stand for the proposition that statistical experts are required in all FCA cases. Rather, in each of the cases cited by DVH, the plaintiffs sought to enter statistical evidence through an expert, and the court held (unremarkably) that the expert testimony must satisfy Federal Rule of Evidence ("FRE") 702, which governs the admissibility of expert testimony. *See, e.g., U.S. ex rel. Scott v. Az. Ctr. for Hem. & Onc. PLC*, 2020 U.S. Dist. LEXIS 75068, *27 (D. Ariz. Apr. 29, 2020) (permitting relator to present testimony from statistical experts, if such testimony satisfies FRE 702, to prove relator's claims "*in this FCA case*") (emphasis added); *U.S. v. Rite Aid Corp.*, 2020 U.S. Dist. LEXIS 123820, at *37 (E.D. Cal. July 13, 2020) (finding that statistical sampling may be used to prove plaintiffs' case and *denying* motion to exclude plaintiffs' sampling plan/extrapolation) (emphasis added).

    None of the other cases upon which DVH rely support its position. For example, in *Cretney-Tsosie v. Creekside Hospice II, LLC*, the defendants sought discovery specifically identifying claims (out of a large sample that included over 215 patients) that the Government found to be ineligible for payment. 2016 U.S. Dist. LEXIS 42283, at *7-8 (D. Nev. Mar. 30, 2016). The court issued an order to respond to the discovery request, and the defendants subsequently moved to enforce that order. *Id.* at *8-10. The Government informed the court that it had narrowed its case and did not intend to prove liability or damages on a claim-by-claim basis; rather, it intended to prove its case through a sampling and extrapolation and wanted to present that evidence through expert testimony about a medical review. *Id.* at * 10-11. Given the litigation over defendants' discovery request seeking specific claims, the court precluded the government from claiming damages on any claims not timely disclosed in the Government's expert disclosures. *Id.* at *19-20. The circumstances of *Cretney—Tsosie* are not present in the instant case.

    *U.S. ex rel. Guardiola v. Renown Health*, 2015 U.S. Dist. LEXIS 116131 (D. Nev. Sep. 1, 2015), is equally inapplicable; it was a battle-of-the-experts case in which the court was assessing the "data universe" for statistical sampling. Nothing in the opinion holds that a relator must introduce sampling/extrapolation only through a statistician.

MORGAN VERKAMP, LLC

production of a subsequent "full, statistically significant sample."[86] After producing records for the probe sample, however, DVH reneged on the next step of the sampling plan.[87]

Because DVH retracted its commitment to the parties' agreed-upon sampling plan, Relator modified his approach as to how to use the records it had received and reviewed, rather than simply abandon the entire lengthy and expensive exercise. Thus, instead of using a statistical sampling approach with a complex explanation by a statistician, Relator intends to present the results of the medical expert's review as a damages data point for the jury's consideration. It is well within the traditional role of a jury to accept or reject evidence regarding the amount of damages. *Dylan Consulting Servs. LLC v. SingleCare Servs.*, 2018 U.S. Dist. LEXIS 50204, at *10-11 (D. Ariz. Mar. 26, 2018) ("That question [of the amount of damages] is for the jury. Dylan has proposed a method of calculation that the jury is able to evaluate, accept, reject, or accept in part [and] has put forward sufficient evidence of actual damages and the amount of damages, and so disputes of fact on these issues defeat summary judgment"); *Canava v. Rail Delivery Serv.*, 2021 U.S. Dist. LEXIS 227195, at *10-11 (C.D. Cal. Aug. 27, 2021), *quoting McConnell v. Wal-Mart Stores, Inc.*, 995 F. Supp. 2d 1164, 1172 n.3 (D. Nev. 2014) (discussing the "traditional right" to have a jury calculate damages, even if calculating damages may be difficult for a jury).

If the jury concludes, based on all the evidence, that the defendants engaged in persistent, pervasive conduct that make it more likely than not that DVH submitted false claims for more than

---

[86] The parties' communications about the sampling process are set forth in forth in Relator's motion to compel production of the additional patient records after DVH recanted on its agreement to produce the second tranche of documents. ECF 140, ¶ 7; ECF 140-4 through 140-13.

[87] Relator moved to compel production of records for the larger sample. ECF 140. While the Court did not grant the motion to compel, Magistrate Judge Ferenbach specifically stated that his orders were setting discovery parameters only and should not be interpreted as limiting liability. Ex. 40, Audio Recording of Hearing on Motion to Compel, 19cv1560 Arik v_sel_11-03-35_to_11-53-03, Position 29:59/-19:28 ("This is just to get discovery done. I can't order something substantive like [cutting off liability] unless it's a sanction."). If DVH can foreclose Relator from making *any* extrapolations based on the charts that were produced *and* Relator was not entitled to the balance of the patient charts that he sought, then the Court's discovery order would effectively have limited DVH's liability to only the patient charts that DVH agreed to produce. Converting a discovery order into a barrier to liability would be unduly prejudicial to Relator and is beyond the scope of the Court's order.

