# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

United States of America ex rel. Tali Arik, M.D.,

　　　　Plaintiff/Relator

v.

DVH Hospital Alliance, LLC d/b/a Desert View Hospital, Vista Health Mirza, M.D. P.C. d/b/a Vista Health, and Irfan Mirza, M.D.,

　　　　Defendants

Case No.: 2:19-cv-01560-JAD-VCF

**Order Granting Defendants' Motion for Summary Judgment, Denying as Moot Defendants' Motion to Exclude Expert Testimony, and Denying Motion to Strike**

[ECF Nos. 171, 172, 202]

Plaintiff-relator Dr. Tali Arik brings this False Claims Act action against DVH Hospital Alliance d/b/a Desert View Hospital, Vista Health Mirza, M.D. P.C., and Dr. Ifran Mirza, alleging that they defrauded the government by claiming Medicaid funds for medically unnecessary patient admissions at this Pahrump, Nevada hospital. The defendants move for summary judgment, arguing that Arik cannot provide sufficient evidence to show that they knowingly engaged in fraudulent conduct violative of the False Claims Act and that several of Arik's liability theories are not cognizable. They also move to exclude Arik's medical-necessity experts and to strike much of the evidence Arik attaches to his summary-judgment response.

I deny Desert View's motion to strike because its evidentiary objections are insufficient to show that I shouldn't consider Arik's evidence at this summary-judgment stage. But even with that evidence in play, Arik's efforts fall short. His claim that the defendants failed to transfer patients who were too sick to receive adequate care at Desert View isn't cognizable under the False Claims Act, and Arik's remaining claims fail because he cannot prove that any defendant knowingly defrauded the government. So the defendants are entitled to judgment on

the entirety of Arik's complaint.  And because resolution of Desert View's motion to exclude experts is unnecessary to my summary-judgment findings, I deny that motion as moot.

## Background

**A.  Desert View Hospital's dissatisfaction with its hospitalist group leads to its hiring of Vista Health.**

DVH Hospital Alliance d/b/a Desert View Hospital is a 25-bed hospital located in Pahrump, Nevada.[1]  Because this facility is in a rural locale, Medicare has designated it as a "critical access hospital" (CAH).[2]  Desert View has an emergency department (ED), but doesn't have an intensive-care unit (ICU), advanced cardiac care unit, or stroke or neurosurgery center.[3]  In December 2016, Desert View hired Rural Physicians Group (RPG) to provide hospitalist services.[4]  But in 2018, Desert View's CEO Susan Davila began searching for another hospitalist group.  In a declaration, Davila avers that that she "became dissatisfied with RPG's performance" because its physicians couldn't provide consistent hospitalist coverage, were uncomfortable with practicing medicine in a rural setting, and didn't offer any specialty services.[5]

Arik disputes Davila's characterizations, arguing that there is no corroborating evidence of any of the performance issues that she mentions.  He instead presents evidence that Davila received unsatisfactory performance reviews from her superiors that focused on Davila's failure to "drive revenue to the facility" and noted that "[a] significant amount of capital has been

---

[1] ECF No. 173-2 at ¶ 4 (Davila declaration).

[2] *Id.* at ¶ 5; ECF No. 103 at ¶¶ 63–70 (operative complaint).

[3] ECF No. 187-1 at 4 (p. 30:7–25).

[4] ECF No. 173-2 at ¶ 11.

[5] *Id.* at ¶ 12.

1    invested in the acquisition of [DVH,] and [Davila] must meet budgeted expectations to

2    demonstrate a return on the investment."[6]  Arik surmises that Davila's interest in replacing RPG

3    stemmed from the group's inability to increase revenue for the hospital.  He offers the

4    declaration of RPG doctor Marianne Hazelitt, in which she recounts that Davila and Bonnie

5    Stolzman, Desert View's Chief Nursing Officer, pressured her to "admit everyone to fill hospital

6    beds" and make sure that they stayed in the hospital "for a minimum of two nights" with the goal

7    to "increase revenue for the hospital."[7]  Hazelitt declares that she consistently refused to

8    improperly admit patients, keep them at the hospital longer than necessary, or admit patients who

9    needed a higher level of care than Desert View could provide, despite Davila's repeated

10    entreaties.[8]

11        In 2019, Davila replaced RPG with Vista Health Mirza, M.D. P.C. (Vista Health),

12    defendant Irfan Mirza's medical practice.[9]  Mirza is a board-certified cardiologist with a primary

13    medical practice in Arizona who had worked at Desert View in the past.[10]  Mirza told Desert

14    View that he and Dr. Anees Arshad, a board-certified pulmonologist, could provide 24/7

15    hospitalist care to Desert View, increase inpatient admissions to the for-profit hospital, and

16    provide the cardiology and pulmonary services that RPG could not.[11]

17        Hazelitt learned that Desert View "terminated RPG's contract because RPG hospitalists

18    did not admit enough patients or keep patients in the hospital long enough for the hospital to be

---

[6] *See* ECF No. 208 at 2–3; ECF No. 208-1 at 5.