MORGAN VERKAMP, LLC

just the patients whose charts were produced and reviewed,[88] then it will be tasked with determining damages of Defendants' conduct. The jury can consider the evidence that Relator's medical expert reviewed 50 patient encounters and found error in 16 of them, and the evidence of the number of patient encounters each year. (It is worth noting that these findings are similar to the Nevada HHS findings that DVH ███████████████████████████████████████████ ████ [89] the jury can consider these samples in conjunction with one another.) If the jury determines that a reasonable method to determine the entire scope of damages is to apply a percentage to the whole (which Defendants are, of course, entitled to argue against), then that calculation is well within a jury's ability to do without expert guidance. *ReBath LLC v. HD Sols. LLC*, 2022 U.S. Dist. LEXIS 119997, at *14-15 (D. Ariz. July 7, 2022) ("Courts have repeatedly excluded expert testimony that involves nothing more than 'simple math'").[90]

Given this history, DVH's complaint that the lack of an expert has violated its due process rights because it has not had the opportunity to rebut any evidence is disingenuous: DVH agreed to sampling as a means of reducing its burden to produce medical and billing records for every patient. At no point during the negotiations did DVH raise any due process concerns with the use of sampling; it did not make any caveats that it would only agree to a methodology if attested to by a statistician; and it did not raise concerns to the Court during the motion to compel hearing that its due process rights would be violated if Relator did not complete a review of every patient encounter. (To the contrary, it argued heavily against producing any additional medical and billing records. ECF 141 at 13-17.) Furthermore, DVH had the opportunity to depose Relator's experts and conduct discovery on any relevant issue in the case. It has also set forth its own competing experts to challenge the findings

---

[88] Defendants may, of course, present contrary evidence, though none has been produced or elicited through testimony thus far.

[89] Ex. 34, Report of Nevada Department of Health and Human Services, at -68145.

[90] Indeed, any other approach would be confusing to the jury. Defendants did not move to strike the portion of Dr. Armstead's report that explains that the charts were drawn as a random sample from a larger pool of patient encounters. It would be counterintuitive to tell the jury that an expert reviewed 50 patient charts that were a generated as a random sample of a larger set, that the expert found error in a certain number of those patient charts, and that the jury is responsible for determining the amount of damages, but then to foreclose the jury from using simple math if they feel that is an appropriate means of calculating damages.

MORGAN VERKAMP, LLC

MORGAN VERKAMP, LLC

of Dr. Armstead as to the sample examples. With complete participation in the sampling process and a fulsome opportunity to defend against any conclusions the jury may draw from the sample (which it has already exercised by way of a competing expert), DVH has not articulated any actual due process concerns regarding Relator's use of the sample patient charts or the findings concerning the same.[91]

### D.   Claims related to patients insured through Medicare Advantage survive summary judgment.

DVH incorrectly argues that Relator's claims relating to patients who were insured through an MAO cannot survive summary judgment. DVH contends that Relator must prove liability through evidence demonstrating that Defendants submitted false risk adjustment data to the Medicare Advantage program. ECF 171 at 31. While this is certainly one way to manipulate the Medicare Advantage program, it is not the only fraud scheme affecting those programs.[92]

There is evidence to demonstrate that Defendants caused harm through the Medicare Advantage program because a fraudulently increased volume of inpatient admissions ultimately increases traditional Medicare revenue.[93] And an increase in DVH's reimbursement rates determined by the cost reports for traditional Medicare would inure to the benefit of the provider in the Medicare Advantage program because hospitals submit rate letters to managed care plans, and the MAOs pay

---

[91] *U.S. ex rel. Martin v. Life Care Ctrs. of Am., Inc.,* supports dismissal of DVH's due process arguments. The court acknowledged that "[u]nder the Fifth Amendment, [a defendant] is not entitled to individually defend each claim brought against it under the FCA." 114 F. Supp. 3d 549, 570 (E.D. Tenn. 2014. In that case, the court found the use of statistical sampling and extrapolation did not violate the defendant's due process rights because the defendant would be afforded the opportunity to depose the Government's expert, challenge that expert's qualifications, retain its own experts, and present all of its evidence at trial. *Id.* at 570. Similarly, in the instant case, Defendants have had the same opportunities.