[7] ECF No. 187-8 at ¶¶ 15, 20 (Hazelitt declaration).

[8] *Id.* at ¶¶ 18–24.

[9] ECF No. 173-2 at ¶ 19.

[10] *Id.* at ¶ 16.

[11] *Id.* at ¶ 17; ECF No. 187-9 at 3 (Vista Health's letter of intent to provide inpatient hospitalist services at Desert View).

profitable."[12]  Hazelitt also recounted a conversation in which Davila advised her that Vista Health "assured [Davila] that they will double the Desert View . . . census" and "will make [the hospital] profitable again."[13]  And Davila hired Vista Health despite the fact that a background check reflected disciplinary action related to Mirza's medical licenses in California, New Jersey, and Arizona.[14]

**B.    Hospitalist practices at Desert View change under Vista Health.**

Vista Health began providing hospitalist services at Desert View on January 10, 2019.[15] During Vista Health's first month, the hospital's inpatient admissions referred from the ED increased by more than 68%.[16]  In February, inpatient admissions referred from the ED were again higher than expected, and the average stay length increased from 2.52 nights to 2.83 nights.[17]  Overall, admissions rose 22% from 2018 to 2019, but decreased by 23% in 2020.[18] And when reviewing the ratio of admissions to ED visits (an important measure, as many of Arik's claims hinge on the allegation that the hospitalists were admitting significantly more patients referred by the emergency room than they should have), Desert View's ratio only changed by a single digit from 2018 (7.1%) to 2019 (8.7%) or 2020 (8.0%).[19]

---

[12] ECF No. 187-8 at ¶ 44.

[13] *Id.* at ¶ 43.

[14] *See* ECF No. 189-6 (sealed).

[15] ECF No. 199-3 at 2.

[16] ECF No. 199-9.

[17] ECF No. 199-10.

[18] ECF No. 173-2 at ¶ 28.

[19] ECF No. 201-1 at 2.  Neither party offers expert reports or testimony explaining the significance of these statistics.

Early in Vista Health's contract, Desert View staff started noticing the impact of increased admissions.  Arik submits the declarations of two nurses employed by Desert View at the time, who describe a distressing working relationship with the Vista Health hospitalists. Registered nurse Lisa Smith avers that within weeks of Vista Health's entrance, the medical-surgical unit began filling with patients "of a much higher acuity than we had before" (i.e., they were sicker), and "communicating with Dr. Mirza became very difficult."[20]  Smith explains that the increase in sicker patients "caused considerable stress" on the nursing staff, but when the nurses complained, the hospitalists belittled them and Desert View administrators dismissed their concerns.[21]  Smith also recounts that Mirza "had a set of fixed orders for a series of cardiac tests that he would put into admissions orders for almost every new patient[], regardless of the reason they were admitted."[22]  According to Smith, Mirza also "admitted patients who did not need to be in the hospital at all, such as patients with a [urinary-tract infection] or who had an abnormal lab level and just needed some fluids."[23]

Registered nurse Nora Fletcher corroborates Smith's characterizations.  She avers that the hospitalists were "arrogant and rude toward the nursing staff," refused to listen to nurses' concerns about patient conditions, and would leave the hospital and not answer phone calls when they were supposed to be on site, resulting in delayed care.[24]  She adds that "Dr. Mirza ordered a cardiac workup on many of the patients that he admitted, regardless of whether the person was

---

[20] ECF No. 187-26 at ¶¶ 8, 15.

[21] *Id.* at ¶¶ 8, 10, 14.

[22] *Id.* at ¶ 9.

[23] *Id.* at ¶ 13.

[24] ECF No. 187-27 at ¶¶ 6, 18–20.

admitted for a cardiac issue."[25]  She also opines that Mirza and Arshad "routinely admitted patients as inpatients whose symptoms and condition were more serious than we could safely treat" at Desert View, leading to "unsafe nurse-to-patient ratios."[26]  Fletcher also states that Mirza "admitted patients who did not appear to require or warrant hospitalization and kept patients in the hospital just to perform cardiac tests."[27]

In September 2019, Desert View's medical-surgical unit manager April Hamilton sent Davila an email recapping a conversation they previously had about the hospitalists.[28]  In the email, Hamilton expressed that she was "concerned with a patient that was being admitted to the Med/Surg Unit" and called Arshad to make sure he was aware of the patient's medical history.[29] Hamilton avers that Arshad told the ED doctor who recommended admission that the patient should have been placed in an ICU but the ED doctor felt that the patient was safe for inpatient admission.[30]  Arshad then told Hamilton that he and Mirza "had decided that they would accept the patients that the ED physicians informed them [were] safe for admission, even when they believed the patient needed [to be] transferred" to an intermediate or intensive-care unit instead.[31]  Arshad told Hamilton that the hospitalists were "tired of having to argue with the [ER]

---

[25] *Id.* at ¶¶ 6–7.