[92] The cases cited by DVH do not foreclose claims involving various Medicare Advantage fraud schemes. In *U.S. ex rel. Gray v. UnitedHealthcare Ins. Co.*, 2018 U.S. Dist. LEXIS 98195 (N.D. Ill. June 12, 2018), the relator alleged that the defendants submitted codes obtained during in-home physicals, even though the in-home visits were not covered services. The relator did not allege that the defendant billed for the non-covered service itself, which would be akin to this case in which DVH received increased payments due to the non-covered services. *U.S. ex rel. Martinez v. KPC Healthcare Inc.,* 2017 U.S. Dist. LEXIS 228205 (C.D. Cal. June 8, 2017), granted a motion to dismiss with leave to amend to clarify that the *United States* made a payment decision based on the defendant's false statements, not just the MAO. Defendants make no such arguments in this case.

[93] Ex. 23, Shell Depo. at 114:17-115:2; 124:2-126:16.

based on the calculated Medicare rate.[94] In other words, DVH's increased inpatient admissions caused an increase in *per diem* rates in traditional Medicare, which in turn led to an increase in *per diem* rates paid under the Medicare Advantage program. DVH's cost reports identify the number of inpatient days that were claimed for payment in the Medicare Advantage program.[95] Thus, there is enough evidence in the record to establish that Defendants' false admissions caused false claims to be submitted under the Medicare Advantage program.

### E.      Defendants' scienter is a jury question.

"Whether a defendant acted with scienter is necessarily a fact-intensive inquiry, often depends heavily on credibility, and is rarely appropriate for summary judgment." *U.S. v. Burkich*. 2022 U.S. Dist. LEXIS 166165, at *27 (N.D. Ga. Sep. 14, 2022) (internal citations and quotations omitted). As noted *supra*, the FCA ascribes liability when a defendant acts "knowingly," (defined as "actual knowledge," "deliberate ignorance," or "reckless disregard") and does not demand "proof of specific intent to defraud." *Bourseau*, 531 F.3d at 1167, *citing* 31 U.S.C. § 3729(b). The FCA was specifically designed to "reach what has become known as the 'ostrich' type situation where an individual has 'buried his head in the sand' and failed to make simple inquiries which would alert him that false claims are being submitted." *Id.* at 1168, *quoting* S. Rep. No. 99-345 at 21 (1986), as reprinted in 1986 U.S.C.C.A.N. 5266, 5286.

### 1.   The hospitalists acted with the requisite scienter.

There is ample evidence from which a reasonable jury can find that the Vista Health hospitalists acted knowingly as defined under the FCA: The Vista Defendants promised to "increase the current volume of admissions through the ER substantially and will be reflected in the quarterly report" and promised 24/7 coverage even though only two doctors were coming on staff and both had practices in other states. Exs. 9; 10 at 17:17-18:16; 1 at 109:9-12, 209:15-211:3. Mirza bragged about increasing DVH's inpatient admissions in his first month at the hospital. Ex. 2, at 12:19-14:1 (Nov. 16, 2022). In fact, he specifically stated that he was admitting more patients to try to make money for

---

[94] Ex. 23, Shell Depo. at 44:8-12; also 93:20-94:14 (Q: [T]hat number – some steps down the road – is going to be used to figure out the per day payment for the Medicare Advantage patients? A: Correct.)

[95] E.g. Ex. 41, 2019 Cost Report, at -41499.

MORGAN VERKAMP, LLC

the hospital. Ex. 26 at ¶ 18. Arshad told a DVH manager that he and Mirza would be admitting patients to DVH even if the admission was improper because the patient needed more resources than DVH offered. Ex. 30. The Vista doctors ignored concerns raised by nursing staff that many inpatient admissions were too sick to be at DVH and that other patients should be sent home rather than be admitted inpatient. Ex. 26, 27. Mirza and Arshad texted about admitting every person who came to the hospital. Ex. 33. Mirza accepted admissions by text with only the patient name and a diagnosis but no other information about the patient's health condition or needs. Ex. 31, 32.

Disregarding all evidence to the contrary, DVH asserts that there is no evidence of scienter based solely on self-serving, conclusory declarations from Drs. Mirza, Arshad, and Syed which offer some variation on the statement that the declarant "genuinely expected [the patients] care to last at least two midnights at the hospital."[96] While some self-serving declarations are permissible, "[t]he district court can disregard a self-serving declaration that states only conclusions and not facts that would be admissible evidence." *Nigro v. Sears, Roebuck & Co.*, 784 F.3d 495, 497 (9th Cir. 2015).[97]