[26] *Id.* at ¶¶ 8, 10.

[27] *Id.* at ¶ 11.

[28] ECF No. 187-30.

[29] *Id.*

[30] *Id.*

[31] *Id.*

physician and tired of being accused of refusing to admit 'anyone.'"[32]  Arshad admitted that "he felt many of these patients were not a 'safe' admission, but felt he had no choice to admit."[33]

**C.      Pahrump Cardiologist Arik blows the whistle on the hospital's new practices.**

In 2019, Arik, a cardiologist who practices in Pahrump and was previously Desert View's Medical Chief of Staff, filed this qui tam lawsuit against Desert View, Vista Health, and Mirza for violating the False Claims Act (FCA).  In his operative complaint, Arik accuses the defendants of admitting patients whose serious conditions required treatment that Desert View could not provide, admitting patients who should have been served on an outpatient basis, and ordering tests that weren't medically indicated by the patients' conditions.[34]  During discovery, Desert View provided records for a "probe sample" of 50 patients admitted in 2019 and 2020.[35]  Arik produced an expert report ascribing medical falsity to 17 of those probe-sample patients.[36]  Overall, Arik ascribes medical falsity to 43 patient episodes described in the complaint and the sample.  He alleges that the defendants submitted false claims through Medicare, Medicaid, and the Medicare Advantage Program.[37]

---

[32] *Id.*

[33] *Id.*

[34] *See, e.g.*, ECF No. 103 (operative complaint).

[35] ECF No. 173-20 at 10 (Dr. Rodney Armstead's expert report, describing the sample of patient episodes he was tasked with reviewing).

[36] *Id.*

[37] ECF No. 103.

**D.      Defendants now seek summary judgment.**

Desert View moves for summary judgment on all of Arik's claims,[38] and Vista Health and Mirza join in that motion.[39]   Desert View contends that: (1) Arik's "failure-to-transfer" theory of FCA liability isn't cognizable because those admissions can't be false under Medicare's medical-necessity requirement; (2) there is no evidence that false diagnostic information was passed through Medicare Advantage providers, as required to show fraud in the Medicare Advantage Program; (3) the unnecessary medical testing that Arik alleges didn't result in overpayments by Medicare at CAH hospitals like Desert View, so no fraud could have been committed due to unnecessary testing; (4) Arik doesn't present credible evidence of any false medical decisions or scienter; and (5) Arik should be precluded from extrapolating damages because he didn't disclose a statistical expert.[40]   Desert View also moves to exclude Arik's medical experts Rodney Armstead and Daniel Woodward, arguing that Armstead is not qualified to opine on the medical necessity of hospital admissions and both doctors used an unreliable methodology to determine when the hospitalists' actions were unnecessary or unreasonable.[41] Lastly, Desert View moves to strike much of the evidence Arik attaches to his response, contending that it lacks foundation, contains hearsay, isn't properly authenticated, or is irrelevant.[42]

---

[38] ECF No. 171.

[39] ECF No. 176.

[40] ECF No. 171.

[41] ECF No. 172.

[42] ECF No. 202.

**Discussion**

**A.    Legal standards**

*1.    Summary-judgment standard*

Summary judgment is appropriate when the pleadings and admissible evidence "show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."[43]  When considering a summary-judgment motion, the court must view all facts and draw all inferences in the light most favorable to the nonmoving party.[44]  When the moving party does not bear the burden of proof on the dispositive issue at trial, it is not required to produce evidence to negate the opponent's claim—its burden is merely to point out the evidence showing the absence of a genuine material factual issue.[45]  The movant need only defeat one element of a claim to garner summary judgment on it because "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."[46]

*2.    The False Claims Act standards*

The FCA imposes significant civil liability on any person who "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval" or "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim."[47]  A private plaintiff may enforce the act's provisions by bringing a qui tam

---

[43] *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (citing Fed. R. Civ. P. 56(c)).

[44] *Kaiser Cement Corp. v. Fischbach & Moore, Inc.*, 793 F.2d 1100, 1103 (9th Cir. 1986).

[45] *Celotex*, 477 U.S. at 323.

[46] *Id.* at 322.

[47] 31 U.S.C. § 3729(a)(1).