## 2. DVH acted with the requisite scienter.

There is also ample evidence from which a reasonable jury can find that DVH acted knowingly as defined under the FCA, including: Davila told an RPG hospitalist that they were being replaced by Vista Health because Dr. Mirza agreed to admit patients the way she wanted him to. Ex. 11, at 130:8-131:14. DVH chose a replacement group that brought only two physicians to provide 24-hour-a-day, 365-day-a-year coverage, without inquiring if they had any hospitalist experience. Ex. 4 at 194:16-195:1. DVH entered into a contract that called for ██████████████████████████████ ████████████████████████████, but did not enforce its own contract terms (nor did it enforce the terms when Mirza and Syed both were the subject of further disciplinary actions). Ex. 15. DVH disregarded repeated warnings from staff about patients who did not need to be admitted at all, and others about the admissions of patients who were too critical to be safely admitted to DVH. Ex. 26 at ¶¶ 10-16; Ex. 27 at ¶¶ 9-10, 17-20. DVH retaliated against staff members who raised concerns

---

[96] ECF 173-5 at ¶¶ 11-44; ECF 173-6 at ¶¶ 10-18; ECF 173-7 at ¶¶ 6-16.

[97] DVH also cites generally to the expert reports of Drs. Shivesh Kumar and Kathleen Bowen. Neither of those reports offer opinions on the providers' mental state and thus are immaterial to the scienter assessment.

MORGAN VERKAMP, LLC

about the Vista Health doctors, but did not take corrective actions against the doctors. Ex. 26 at ¶ 16; Ex. 27 at ¶¶ 16-21; Ex. 11 at 124:1-126:15. DVH made no documented response when a nurse-manager reported to the CEO that Dr. Arshad stated that he and Dr. Mirza were going to admit patients that they knew were not safe to be admitted to DVH. Ex. 30.

Given the evidence which speaks to Defendants' knowledge and that the issue is most properly reserved for the trier of fact, summary judgment is not supported as to scienter.

### F.     Issues Concerning the Vista Defendants' Part B Claims are Ripe for Trial.

Citing its prior arguments regarding MAOs and falsity, DVH incorrectly argues that Relator's claims concerning necessary and reasonable testing fail because such tests are not separately billed under Part A, but encompassed in a single *per diem* payment. ECF 171 at 34-35. This argument is without merit for two reasons. First, the Medical Necessity Rule requires *all* treatment to be reasonable and necessary regardless of how a claim is submitted. Thus, when Medicare reimburses DVH for the *per diem* rate calculated by the cost reports, it expects that all of what it is paying for (including the admission itself and the testing) satisfies the Rule. Thus, unnecessary and unreasonable testing during an inpatient stay at DVH (even if the admission is necessary and reasonable) violates the Medical Necessity Rule can give rise to the submission of a false claim. Of course, if a single claim was false for multiple reasons (e.g. the admission was unnecessary or unreasonable *and* testing was unnecessary or unreasonable), the claim would not be counted twice for damage purposes. But, that is not a question of liability and not properly subject to a summary judgment motion.

Second, DVH's argument ignores Part B claims made by and paid to the Vista Defendants that are untethered from the *per diem* rate collected by DVH. Neither DVH's motion nor the Vista Defendants' "joinder" address the Part B claims that the Vista Defendants submitted for: (a) the professional component of hospitalist services rendered at DVH; or (b) claims related to the ordering and reviewing of unnecessary and unreasonable diagnostic testing for patients admitted at DVH. Accordingly, those claims are ripe for trial.

### IV.     CONCLUSION

For the reasons set forth above, Relator respectfully requests that the Court deny DVH's motion for summary judgment.

Respectfully submitted,


/s/ Jillian L. Estes
Jesse Sbaih & Associates, Ltd.
Jesse M. Sbaih (#7898)
Ines Olevic-Saleh (#11431)
The District at Green Valley Ranch
170 South Green Valley Parkway, Suite 280
Henderson, Nevada 89012
Tel.:    (702) 896-2529
Fax:    (702) 896-0529
Email: jsbaih@sbaihlaw.com

Morgan Verkamp LLC
Frederick M. Morgan, Jr. (*pro hac vice*)
Jillian L. Estes (*pro hac vice*)
Sonya A. Rao (*pro hac vice*)
4410 Carver Woods Dr., Suite 200
Cincinnati, OH 45242
Tel.:    (513) 651-4400
Fax:    (513) 651-4405
Email: rick.morgan@morganverkamp.com
            jillian.estes@morganverkamp.com
            sonya.rao@morganverkamp.com

*Attorneys for Plaintiff-Relator*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a copy of the foregoing was sent via the Court's electronic filing system and served on all counsel of record on this 4th day of May, 2023.


/s/ Jillian L. Estes
Jillian L. Estes

*Attorney for Plaintiff-Relator*