1   suit on behalf of the United States.[48]  To prevail on an FCA claim, a plaintiff must show "(1) a

2   false statement or fraudulent course of conduct, (2) made with scienter, (3) that was material,

3   causing (4) the government to pay out money or forfeit moneys due."[49]  Courts are advised to

4   interpret the FCA "broadly, in keeping with Congress's intention 'to reach all types of fraud,

5   without qualification, that might result in financial loss to the Government.'"[50]

6        Arik's allegations fall under an express "false certification" theory of FCA liability.

7   Express certification occurs when "the entity seeking payment certifies compliance with a law,

8   rule[,] or regulation as part of the process through which the claim for payment is submitted."[51]

9   The Ninth Circuit has determined that a "false certification of medical necessity," like the ones

10  that Arik alleges here, "can give rise to FCA liability."[52]  It has held that a physician's

11  certification that treatment was "medically necessary" can be fraudulent if "the opinion is not

12  honestly held, or if it implies the existence of facts—namely, that inpatient hospitalization is

13  needed to diagnose or treat a medical condition, in accordance with accepted standards of

14  medical practice—that do not exist."[53]

15

16

17

18

---

19  [48] *Id.* at § 3730(b).

20  [49] *United States ex rel. Campie v. Gilead Scis., Inc.*, 862 F.3d 890, 899 (9th Cir. 2017).

21  [50] *Winter ex rel. United States v. Gardens Reg'l Hosp. & Med. Ctr., Inc.*, 953 F.3d 1108, 1116
    (9th Cir. 2020), *cert. denied sub nom. RollinsNelson LTC Corp. v. United States ex rel. Winters*,
    141 S. Ct. 1380 (2021) (quoting *United States v. Neifert-White Co.*, 390 U.S. 228, 232 (1968)).

22  [51] *Ebeid ex rel. United States v. Lungwitz*, 616 F.3d 993, 998 (9th Cir. 2010).

23  [52] *Gardens Reg'l Hosp.*, 953 F.3d at 1117.

    [53] *Id.* at 1119.

### 3.        *Medicare payment standards for inpatient admissions*

The Medicare program provides basic health insurance for individuals who are 65 or older, disabled, or have end-stage renal disease.[54]  "[N]o payments may be made . . . for any expenses incurred for items or services . . . [that] are not reasonable and necessary for the diagnosis or treatment of illness or injury to improve the functioning of a malformed body member[.]"[55]  Medicare reimburses providers for inpatient hospitalization only if "a physician certifies that such services are required to be given on an inpatient basis for such individual's medical treatment, or that inpatient diagnostic study is medically required and such services are necessary for such purpose."[56]

The Centers for Medicare & Medicaid Services (CMS) administer the Medicare program and issues guidance governing reimbursement.  CMS has implemented a length-of-stay proxy for physicians to certify that inpatient admissions meet the medical-necessity requirement.  Under that regulation, "an inpatient admission is generally appropriate for payment under Medicare Part A when the admitting physician expects the patient to require hospital care that crosses two midnights."[57]  The regulations expect doctors to exercise their clinical judgment on a patient's length of stay based on "complex medical factors" but does not give them unfettered discretion to decide whether inpatient admission is medically necessary: "The factors that lead to a particular clinical expectation must be documented in the medical record in order to be granted

---

[54] 31 U.S.C. § 1395c.

[55] *Id.* at § 1395y(a)(1)(A).

[56] *Id.* at § 1395f(a)(3).

[57] 42 C.F.R. § 412.3(d)(1).

1  consideration."[58]  Medical necessity is a question of fact, and "[a] physician's order or

2  certification will be evaluated in the context of the evidence in the medical record."[59]

3  ### 4. *Rules for critical-access hospitals*

4  In 1997, the Balanced Budget Act created the critical-access hospital (CAH) certification

5  program for hospitals located in rural areas.[60]  CAHs are reimbursed differently by both

6  Medicare and Medicare Advantage than other acute hospitals, and those providers'

7  reimbursement schemes also differ from one another.[61]  Hospitals must meet specific

8  requirements to qualify for CAH certification and receive the CAH Medicare reimbursement

9  rates, including complying with applicable federal laws and regulations "related to the health and

10  safety of patients;" maintaining a maximum number of 25 inpatient beds, which may be used for

11  either inpatient or swing-bed services; and establishing agreements with other hospitals to

12  provide "[a]dditional or specialized diagnostic and clinical laboratory services that are not

13  available at the CAH."[62]

14

15  **B.    Arik's failure-to-transfer liability theory fails because it is too speculative and not cognizable under the FCA.**

16  Arik's expert Rodney Armstead opines that many of the services alleged in the complaint

17  and studied in the probe sample were medically unnecessary because the patients were so sick

18

---

19  [58] 42 C.F.R.§ 412.3(d)(1)(i); *see also id.* at § 412.3(a)–(c); *see generally* 42 U.S.C. § 1395f(a)(3).

20  [59] 42 C.F.R. § 412.46(b); *see also id.* at §§ 412.3(d)(1)(i), 412.3(d)(3).

21  [60] 105 Pub. L. 33, 111 Stat. 251, § 1820 (Aug. 5, 1997).

22  [61] *Compare* 42 C.F.R. §§ 413.1(a)(2)(i), 413.1(b), 413.5, 413.70, 413.114 (articulating a cost-based reimbursement scheme coupled with interim, per diem payment for operating expenses), *with* 42 U.S.C. § 1395w-23 *and id.* at § 422.300 (articulating a capitation-payment system with fixed payments based on previous cost reports and risk adjustments).

23  [62] 42 C.F.R §§ 485.608, 485.620(a), 485.635(c)(1)(ii).

that they needed to be transferred to a high-acuity hospital with the resources to better treat them.[63]  Armstead explains that the appropriate care for those patients would require "multiple specialties[] and high-level medical interventions and services beyond what is available at a critical-access hospital" like Desert View.[64]

Desert View contends that Arik cannot pursue claims for any of the patient admissions that he alleges were medically unnecessary based on this "failure-to-transfer" theory.[65]  "From a medical necessity standpoint," Desert View argues, "this claim fails because there is no dispute that the medical-necessity requirement for inpatient admission was satisfied" for those patients.[66] The hospital relies on the Medicare regulation used to assess the propriety of inpatient admissions, which counsels that "an inpatient admission is generally appropriate for payment under Medicare Part A when the admitting physician expects the patient to require hospital care that crosses two midnights."[67]  Desert View asserts that both parties agree that those patients

---

[63] ECF No. 173-20 (Armstead's expert report).  Desert View challenges the qualifications and reliability of Arik's medical experts.  ECF No. 172.  But this discussion of Arik's expert's opinions is merely to establish the background of Arik's failure-to-transfer theory.  Ultimately, the sufficiency of Arik's medical experts does not factor into my analysis, so I deny that motion as moot.  Nothing in this discussion should be construed as a ruling on the sufficiency of Arik's experts.

[64] *See id.* at 13.

[65] *See* ECF No. 103; ECF No. 173-20; ECF No. 173-22.

[66] ECF No. 171 at 27.

[67] 42 C.F.R. § 412.3(d)(1).  Most of the patients identified in this case were Medicare beneficiaries.  But there are also patients participating in Medicaid and the Medicare Advantage Program.  Desert View explains that MAOs (private insurers that provide insurance coverage through the Medicare Advantage Program) must provide at least the same benefits that are covered under Medicare Part A, so the two-midnight rule is the minimum threshold, though they can choose to cover shorter inpatient stays.  ECF No. 171 at 18 (citing 42 C.F.R. §§ 422.100(c)(1) & 422.101(a)).  And for Medicaid patients, the government defines an inpatient as someone who "receives room, board[,] and professional services in the institution for a 24-hour period or longer, or is expected by the institution to receive room, board[,] and professional services in the institution for a 24-hour period or longer even though it later develops that the patient dies, is discharged, or is transferred to another facility and does not actually stay in the

needed inpatient care for at least two midnights—they just disagree about where the patients should have received that care.[68]  So this failure-to-transfer theory is really about the standard of care provided to patients, not about the violation of any regulatory scheme material to CMS's payment of claims, the hospital contends.

Desert View adds that Arik's failure-to-transfer theory is speculative because "numerous conditions must be met before a patient can be transferred to another hospital, such as obtaining the patient's consent, the accepting hospital having a bed available for the patient, a specialist available to treat the patient's needs, and the availability of suitable transportation."[69]  It argues that Arik's "experts' medical-necessity determinations for these patient admissions depend entirely on whether the patients would have consented to a transfer to a hospital that was willing and able to treat them."[70]  And a triable issue of fact cannot be created from the "speculative" opinion that the patients should have been transferred, Desert View contends.

### 1.   The failure-to-transfer theory isn't cognizable under the FCA.

Arik's failure-to-transfer theory does not fit into the FCA framework for medical-necessity claims.  The expert opinions that certain patients should have been transferred instead of admitted as inpatients at Desert View concern the standard of care that a patient can be expected to receive, not the medical necessity of the care provided, and the Supreme Court has

---

institution for 24 hours."  42 C.F.R. § 440.2(a).  For the purposes of this analysis, the precise length of time discussed in the various regulations isn't relevant—all that is relevant is that the regulations primarily measure the propriety of inpatient admission based on expected length of stay.

[68] ECF No. 171 at 27.

[69] *Id.* at 28.

[70] *Id.* (citing ECF No. 173-17, Dr. Woodward's deposition, in which he agreed with the statement that, "if a patient declined to be transferred, then admission at Desert View was appropriate").

noted that the FCA "centers on allegations of fraud, not medical malpractice."[71]  All parties agree that these patients needed to be admitted to *a* hospital—their disagreement centers around the care available at this hospital versus another.  Arik cannot show that the hospitalists or Desert View submitted a "false" claim for these patients because he cannot and does not show that the hospitalists didn't expect these undisputedly sick patients to need inpatient treatment for at least two midnights—according to all accounts, they did.  So Arik has not sufficiently shown that the doctors could have submitted false certifications for those sick patients.

### 2.   *The failure-to-transfer theory is too speculative.*

Arik's failure-to-transfer theory is also too speculative.  A hospital is required to consider several factors before transferring a patient, and Arik's experts admitted that they did not know whether those conditions would have been met for the patients that they opine should have been immediately transferred upon admission to the ED.[72]  Indeed, Arik's experts admit that if a patient refuses transfer, treatment at Desert View would be a medically prudent decision.[73]  Desert View also presents evidence that at least two of the failure-to-transfer patients were offered transfer and declined it.[74]  So because Arik's failure-to-transfer theory does not comport with the FCA's statutory scheme and is too speculative to support a liability finding, I grant summary judgment for Desert View on Arik's failure-to-transfer theory.

---

[71] *See Univ. Health Servs. v. United States ex rel. Escobar*, 579 U.S. 176, 196 (2016).

[72] ECF No. 173-16 at 24 (pp. 163–165) (Armstead's deposition, in which he did not know if patients would have consented to transfer or if another hospital would have been able to accept those patients); ECF No. 173-17 at 11 (p. 95:13–96:9).

[73] ECF No. 173-17 at 10 (p. 90:9–12).

[74] ECF No. 173-18 at 14–15, 48–49.

**C.     Arik cannot prove scienter for his remaining claims.**

After the claims relying on the failure-to-transfer theory are excised, Arik is left with 23 patient episodes that he alleges violated the False Claims Act.  Arik alleges that some of those patients were admitted when they should have been treated on an outpatient basis, or were subjected to medical testing that wasn't necessary based on their symptoms.[75]  He theorizes that the hospitalists and Desert View intentionally admitted patients to increase the reimbursements they would receive from the Medicare, Medicaid, and Medical Advantage programs, as inpatient admissions are entitled to higher reimbursement rates than outpatient or observation treatments.[76]

Scienter is of "central importance" to liability under the FCA and is thus considered a "rigorous" requirement.[77]  To satisfy this element, the relator must prove that the defendants "[knew] the treatment was not medically necessary, or act[ed] in deliberate ignorance or reckless disregard of whether the treatment was medically necessary."[78]  "For a certified statement to be 'false' under the Act, it must be an intentional, palpable lie."[79]  Scienter "refers to [the defendant's] knowledge and subjective beliefs—not to what an objectively reasonable person may have known or believed."[80]  The FCA "focuses on the submission of a claim and does not concern itself with whether or not there exists a menacing underlying scheme."[81]

---

[75] ECF No. 103 at ¶ 117; *see also* ECF No. 173-20; ECF No. 173-22.

[76] ECF No. 103 at ¶¶ 122–40.

[77] *United States ex rel. Hendow v. Univ. of Phoenix*, 461 F.3d 1166, 1171–72 (9th Cir. 2006); *Universal Health Servs., Inc. v. United States*, 579 U.S. 176, 192 (1989).

[78] *Gardens Reg'l Hosp.*, 953 F.3d at 1114 (citing 31 U.S.C. § 3729(b)(1)).

[79] *United States ex rel. Hopper v. Anton*, 91 F.3d 1261, 1267 (9th Cir. 1996).

[80] *United States ex rel. Schutte v. SuperValu Inc.*, 598 U.S. 739, 749 (2023).

[81] *United States v. Kitsap Physicians Serv.*, 134 F.3d 995, 1002 (9th Cir. 2002) (cleaned up) (citing *United States v. Rivera*, 55 F.3d 703, 709 (1st Cir. 1995) (noting that the FCA "attaches

Desert View contends that Arik must prove two levels of scienter: one by the hospitalists who knew that their admissions for specific patients were unnecessary; and one by Desert View, which knew that it was submitting claims for medically unnecessary admissions. Arik appears to agree that both levels are required but contends that there is enough evidence to bring the scienter of both actors to a jury. But none of Arik's evidence provides support for the allegation that the hospitalists or Desert View knew they were fraudulently certifying inpatient admissions or unnecessary testing. Although the evidence potentially raises a genuine issue of fact for scienter about Arik's failure-to-transfer claims, those are not cognizable under the FCA,[82] and the evidence doesn't support Arik's remaining claims.

### 1. *The circumstances of Vista Health's hiring don't create a genuine issue of fact.*

The first category of evidence Arik relies on to show scienter are various statements by the hospitalists and Desert View's CEO Davila indicating that the hospitalists were hired to increase admissions and despite Davila's knowledge that Mirza had a long and sordid disciplinary record. He also points to Mirza's dubious promise to provide 24/7 hour coverage with just two doctors, both of whom had practices in other states, and calls into question Davila's blind acceptance of that promise without concern for its seeming impossibility. Arik also relies on Dr. Hazelitt's declaration that Davila told her that she was hiring Vista Health because it would "make Desert View profitable again" and that Hazelitt was pressured to admit patients that she didn't believe should be admitted.[83]

---

liability, not to the underlying fraudulent activity or to the government's wrongful payment, but to the 'claim for payment'").

[82] *See supra* pp. 14–15.

[83] ECF No. 187-8 at ¶¶ 21, 43.

But these promises and desires to increase admissions and thus profitability do not support the inference that the defendants understood that those increased admissions would be *fraudulent.* And Arik doesn't support that inference with any viable evidence that the hospitalists understood that their promises to increase revenue were interpreted by Desert View to mean that Vista Health was planning to submit fraudulent claims to achieve those goals. Arik offers no evidence sufficient to question Desert View's explanation that it expected increased admissions because the hospitalists held specialties that would increase admissions, while the replaced hospitalist group RPG did not. And evidence that a for-profit hospital was trying to generally increase profit is insufficient to show knowing fraud.[84] Further, while Davila's decision to overlook Mirza's disciplinary history and his dubious promise to staff the hospital 24/7 with just two doctors may show Davila's questionable judgment, Arik fails to connect that poor judgment to the understanding that her choices would lead to fraudulent reimbursements. So I find that Arik's evidence about the circumstances leading to Vista Health's hiring does not create a genuine issue of fact as to Desert View, Vista Health, or Mirza's scienter.

### 2. Mirza's text messages are beyond the timeframe useful to show scienter.

Arik next points to two sets of text-message conversations to attempt to show that the doctors knew they were falsely certifying patient admissions from 2019 to mid-2020. The first is between Arshad and Mirza, in which these hospitalists discuss "admitting everybody" and Arshad hurls vague accusations at Mirza about his medical practice.[85] The second set is between

---

[84] *Kitsap*, 134 F.3d at 1002; *see also United States ex rel. Osinek v. Permanente Med. Grp.*, 2022 WL 16943886, at *6 (noting, in an FCA case in which the plaintiff presented evidence of a hospital's goal to drive revenue, that "[l]ooking for ways to increase profit is not in and of itself illegal").

[85] ECF No. 187-33.

Mirza and Desert View's ED doctors.[86]  In those messages, the ED doctor would send snippets of patient information to Mirza, seeking approval to admit those patients.  Mirza frequently accepted the admission recommendation within minutes—sometimes seconds.  Arik suggests that these messages show that Mirza did not actually confirm that the patients needed to be admitted to diagnose and treat their medical conditions.

The problem with this evidence is its timing: these text exchanges took place from June 2020 through 2022, which is after the scope of the complaint episodes, the latest of which was in May 2020.[87]  The FCA is not concerned with general schemes but evidence of specific false claims.[88]  None of the patients discussed in the texts were mentioned in Arik's medical-expert reports, nor does Arik have billing records for those patients to connect them to any fraudulent reimbursement.  So Arik's text-message evidence can't show scienter for the false claims alleged in the complaint or identified through discovery.

### 3.    *Nursing staff declarations, while derogatory, don't show fraud.*

Arik also relies on the declarations from registered nurses Lisa Smith and Nora Fletcher to support his claims.[89]  They both recount that the hospitalists were rude and condescending to

---

[86] ECF No. 187-31; ECF No. 187-32.

[87] *See* ECF No. 175 (sealed patient-episode chart).

[88] *Kitsap*, 134 F.3d at 1002.

[89] ECF No. 187-26; ECF No. 187-27.  Desert View objects to these declarations, largely on foundation, hearsay, and relevance grounds.  *See* ECF No. 202 at 5–19.  I don't consider Desert View's relevancy objections because "they are duplicative of the summary-judgment standard itself" and "there is no need for the court to separately determine" whether a fact is relevant "because, even assuming it is not, it will not affect the ultimate summary judgment ruling." *Sandoval v. Cnty. of San Diego*, 985 F.3d 657, 665 (9th Cir. 2021).  I also don't consider the foundation and hearsay arguments because those issues can be resolved through live testimony at trial, and the nurses have established that they worked at Desert View and had regular interactions with the hospitalists, providing enough foundation to consider their arguments at this stage.  Desert View also contends that the nurses offer improper opinion testimony about the reasonableness of medical testing and inpatient admissions that the hospitalists ordered, but Arik

the nursing staff, refused to listen to their concerns, and were frequently away from the hospital when the nurses needed consultations on patient care.[90]  They also noticed that the hospital was more crowded under Vista Health than it was under RPG, which made it difficult for the nurses to provide care to their patients.[91]  Fletcher raised some of her concerns to Desert View supervisors and was told that it was not a nurse's job to question the hospitalists and was instructed to limit her attempts to contact the physicians.[92]  Smith also comments on the hospitalists' treatment of the nurses and states that she complained to her Desert View supervisors several times but was afraid of retaliation if she "became a squeaky wheel."[93]

While these declarations opine on the nurses' working conditions under the hospitalists' tenure, they don't show that the hospitalists knowingly submitted fraudulent claims for any specific patients.  Evidence that the physicians were rude to the nursing staff or were absent for periods of time does not give rise to the inference that the medical decisions these hospitalists were making were fraudulent under the False Claims Act.  Nor do the nurses' disagreements with the hospitalists' admission decisions show that the hospitalists subjectively knew that those

---

clarifies that he isn't "offering an opinion on medical necessity (or lack thereof) of the hospital admissions" but instead provides these nurses' opinions only to show they would "testify to facts about the circumstances at the hospital as a result of [the hospitalists'] admissions."  ECF No. 212 at 10.  So I do not consider the nurses' statements regarding the propriety of the hospitalists' care.

[90] ECF No. 187-26 at ¶¶ 8, 10, 14; ECF No. 187-27 at ¶¶ 6, 18–20.

[91] ECF No. 187-26 at ¶¶ 12–13; ECF No. 187-27 at ¶¶ 10 (recalling "one occasion [in which] there were at least two beds in the hallway occupied by patients, with three more occupied beds in the social services/infusion area," and observing that there weren't enough nurses to "adequately care for everyone").

[92] ECF No. 187-27 at ¶ 9.

[93] ECF No. 187-26 at ¶ 16.

admissions weren't medically necessary.  So the declarations do not provide evidence of scienter sufficient to create a genuine factual dispute.

### 4.     The Hamilton email supports only Arik's non-cognizable failure-to-transfer theory.

Finally, Arik highlights an email from Desert View's medical surgical manager April Hamilton to Davila.  It summarizes a discussion in which Hamilton recounts that Arshad told her that he and Mirza "had decided that they would accept the patients that the ED physicians informed them [were] safe for admission, even when they believed the patient needed [to be] transferred" to an intermediate or intensive-care unit instead, because they were "tired to having to argue with the ED physician and tired of being accused of refusing to admit 'anyone.'"[94]

This email—if Arik could overcome at trial the various evidentiary objections Desert View lodges against it[95]—may show that Arshad and Mirza knowingly admitted patients who were too sick to be admitted at Desert View and that Desert View (through its CEO) knew of

---

[94] ECF No. 187-30.

[95] Desert View objects to this email on hearsay grounds.  It argues that the statement-by-a-party-opponent exception to hearsay doesn't apply because Dr. Arshad is not a named defendant and isn't an agent of Vista Health or Desert View, citing Arshad's deposition testimony that he was not a party to the contract between Vista Health and Desert View and got paid by Mirza through some type of contractor arrangement.  ECF No. 202 at 20.  But, as Arik points out, the party-opponent exception requires a "fact-based inquiry applying common law principles of agency" to determine whether the exception applies in these instances.  *United States v. Bonds*, 608 F.3d 495, 504 (9th Cir. 2010) (quotation omitted).  And Arik proposes several other exceptions that might apply and offers reasons to admit the email for purposes other than proving the truth of the matter asserted.  ECF No. 212 at 11–12.  At this stage, I cannot determine if the hearsay exception applies.  Plus, the task on summary judgment is to determine whether the content of the evidence presented may be admissible at trial, no matter the form.  *Fraser v. Goodale*, 342 F.3d 1032, 1036 (9th Cir. 2013) ("At the summary judgment stage, we do not focus on the admissibility of the evidence's form.  We instead focus on the admissibility of its contents.").  Arshad is a listed witness and could testify to his conversation with Hamilton and what he conveyed to her about admitting patients that he believed were not "safe."  So I overrule Desert View's objections and consider this evidence at this stage.

those actions but did nothing to investigate or prevent them.[96]  But as discussed *supra*, those failure-to-transfer claims are not cognizable.  The email does not reach beyond the hospitalists' decision to admit patients that they would have rather transferred, and does not lend support for the scienter element on Arik's remaining claims: that the hospitalists admitted patients who should have been cared for on an outpatient basis or that they performed unnecessary tests.  So, because none of the evidence Arik presents proves scienter on the part of the hospitalists or Desert View for his remaining claims, I grant summary judgment in the defendants' favor and close this case.[97]

## Conclusion

IT IS THEREFORE ORDERED that DVH Hospital Alliance d/b/a Desert View Hospital's motion for summary-judgment, joined by Vista Health Mirza, M.D. P.C., and Ifran Mirza **[ECF No. 171] is GRANTED**.

IT IS FURTHER ORDERED that Desert View's motions to exclude experts **[ECF No. 172] is DENIED as moot**.

IT IS FURTHER ORDERED that Desert View's motion to strike evidence **[ECF No. 202] is DENIED**.

**The Clerk of Court is directed to ENTER JUDGMENT** for all defendants and against plaintiff-relator Tali Arik and to **CLOSE THIS CASE**.

_____
U.S. District Judge Jennifer A. Dorsey
February 27, 2024

---

[96] No response to this email or evidence of any follow-up from Davila on this issue was included in the evidence for summary judgment.

[97] Arik abandoned three additional false-claim theories of liability (backdated admissions, inflated costs, and rebilling inpatient claims) in his summary-judgment response, ECF No. 209 at 17 n.77, so I don't consider those theories in this order.